# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ROYAL INSURANCE COMPANY ) 
OF AMERICA, *et al.*, )

            Plaintiffs, )       Civil Action No. 00-2128

         v. )       Magistrate Judge Caiazza

LATROBE CONSTRUCTION )
COMPANY, )

           Defendant. )

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Having conducted a bench trial in the above-captioned case, the court now enters these findings of fact and conclusions of law.

## I. CONVENTIONS

In the analyses that follow, the court will utilize the narrative voice, rather than numbered findings and conclusions. Where any doubt may arise, the undersigned will specify whether the determination is made by the court sitting as finder of fact, rather than as a matter of law.

The trial transcript in this case has been filed, on a daily basis, under separate docket numbers. In citing the transcript, the court will refer to the docket number corresponding to the date of the transcript, then a period (".") symbol, followed by the specific page number(s). After each entry, in parentheses, will appear the identity of the witness. Thus, the testimony of Gerald Chimenti, appearing on the hundredth page of the transcript dated February 8, 2005 (Doc. 124), will be cited "Tr. at 124.100 (Chimenti)."

At trial, the Plaintiffs' exhibits were assigned numeric values, and the Defendant's alphabetical. Where appropriate, the court will cite not only the exhibit number or letter, but also the bates-stamped number(s) appearing on the relevant page(s).

The parties have filed proposed findings of fact and conclusions of law. The Defendant's are filed at Document Number 145, the Plaintiffs' at 146, and the Plaintiffs have filed a supporting brief at Document Number 147. The court will cite the parties' submissions as "Latrobe's Findings & Conclusions," "Royal's Findings & Conclusions," and "Royal's Br.," respectively.[1]

## II. <u>GENERAL BACKGROUND</u>

### A. <u>Factual Background and Procedural History</u>

Between 1974 and 1995, the Plaintiffs Royal Insurance Company of America, Royal Indemnity Company and/or American and Foreign Insurance Company (collectively, "Royal") underwrote the Defendant Latrobe Construction Company's ("Latrobe's") workers' compensation liabilities through the issuance of seven 3-year retrospectively rated insurance programs ("the Retrospective Premium Policies," "the Retrospective Policies," or "the Policies"). *See* Latrobe's Findings & Conclusions at 2, ¶ 2. In 1995, when the retrospective program was not renewed, Royal made adjustments on the Policies and demanded additional premiums in excess of $900,000.00. *See id.* at 1, ¶ 1.

---

[1] The undersigned has reviewed the Defendant's Trial Memorandum dated May 13, 2005. *See* Doc. 144. The court omits reference to it only because the arguments set forth therein have been considered and accepted/rejected through the analyses below.

Following the demand for additional premiums, Latrobe retained counsel to determine the propriety of Royal's request. *See id.* at 2, ¶ 3. To this end, Latrobe's counsel reviewed twenty-one of the underlying workers' compensation files. *See generally id.* at 4-5, ¶ 20. These files were selected because they remained administratively "open" and, more particularly, they appeared to be the claims driving Royal's request for additional premiums. *See generally id.* at 2, ¶ 4. When Latrobe's counsel found perceived errors in Royal's claims handling, the company refused payment and this litigation ensued.

As of the date of trial, Royal was seeking $851,549.00 in retrospective insurance premiums and $594,456.00 in interest, for a total of $1,446,005.00. *See* Tr. at 146.3 (Atty. Fox, opening statement). Latrobe denies liability and has filed a counterclaim, seeking the return of excess premiums, already paid, as a result of Royal's alleged claims mishandling. *See generally* Latrobe's Findings & Conclusions at 3, ¶ 11. Latrobe also seeks damages under Pennsylvania's bad faith statute. *See id.* at 3, ¶ 12.

This court previously has adopted the reasoning and standards in Liberty Mutual Ins. Co. v. Marty's Express, 910 F. Supp. 221 (E.D. Pa. 1996). There, the court explained the "potential conflict of interest that faces an insurer that issues a retrospective premium policy," well recognized in the law:

> [Under a retrospectively based policy, there may be] a temptation to act somewhat more cavalierly when spending someone else's money than when spending its own. Moreover, there may [exist] a temptation toward generosity when the insurer's fee increase[s] with each dollar paid out.

*See id.* at 223-24 (citation and internal quotations omitted).

In light of the foregoing, this and many other courts have found that issuers of retrospective premium policies owe an "implied obligation of acting reasonably and in good faith in handling [the underlying] claims." *See generally* Order dated Dec. 15, 2004 (Doc. 118) at 5 (citing and quoting Marty's Express).  As to burdens of proof, once the insured comes forth with "sufficient evidence to suggest that the insurer violated" these obligations, the insurer bears "the ultimate burden of persuading the [fact finder] it acted reasonably and in good faith." *See id.*

Before trial, the parties stipulated that Latrobe had adduced sufficient evidence to meet the insured's initial burden, contemplated here and in Marty's Express as being "slight." *See* Joint Stip. (Doc. 122) at ¶ 1.  At trial, Royal bore the burden of persuasion that it acted reasonably and in good faith regarding the twenty-one claims files reviewed by the parties' experts.  *See id.* at ¶ 2.  In entering the stipulation, though, the parties made clear that Royal "[did] not admit that it acted unreasonably or with bad faith" in connection with any of the files. *See id.* at ¶ 4.

The court also bifurcated the trial into two phases.  *See* Dec. 15th Order at 4.  Phase I was to address "claims handling," and would be "akin to the typical 'liability' inquiry."  *See id.*  More specifically, the initial Phase was expected to address "Latrobe's allegation that Royal and its workers' compensation attorneys mishandled some or all of the . . . claim[s] files that were reviewed by the parties' experts."  *See id.* (citation omitted).  Phase II was described as being "more analogous to a damages phase," addressing among other things whether the twenty-one files "constitute a statistically reliable sampling" of the eight hundred-plus claims handled under the Retrospective Policies, and whether Latrobe properly may "challenge its payment of premiums attributable to [the hundreds of] claims [it] did not review."

-4-

*See* Dec. 15th Order at 1-2; *see also generally* LuAnn Haley's Expert Report, attached as Ex. B to Doc. 40, at un-numbered pg. 2 (Royal's documents reveal 886 workers' compensation claims filed against Latrobe).

Phase I of the trial commenced on February 8, 2005 (*see* Doc. 124), and it was continued on February 9 (Doc. 125), February 10 (Doc. 126), February 22 (Doc. 128), February 23 (Doc. 129),  February 24 (Doc. 130), March 1 (Doc. 132), April 11 (Doc. 140), and April 12, 2005 (Doc. 141).  Having reviewed the parties' submissions, as well as the trial transcript for Phase I, the court now is prepared to enter its findings and conclusions.

## B.  **Damages, Generally**

As will be discussed below, nearly all of the court's damages analyses will be reserved for Phase II of the trial.  *See generally* discussions *infra*.  The court now offers only a general framework for considering damages in this retrospective premiums case.

The parties are in agreement that Latrobe's retrospective premium obligations were closely related to the "incurred losses" under the Policies.  *See* Tr. at 124.25 (Atty. Gordon, opening statement) (incurred loss is "the primary variable component of the retro[spective premiums] formula"); 124.49-50 (Raabe); 124.73-74 (Chimenti).  The greater the incurred losses, the greater the likelihood and/or amount of retrospective premiums obligation.  *See id.* Incurred losses consist of the amount of money the carrier has paid out on medical and wage loss (or "indemnity") expenses under the polic(ies), plus the amount the carrier reserves for anticipated future pay-outs.  *See* Latrobe's Findings & Conclusions at 6, ¶ 29; *see also* Tr. at 124.74-75 (Chimenti).

It is Latrobe's position that Royal's alleged claims mishandling resulted in greater incurred losses, thereby inflating the retrospective premiums owing under the Policies. Royal disputes that it mishandled the claims and that the incurred losses were unduly inflated.

These matters aside, the court as fact finder concludes that Royal owed an obligation to adjust Latrobe's incurred losses to account for any apparent claims-handling errors, changes in reserves, and/or supersedeas fund reimbursements (discussed in more detail below). *See* Tr. at 124.60-61 (Raabe) (discussing general duty to adjust incurred losses); *id.* at 126.161 (Leger) (same); *id.* at 125.87-89 (Weber) (not disputing that, where workers' compensation claim was withdrawn, Royal should have reduced reserves on file); *and id.* at 129.8 (Kornfeind) (contemplating that supersedeas reimbursement secured on Latrobe's behalf would be "credited to [its] retro[spective] program").

The above findings regarding damages are the only ones necessary to, and appropriate for, the court's analyses at Phase I of the trial. As will be seen below, any damages calculations relating to the confirmed mishandling of claims will be reserved for Phase II.

### III.  LEGAL DETERMINATIONS AFFECTING THE CASE ON A GLOBAL BASIS

#### A.  Royal's Argument Under the Policies' "Deems Expedient" Clause

On the first day of trial, Royal filed a brief seeking judgment as a matter of law under Transcontinental Ins. Co. v. Century Steel Erectors Inc., 318 F. Supp.2d 276 (W.D. Pa. 2004) (Ambrose, C.J.).  *See* Tr. at 124.4 (Atty. Fox, opening statement); *see also generally* Royal's Trial Mem. (Doc. 123) at 2-4 *and* Royal's Br. at 7-10.  Counsel acknowledged that the issue could have been raised on summary judgment, but indicated that Royal only recently had become

aware of the Transcontinental decision.  *See* Tr. at 124.4.

In Transcontinental, the court concluded that the purchaser of a retrospective premiums policy was precluded from arguing bad faith in claims handling because said policy contained a "deems expedient" clause.  *See id.*, 318 F. Supp.2d at 278.  In reliance on the Third Circuit Court's decision in Caplan v. Fellheimer Eichen Braverman & Kaskey, 68 F.3d 828 (3d Cir. 1995), the Transcontinental Court concluded that the deems expedient clause bestowed upon the insurer absolute discretion in settling the underlying lawsuit, irrespective of whether the policyholder consented to or agreed with such settlement.  *See id.* at 278 (citing and quoting Caplan).  While acknowledging that Caplan did not involve a retrospective premiums policy, the Transcontinental Court nevertheless found that the "broad principles set forth" in the Third Circuit Court's opinion precluded the insured's bad faith argument.  *See id.* at 278-79.

Royal's citation to Transcontinental comes too late.  Although counsel suggests that the "deems expedient" argument only became apparent when Transcontinental was issued in March 2004 (still more than ten months before trial), the underpinnings for Royal's deems expedient theory existed long before that.  The only case relied upon in Transcontinental, the decision in Caplan, has been part of Third Circuit jurisprudence since 1995.  Royal could have made its "deems expedient" argument sooner, and it has waived the right to summary adjudication.  *Compare* Order dated May 7, 2004 (Doc. 77) (setting summary judgment deadline of May 28, 2004) *with* In re School Asbestos Litigation, 977 F.2d 764, 794 (3d Cir. 1992) (court has broad discretion to find waiver where "parties [who] have been warned that they must move [for

summary judgment] by a certain time . . . do not do so") (citations omitted);[2] *see also id.* at 793

(while Federal Rule 56 permits summary judgment "at any time," text of Rule requires that

motions be filed "<u>at least ten days</u> . . . <u>before trial</u>" so that "a hearing on the motion" may be had)

(internal quotations omitted, emphasis added).

      Even were summary judgment still available, the undersigned respectfully disagrees with

the decision in <u>Transcontinental</u>.  From the inception of this case, the parties have understood the

law governing retrospective premium policies to require good faith and reasonableness in the

insurer's claims handling.  Other courts have rejected the notion that the implied duties of good

faith and reasonableness are undone by "deems expedient"-type language. *See, e.g.*, <u>Corrado</u>

<u>Bros., Inc. v. Twin City Fire Ins. Co.</u>, 562 A.2d 1188, 1191 (Del. 1989) ("[d]espite the latitude

imparted by . . . 'deems expedient' [provisions,] . . . an insurer may not settle a claim in which a

retrospective premium will be imposed . . . unless the settlement is both in good faith and

reasonable") (citations omitted).  Furthermore, applying the <u>Caplan</u> Court's "deems expedient"

analysis to this retrospective premiums case would run afoul of Pennsylvania law regarding the

expectations of the parties.  *See* <u>Bleday v. OUM Group</u>, 645 A.2d 1358, 1362 (Pa. Super. 1994)

(stating in dicta that "[a] 'deems expedient' provision is not absolute," and may be overridden by

"the [contrary] intent and expectation[s] of the parties") (citation omitted), *appeal denied*,

655 A.2d 981 (Pa. 1995).

---

[2]  Technically, the court's May 7, 2004 Order established the deadline for <u>Latrobe</u>'s filing of a motion for summary judgment.  *See* May 7th Order at ¶ 1.  This is explained, however, by the fact that Latrobe alone requested an opportunity to seek summary adjudication.  Royal actually opposed Latrobe's request, highlighting the expiration of a previous summary judgment deadline.  *See* Royal's Opp'n Br. (Doc. 74) at ¶ 2.  In any event, the record makes clear that Royal enjoyed ample opportunity move for summary judgment, and the "deems expedient" argument has been waived.

Finally, the court respectfully submits that the <u>Transcontinental</u> decision fails to account for the fundamental difference between retrospective policies and standard ones, namely the heightened conflict of interest:

> Unlike in a retrospective premium policy, there is no inherent conflict of interest involved in a standard policy. . . .  <u>[T]he conflict of interest that exists in every retrospective policy</u> . . . <u>is qualitatively different from, and greater than, the conflict present in cases where an insurer must determine whether to tender policy limits in response to a third-party claim.</u> . . .  [W]ith a retrospective plan, any improperly managed claim has an adverse impact on the employer's insurance costs.  <u>Therefore, insurers have an additional responsibility to investigate and settle every claim [reasonably and in good faith</u>].

*See* <u>Marty's Express</u>, 910 F. Supp. at 224 (citation and internal quotations omitted, emphasis added).[3]

For all of these reasons, Royal is not entitled to summary judgment under the "deems expedient" clause.

## B.   <u>The Timeliness of Latrobe's Claims Handling Objections</u>

Royal argues that Latrobe's claims handling objections should be rejected as "unfair," given the insured's enjoyment of "decades of uninterrupted insurance coverage" with no prior complaints.  *See* Royal's Br. at 12-16 (relying on <u>Hartford Accid. & Indem. Co. v. Coastal Dry Dock & Repair Corp.</u>, 468 N.Y.S.2d 876 (N.Y.A.D. 1983), *aff'd*, 479 N.Y.S.2d 10 (N.Y. 1984)).

---

[3]  In fairness to Chief Judge Ambrose, we do not know how the "deems expedient" issue was presented in <u>Transcontinental</u>, what legal authority was cited, *et cetera.*  What we do know is that here the parties were aware, and have litigated under the operation, of legal authority establishing the implied duties of good faith and reasonableness.  This is enough, and Royal's more recent foray into the deems expedient jurisprudence is both untimely and unwarranted.

Royal appears to urge that judgment be entered in its favor under this theory. *See id.*

Again, Royal's argument comes too late. As of the commencement of trial, Royal failed to show, by way of dispositive motion or otherwise, that Latrobe's claims handling challenges were untimely as a matter of law. Instead, the parties proceeded to trial with the primary objective of determining the reasonableness of Royal's claims handling practices. If Royal had an "unfairness" argument, it has long been waived. *See* discussion *supra* (holding same regarding "deems expedient" issue).

In addition, Royal's current retrospective premiums demand includes audits and adjustments of previous coverage periods dating back through the 1980s. *See, e.g.*, Ex. C to Compl. (Doc. 1) at 1-3 (Royal's "Statement of Account," reflecting adjustments based on prior coverage terms); Rpt. of G. Chimenti dated Jul. 10, 2003 (attached under Ex. C to Doc. 39) at 2-3 (reflecting additional premium charges relating to coverage periods in early 1980s); *cf. also generally* Tr. at 124.56 (Raabe) (uncontested testimony that, as of filing of this lawsuit, all seven of parties' 3-year retrospective plans remained administratively open). The court concludes, as a matter of both law and fact, that Royal cannot claim unfairness regarding Latrobe's instant grievances while itself making premium demands based on coverages dating back through the early 1980s.

Under the facts and circumstances presented in this case, the court finds neither party's primary contentions time barred, and Royal's argument is rejected.[4]

---

[4] To the extent Royal relies on <u>Coastal Dry Dock</u>, the court finds that decision highly inapposite. Said opinion, which reflects a dated decision from a jurisdiction adopting a minority position regarding retrospective premium policies, is out of step with the precedent adopted herein. *Cf.* <u>Insurance Co. of Greater N.Y. v. Glen Haven Resid. Health Care Facility</u>, 676 N.Y.S.2d 176, 177 (N.Y.A.D. 1998) ("New York has never recognized a cause of action or defense for breach of an insurer's implied covenant of

**C.  Latrobe's Arguments Regarding the Seven Claims Files Not Analyzed in the Report of Claims Expert LuAnn Haley**

In its proposed findings and conclusions, Latrobe asks the court to conclude that Royal has failed its burden of persuasion regarding seven of the twenty-one claims files in question, namely those not identified in Ms. Haley's report as having errors.  *Compare, e.g.,* Latrobe's Findings & Conclusions at 98-100, ¶¶ 445-51 (seeking favorable rulings on seven claims files) *with* Ex. B to Doc. 40 (Ms. Haley's Expert Rpt., failing to level criticisms regarding same seven files).  No such ruling will issue.

At the onset, the court finds Latrobe's argument somewhat disingenuous.  In light of Ms. Haley's failure to criticize the seven files, Royal and Mr. Weber limited their discussion of the individual files to the other fourteen claimants.  This approach was consistent with the good litigation practice of limiting the parties' analyses to areas of genuine dispute.  Such narrowing of the issues is essential to the judicial process, and Latrobe's suggestion to the contrary carries at least a hint of gamesmanship.

Latrobe's requests are equally unsatisfying on the merits.  Highlighting a pre-trial stipulation, counsel posits that "Royal accepted the burden to prove that it handled the [seven additional] claim[s] reasonably and in good faith," and it "has offered no evidence in the record to establish" the same.  *See* Latrobe's Findings & Conclusions at 98-100, ¶¶ 445-51.

---

good faith and fair dealing" within context of retrospective premium policies); <u>Commissioners of State Ins. Fund v. J.D.G.S. Corp.</u>, 676 N.Y.S.2d 575, 576 (N.Y.A.D. 1998) ("[we] ha[ve] consistently rejected . . . so-called defenses and counterclaims[, recognized in the] decisions [of] other [s]tates," that issuers of retrospective policies bear "the affirmative burden of proving [they] acted reasonably and in good faith in adjusting claims and imposing reserves") (both citing <u>Coastal Dry Dock</u>).  For the reasons just described, any citation to New York precedent will be viewed with skepticism.

It is true that, by stipulation, the parties agreed Latrobe had adduced sufficient evidence to meet its "slight" burden of production under Marty's Express. *See* discussion *supra*, "General Background." Latrobe reads too much into the stipulation, however, in asserting that Royal agreed to produce affirmative evidence regarding specific claims files not even criticized by Ms. Haley. The court is certain this was not Royal's understanding of the agreement.

To the extent that Royal bears the burden of persuasion, the court concludes as fact finder that Mr. Weber's testimony regarding the reasonableness of Royal's claims handling generally, coupled with the absence of specific objections by Ms. Haley, is sufficient to meet the insurer's burden regarding the seven case files in question.

Latrobe also suggests that the reason Ms. Haley did not find error in the seven files was Royal's failure to provide full documentation regarding the same. *See* Latrobe's Findings & Conclusions at 100, ¶ 452 (proposing court find credible Ms. Haley's testimony that documentation provided to her by Royal was sufficient to review only 14 of 21 claims). Ms. Haley's expert report neither states nor implies, however, that she required further documentation to properly assess the claims handling practices in the remaining seven files.

At all relevant times it has been the court and parties' understanding that review of the individual cases would be restricted to the fourteen files discussed in Ms. Haley's report. *See discussions* immediately *supra*; *see also, e.g.*, Tr. at 126.115 (Gordon) (confirming through colloquy with court that review of claims files would be limited to fourteen, "[t]hat's it"). So it shall remain.

## D. Standards Applicable Under *Marty's Express* and Rulings Regarding Statutory Bad Faith

Royal bears the burden of persuading the fact finder that it handled the relevant workers' compensation (at times hereinafter, "WC") claims reasonably and in good faith. *See* discussions *supra*. What this means, however, warrants elaboration.

Marty's Express contemplates that the standards of good faith and reasonableness are measured within the context of what is "professionally" appropriate. *See id.*, 910 F. Supp. at 224. The parties' reliance on claims experts, who are professionals within the context of workers' compensation litigation, therefore is justified.

The law provides further standards governing whether a party has acted reasonably and in good faith. It is equally important, however, to be clear what standards do not apply. *Cf. generally* Philadelphia Plaza-Phase II v. Bank of Amer. Nat'l Trust & Sav. Ass'n, 2002 WL 1472337, *2 n.1 (Pa. Comm. Pl. Jun. 21, 2002) ("[i]t is important to distinguish among different types of good [and bad] faith").

The court rejects Royal's suggestion that the implied duties in a retrospective premiums case are equivalent to statutory bad faith. *See, e.g.*, Royal's Trial Mem. (Doc. 123) at 6 (citing and quoting standards under Pennsylvania's bad faith statute); Royal's Br. at 27 (same); Royal's Findings & Conclusions at 24, ¶ 279 (same). While there is authority for the proposition that an insured may establish statutory bad faith in a retrospective premiums case,[5] the duties contemplated in Marty's Express are implied, not statutory. *See id.*, 910 F. Supp. at 225.

---

[5] *See* Argonaut Ins. Co. v. HGO, Inc., Cohen-Seltzer, Inc., 1996 WL 433564, *5 (E.D. Pa. Jul. 25, 1996) ("the court cannot find that the legislature meant to exclude bad faith [in retrospective premium] policies from the sanctions of" Pennsylvania's bad faith statute).

Citation to the statutory bad faith standards muddies the water, and the court therefore will avoid them in its analyses below.

In a similar vein, the court as fact finder concludes that Latrobe has not demonstrated Royal violated the statutory bad faith standards.  In this regard, Pennsylvania law demands that the insurer act with "<u>dishonest purpose</u>," "through some <u>motive</u> of <u>self-interest or ill-will</u>." *See* <u>Regis Ins. Co. v. Wood</u>, 852 A.2d 347, 350 (Pa. Super. 2004) (citations omitted, emphasis added).

As the trier of fact, the court sees no evidence to support this level of *scienter*, motive or intent.  To the contrary, the undersigned finds credible the testimony of Royal's witnesses who indicated that they were either unaware a retrospectively rated policy was in place, or that they knew of it but did not let the fact affect their claims handling practices.  *See, e.g.*, Tr. at 128.19-20 (Kornfeind); 132.42 (Breitfeld).  The undersigned, as fact finder, also concludes that the testimony of Royal's claims expert Peter Weber alone is sufficient to demonstrate the absence of statutory bad faith.  *See generally* discussions *infra* (finding Mr. Weber credible and relying on his opinions in support of fact findings, both in general and in connection with specific claims files).  For these reasons, the court will limit its analyses and discussions below to the implied duties of good faith and reasonableness contemplated in <u>Marty's Express</u>.  Oftentimes hereafter, the court will discuss the inquiry in terms of reasonableness, both for the sake of economy and to avoid any connotations the phrase "bad faith" may impart.

Turning back to the implied duties in <u>Marty's Express</u>, the court finds useful the discussions in <u>Argonaut</u>, another retrospective premiums case.  Applying Pennsylvania law,

the <u>Argonaut</u> Court likened the retrospective policy standards to those implied in "[e]very

contract":

> [E]ach party [to a contract has] a duty of good faith and fair dealing
> in its performance. . . . [T]he implied covenant of good faith is
> broadly defined. [Thus, while t]he breach of the obligation to act
> in good faith cannot be precisely defined in all circumstances, . . .
> examples of [violative] conduct include . . . <u>evasion of the spirit of
> the bargain</u>, <u>lack of diligence and slacking off</u>, or <u>willful rendering
> of imperfect performance</u>. . . .

*Id.*, 1996 WL 433564 at *4; *accord* <u>Kaplan v. Cablevision of Pa., Inc.</u>, 671 A.2d 716, 721-22

(Pa. Super.) (applying same standards), *appeal denied*, 683 A.2d 883 (Pa. 1996) (table);

<u>Dinger v. Allfirst Fin., Inc.</u>, 82 Fed. Appx. 261, 265-66 (3d Cir. Oct. 30, 2003) (applying

Pennsylvania law and holding same).[6]

    The court as fact finder concludes that, for the same reasons Royal did not violate the

statutory bad faith standards, the insurer neither "eva[ded] of the spirit of the bargain" nor

"willful[ly] render[ed] imperfect performance" under the Retrospective Policies. *See* discussion

*supra*. Most relevant, then, are complaints that Royal's conduct reflected a "lack of diligence"

or "slacking off," thereby rendering its claims handling professionally unreasonable.

*Cf.* <u>Argonaut</u>, 1996 WL 433564 at *4.

    The court also finds persuasive the standards annunciated in one of the cases cited by

Latrobe, <u>Benton Express, Inc. v. Royal Ins. Co. of Amer.</u>, 457 S.E.2d 566 (Ga. App. 1995)

(*cert. denied*, Sept. 5, 1995). *See* Latrobe's Findings & Conclusions at 103, ¶ 2 (citing same in

connection with <u>Marty's Express</u>). In affirming the entry of summary judgment in favor of the

---

[6]  The other two examples cited in <u>Argonaut</u>, "abuse of a power to specify terms, and interference with or
failure to cooperate in the other party's performance," are inapplicable here. *Cf. id.*

insurer, the <u>Benton</u> Court agreed that the insured's grievances regarding claims handling were required to go beyond "evidence that [Royal] did not bring to bear on the individual . . . claims [the] level and degree of expertise [the insured's] witnesses fe[lt was] warranted." *See id.*, 457 S.E.2d at 568 (internal quotations omitted, some alterations in original).

This court concurs that the reasonableness determination should not rest on "evidence of disagreement" between Latrobe and Royal's witnesses regarding the precise "level and degree of expertise" the insurer should have brought to bear on the underlying claims. *Cf. id.*

In light of these legal conclusions, the court's discussion of the individual claims files will often juxtapose the "lack of diligence"/"slacking off" standards from those reflecting a mere disagreement between the experts regarding the optimal claims handling practices in a given case. *See* discussion immediately *supra*; *see also* discussion *infra* (agreeing, as fact finder, with Mr. Weber that reasonableness is not defined by collection of "perfect world" information, but rather is informed by what is practicable given time limitations in Workers' Compensation Act, as well as no-fault policies underlying same). Thus, evidence tending to demonstrate Royal lacked reasonable diligence or slacked off will go further than Latrobe's arguments regarding what its expert believed was the best or most enlightened approach.

**E.   Disputes Regarding the Designation of Louis Kornfeind's Deposition**

The docket reflects various objections regarding the parties' designations and counter-designations of the deposition testimony offered by former Royal claims manager and corporate designee Louis Kornfeind. *See generally, e.g.*, filings at Doc. Nos. 127, 135, 137, and 143. Having reviewed all portions of the Kornfeind deposition designated and counter-designated by

-16-

the parties, the court finds that these disputes have no material effect on the findings and

conclusions made herein.  Accordingly, those portions of Mr. Kornfeind's deposition that have

been designated and counter-designated by the parties hereby are admitted, and the parties'

objections are overruled as moot.[7]

### IV.  GLOBAL DETERMINATIONS INVOLVING BOTH SUBSTANTIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

#### A.  Ms. Haley's Criticisms, Generally, and the Need to Evaluate Royal's Claims Handling On a Case-By-Case Basis

In criticizing Royal's treatment of the fourteen WC files, Ms. Haley has opined that the

insurer engaged in certain recurrent, systematic claims handling errors.  *See, e.g.*, Tr. at 129.122-

123 (Haley) (identifying, among other things, Royal's purported failure to obtain preexisting

medical records, take witness statements, investigate mechanism of injury, and secure

independent medical evaluations ("IMEs")).  This testimony notwithstanding,

the court concludes that both the facts and the law compel an examination of the individual

claims files on a case-by-case basis.

Turning first to the law, the court finds instructive the standards in Pennsylvania

regarding the reasonableness of employer/carrier contests.  The "reasonable contest" standards

may arise at any stage of a WC case, from whether or not to issue a Notice of Compensation

Payable ("NCP"), to whether to file a petition to modify, suspend or terminate benefits.

*See generally* <u>Bates v. W.C.A.B. (Titan Const. Staffing, LLC)</u>, 878 A.2d 160, 163 (Pa. Commw.

---

[7]  For the benefit of further judicial review, this court notes that a copy of Mr. Kornfeind's deposition transcript, including all portions admitted above, can be found in the case file under Exhibit B to Document Number 39.

2005) (quoting statute establishing reasonable contest inquiry, and revealing its application to "petitions to terminate, reinstate, increase, reduce or otherwise modify compensation awards").

To determine whether an employer/carrier's contest is reasonable, nearly every legal standard acknowledges the need for an individualized, factual evaluation based on a totality of the circumstances. *See, e.g., id.* ("[i]n reviewing the record to determine whether an employer's contest was reasonable, the court must look at the totality of the circumstances") (citation and internal quotations omitted); Orenich v. W.C.A.B. (Geisinger Wyoming Valley Med. Ctr.), 863 A.2d 165, 171 (Pa. Commw. 2004) ("[w]hether or not there has been a reasonable basis for contesting a claimant's award of benefits depends upon both the facts and the legal issues involved in each case") (citation omitted), *appeal denied*, 880 A.2d 1242 (Pa. 2005) (table); *see also* Guard Ins. Group & Railworks v. W.C.A.B. (York & TIG Premier Ins.), 864 A.2d 1285, 1290 (Pa. Commw. 2005) ("[t]he reasonableness of an employer's contest . . . must be based on the facts found by the [Workers' Compensation Judge, or] WCJ") (citation omitted). While recognizing that the "reasonable contest" analogy has its limits, the aforementioned standards serve to emphasize that the reasonableness inquiry in Marty's Express, like most others in the law, is highly fact-specific.

Another justification for evaluating reasonableness on a file-by-file basis stems from the injury/harm standards often applied in retrospective premium cases, and adopted herein below. Specifically, the precedent recognizes that, even assuming unreasonableness can be established, an inquiry must be made into the actual harm suffered as a consequence thereof.

This inquiry is made obvious by the recognition that, simply because an insurer mishandles a claim, it does not follow that said claim has *no* value for the purposes of the

retrospective premiums calculation.  This concept most often is raised within the context of settlement:

> [O]nce the insured produce[s] evidence that the insurer [acted unreasonably] in handling a particular claim, <u>then the burden shift[s] to the insurer to prove that the [resulting] settlement . . . did not exceed the highest reasonable amount at which the claim would have . . . settled . . . had [it] been [handled] properly</u>. . . .
>
> In other words, for each settlement, the insurer [may] try to show that the amounts paid were reasonable even though [it] did not [properly handle] the claim before settling it. . . .  [This] reasoning . . . [is] inconsistent with [the insured's unsupportable notion] that it should be able to recover all [retrospective] premiums without litigating whether the particular individual settlements were reasonable.  [This approach erroneously presumes a full] recover[y of] all premiums <u>without proving any actual loss sustained</u> . . .

*See* <u>Liberty Mut. Ins. Co. v. Tribco Const. Co.</u>, 185 F.R.D. 533, 540  (N.D. Ill. 1999) (citations and internal quotations omitted, emphasis added); *see also, e.g.,* <u>Deerfield Plastics Co., Inc. v. Hartford Ins. Co.</u>, 536 N.E.2d 322, 324 (Mass. 1989) (insurer may come forward with evidence to show that insured "sustained no loss because of [the unreasonable] claim investigation"); <u>Insurance Co. of North Amer. v. Binnings Const. Co., Inc.</u>, 288 So.2d 359, 362 (La. App. 1974) ("even if a claim were settled at an unreasonably high figure, the insurer would still be entitled to a premium based on what would have been a reasonable figure"; "<u>[t]he insured has [enjoyed] the benefit of having its liability discharged and should pay the correct contract price for the benefit</u>") (emphasis added).

Although the aforementioned cases discuss actual loss/harm within the context of unreasonable settlements, the court sees no reason why this concept should not extend to all types of alleged overpayment.  The need to show actual harm also validates Mr. Weber's

-19-

assertion that, where Royal can show Ms. Haley's criticisms had no impact on the outcome of a file, such purported unreasonableness is, in effect, harmless error. *Cf. generally, e.g.,* Tr. at 125.133, 125.167 (Weber) (opining that allegedly unreasonable failures to act had no bearing on ultimate result). Finally, the requisite inquiry into the degree to which admittedly unreasonable conduct actually harmed Latrobe mandates the case-by-case approach referenced above.

Related to these legal conclusions, but equally as a matter of fact, the court concludes that the different phases of a workers' compensation claim likewise supports an individualized approach. The court's review of the case files here has revealed three general areas in which Royal's claims handling could go awry: (i) the decision of whether to pick up the claim in the first place (*i.e.*, issuance of the NCP); (ii) maintenance of the file thereafter (including medical management, whether to file petition(s) to modify, suspend, or terminate benefits, whether to reinstate benefits after an aggravation or recurrence, *et cetera*); and (iii) the ultimate resolution of the case, often within the context of settlement.

The relevance of these distinctions may be illustrated as follows. Say, hypothetically, an insured asserts that its carrier should have taken various investigative actions where the circumstances surrounding an alleged work injury arguably were suspect. At the same time, however, the court may conclude that the carrier's acceptance of the claim was justified, irrespective of the investigative efforts taken or not taken, because the claimant spent two days following the work incident in intensive care with a head injury. As the trier of fact, the court may find it far more likely than not that the claimant really was injured at work (or at least that his claim, as a practical matter, was unassailable), and therefore the issuance of an NCP was

appropriate. Under these circumstances, the only actual harm suffered by the insured would have

to relate to subsequent claims handling events. In essence, then, a finding of reasonableness

and/or lack of harm at any stage of the WC process would exculpate the insurer at that (and, most

likely, previous) stage(s) of the claims handling process.[8]

  This hypothetical situation (which later will be revealed as less than so) demonstrates

why each of the claims files here must be evaluated on a case-by-case basis. It also explains why

the court will evaluate the individual claims files sequentially, testing the reasonableness of

Royal's conduct at each step of the WC process.

  The need for detailed, case-by-case analyses also is compelled by the facts in this case.

Although Ms. Haley has testified regarding the existence of systematic and recurrent claims

handling errors, and overlap in her criticisms undoubtedly does exist, they are not quite as

widespread or uniform as she suggests.[9] In reviewing Ms. Haley's testimony as a whole,

---

[8] Even assuming, in this hypothetical scenario, that the failure to investigate rose to the level of patently unreasonable, any allegations of resulting harm would be purely speculative. In other words, if the court concludes that the circumstances surrounding the claim (*i.e.*, two days of hospitalization with a head injury) pragmatically compelled the issuance of an NCP, the insured can show no harm based on the failure to investigate. While this conclusion may seem unfortunate for Latrobe, it may well explain the relative dearth of precedent addressing detailed criticisms of claims handling at each and every stage of the WC process. *See* discussion *supra* (noting decisions addressing value of underlying case settlements only). And though Latrobe has the right to challenge the details of Royal's claims handling at various stages, it should not be surprised to encounter difficulties in defining and proving actual harm in connection with its detailed and varied criticisms.

[9] Of the twenty-one claims files reviewed, seven have gone unchallenged and two involved fatality claims, a situation raising unique issues and criticisms. *See* discussion *supra* (regarding seven claims not challenged); *see also, e.g.*, discussions *infra* regarding Peksa and Werder; Tr. at 124.181 (Weber) (noting concurrence between experts that "fatal claims and [related] dependency issues are particularly rare"). Of the little more than half remaining, one of the case files contains no claims handling criticisms, *see* discussion *infra* regarding Overly; written statements were taken in two, *see* Tr. at 129.126 (Haley) (identifying Overly & Newell); and records of preexisting injury were developed in three, *see id.* at 129.126, 129.131 (Overly, Nixon & Markle).

the court finds that her criticisms do not establish widespread, systematic problems in Royal's handling of the WC claims.

Finally, the court as fact finder concludes that Latrobe and Ms. Haley's criticisms, generally, suffer some minor but overarching credibility problems.

As referenced in the individual claims file analyses, Latrobe's evidence often exhibits a tendency to rely on hindsight in concluding how the claims ideally should have been handled. The court agrees with Mr. Weber that hindsight is often 20/20,[10] and these observations cannot help but influence the fact finder's overall impression of Latrobe's evidence.

Likewise unfavorable to Latrobe is the existence of disagreement between the criticisms of Ms. Haley and those previously offered by Defense counsel. *See, e.g.*, Tr. at 124.181 (Weber) ("Mr. Gordon's letters initially criticized 21 of the 22 files . . ., and Ms. Haley's report only deals with 14"). To be fair, counsel has stated that the differences may be explained by Latrobe's having incomplete records at the time his comments were made. *See id.* at 126.116 (Gordon, argument) ("when I filed my critique[s], we didn't have all the records"). This would not appear to explain all of the discrepancies, however,[11] and Latrobe's criticisms to this fact finder seem to include a healthy dose of advocacy.[12]

---

[10] *See, e.g.*, Tr. at 126.27 (Weber) (credibly testifying, in response to defense counsel's inquiry regarding whether case should have settled during very specific time frame, that "[h]indsight is always 20-20").

[11] *See* Tr. at 125.58-59 (Weber) (discussing two criticisms leveled by Defense counsel that would not appear affected by lack of documentation).

[12] At trial, Defense counsel also argued that the opinions reflected in his letters are irrelevant because he is not an expert witness in this case. *See* Tr. at 126.116 (Gordon, objecting). Counsel's participation made him part of the factual landscape, however, so the conflict in criticisms is fair game.

Of course, these observations are unsurprising in a case so vigorously contested and litigated. It is also true that knowledgeable persons within the same field often will have differences of opinion. For these reasons, the fact finder will attach little weight to the foregoing conclusions. The court does believe, however, that these observations serve to emphasize why evidence of disagreement between the experts is not the appropriate inquiry. *See generally* discussion *supra* regarding same.

**B. The Twenty-One Day Period for Accepting Claims and the Need for Adequate Grounds for Denial**

Mr. Weber explained an employer/carrier's obligation to either pick up or deny a WC claim within twenty-one days. *See* Tr. at 124.138 (Weber) ("[t]he insurance company has an obligation to decide whether or not that claim is going to be accepted . . . within a 21-day period"). He also credibly testified that this time limitation places significant restraints on the investigation an employer/carrier reasonably can undertake before making its decision. *See id.* at 124.138-140 (explaining difficulty in obtaining detailed information in this time frame, and opining it is common for carrier to confirm much information by telephone); *see also id.* at 124.139 ("it becomes very difficult . . . within a 21-day period to have every scrap of information that you might, in a perfect world, want to have in a file before you make a decision").[13] Last was Mr. Weber's credible testimony that the employer/carrier needs to have an

---

[13] Mr. Weber's testimony regarding "perfect world" evidence is particularly compelling given WC claimants' need for prompt relief:

> [W]hat would I want in a perfect world . . . ? Would I want . . . claimant statements? Would I want witness statements? Would I want all the available present medical treatment records? Would I want any preexisting medical records that might have some relevancy to this particular injury?

adequate basis for rejecting a claim, or otherwise be faced with costs, penalties, and reputation problems. *See, e.g., id.* at 124.138 (penalties); *id.* at 124.139, 124.161-162 (reputation with WCJs and Bureau); *and id.* at 124.144 (unreasonable contest). As fact finder, the court agrees with these principles.

So too does the law. As recognized by the Pennsylvania Supreme Court:

> The [Workers' Compensation] Act imposes upon employers the
> duty to promptly commence  payment of compensation[, even
> when] . . . the cause of an employee's disability may not . . .
> be obvious. . . .  [As a consequence,] . . . an employer promptly
> [may] commence[] payment of compensation prior to . . .
> completion of [its] investigation into the cause of claimant's
> injuries[, subject to] . . . . the employer['s later being] . . . permitted
> to seek relief.  This rule promotes the early payment to injured
> employees which is clearly contemplated by the Act[,] while . . .
> preserv[ing] the legitimate expectation that an employer's liability
> [later may be challenged].

*See* Barna v. W.C.A.B. (Jones & Laughlin Steel Corp.), 522 A.2d 22, 24 (Pa. 1987) (emphasis added). Indeed, and contrary to Ms. Haley's suggestion, "the duty upon the employer and insurer to promptly commence payment . . . sometimes may leave [them] unaware of the cause of injury

---

In a perfect world, I may want that. In this world, I am not going to get [it]. . . . And if I have no reason to question the legitimacy of the claim or the seriousness of the event, then I am going to make a decision to pay the claim before all those i's are dotted and those t's are crossed, and I believe that that is what happens more often than not in Pennsylvania . . . .

[Otherwise], you would be waiting two, three, four months to collect all the information. You would be forced to issue a notice of denial at the twenty-first day.  These individuals can't afford to wait for wage replacement benefits for two or three months. You are going to force them to go to a lawyer.  You are going to force that lawyer to file a petition and the case is going to be in litigation when it otherwise should not be . . . . You cannot apply [this approach] across the entire universe of claims.

*See id.*, Tr. at 124.163-64 (emphasis added).

or the facts surrounding the claim." *See* <u>Waugh v. W.C.A.B.</u>, 737 A.2d 733, 736 (Pa. 1999) (citation omitted, emphasis added).

This is not to suggest that the employer is powerless to resist an invalid claim, either in the first instance or later in the administrative process. *See, e.g.,* <u>Barna</u>, 522 A.2d at 24 (where "an employer promptly commences payment of compensation . . . and later determines that the claimant's disability was [not] work-related, . . . the employer must be permitted to seek relief"). In considering whether to deny in the first instance, however, the employer/carrier acts reasonably in requiring a solid basis for denial.[14] *Cf. generally* <u>Ricks v. W.C.A.B. (Parkway Corp.)</u>, 704 A.2d 716, 720 (Pa. Commw. 1997) (revelations upon subsequent investigation "do not turn [a] contest from one that was unreasonable to start into one that is reasonable"; "[r]elying on evidence elicited months after the decision to [deny] . . . constitutes an impermissible post-hoc justification") (citation and internal quotations omitted).

These standards, as well as the individualized nature of the reasonableness inquiry, make Ms. Haley less credible in opining that an insurer should "always" deny a claim to await medical records regarding a preexisting injury to the same anatomic region. Such a generalized approach as to what constitutes reasonable claims handling is helpful under neither the facts nor the law.[15]

---

[14]  This conclusion is reached primarily as a matter of fact, based on Mr. Weber's credible testimony. *See generally* discussions *supra*. It also is supported in the law. *See* authority cited in text immediately *infra*.

[15]  To be sure, courts have held that, under the facts before them, the grounds for denial identified by Ms. Haley supported a reasonable contest. *See, e.g.,* <u>General Carbide Corp. v. W.C.A.B. (Daum)</u>, 671 A.2d 268, 271 (Pa. Commw. 1996) (discussing employer's initial denial of claim to conduct further investigation, including to await receipt of medical records). This court, however, does not read the aforementioned precedent to endorse or compel generalized rules regarding when it is reasonable to deny a claim pending further investigation and when it is not. As seen above, generalizations are not helpful in this area of individualized inquiry. In addition, the court cannot agree that the "reasonable claims handling" standards contemplated in <u>Marty's Express</u> and here comport with the notion that there exists

### C.  Mr. Kornfeind's Deposition and Royal's "Best Practices" Manual

Latrobe has highlighted similarities between Mr. Kornfeind's and Ms. Haley's testimony regarding claims handling generally, as well as Royal's "Best Practices" manual.  *See, e.g.*, Latrobe's Findings & Conclusions at 12, ¶ 59.  The Best Practices manual was "a set of training guidelines, . . . used primarily to train new adjusters."  *See* Royal's Findings & Conclusions at 4, ¶ 33 (citing Tr. at 132.18) (Breitfeld)).

As fact finder, the court concludes that Royal's "Best Practices" guidelines, and Mr. Kornfeind's testimony regarding the same, were just that:  discussions of *best* practices for claims handling in general, not taking into account the facts and circumstances presented in any case.  *Cf.* Tr. at 125.4 (Weber) (opining same).  For the reasons stated above, Royal's discussions of "best" practices, generally, are not very helpful in resolving the germane issues here.   In light of the individualized nature of our inquiries, as well as Royal's burden to show reasonable, not optimal, claims handling practices, the finder of fact attaches only modest weight to Latrobe's arguments regarding Mr. Kornfeind and Latrobe's Best Practices guidelines.

Again, this approach is consistent with the law.  *Cf. generally* <u>Lemansky v. W.C.A.B.</u> <u>(Hagan Ice Cream Co.)</u>, 738 A.2d 498, 503 (Pa. Commw. 1999) (compliance with "an insurance carrier's internal claims management policy" was not dispositive regarding reasonableness of contest), *appeal denied*, 759 A.2d 389 (Pa. 2000) (table).

---

only one reasonable way to handle a specific issue in every case.

## V. <u>GLOBAL FACTUAL FINDINGS AND<br>CREDIBILITY DETERMINATIONS</u>

### A. <u>Generally</u>

1. The Parties' Motives and Sophistication, and the Efficacy of the Retrospective
Premiums Programs

The court finds irrelevant the parties' motivations for entering into the Policies, the level

of Latrobe's business sophistication, and/or the degree to which the programs were cost-effective

for either side. *Cf., e.g.*, Tr. at 124.78 (Chimenti) (testifying Latrobe fared well under

retrospectively rated programs in many years). The Policies were what they were, and all that

matters is whether Royal's claims handling was reasonable.

2. <u>The Reputations of Certain Westmoreland County Physicians</u>

The court will not consider Ms. Haley's comments regarding certain physicians'

tendencies to find claimants' injuries work-related. *See* Tr. at 130.4-5 (Haley) (testifying that

Drs. Catalano and Wigle were more inclined to attribute injuries to work incidents to receive

greater financial reimbursement). Even assuming her testimony to be true, the court has no basis

for concluding that the WCJs in Westmoreland County would share this belief and/or allow it to

affect their rulings. The court will attach no inferences regarding the referenced physicians.

*Cf. id.* at 140.81 (Gordon, argument) ("we . . . stipulate that there is nothing . . . in the files . . .

to show that these two physicians [we]re gouging").

**B.  Findings Regarding, Or Requested By, Royal**

1.  Reasonableness of Royal's Three-Point Contact System

As seen above, the court sees little utility in discussing the reasonableness, or lack

thereof, regarding Royal's practices generally and without reference to the specific claims files.

*See generally* discussions *supra*.  The court does find, though, that the insurer's practice of

contacting the employer, the employee, and his medical provider before accepting a claim was a

reasonable approach.  *See generally* Tr. at 132.19-23 (Breitfeld) (discussing three-point contact

system).  The fact finder does not take issue, moreover, with the aforementioned contacts being

made by telephone.  *See* discussion *supra* (finding credible Mr. Weber's testimony that, in light

of time limitations, it is not uncommon for carriers to pick up claims based on telephone

contacts).[16]

On the other hand, Royal's failure to utilize the three-point contact system, or to act with

reasonable diligence regarding the same, may constitute evidence of unreasonable claims

handling.

---

[16]  Royal's three-point system often entailed contacting the claimant by telephone, rather than taking a written statement.  *See id.*  Ms. Haley questions this practice, suggesting that a written statement always should be taken.  *See generally, e.g.*, 129.36 (Haley) ("[u]sually you need to have some type of statement, . . . written or recorded").  While the court, as fact finder, may not quibble with a written statement's being best evidence, the undersigned does not attach to the practice the almost talismanic quality suggested by Ms. Haley.  The court does not find credible the suggestion that, merely because a claimant is required to write something down, what he says automatically becomes more accurate and/or credible.  An oral statement, if properly taken, would appear no less likely to be effective.  In addition, the court questions how the lack of a written statement, alone, could ever establish actual harm to Latrobe in these cases.  At best, the failure to take a written statement would have to be one piece of a larger picture demonstrating that, at the time the decision was made, the issuance of an NCP was unreasonable.

-28-

2.  <u>Nurse Hall's Impact on the Reasonableness of Royal's Claims Handling</u>

Royal asserts that its claims handling was enhanced by Royal's employment of "an experienced and highly professional registered nurse," Mary Hall.  *See* Royal's Findings & Conclusions at 6, ¶ 48.  Ms. Hall "was assigned . . . to coordinate the claimants' medical treatment, attend doctor's appointments, and to manage and closely monitor the medical treatment of the claimant[s] in order to ensure [their] recovery and to [encourage their] return . . . to work."  *See id.*  The Defendant disputes "the level of involvement that Ms. Hall had with Latrobe," citing the company's contact person with Royal, Robert Dell ("Mr. Dell"), who denied "Ms. Hall spent substantial time at Latrobe."  *See* Latrobe's Findings & Conclusions at 101, ¶ 460.

As fact finder, the court agrees that Ms. Hall had substantial involvement in Latrobe's claims and her involvement enhanced the reasonableness of Royal's efforts.  As seen below, Mr. Dell's testimony is not credible, and the claims files are replete with references to Nurse Hall's involvement in these cases.  *Compare, e.g.*, Tr. at 124.169-70 *and* 128.17-18 (Kornfeind) (discussing Nurse Hall's personal involvement and interaction with claimants and examining physicians; "she was the eyes and ears for [Royal]," having been "face to face with" employer, employee and physicians) *with id.* at 141.43 (Dell) (denying Ms. Hall's presence); *see also, e.g., id.* at 125.5 (Weber) (revealing Nurse Hall's involvement in <u>Augustine</u> file); *id.* at 128.56 (Kornfeind) (<u>Baird</u>); *id.* at 128.77-78 (<u>Depree</u>); *id.* at 128.103-104 (<u>Garland</u>); *and id.* at 128.133 (<u>Moore</u>).

For these reasons, the court finds credible the testimony of Royal's witnesses regarding Nurse Hall.

3. <u>The Westmoreland County WCJs Were Claimant-Oriented</u>

Messrs. Weber and Kornfeind testified that the WCJs in Westmoreland County had a strong reputation as being claimant-oriented, and that this fact informed Royal's claims handling practices. *See, e.g.*, Tr. at 124.159-161 (Weber) (WCJs "[we]re pro claimant," which led carriers "to be more careful in choosing which cases you [we]re going to do battle in," because "[you we]re not going to win most of the cases to begin with" and did not "want to develop a reputation with the judges that you [we]re coming in . . . [tilt]ing at windmills"); *id.* at 128.129 (Kornfeind) (counsel advised Royal of WCJs' claimant-oriented tendencies "on many occasions," and carrier "knew of [this fact]" and "relied on it"); *see also generally id.* at 126.88 (Weber) ("apparently Judge Kenney and Judge Cassidy were both prior union officials and Judge Guyton" was "a union attorney"). As fact finder, the court concludes that the WCJs were claimant-oriented, and that Royal and its attorneys acted reasonably in adjusting their claims handling practices accordingly.

The court likewise finds credible the experts' testimony that, although the WCJs were claimant-oriented, they looked unfavorably on individuals who had been offered work within their capacity but refused it. *See id.* at 125.189 (Weber) ("although these judges were very claimant oriented, they did not like claimants who refused to return to work when there was a legitimate job offer in place"); 129.134-135 (Haley) (confirming same).

4. <u>At Least Some of Royal's Costs of Litigating Claims Were Passed on to Latrobe</u>

Royal has argued that the costs of litigating the underlying claims eventually were passed on to Latrobe, thereby discouraging the over-litigation of the case files. *See, e.g.*, Royal's

Findings & Conclusions at 6, ¶ 53.  The insurer has introduced some evidence in support of this assertion.  *See* Tr. at 124.79-81 (Chimenti).

The court finds, as a matter of fact, that at least some of the litigation expenses were more likely than not passed on to Latrobe, and that this generally favors Royal's position. The problem with this argument, however, is that it would appear true in any retrospective premiums case.  Irrespective of this consideration, the need for heightened scrutiny has remained.

For these reasons, the undersigned attaches limited weight to Royal's testimony and arguments in this regard.  Royal's evidence does bolster the conclusion, however, that there must exist some limits regarding what reasonably may be demanded of carriers in terms of claims investigation/maintenance and any resulting litigation.

## C.  Findings Regarding Latrobe and Its Witnesses

### 1.  Ms. Haley's Credibility, Generally

Before trial, the court denied Royal's motion to disqualify Ms. Haley based on her past relationship with Fried, Kane, Walters, Zuschlag and Grochmal ("Fried Kane"), one of the law firms retained by Royal to handle Latrobe's WC files.  *See generally* Mem. & Order dated Sept. 17, 2004 (Doc. 108) at 5-9.  While the court denied the drastic sanction of disqualification, it expressed "little doubt that Ms. Haley's apparent conflict of interest . . . may bear upon her credibility as an expert witness."  *See id.* at 9 n.3.

On one hand, the evidence has proven Ms. Haley to be a highly experienced and knowledgeable WC practitioner, with an "excellent reputation."  *See generally* Tr. at 124.131 (Weber).

On the other hand, Ms. Haley cannot deny that she worked directly (if only in a limited capacity) on at least two of the claims files being litigated here. *See id.* at 130.77-78 (admitting to having worked on <u>Markle</u>, and that her time was billed in <u>Moore</u>).

As fact finder, the court in no way doubts Ms. Haley's knowledge or expertise in the area of workers' compensation law. She has acted commendably on behalf of her client during the first phase of this trial. It is her willingness to act as an expert, despite the seemingly apparent conflicts of interest, that undermines her credibility.

So often in the law and elsewhere, it is not impropriety itself but the appearance of impropriety that calls into question a person's conduct. As far as the fact finder is concerned, it matters not whether Ms. Haley was materially involved in one or more of Latrobe's case files or whether she now can remember such involvement. What matters is that the law firm in which she was a partner had a substantial role in litigating some of the claims files at issue here. Ms. Haley cannot credibly assert that her partners at Fried Kane were "competent" workers' compensation lawyers, but at the same time question how they handled some of the very claims discussed in her report. *Compare* Tr. at 130.78 (Haley) (confirming Fried Kane's competency) *with* discussions *infra* regarding <u>Markle</u>, <u>Moore</u> and <u>Werder</u> (each revealing substantial involvement of Fried Kane lawyers in allegedly unreasonable practices).[17]

The court also finds noteworthy Ms. Haley's current status as a sitting ALJ who presides over workers' compensation claims in Arizona. Canons of judicial conduct normally prohibit judges from "moonlighting" within the area of their chosen profession. *See, e.g.*, ABA Model

---

[17]  During trial, Defense counsel suggested it was Royal, not Fried Kane, that acted unreasonably. *See* Tr. at 130.82 ("Your Honor, . . . we have not made a claim here that Fried [Kane] . . . mishandled the claims"). As will be seen below, however, this distinction is not borne out by the evidence.

-32-

Code of Judicial Conduct, Canon 4(E)(1)-(2) ("[a] judge shall not serve as . . . personal

representative . . . [or] attorney in fact or other fiduciary," except for family members; nor should

judge "serve as a fiduciary if it is likely that the judge as a fiduciary will be engaged

in proceedings that would ordinarily come before the judge") (emphasis added); *cf. also id.* at

Canon 4(G) ("[a] judge shall not practice law").  To be sure, the Arizona Supreme Court Judicial

Ethics Advisory Committee has issued an opinion that would exonerate Ms. Haley of any

violation of the State's Code of Judicial Conduct.  *See* Az. Jud. Adv. Op. 92-3, 1992 WL 810456

(Jan. 31, 1992) ("the Code of Judicial Conduct does not apply to administrative law judges").

Nevertheless, Ms. Haley's status as an active workers' compensation judge arguably raises

concerns regarding the appearance of impropriety.

 For these reasons, Ms. Haley's credibility is somewhat diminished, if more on an abstract

level than a practical one.  As fact finder, the court will not ignore the substance of this

knowledgeable expert's testimony, but in close calls, the opinions of the likewise knowledgeable

Mr. Weber will be given more credence.[18]

### 2.  Mr. Dell and His Role As Liaison Between Latrobe and Royal

 Mr. Dell, former officer manager for Latrobe, was responsible for reporting workers'

compensation incidents to Royal.  *See* Latrobe's Findings & Conclusions at 21, ¶¶ 108-109.

The parties are in disagreement regarding the degree to which Mr. Dell was or should have been

involved in investigating and/or confirming the nature and circumstances of the claimants'

alleged work injuries.

---

[18]  Of course, Ms. Haley and her colleagues' involvement in Markle, Moore, and Werder is another story. *See* discussions *infra* (finding substantial credibility problems in connection with these files).

According to Royal, Mr. Dell "worked with [the carrier] to confirm the facts underlying work-related accidents resulting in claims." *See* Royal's Findings & Conclusions at 6, ¶ 57; Tr. at 128.13-14 (Kornfeind) ("we would question [Mr. Dell] on . . . how the accident occurred, if it occurred, . . . and did he have any significant problems . . . with the injury").

According to Latrobe, Mr. Dell's responsibilities were largely ministerial, restricted to reporting the incident and moving paperwork. *See* Latrobe's Findings & Conclusions at 22, ¶¶ 110-11 ("Mr. Dell did not . . . participate in the investigation of any workers' compensation claim," having "worked in the corporate offices situated miles away from where claims would occur"); Tr. at 141.41-42 (Dell) (testifying to same).

Some genuine disagreement does appear to exist between the parties regarding the extent to which Latrobe assumed responsibility for flagging suspect work incidents and/or troublesome claims or claimants. As fact finder, though, the court concludes that Royal had a reasonable expectation that Latrobe would identify and report problems to the carrier.

Latrobe's assertion that Mr. Dell (and other of its agents) played only a ministerial role is inconsistent with the evidence of record, including the testimony of claims expert Ms. Haley. *See, e.g.*, Tr. at 128.115-116 (Kornfeind) (in Jury, Mr. Dell reported previous "auto accident that the claimant had"); *id.* at 129.88 (Kornfeind) (in Baird, Mr. Dell objected to Royal's reinstatement of claimant's benefits); *id.* at 129.175-176 (Haley) (in Depree, "Latrobe represent[ed] to Royal that the claim should be thoroughly investigated" because of claimant's recent disciplinary problem); *id.* at 129.206 (Haley) (in Jury, Mr. Dell "called . . . to [make Royal] aware that [the claimant] had a bad auto accident years ago, and he goes off work all the time, and keep an eye on him"); *id.* at 130.146-147 (Haley) (in Depree, "Mic" from Latrobe told

Royal claim was "okay to pay"); *see also* Ex. 274 (Royal's contact sheet in <u>Nixon</u>, confirming

that Mr. Dell gave description of accident similar to claimant's).

Regarding Mr. Dell's not having worked at the likely site(s) of injury, the court as fact

finder agrees with Mr. Weber's statement that, "[in] designating . . . a contact," Latrobe "should

[have picked] somebody who [wa]s knowledgeable about what[ was] going on at the company."

*See id.* at 125.119 (Weber).

Given the parties' disagreement regarding Latrobe agents' actual role in identifying

problem claims, the court must find one side more believable than the other.  Mr. Dell's

testimony does not comport with the reality reflected in the evidence, and for this reason the

court finds Royal more credible.

The same evidence that reveals Latrobe's involvement in confirming, and at times

questioning, the underlying WC claims also supports the fact finder's conclusion that Royal acted

reasonably in relying on the same.

3.  <u>Seasonal Layoffs and the Limited Availability of Light Work at Latrobe</u>

Royal's witnesses have testified credibly regarding the aforementioned matters, and there

has been little evidence from Latrobe in rebuttal.  *See generally* Tr. at 124.154, 125.9-10 (Weber)

(discussing seasonal layoffs and shortage of light work positions at Latrobe); *id.* at 128.36-37,

128.82, 128.114 (Kornfeind) (same).  Accordingly, Royal's evidence is accepted by the

fact finder.[19]

---

[19]  Royal's other generalizations regarding Latrobe's workers will not be credited.  Although Mr. Weber suggested that Latrobe had an aging work force of long-tenured employees, *see, e.g.*, Tr. at 124.155, Ms. Haley rebutted this testimony through her survey of the relevant files.  *See id.* at 129.144-45 *and* Ex. J.

-35-

# VI.  RULINGS ON THE INDIVIDUAL CLAIMS FILES[20]

## 1. Ralph Augustine

Mr. Augustine's work injury occurred on November 17, 1994, when he was struck in the back of the head by a large cylinder.  *See* Tr. at 125.4 (Weber).  Following the accident, he spent at least two days in Latrobe Area Hospital's intensive care unit with a head injury and trauma to the cervical spine.  *See* Ex. K at 0215 (hospital treatment notes); *see also* Tr. at 125.5 (Weber) (two days in intensive care); *id.* at 128.30 (Kornfeind) (three days); *and* Ex. 212 (Nurse Hall's notes, stating claimant "was in hosp[ital for] 3-4 days [with] a closed head injury").  Royal issued an NCP on November 22, 1994, *see* Ex. K at 0003, and in February 1995 treating physician Dr. Muccio found the Claimant was "making slow progress . . . . secondary to the fact that his acute injury was superimposed upon chronic degenerative changes."  *See* Ex. 281 at 0272.[21]

Not long after Royal accepted the claim, Nurse Hall questioned whether the Claimant's prior injuries were contributing to his problems.  *See, e.g.*, Ex. 212 at 0039.  Royal monitored the situation, *see, e.g.*, Ex. 281 at 0056, 0070, 0084, and on January 3, 1996, Dr. Catalano unequivocally opined that the Claimant's headaches were a result of his work injury. *See* Ex. 219.

---

[20]  Unless otherwise specified, the rulings regarding the individual claims files are made by the court as finder of fact.  Also, the court does not purport to address herein every criticism and defense made by the parties in connection with the individual claimants.  Rather, the undersigned will focus on the most substantial positions advanced.

[21]  Mr. Augustine also was injured in a motor vehicle accident in 1989.  *See generally* Ex. K at 0014. Ms. Haley has opined that Dr. Muccio, in referring to the Claimant's "acute injury," could have meant the 1989 injury.  *See* Tr. at 130.123-125.  This is not credible, as Dr. Muccio's previous report identified the date of the Claimant's injury as November 17, 1994, *i.e.*, the day of the work incident.  *Compare* Ex. 281 at 0260 *with id.* at 0272.

On October 4, 1995 and January 17, 1996, Drs. Weisman and Catalano, respectively, cleared Mr. Augustine to return to light duty work. *See* Ex. 221 at 0380; Ex. 220. Latrobe was unable to accommodate the Claimant's restrictions, and Royal made an unsuccessful attempt to place him in funded employment. *See* Tr. at 125.9 (Weber) *and* Ex. 281 at 0088 (confirming Latrobe's inability to accommodate light work); Tr. at 128.35 (Kornfeind) *and* Ex. 214 at 0132-0135 (funded employment).

In light of the Claimant's capacity to work, Royal filed a suspension petition in August 1996. *See generally* Tr. at 125.10-11 (Weber) *and* at 128.47 (Kornfeind). The petition was withdrawn in September 1996, when Mr. Augustine signed a supplemental agreement and returned to work. *See id.*

a.    Issuance of the NCP

Royal acted reasonably in picking up this claim. As referenced above, Mr. Augustine spent at least two days in intensive care with a head injury. Neither Mr. Dell nor anyone else at Latrobe questioned the injury, and Royal was reasonable in its belief that the Claimant would not have spent two days in intensive care absent an acute event. Royal's failure to take written statements from the Claimant and the alleged witness, Mr. Pritts, does not alter these conclusions.

Nor does it matter that the subluxation of Mr. Augustine's cervical spine was related to his previous automobile accident. *See, e.g.*, Tr. at 129.155, 140.132-133 (Haley) (testifying regarding same). The record makes clear that the Claimant was hospitalized for both neck and head injuries; the NCP related to both. *See* Tr. at 129.148 (Haley) (Royal "accepted liability for

-37-

concussion [and] subl[u]xation with fracture at C-2") (emphasis added).  Irrespective of whether

the medical examination identified pathology from the prior injury, Royal had no reasonable

basis for denying the claim.

       b.    The Failure to Develop Prior Medical Records and Claims Handling Generally

The court sees no harm resulting from Royal's failure to develop medical records

regarding the Claimant's prior automobile accident(s).[22]  Drs. Muccio and Catalano plainly

attributed Mr. Augustine's disability to the work incident.  *See* discussions *supra*.  The Claimant

had been back to work for some time after his 1989 accident, and there was no reason to attribute

his current inability to work to anything other than the more recent occupational injury.

*Cf.* Ex. 281 at 0056 ("we have a [claimant] who has had 2 severe injuries in auto accidents,"

and "he managed to get back to work each time"); *cf. also* Tr. at 124.167 (Weber) (Pennsylvania

law "provides that an aggravation of a preexisting condition is as compensable as an injury where

you had no preexisting pathology").

More generally, the court finds no evidence that Royal "slacked off" or exhibited a lack

of diligence in handling the claim.  Nurse Hall was substantially involved in this case.

She questioned whether Mr. Augustine's prior injuries were contributing to his problems, and

Royal monitored this concern and followed up with Dr. Catalano regarding the same.  *See*

discussion *supra*.  It is not enough that Latrobe did not like what was found, or that its expert

would have done more.  *Cf.* Tr. at 125.127-128 (Gordon, cross-exam. of Weber) (questioning

whether Dr. Catalano acted as patient-advocate); *see also* discussion *supra* (reasonableness does

---

[22]  Although there is evidence that the Claimant may have suffered two prior accidents, the court finds
this fact immaterial to its analyses.

not turn on "level and degree of expertise" thought appropriate by insured).[23]

      c.    <u>Investigation of the Claimant's Criminal Activity</u>

Latrobe highlights that, just days after Mr. Augustine was visited by police in March 1995 regarding allegations of stolen property, he reported an abrupt increase in symptomatology. *Compare* Ex. K at 0011 ("Probable Cause Affidavit" dated Mar. 18, 1995) *with* Ex. 213 (Dr. Muccio's report of Mar. 20, 1995, indicating recurrence of symptoms); *cf. also generally* Tr. at 125.163 (Weber) ("there was a suspicion that [Mr. Augustine] was running a chop shop"). Ms. Haley appears to suggest that the criminal investigation rendered all WC payments thereafter inappropriate. *See* Tr. at 129.158 ("certainly after March of 1995, the amount [of benefits] paid after that would not be appropriate").

In the undersigned's view, this is the type of hindsight-driven criticism that cannot properly be entertained. There is no indication that Royal knew, or should have known, of the criminal investigation when Mr. Augustine reported an increase in symptomatology in March 1995. What the record does indicate is that the Claimant was arrested in January 1996, and Royal began conducting an investigation in March of the same year. *See* Ex. 215. The investigation continued through May 1996, a suspension petition was filed in August, and the Claimant returned to work in September.

---

[23] The court is not persuaded by Latrobe's argument that, because Dr. Catalano requested the Claimant's prior medical records and did not receive them, Royal mishandled the claim. *See generally* Tr. at 129.153 (Haley). While there is evidence that Dr. Catalano made such a request, his need for the records apparently was not great enough to preclude an unequivocal opinion of work-relatedness. *Compare* Ex. K at 0059 (Nurse Hall's notes, indicating Dr. Catalano requested prior medical records) *with, e.g.*, Tr. at 125.6 (Weber) ("Dr. Catalano . . . was involved in treating Mr. Augustine both at the time of the prior MVA injuries and the more current injuries[, a]nd his report state[d] unequivocally that Mr. Augustine's problems were related to the episode at Latrobe").

As fact finder, the court has no reason to conclude that further investigative or litigious efforts would have yielded a different result, and any criticisms in this regard reflect a disagreement regarding the level or degree of Royal's expertise rather than showing it acted without reasonable diligence.

    d.    <u>Lack of Light Work; Resolution of Claim</u>

Latrobe apparently criticizes Royal for having failed to determine whether Mr. Augustine's pre-injury job was at the light exertion level. *See generally* Tr. at 125.141-142 (Gordon, cross-exam. of Weber). This criticism fails on the face of the record. *See, e.g.,* Ex. 221 at 0380 (Dr. Weisman's report, opining Claimant was not "capable of returning to his former heavy employment"). Otherwise, Royal acted with reasonable diligence in requesting that Mr. Augustine be placed in a light work position at Latrobe, in attempting to establish funded employment, in filing a suspension petition, and in securing the Claimant's return to work.

    e.    <u>Conclusion</u>

Royal acted reasonably and in good faith regarding Mr. Augustine.

**2.**    **<u>Merle Baird</u>**

This Claimant injured his back at work on September 16, 1992, when a jack slipped and fell on him. *See* Tr. at 125.11 (Weber). Royal contacted Latrobe four days later, and the company's agent(s) confirmed that the "claim [was] compens[a]ble[, n]o question." *See* Ex. L at 0666. Accordingly, Royal issued an NCP. *See id.* at 0653. Mr. Baird made two unsuccessful attempts to return to modified work, in June and September 1995. The September attempt

resulted in what Dr. Smith referred to as "a major exacerbation." *See* Ex. L at 1026. Royal

reinstated benefits, and the claim ultimately settled for $95,000.00. *See generally* Tr. at 125.13-

15 (Weber).

Many of Latrobe's criticisms focus on two prior injuries suffered by Mr. Baird, the first in

1981 and the second in approximately 1988. The Claimant identified the 1981 accident during

Royal's initial contact. *See* Ex. L at 0666 (identifying prior back injury "10 years" ago).

Nurse Hall attempted to secure medical records regarding this injury, but was unsuccessful.

*See* Tr. at 125.12 (Weber). Mr. Baird did not identify the 1988 injury, and the first reference to it

appeared in Dr. Haque's report dated September 23, 1993. *See* Ex. 234.


a.      Issuance of the NCP

Royal acted reasonably in issuing the NCP. Latrobe's agent(s) approved the claim,

*see* discussion *supra*, and otherwise there was no basis for denying it.


b.      The 1988 Injury and Failure to Develop Records

Latrobe's criticisms regarding the 1988 injury are unpersuasive. As best as the court can

tell, Royal only learned of this injury in September 1993, over one year after the NCP was issued.

*See* discussions *supra*. The court finds credible Mr. Weber's testimony that the information

came too late to be of practical use. *See* Tr. at 141.7 ("[W]hat are they going to do with this

information? Are they going to file a petition to set aside the [NCP] a year after the fact? I don't

think so. I mean, they could try, but they were not going to win.").

The court also questions Ms. Haley's suggestion that Mr. Baird reported having received

treatment within the "last four or five months" before the work incident. *See* Tr. at 129.164-165

(Gordon, direct exam.; Haley testifying in response); *see also* Royal's Contact Sheet (Ex. L at 0666) (purportedly indicating same). The court as fact finder cannot determine whether the contact sheet upon which Ms. Haley relies says "last time 4 or 5 months," or "lost time [ten years ago]" as suggested by Royal. *See* Tr. at 130.139 (Haley, on cross-exam.); *cf. also* Ex. 274 at 11484 (contact sheet in Nixon, authored by same claims handler, clearly using phrase "lost time" rather than "last time"). Accordingly, the court can attach no weight to Ms. Haley's testimony in this regard.

Finally, the court remains unconvinced that Dr. Haque's reference to the 1988 injury triggered a duty to develop medical records regarding the same. *Cf.* Tr. at 129.166 (Haley) (suggesting that Dr. Haque's report did not answer question of whether Mr. Baird's current symptoms could be attributed to work injury). As Mr. Weber observed, the Claimant already had been receiving benefits pursuant to an NCP reasonably issued over one year earlier. *See* discussion *supra*. Although Dr. Haque's report is less than entirely clear regarding the cause of Mr. Baird's symptoms, the physician failed to question the occurrence of the work incident or that the Claimant currently was suffering. *See* Ex. 234 at 1057 (after prior injuries, Claimant had "returned to work," but back pain "developed again" in connection with more recent work incident). Under these circumstances, Latrobe's criticisms fall short.[24]

---

[24]  Latrobe's counsel also notes that Dr. Haque's report was sent to Dr. Baldinucci, the treating physician Royal contacted before accepting the claim. *See* Tr. at 141.20 (Gordon, cross-exam. of Weber). Counsel suggests that, had Royal developed Dr. Baldinucci's medical records, the insurer would have learned sooner of the 1988 injury. *See id.* at 141.21. The court finds it unreasonable, however, to have demanded that Royal develop Dr. Baldinucci's records when the same physician was consulted before the NCP was issued. Royal had a reasonable expectation that this medical professional, before signing off on his patient's WC claim, made an inquiry sufficient to support his endorsement of work-related disability. It was not, nor should it have been, Royal's place to second-guess Dr. Baldinucci's medical opinion by demanding supporting documentation.

c.    The September 1995 Reinstatement of Benefits:  Aggravation Versus Recurrence

Ms. Haley appears to suggest that the Claimant's exacerbation of symptoms in September 1995 should have been construed as an aggravation rather than a recurrence, or that more medical evidence should have been developed in this regard.  *See* Tr. at 129.170-171. The distinction would have been significant, as the exacerbation occurred after Latrobe switched to a new insurance carrier.  *See generally* Tr. at 125.168 (Weber) (explaining that, if Mr. Baird suffered aggravation, injury would not fall under Royal's retrospective program).

The court agrees that, in a perfect world, the aggravation versus recurrence determination would be supported by detailed medical opinion(s) regarding whether an "intervening incident . . . contribute[d] materially to the physical disability" in question.  *Cf.* South Abington Twp. v. W.C.A.B. (Becker & ITT Specialty Risk Servs.), 831 A.2d 175, 181 (Pa. Commw. 2003) (citation omitted).  In this case, however, the Claimant returned to work for only "short period[s] of time" following an extended duration of disability.  *See* Ex. L at 1026 (Dr. Smith's report of Apr. 8, 1996).  The circumstances surrounding Mr. Baird's failed work attempts reasonably supported a finding of recurrence, and Dr. Smith's report supplies at least some medical evidence in this regard.

In addition, evidence of potential disagreement regarding the recurrence/aggravation dichotomy is not indicative of Royal's slacking off or failing to exercise reasonable diligence. The reasonableness inquiry is not an invitation for Latrobe to micro-manage the carrier's claims handling practices; nor should it devolve into "second guessings" regarding which of many rational interpretations was most appropriate.

-43-

    d.    <u>Conclusion</u>

The remaining criticisms of this file are either insubstantial or are addressed by implication above.  Royal has carried its burden of persuasion regarding Mr. Baird.

**3.    <u>Eric Depree</u>**

This Claimant's purported work injury occurred on July 23, 1992, when he suffered a low back injury shoveling stone.  *See* Tr. at 125.20 (Weber).  The incident came after his job responsibilities were shifted from clerical duties to heavy labor.  *See id.*; *see also id.* at 125.170-171 (Weber).  The change was precipitated by Latrobe's charges that the Claimant was altering time cards for other employees.  *See id.*  Mr. Depree apparently was dissatisfied with his change in position, and the alleged work injury occurred only days later.  *Cf. generally id.* at 125.172.

Royal contacted Latrobe on August 6, 1992 regarding the claim, and a company agent indicated it was "ok[ay] to pay."  *See* Ex. M at 1711.  The same day Royal contacted Mr. Depree, who expressly denied prior back injury.  *See id.*  On this information, along with a treating physician's approval, Royal issued an NCP.  *See id.*; *see also* Ex. M at 1650.

Mr. Depree remained on disability until Dr. Boyle released him to his former position, part time, in January 1993.  *See* Ex. M at 2016.  In February, the Claimant signed an "Agreement to Stop Weekly [WC] payment[s]," also known as a "final receipt."  *See id.* at 1652.  Therein, Mr. Depree indicated he was "fully recovered from [his] injury or disease."  *See id.*

After some administrative and layoff-related delays, the Claimant returned to work in April 1993.  Approximately one month later, Mr. Depree claimed to have reinjured his back slipping on a ladder.  *See* Ex. 239 *and* Tr. at 125.21 (Weber) (addressing alleged ladder incident

in May 1993).  Shortly thereafter, Royal reinstated benefits.  *See* Tr. at 125.21, 125.177 (Weber).

While Mr. Depree remained on disability, Royal began to receive reports indicating his noncompliance with medical treatment and lack of desire to return to work.  *See, e.g.*, Ex. 241 (notes of L. Kornfeind dated Jul. 28, 1993) ("Claimant apparently [is] not cooperating with work hardening"); Ex. 242 (email to M. Hall dated Oct. 8, 1993) (Mr. Depree "is going to give us a hard time in that he does not want to return to work"); Ex. M at 2038 (May 4, 1994 rpt. of Dr. Boyle) ("I told [the Claimant] that I could place no faith in his credibility [given] his repeated noncompliance").  Royal also obtained records indicating that Mr. Depree had suffered back problems before the work incident(s), something he previously failed to reveal.  *See, e.g.*, Ex. M at 1999 (Dr. Muccio's rpt. of Oct. 28, 1993) (Claimant "present[ed] with an MRI scan done in April of 1992," before injury in July 1992).

In May 1994, Dr. Boyle claimed to release Mr. Depree to work without restriction, citing repeated incidences of noncompliance with recommended treatment modes.  *See* Ex. M at 2038.  Four months later, the Claimant submitted to a functional capacity evaluation ("FCE").  *See* Ex. 248 (summary of FCE dated Sept. 27, 1994).  The FCE indicated a capacity for light to medium work, but the report indicated Mr. Depree had made "submaximal effort," leading to "[e]quivocal" results that required "other data" to "mak[e] decisions regarding medical management and vocational planning."  *See id.*

Royal engaged vocational rehabilitation services, but the provider placed its services on hold pending completion of an IME.  *See* Ex. 247 (voc. rpt. dated Dec. 8, 1994) at 1939.  In late January 1995, Mr. Kornfeind confirmed the appropriateness of obtaining an IME, and he also suggested surveillance.  *See* Ex. M at 1885.  No IME was conducted, however, and a

settlement was reached in May 1995 for $37,000.00. *See* Tr. at 125.184 (Weber). In a decision approving the settlement, the WCJ noted that Mr. Depree in the meantime had secured alternative employment. *See generally* Ex. 245 (ltr. from Fried Kane lawyer M. Sherman, discussing court's approval of settlement).

In addition to the lump sum payment of $37,000.00, Mr. Depree received total disability benefits from the time of the alleged ladder incident in May 1993 until the settlement was finalized in September 1995. *Cf.* Tr. at 129.183 (Haley).

This Claimant's file presents a good case study regarding the nature and type of criticisms leveled by Latrobe that fail, and those that have merit. As seen below, Royal's claims handling was reasonable through May of 1993, and the insured's grievances to that point are founded on hindsight and second guessing. After Mr. Depree's alleged ladder incident in May 1993, however, Royal acted with less than reasonable diligence in handing the claim.

a.    Issuance of the NCP and Claims Handling Through May 1993

Royal acted reasonably in accepting Mr. Depree's claim in the first instance. The carrier's contact sheet indicates that Latrobe "ok[ayed]" the claim. *See* discussion *supra*. There is no indication that Royal knew, or should have known, about Mr. Depree's contemporaneous disciplinary problems; neither Mr. Dell nor any other agent of Latrobe informed the carrier of the same. Even had the insurer learned of the disciplinary action, moreover, this information alone would have been insufficient to compel a denial of the claim. *See generally* discussion *supra* (concluding as fact finder that Royal acted reasonably in requiring solid basis for denial). Absent other indicia of problems, the insurer's contacts with the

-46-

employer, the employee and his treating physician reasonably could overcome the timecard

incident; even in hindsight, Latrobe cannot preclude the possibility that Mr. Depree did in fact

suffer a work injury. *Cf.* Tr. at 125.30 (Weber) (testifying that misconduct unrelated to disability

would have had no direct impact on WC adjudication).

Next is Royal's purported failure to develop medical records, an argument that in this

instance relies particularly on hindsight. During Royal's initial contact, the Claimant specifically

denied prior back problems. Latrobe "okayed" the claim, as did one of Mr. Depree's treating

physicians. *See* discussions *supra.* How Royal was expected to anticipate the existence of prior

pathology remains unclear. Mr. Depree apparently lied to Royal's agent during the initial

contact, and there is no reason to believe that he would have been more truthful had a written or

recorded statement been taken. *See* discussion *supra* at n.16; *cf. also, e.g.*, discussion *infra*

regarding Newell (at trial, Latrobe questioned work-relatedness of injury despite signed

statement of claimant).

The only other way Royal could have learned of Mr. Depree's prior back problems was to

adopt a policy of retrieving complete medical records for each and every claimant, irrespective of

whether he, his doctor, and/or the employer identified prior medical issues. This obviously

proves too much, and Latrobe's criticism is not convincing.

Otherwise, there is no reason to conclude that Royal mishandled Mr. Depree's claim

through May 1993. The Claimant was released to work in January 1993, and Royal secured a

"final receipt" the following month. *See* discussion *supra.* The Claimant returned to work, and

he remained there until the alleged ladder incident in May 1993.

b.     The Handling of the May 1993 Incident and Thereafter

The evidence regarding Royal's reinstatement of benefits in May 1993 is sketchy, at best. All Mr. Weber could indicate was that the Claimant allegedly slipped on a ladder, he again treated with Dr. Boyle, and Royal reinstated benefits. *See* Tr. at 125.177-178 (Weber). There are no records indicating that Royal communicated with Dr. Boyle or anyone at Latrobe before benefits were reinstated. *Cf. id.* (admitting there was no evidence Latrobe was contacted).

Royal has relied heavily on its three-point contact system, and the court generally has found such reliance reasonable so long as the carrier diligently implemented the same. The system apparently was abandoned, however, regarding Mr. Depree's alleged recurrence/aggravation.

Mr. Weber's testimony implies that, somehow, Royal learned the Claimant was treating with Dr. Boyle and said physician approved the reinstatement of benefits. *See* Tr. at 125.177 (suggesting that Dr. Boyle "put [Mr. Depree] out on disability"). There is no source evidence for this assertion, however, nor is there any indication that even the most minimal investigation was undertaken. *See id.* at 125.177-178 (admitting that no further investigation was apparent). In essence, the court has no basis to conclude that *anything* was done to investigate this claim before Royal reinstated benefits.

Following the reinstatement, Royal's efforts regarding Mr. Depree fairly may be characterized "slacking off" or lacking reasonable diligence. Despite repeated indications that the Claimant was noncompliant and unwilling to return to work, remarkably little was done by Royal in terms of medical evaluation and/or management. And while this Claimant arguably presented somewhat of a "nightmare" scenario (*i.e.*, a hostile, unmotivated employee with just enough medical evidence to make suspension or termination somewhat difficult), Royal sat by

-48-

passively while Mr. Depree collected over two years worth of seemingly questionable disability benefits. *See generally* discussion *supra* (noting Royal's payment of total disability benefits from date of uninvestigated ladder incident in May 1993 through finalization of settlement in September 1995).[25]

Finally, in light of Mr. Depree's substantial credibility problems and his retention of alternative employment, the court cannot conclude that the $37,000.00 settlement was on its face reasonable.

c.   Conclusion

Unlike the ones before it, the Depree file appears to have been running on "autopilot," beginning with Royal's failure to meaningfully investigate the ladder incident before reinstating benefits. To this extent, the insurer has failed to carry its burden of persuasion regarding claims handling, and Mr. Depree must be revisited at Phase II.[26]

---

[25]   Although the court finds a lack of diligence based on the larger picture, there is further evidence of unreasonableness in the details. First is Dr. Boyle's May 1994 release to work based on Mr. Depree's noncompliance. *See* discussion *supra* in text. The court agrees with Mr. Weber that this opinion would not, in and of itself, have supported a termination petition. *Cf. generally* Tr. at 125.180-181. But Royal did nothing thereafter, despite its own witnesses' admission that an IME would have been appropriate. *See id.* at 125.183 (Weber) (admitting "[i]t would be unusual" for Royal not to secure IME between May 1993 and final settlement in September 1995); *see also* discussion *supra* (noting Mr. Kornfeind's indication in January 1995 that IME should be conducted). Next, Mr. Kornfeind has testified that Royal settled Mr. Depree's claim in reliance on the September 1994 FCE findings, which indicated a capacity for light to medium work. *See* Tr. at 128.93. What Mr. Kornfeind failed to appreciate, however, was the plainly "[e]quivocal" nature of the results. *See* discussion *supra* in text (noting conclusion in FCE report that "other data" was required to "mak[e] decisions regarding medical management and vocational planning").

[26]   The court will reserve for Phase II its findings regarding the actual loss or harm that resulted from Royal's confirmed mishandling in Depree. *See* discussion *supra* regarding actual loss/harm *and* discussion *infra* at § VIII(B) ("Remaining Damages Analyses at Phase II"). All the court currently finds is that Royal has failed its burden of persuasion regarding the handling of Mr. Depree's claims from May 1993 on.

4.    **Harry Freed**

This Claimant suffered a work injury on January 15, 1993.  *See* Tr. at 129.188 (Haley). Royal unilaterally ceased paying WC benefits in May 1994, based on a job offer the Claimant allegedly could perform.  *See id.* at 125.188.  Later, WCJ Cassidy ordered Mr. Freed's benefits suspended effective May 1994, but assessed a ten per cent penalty based on Royal's unilateral cessation of benefits.  *See id.*

After succeeding with the suspension petition, Royal requested and secured a reimbursement from the Bureau's Supersedeas Fund in the amount of $28,873.00. *See* Tr. at 129.191 (Haley).

a.    Royal's Unilateral Cessation of Benefits

Royal had no basis to unilaterally terminate Mr. Freed's benefits.  Mr. Weber concedes the same.  *See* Tr. at 125.187, 125.190.  In this regard, the court finds that Royal did not handle the file reasonably.

As a consequence, Latrobe may be entitled to adjustments based on penalties and interest assessed for Royal's unilateral cessation.  In addition, the evidence supports a conclusion that Latrobe did not enjoy a full supersedeas fund reimbursement.

At all times relevant to this litigation, a Pennsylvania employer who filed a petition to suspend or terminate WC benefits was required to continue making payments until a final decision was made.  *See id.* at 125.83-84 (Weber).  If the employer succeeded, it would be entitled to reimbursement, from the Bureau's reimbursement fund, of the benefits paid between the filing of the petition and the favorable decision.  *See id.* at 125.191.

Here, had Royal timely filed a suspension petition rather than unilaterally terminating Mr. Freed's benefits, Latrobe could have recovered from the supersedeas reimbursement fund any benefits paid from the time of the suspension petition to the time of the favorable decision. While Royal ultimately did file petition(s) for suspension/termination, it did so only months after having unilaterally ceased payments in May 1994.  At Phase II, the damages analysis should account for the fact that, had Royal timely filed a suspension petition in the first instance, Latrobe would have enjoyed a greater reimbursement from the supersedeas fund.[27]

> b.     The Supersedeas Recovery Actually Secured

As noted above, Royal did obtain a reimbursement in the amount of $28,873.00.  *See* discussion *supra*.  Although Ms. Haley suggests that Royal was untimely in requesting reimbursement, she has identified no harm to Latrobe in this regard.  *Compare* Haley's Expert Rpt. at un-numbered pg. 23 ("Royal was very late in attempting to recover supersedeas funds") *with* Tr. at 129.188-192 (Haley) (failing to explain how timeliness of supersedeas request adversely impacted Latrobe).

Ms. Haley also testified that the Supersedeas Fund recovery was improperly credited to Latrobe's "expenses" column rather than incurred losses, thereby avoiding a proper reduction in the insured's potential retrospective premiums obligation.  *See* Tr. at 191 (Haley).

---

[27]  Mr. Weber noted that, when Royal did finally file a petition, it filed one for termination "based upon what they thought was an opinion of full recovery."  *See id.* at 125.191.  This appears to have been done in error, as the petition later was amended to seek a suspension based on the job offer.  *See id.* In criticizing the handling of this file, however, Ms. Haley did not draw a distinction between the termination petition and the later amendment to a suspension petition.  *See id.* at 129.190, 129.192 (Haley).  Accordingly, the damages analysis should consider only the additional payments made between, (i) when Royal reasonably should have filed a suspension petition, and (ii) when it actually filed the termination petition.

The court agrees with Royal, however, that this testimony goes beyond the scope of Ms. Haley's expert report. *See* Haley's Expert Rpt. at un-numbered pg. 23 (stating, cryptically, that Royal "failed to credit its claim for damages against its insured monies that were recoverable from the Supersedeas Fund"). Ms. Haley's report was insufficient to place Royal on notice of her belief that the reimbursement was placed in Latrobe's expenses column, as opposed to incurred losses, and that said conduct led to an overstatement of retrospective premiums due.

More importantly, Latrobe has failed to identify, or secure the admission of, source evidence demonstrating that the supersedeas reimbursement was improperly credited. *Cf.* Tr. at 129.8 (Kornfeind) (testifying that adjustments to retrospective program based on supersedeas fund reimbursement would not appear in claims files reviewed by Ms. Haley, but rather in underwriting report). Accordingly, Latrobe's criticisms regarding the $28,873.00 reimbursement are not persuasive.

c.    <u>Conclusion</u>

As explained above, Royal's claims handling in <u>Freed</u> was not entirely reasonable, and this Claimant may be revisited at Phase II to the extent described above.

## 5.    **Dennis Garland**

Mr. Garland's file is unique in that it began as a "medical-only" claim. *See generally* Tr. at 128.97 (Kornfeind) (noting same). The Claimant suffered a work injury on July 19, 1993, when he slipped off the fender of a high lift. *See generally* Ex. O at 3019. Mr. Garland was able to continue working, subject to exertional restrictions placed upon him by treating physician Dr. Wheeling. *See* Ex. AB at 3137-3138 (Claimant placed on "light-duty").

Mr. Garland continued working in a modified position until late December 1993, when he was laid off from his light-duty job. *See* Tr. at 125.33 (Weber); *id.* at 128.101 (Kornfeind); *and* Ex. 253 (Kornfeind's notes of Dec. 28, 1993, indicating author spoke to Claimant regarding impending layoff). Royal then determined that, in light of Latrobe's laying off Mr. Garland from a restricted-duty position, the institution of temporary total disability benefits was warranted. *See* Tr. at 128.101 (Kornfeind) (testifying same); *cf. also id.* at 125.34 (Weber) ("if you [a]re working under restrictions" and "that job is eliminated through no fault of your own, you're entitled to be reinstated to temporary total disability benefits"). An NCP was issued in January 1994, and the file shifted from medical-only status to a lost wage case. *See* discussions *supra*.

At all relevant times, Mr. Garland's WC claim was based on his reports of pain and/or numbness in his lower right extremity, primarily around the hip and/or groin. Initially, his physicians appeared hopeful they could identify the source of his discomfort. *See, e.g.*, Ex. 301 at 3806 (Dr. Sahlaney's bill for office visits in July and August 1993, noting "thigh sprain"); Ex. 257 (Dr. Seeber's report of Jan. 6, 1994) ("[i]t would appear that he has soft tissue injury to the right hip region"); Ex. 259 & Tr. at 128.111 (Kornfeind) (discussing Dr. McKay's diagnosis of "a definite palpable herniation in the area of [the] 'spermatic cord'"). As the claim progressed, however, the medical professionals had difficulty identifying the etiology of the pain, at times noting a lack of objective findings. *See, e.g.*, Ex. O at 3309 (Dr. Wheeling's report of Apr. 29, 1994) (noting groin pain, "[e]tiology I don't know"); Ex. O at 3343 (Dr. Victoria Smith's report of Aug. 2, 1994) (assessing "[g]roin pain, etiology unclear"); Ex. O at 3369 (Dr. Jarrett's IME report of Sept. 23, 1994) (noting lack of "objective findings which would corroborate [Claimant's] symptoms" and finding it "difficult . . . to formulate a mechanism [to]

explain" them); Ex. Y (Dr. Zorub's Apr. 17, 1995 IME report) ("I find no objective neurological

deficit").

Nevertheless, the doctors continued to find restrictions in the Claimant's exertional

capacity, and he continued to receive benefits.  *See, e.g.*, Ex. O at 3369 (Dr. Jarrett's opinion that

"modified duty would be appropriate"); Ex. Y (Dr. Zorub "[did] not think [the Claimant could]

return to the heavy duty position that he was employed in and . . . would place him in a modified

light duty capacity").

In early 1997, Mr. Garland was placed in funded employment.  *See* Tr. at 125.35, 126.4

(Weber).  This approach failed, and at some time thereafter the case was settled for

approximately $100,000.00.  *See id.* at 126.4.

    a.   <u>Royal's Acceptance of the Medical-Only Claim</u>

Mr. Kornfeind explained the carrier's practices as follows:

> Medical-only claims are investigated mostly through the medical
> reports that we have and through talking to the employer, see[ing]
> how the claimant is doing and mostly looking at the meds,
> reviewing them to see if treatment is helping the individual
> progress.
>
> At that time, Lorraine Mastruso, . . . was on the [Garland] file and
> she was monitoring the progress as far as his pain.

*See* Tr. at 128.97-98.

As just seen, medical-only claims were subjected to somewhat less scrutiny than lost time

claims.  *Compare id. with* discussion *supra* regarding Royal's three-point contact system.

Latrobe has failed to demonstrate that the carrier acted unreasonably in treating medical-only

claims with a somewhat lighter hand, and the fact finder concludes generally that this approach was reasonable.

Even assuming more investigation was appropriate in connection with Mr. Garland, there is no evidence of actual harm or loss to the insured. The Claimant had worked in his heavy-exertion position for two years prior to the accident, *see* Tr. at 129.193 (Haley), and he returned to work immediately thereafter. *See id.* at 129.194. There is no indication that Latrobe ever questioned the incident, nor has any physician doubted that an acute event occurred. The court concludes, by a preponderance of the evidence, that the work incident did happen or, at a minimum, that Royal could not have demonstrated the contrary.[28]

b.      Failure to Rely on Dr. Salhaney's Opinion of No Restriction

On November 27, 1993, Dr. Salhaney checked a box on a pre-printed form indicating that Mr. Garland could "return to his[] pre-injury job without restriction." *See* Ex. O at 3280 (emphasis omitted). Latrobe takes the position that this form justified denying the WC claim.

The court disagrees. Both before and after Dr. Salhaney issued his report, other physicians made findings inconsistent with the opinion of no restriction. On November 11, 1993, Dr. Wheeling ordered physical therapy, three times a week, for six weeks. *See* Ex. 301 at 3275. Then, on December 27, 1993, Dr. Seeber noted and did not question the Claimant's placement on light duty, per Dr. Wheeling's instruction. *See* Ex. 256. The court finds credible

---

[28]  The court rejects Latrobe's argument that Royal acted unreasonably in failing to develop medical records regarding a preexisting injury in 1973. *Cf. generally* 129.204 (Haley). Among other things, the injury was too remote, and Mr. Garland had enjoyed two years of uninterrupted service before the work incident. *See* discussion *supra* in text; Tr. at 128.113 (Kornfeind) (discussing remoteness of injury).

-55-

Mr. Weber's testimony that Royal did not act unreasonably in declining to "seize [up]on this one report" in the face of contrary medical evidence. *See* Tr. at 141.10-11.  Indeed, the record as a whole reveals Dr. Salhaney's opinion to be an outlier amongst the otherwise consistent evidence of functional limitation.

### c.    Issuance of the NCP for Lost Wages

Mr. Garland was working under restrictions until he was laid off from his light duty position. *See* discussion *supra*.  Mr. Weber testified that the Claimant's layoff from restricted duty required the institution of temporary total disability benefits. *See id.*  Although Latrobe's expert has posited a different legal interpretation, this merely establishes disagreement regarding the level and degree of expertise, not that Royal acted with less than reasonable diligence.[29]

### d.    The Shift from Medical-Only to a Lost Wage Claim; Timeliness of IMEs

As noted above, Royal subjected medical-only claims to somewhat less investigation, and the court generally has found this approach reasonable.  In light of the carrier's reliance on its three-point contact system, however, the question remains whether Royal acted reasonably once this claim shifted from medical-only to wage loss.

Even Mr. Kornfeind recognized the significance of the change, as his notes specifically instructed Royal's claims handler(s) to undertake the three-point investigation.

---

[29]  Latrobe argues that the legal authority cited by Mr. Weber is inapposite because Mr. Garland was never off work before being laid off (unlike the claimant in Williams, who went off work, returned with restrictions, and then was laid off).  In this regard, Ms. Haley's testimony is not credible. *Compare* Tr. at 161 (Haley) (admitting unfamiliarity with "Williams line of authority") *with id.* (Gordon, objecting) (arguing Williams is "of no relevance here" because said decision involved "an individual who is out of work and comes back to work") *and id.* (Haley) (testifying, post-objection, that Williams was distinguishable).

*See* Ex. O at 3131 (Kornfeind's notes, dated Nov. 19, 1993) (instructing that employer,

employee, and physician be contacted). These instructions notwithstanding, there is no evidence

the three-point contact system was implemented.[30]

     Again, however, the court has no evidence before it to support a finding of actual loss or

harm. Dr. Wheeling plainly restricted the Claimant to light duty work, that work dried up,

and Mr. Garland was laid off. For the reasons articulated above, the issuance of an NCP was

appropriate. The lack of additional investigation mattered not.

     Mr. Kornfeind also suggested in November 1993 that Royal "consider [an] I.M.E."

*See* Ex. O at 3131. Ms. Haley concurs, arguing that an IME always should be taken before

converting a medical-only claim to one for lost wages. *See* Tr. at 130.166.

     As noted above, IMEs were conducted in this case in September 1994 and April 1995.

*See* discussions *supra* regarding Drs. Jarrett and Zorub. At trial, Mr. Kornfeind testified that

IMEs were not done sooner because the Claimant had been the subject of "ongoing medical

treatment." *See* Tr. at 128.102-103.

     In light of the apparent conflict between Mr. Kornfeind's testimony and his notes, this

witness is found less than fully credible regarding the need for an IME. Nevertheless, the court

as fact finder independently concludes that the file contained sufficient medical records to allow

the reasonable monitoring of the Claimant's condition until the time of the first IME. The court

also concludes that Latrobe's desire to pinpoint appropriate time frame(s) for IMEs proves too

---

[30] To be clear, Mr. Kornfeind's instructions actually preceded the <u>Garland</u> file's shift from medical-only to lost wages. *Compare* Ex. O at 3131 (notes of Nov. 19, 1993) *with id.* at 3020 (NCP, stating disability commenced Dec. 31, 1993). In issuing his instructions, however, Mr. Kornfeind did indicate that a wage loss was anticipated in the near future. *See id.* (noting Mr. Garland would be "losing time").

much under the reasonableness inquiry; the company was entitled to reasonable diligence in

claims handling, not to manage every detail of Royal's efforts.

> e.     Lack of Agreement Regarding Diagnosis; Questions Regarding Etiology and/or
>        Mechanism of Injury; Lack of Objective Findings

Perhaps the greatest points of contention surrounding this file relate to the medical

perplexities presented by Mr. Garland's complaints of pain.  The court finds telling the reference

point for Ms. Haley's analysis:

> Q.     In your experience, [will] doctors disable a claimant based upon
>        subjective symptomatology alone?
>
> A.     Some doctors will do that.  But, as I've said, . . . most of the
>        straight-shooting conservative physicians will not disable someone
>        on subjective findings without objective findings.

*See* Tr. at 130.166 (emphasis added).

This approach is problematical in at least two ways.  First, it is not entirely consistent

with the law.  *See generally, e.g.*, Crowell v. W.C.A.B. (Johnson Dairy Farm), 665 A.2d 30, 33

(Pa. Commw. 1995) ("severe pain, even without evidence of an anatomical cause, is sufficient to

support a finding of continued disability") (citation and internal quotations omitted).  Second,

neither Royal nor Latrobe had the right to demand that their claimants be treated only by

"straight-shooting conservative physicians."  As a matter of both law and fact, the court cannot

ground the reasonableness inquiry on Ms. Haley's conservative approach.

Turning to the evidence, Mr. Garland would appear the "poster child" for finding

functional limitation based on subjective complaints alone.  Indeed, every physician that

questioned the etiology of his symptoms and/or noted the lack of objective findings went on to

conclude, expressly or by implication, that he suffered restrictions in his capacity to work.

*See, e.g.*, discussions *supra* regarding Dr. Wheeling (placing Mr. Garland on restrictions despite

inability to determine etiology of symptoms); Dr. Smith (finding "etiology unclear,"

but recommending physical therapy); Dr. Jarrett (finding etiology "elusive" and questioning

mechanism of injury, but restricting Claimant to "modified duty"); *and* Dr. Zorub (noting lack of

objective findings but limiting Mr. Garland to "light duty" work).[31]

Despite the lack of objective findings, the inability to determine the cause of the

Claimant's symptoms, and even the lack of a clear diagnosis, the physicians in this case

uniformly found Mr. Garland unable to engage in his pre-injury work.  Royal acted reasonably

in accepting the claim.

    f.   <u>Conclusion</u>

For the reasons stated above, Royal has carried its burden of persuasion regarding

Mr. Garland.  The court agrees with Messrs. Weber and Kornfeind that this Claimant presented

a difficult case.  *See* Tr. at 128.100 (Kornfeind) ("[i]t was a very complex medical case, and it

took a lot of work . . . to identify exactly what was going on"); *id.* at 125.35-36 (Weber) ("[s]ome

of these files," like <u>Garland</u>, "would present real problems trying to resolve").  This does not

---

[31]  Regarding mechanism of injury, Ms. Haley highlights the report of Dr. Jarrett which stated:  "It would be somewhat unusual to have a peripheral nerve injury from an accident of this type, which did not involve any crush type injury or soft tissue trauma[; thus, i]t is difficult for me to formulate a mechanism [to] explain this man's symptoms in the face of so many [negative test] studies."  *See* Ex. O at 3369; *see also* Tr. at 129.200 (Haley) (noting same).  To the extent Latrobe relies on this comment to dispute work-relatedness, the court finds it outweighed by the numerous other medical reports that failed to question the occupational nature of the injury.  In addition, Dr. Jarrett's assertion regarding a lack of soft tissue injury was contradicted by Dr. Seeber's earlier findings.  *See* Ex. 257 ("[i]t would appear that [Mr. Garland] has soft tissue injury to the right hip region").

mean that Royal mishandled the claim, and the court finds that the carrier's efforts were reasonable.

### 6.  <u>William Jury</u>

This Claimant was injured at work on October 11, 1989, when he suffered upper and lower back strain.  *See* Tr. at 125.36 (Weber); *id.* at 130.170 (Haley).  Upon completion of the three-point contact investigation, which included a discussion with Mr. Dell on October 19th, Royal issued an NCP.  *See* Ex. P at 4591 (contact sheet) *and id.* at 4416 (NCP).

Mr. Dell telephoned Royal on November 7, 1989 (after the carrier initially contacted him on October 19th and issued the NCP on October 25th) to advise that Mr. Jury "had a bad auto[mobile] accident years ago," he "[went] off work alot," and Royal should "keep an eye on him."  *See* Ex. P at 4599 (notes regarding Mr. Dell's call).

The Claimant remained off work until April 1991, when he was medically released for light exertional duty.  *See generally* Ex. P at 4659.  The position of "bin boy" was developed for Mr. Jury, and he remained in that position for three weeks until Latrobe fired him for poor attendance.  *See generally id.*

By June 1991, the Claimant retained attorney Vincent J. Quatrini ("Mr. Quatrini").  *See generally* discussions immediately *infra*.  On June 10, 1991, Mr. Quatrini sent a letter to Royal stating:  "I am suspect any time an employer discharges an individual for attendance problems where the individual has a recognized disability.  It will remain our position that Mr. Jury is entitled to total disability."  *See* Ex. 292.

On June 19, 1991, the Claimant filed a petition for reinstatement of WC benefits and attorney's fees for unreasonable contest. *See generally* Ex. P at 4551, at "Third" finding.

In early July 1991, Royal sent a letter to Mr. Quatrini offering to settle the claim for $25,000.00. *See* Ex. 284. With no response forthcoming, Royal filed a petition for modification on August 12, 1991. *See* Ex. P at 4551, "Sixth" finding.[32]

The litigation proceeded and, in a hearing before WCJ Kenney on September 20, 1991, Latrobe's request for supersedeas was denied and it was ordered to pay benefits. *See* Ex. P at 4552, "Tenth" finding; Tr. at 129.212 (Haley). This ruling was based on the WCJ's conclusion that the "evidence of record . . . was insufficient to establish . . . the Claimant was not totally disabled." *See* Ex. P at 4552, "Tenth" finding.

On November 20, 1991, Mr. Jury submitted to an IME before Dr. Anne Valko. *See* Ex. P at 5078-5083. Among other things, Dr. Valko observed that: the Claimant "had a preexisting low back problem" resulting from an automobile accident in 1984; during the work injury in October 1989, he "may have sustained mild soft tissue injury or aggravation" of his preexisting pathology; "[i]t would be of interest to see if he had presented to anyone for complaints of back pain in the intervening years from 1985 to 1989"; and Mr. Jury "[wa]s capable of returning to" the bin boy position, provided it was sedentary to light duty work. *See id.* at 5079, 5082-5083.

In January 1992, Royal's outside counsel Edward Dixon, Esq. ("Mr. Dixon") recommended that the carrier's petition for modification be withdrawn and Dr. Valko's opinions developed in support of future litigation. *See* Ex. Z. In February 1992, WCJ Kenney allowed the

---

[32] On September 12, 1991, Mr. Quatrini sent a letter apologizing for the delay but rejecting Royal's settlement offer. *See* Ex. 285.

parties to withdraw their outstanding petitions, but he awarded costs and attorney's fees to

the Claimant. *See* Ex. P at 4552, "Twelfth" and "Thirteenth" findings.

On March 3, 1992, Dr. Valko authored a report stating:

> [R]egarding Mr. Jury[,] . . . I did review the films and his old
> records. It would appear that the work-related injury . . . was
> probably a mild soft tissue injury which may have temporarily
> aggravated his old underlying . . . injury. I would not expect him to
> have any permanent disability from the October[] 1989 [work]
> injury[,] which was relatively minor in contrast to his previous
> motor vehicle accident. . . . I can state this with a reasonable
> degree of medical certainty.

*See* Ex. 296.

In a letter dated March 31, 1992, Mr. Dixon again discussed litigation strategy:

> I am in receipt of [Dr. Valko's letter]. It is quite favorable and
> would support a [t]ermination [p]etition. You must remember[,]
> though,] that we are in front of [WCJ] Kenney . . . and our chances
> of prevailing are not [good].[33]  However, perhaps we can put
> ourselves in a better position for a [reasonable] settlement . . . .
>
> Additionally, [the C]laimant's medical may end up being weak and
> we may get lucky. It is worth pursuing given the reluctance of
> [Latrobe] to bring Mr. Jury back. That does not mean . . . we
> should abandon the hope that at some point [the company] will be
> accommodating. We should probably see how the litigation
> process goes before [asking] them to take this gentleman back.
> If we got them involved and they created a position for him, we
> would have a much better chance of prevailing . . . . [I] await your
> authorization to file a petition.

*See* Ex. 297.

---

[33]  Mr. Dixon repeatedly advised Royal that WCJ Kenney was not a favorable draw, given "his proclivity to be claimant-oriented and his relationship with Attorney Quatrini." *See, e.g.*, Ex. 295.

-62-

Mr. Dixon apparently was authorized to file a petition to terminate, as he did so in May 1992.  *See generally* Ex. P at 4552, "Fourteenth" finding.  The WC hearing on this case commenced August 21, 1992, and was continued over a long period of time, on February 4, 1993, July 15, 1993, and December 17, 1993.  *See* Ex. P at 4550.[34]  Both before and after the final hearing date, Mr. Dixon advised Royal he was not optimistic:

> [O]ur chances of prevailing before [WCJ] Kenney on the termination, in which the employer fired the [C]laimant for allegedly not doing his work (while he was claiming an injury) and, according to the Judge and some of his staff, does not have a good reputation in the community as a fair employer, are simply non-existent.  Perhaps we would have more leverage while the [t]ermination [p]etition is still pending to amicably resolve the case.

*See* Ex. 298.  Shortly thereafter, Mr. Dixon extended a settlement offer of $50,000.00, which the Claimant declined.  *Cf. id. and* Ex. 299.

In the WC proceedings, "[a]ll evidence was received" by July 1994, and on October 15, 1994 WCJ Kenney issued an order denying Royal's petition, directing the continued payment of medical and indemnity benefits, and finding an unreasonable context.  *See id.* at 4564.

At some point thereafter a settlement was reached.  *See* Tr. at 129.219 (Haley); *id.* at 140.62 (Dixon) (stating belief that case settled in 1995).

---

[34]  Mr. Dixon testified that the litigation process was delayed by WCJ Kenney's illness.  *See* Tr. at 140.50 ("[the] case was litigated over a term of two and a half years," which was "longer than usual . . . because Judge Kenney was ill and off the bench often").

a.    Issuance of the NCP

Acceptance of this claim was reasonable.  Notably, Mr. Dell was contacted about the Claimant and did not appear to question the acute event.  *See* Ex. P. at 4591.  Royal's contact sheet stated that "[Mr. Dell felt] there were probably witnesses . . . but would have to inquire at the quarry."  *See id.*  This comment reasonably may have been interpreted as indicating Mr. Dell would follow up with potential witness(es), and he did not report any results before the NCP was issued on October 25, 1989.  *Cf. id.*

As to Mr. Dell's concerns regarding the Claimant's prior automobile accident, they were only reported after the NCP issued.  *See* discussion *supra*; *see also* Ex. P at 4599.

Last, Dr. Valko's report of November 20, 1991 indicated that the October 1989 work incident caused soft tissue injury and/or aggravated the Claimant's preexisting injury.  *See* discussion *supra*.

Royal acted reasonably in accepting this claim.


b.    Mr. Jury's Return to Work and Royal's Failure to File a Modification Petition Within Fifteen Days

In April 1991, the Claimant's treating physician cleared him to work in the bin boy position.  *See* discussion *supra*.  Once Mr. Jury returned to work, Royal transmitted to Latrobe a supplemental agreement for the Claimant's signature, a procedure that would allow the carrier to cease paying disability benefits.  *See generally* Tr. at 140.7 (Dixon); Ex. 293 (M. Hall's ltr. to Mr. Dixon dated Jun. 24, 1991).  Latrobe allowed Mr. Jury to take the agreement home with him, and he never returned it.  *See id.*

-64-

In light of Mr. Jury's failure to sign the supplemental agreement, the parties are in agreement that the appropriate step for Royal was to file a petition for modification. *See, e.g.*, Tr. at 130.175 (Gordon, clarification for court) ("if [you] don't have a supplemental agreement signed, then you file the petition for modification"). There was disagreement, however, regarding the effects of filing or neglecting to file such a petition within fifteen days of the return to work.

Ms. Haley testified that, had Royal filed the petition for modification within fifteen days, it could have taken an automatic supersedeas (*i.e.*, suspension) of benefits based on the Claimant's return to work. *See, e.g.*, Tr. at 141.37. This is consistent with the testimony of Mr. Dixon. *See id.* at 140.8 ("if you filed a [petition] for modification within fifteen days, you could take what we call an automatic supersedeas, meaning benefits could be stopped . . . while you litigated the petition").

Mr. Weber testified, however, that the automatic supersedeas mechanism was available only if the claimant returned to work at his pre-injury wage, a situation not presented here. *See* Tr. at 141.17. Mr. Weber also testified that the automatic supersedeas allowed a cessation of payments only while the claimant "[wa]s actually working," a situation no longer presented once Mr. Jury was fired in May 1991. *See id.* at 141.4.

As fact finder, the court concludes that the fifteen day dispute is much ado about little. First, the court does not agree that Royal acted unreasonably in failing to ensure that the supplemental agreement was returned within fifteen days and, if not, that a modification petition was filed within that time frame.

As referenced above, Royal transmitted the supplemental agreement to Latrobe, who then allowed the Claimant to take it home. While allowing Latrobe to handle the matter may not have been the best procedure, the court cannot say that it was *per se* unreasonable. And while Royal could, and probably should, have instituted a system of checks to ensure that the agreement was promptly signed and returned, the court cannot say the insurer acted unreasonably in failing within fifteen days to: (a) determine that the agreement would not be timely signed and received, and (b) have its counsel file a modification petition before the time frame expired.

Even assuming the contrary, the court sees no meaningful consequence(s) of the failure to secure an automatic supersedeas. Latrobe fired the Claimant on May 23, 1991, and Mr. Weber credibly has testified that the automatic supersedeas would not apply to the time that Mr. Jury was out of work. Moreover, the significance of Latrobe's decision to fire the Claimant, rather than to wait for a WCJ to adjudicate the matter, cannot be ignored. *Compare* Ex. 292 (Mr. Quatrini's letter, stating "I am suspect any time an employer discharges an individual for attendance problems where the individual has a recognized disability") *with* Tr. at 129.212 (Haley) (opining that Mr. Quatrini was an "excellent [WC] practitioner").[35]

Even assuming the automatic supersedeas properly extended beyond the time Mr. Jury was fired, the parties found themselves before the WCJ only months later on the Claimant's petition to reinstate. *See* discussion *supra*. After the hearing in September 1991, the WCJ

---

[35] The fact finder declines Latrobe's position that Mr. Jury "rejected the [bin boy] position" or acted in bad faith regarding the same. *Cf. generally, e.g.*, Tr. at 140.64 (Gordon, cross exam. of Dixon). As Mr. Dixon explained, that determination was one for the WCJ to make, not Latrobe. *See id.* ("It[ is] not up to the employer to determine whether he accepted or rejected the job. Once the judge sees that he got fired, the judge believes that the employer [has] usurp[ed his] duty to make that determination.").

-66-

ordered the payment of benefits, and there is no reason to believe that the result would have been different had an automatic supersedeas been taken. *See id.* (noting denial of supersedeas request because "[the] evidence of record . . . was insufficient to establish that the Claimant was not totally disabled").

Finally, Ms. Haley was not credible in testifying that an automatic supersedeas would have justified Latrobe's decision to terminate Mr. Jury's employment. *See* Tr. at 129.214-215. The Claimant consistently asserted that he was having difficulty performing the bin boy position because of his WC injury; the mere taking of an automatic supersedeas would not have placed the determination in the hands of Latrobe. *See* discussion *supra*.

c.    Royal's Failure to Reinstate Benefits Upon Mr. Jury's Firing

Ms. Haley testified that, in light of the failure to secure a supplemental agreement or automatic supersedeas, Royal had no legal basis for declining to reinstate Mr. Jury's benefits once he was terminated. *See* Tr. at 129.215-216. This does appear to be true, although the WCJ ordered benefits reinstated only a few months later. *See* discussion *supra*.[36]

The fact finder has some uncertainty regarding the effect(s), if any, of Royal's failure to reinstate benefits in the absence of a supplemental agreement. Presumably, the WCJ's later assessment of attorney's fees in February 1992 may have coincided with the same. *See* Ex. P at 4552, "Thirteenth" finding. At Phase II, the claims handling experts are invited to address whether actual harm resulted from Royal's failure to immediately reinstate Mr. Jury.

---

[36]   The court also notes that, even before the WCJ ordered the payment of benefits, Mr. Jury apparently continued to receive partial disability in the amount of $207.56 per week. *See* Ex. 293.

d.    Royal's Failure to Settle

Latrobe and Ms. Haley argue that Royal should have settled this case soon after Mr. Jury

left the bin boy position. *See, e.g.*, Tr. at 126.27 (Gordon, cross-exam. of Weber) (questioning

whether August 1991 "[w]as it an ideal time to settle [the] case"); *id.* at 129.220 (Haley)

(claiming Royal acted unreasonably in "fail[ing] to resolve this case when they had a request to

consider a resolution by Mr. Quatrini").

Ms. Haley's testimony regarding Mr. Quatrini's discussion of settlement mischaracterizes

the evidence.  In a letter dated August 20, 1991, Mr. Dixon stated that the "[C]laimant's attorney

ha[d] already discussed the idea of . . . settlement with [Mr. Jury] and ha[d] probably done so

since the [C]laimant first consulted with him." *See* Ex. 294 at 4660.  This is a far cry from

evidence that Mr. Quatrini offered meaningful settlement negotiations before the WCJ's ruling

in September 1991.

The record does reveal that Royal made explicit settlement offers to Mr. Quatrini, both

before the Claimant's benefits were reinstated and after. *See* Ex. 284 (offering $25,000.00 in

July 1991); Exs. 298 & 299 ($50,000.00 in Dec. 1993).  To the extent Latrobe questions whether

Royal offered enough money, or the precise timing of the settlement offers, these again go more

to the level and degree of the carrier's expertise, not its slacking off or acting without diligence.

Latrobe's criticisms regarding the failure to settle are not persuasive.

e.    Royal's Failure to Develop Medical Records Regarding Mr. Jury's 1984 Injury

In her IME report, Dr. Valko indicated, (a) "it [wa]s imperative that someone obtain the

x-rays" taken in connection with the 1984 accident, and (b) "[i]t would be of interest to see if

-68-

[the Claimant] had presented to anyone for complaints of back pain" between the 1984 accident and the 1989 work injury. *See* Ex. P at 5081-5082.

As to the x-rays, Dr. Valko's letter of March 3, 1992, indicates that they were made available to her. *See* Ex. 296 (noting that physician "review[ed] the films and his old records"). Regarding complaints of back pain in the intervening years, the record before the WCJ indicated that none were made to his treating physicians. *See* Ex. P at 4557-4558 (Dr. Smith's office treated Mr. Jury since 1984 accident, and "the Claimant never complained of any back symptoms and never mentioned any back pain").

Even assuming Royal owed a duty to earlier develop these records, no actual harm came to Latrobe as a result. *See* discussion immediately *supra*; *see also* discussions above regarding reasonableness of Royal's NCP and Dr. Valko's conclusion that Claimant suffered soft tissue injury or aggravation in 1989 work incident.

f.    Royal's Termination Petition

Royal had a reasonable basis for filing a termination petition in May 1992, namely the report of Dr. Valko dated March 3, 1992. *See* Ex. 296 (based on review of old records, work-related injury "probably . . . temporarily aggravated" Claimant's preexisting condition, and physician did "not expect him to have any permanent disability" from same) (emphasis added); *cf. also* Ex. P at 5082 (rpt. of Nov. 20, 1991, indicating that aggravation should have resolved within "[a] few months" of work injury, at latest). While apparently overlooked by both Mr. Weber and WCJ Kenney,[37] the court as fact finder (and/or as a mixed question of law and fact)

---

[37] *See* Tr. at 125.40-41 (Weber) (testifying that Dr. Valko's November 1991 report, alone, did not support termination petition and stating that reliance on it would constitute "negligence"); *see also* discussion *infra* (noting WCJ Kenney's failure to mention Dr. Valko's March 3, 1992 report).

concludes that the March 3d report was sufficient to support the termination petition.

       g.    <u>Royal's Participation in the Hearing; the Adverse Decision</u>

Aside from Mr. Dixon's testimony, the only concrete evidence regarding what transpired during the termination hearing is found in WCJ Kenney's written decision. *See* Ex. P at 4548-4565. Notably absent from the decision is any reference to Dr. Valko's report of March 3, 1992, the very one justifying Royal's petition to terminate. *See id.* This situation was not helped by Dr. Valko's apparent inability to recall that she indeed had reviewed Mr. Jury's x-rays and/or records from the prior accident. *Compare* Ex. 296 ("I did review the films and his old records") *with* Ex. P at 4555 (Dr. Valko "conceded that she did not know whether she had reviewed the x-ray films from 1984," despite having stated such review was "imperative").

Mr. Dixon has testified that he did discuss Dr. Valko's March 3d report at the hearing, *see* Tr. at 140.19-20, and that WCJ Kenney "made an error" by "reject[ing] it." *See id.* at 140.65-66.

On this record, the fact finder cannot determine precisely what happened at the hearing. The best the court can tell is that a conflict appeared between the testimony of Dr. Valko, who was equivocal regarding her review of old medical records, and that of treating physician Dr. Smith, who testified and provided documentary evidence that Mr. Jury had not been treated for his back in the years preceding the work injury. *See* discussions *supra*; *see also* Ex. P at 4560 (WCJ Kenney relied on "office notes of Dr. Smith . . . reveal[ing] that the Claimant did not treat at all for any back discomfort from 1986 until the time of the work injury"). WCJ Kenney credited Dr. Smith, and there is no basis to conclude that the adverse decision resulted from

unreasonableness by Royal or its counsel.

To be sure, Latrobe may disagree with Royal and/or Mr. Dixon's failure to develop evidence regarding Mr. Jury's pre-injury absences. *See* discussion *supra* (noting Mr. Dell's indication that Claimant "had a bad auto[mobile] accident years ago" and "[went] off work alot"). The insured also may question whether Royal's counsel did enough to rehabilitate Dr. Valko's testimony that she did not recall reviewing the old records.

But these types of "what-ifs" also run in the other direction. For example, what if Latrobe had earned a better reputation with Judge Kenney and the employment community? What if Latrobe had not unilaterally fired Mr. Jury for his proclaimed inability to perform the bin boy position? *Cf.* Tr. 140.58-59 (Dixon) (questioning same).

As a matter of both law and fact, the court does not believe that the reasonableness inquiry should devolve into second guessings regarding matters so subjective as what constitutes proper and sufficient legal strategy and/or representation. Entertaining such an approach would be to open pandora's box, allowing *ad nauseam* attacks on every litigation decision in the guise of the good faith/reasonableness inquiry.

It suffices to say that Royal and/or Mr. Dixon did not slack off or act with less than reasonable diligence in litigating Jury. Mr. Dixon's thoughtful, detailed letters and testimony regarding the litigation are sufficient to establish the same. *See, e.g.*, Exs. 260, 294, 297, 299 & Z. Any disagreement by Latrobe or its witnesses goes to the level and degree of Royal's expertise, and their challenges are unavailing.

h.    Conclusion

Mr. Jury's file is an example of how, even absent unreasonable claims handling,

a WC case can unfold badly over time.  In explaining why Royal continued to fight such

a seemingly hopeless battle, Mr. Dixon insightfully commented:

> [A]t [some] point, you [do]n't have any choice because you cannot
> file something and just sit on your hands and . . . settle cases for
> exorbitant amounts of money because you're concerned that you
> won't win . . . .  You have to move the case [forward in] litigation,
> try to negotiate, and advise the company along the way [of] their
> chances of winning or losing.

*See* Tr. at 140.55.

Royal's counsel found itself in this position in <u>Jury</u>, and the insurer has carried its burden

of persuasion.[38]

**7.    <u>Paul Markle</u>**

This Claimant's work injury occurred on October 25, 1994, when he injured his neck and

upper back "getting out of the way of falling stone."  *See* Ex. Q at 05790 (Employer's Report of

Occup. Injury or Disease); *id.* at 05738 (rpt. of Jan. 9, 1995) (in avoiding falling stone,

---

[38]  In reaching this conclusion, a few notes are in order.  First is the fact finder's conclusion that
Latrobe's unilateral decision to terminate was in part responsible for <u>Jury</u> becoming such a troublesome
file.  *See generally* discussions *supra*.  Although the court expressly declines to rely on it, Latrobe's
challenges bring to mind the equitable doctrine of unclean hands.

Next, the court summarily rejects Latrobe's argument that Royal acted unreasonably in connection with
its surveillance efforts.  *Cf.* Tr. at 140.45 (Gordon, cross-examining Mr. Dixon regarding same).
The insurer's evidence establishes reasonable diligence in this regard.  *See* Tr. at 125.37 (Weber).

Last, the court's finding of reasonableness, generally, does not preclude the parties' revisiting at Phase II
Royal's failure to immediately reinstate benefits in the absence of a supplemental agreement.
*See* discussion in text *supra*, at § VI(6)(c).

Mr. Markle "planted his feet and turned his neck and back quickly"); *id.* at 01863 (WCJ

Guyton's decision dated Aug. 14, 1998) ("[t]he Claimant sustained an injury to his neck while

avoiding being struck by rocks during a roof fall"); *id.* at 03997 (rpt. of Dr. Smith dated Aug. 21,

2000) ("[h]e twisted violently to get out of the way from the rock").  Royal issued an NCP in

November 1994, and Mr. Markle began receiving benefits.  *See generally* Ex. Q at 04131 (NCP).

   In June 1996, Dr. Charles Stone conducted an IME and issued an opinion of full recovery.

Royal retained Fried Kane lawyer Dale A. Cable, Esq. ("Mr. Cable"), who filed a petition to

terminate benefits in August 1996.  *See* Tr. at 125.46 (Weber) & 134.9 (Haley) (discussing

Dr. Stone's IME); *id.* at 130.13 (Haley) ("Mr. Cable . . . handled the litigation throughout this

[file]"); *and* Ex. Q at 01863 (WCJ's decision, identifying Mr. Cable as counsel for

Royal/Latrobe).

   On March 11, 1997, and as the termination petition remained pending, treating physician

Dr. Catalano referred the Claimant to Dr. Roppolo for an MRI test.  *See* Ex. Q at 6729.

The results were "compared with [a] previous exam of 3/19/91," and they showed "moderate to

severe . . . foraminal narrowing, mildly increased since the previous exam."  *See id.*

   On August 14, 1998, WCJ Guyton issued an order denying the termination petition.

The WCJ credited treating physicians Boyle and Catalano, who opined that the Claimant

remained disabled:

> Both [of these] physicians diagnosed the [C]laimant as suffering
> from herniated cervical disc at the level of C6-7.  Dr. Catalano
> testified that neither the . . . November 21, 1989 . . . or March 19,
> 1991 MRIs demonstrated a herniated disc at this level.  In addition,
> Dr. Boyle interpreted the [C]laimant's April 1996 EMG/NCT
> studies as showing possible right sided C-7 radiculopathy. . . .

-73-

> Dr. Stone opined that the [C]laimant had only suffered soft tissue
> injuries on October 25, 1994, as Dr. Stone did not see any
> herniated discs when [he] reviewed the [C]laimant's diagnostic
> studies[, including a] December 28, 1994 myelogram and [a]
> February 12, 1996 MRI.  Yet, the [C]laimant's diagnostic studies
> were interpreted by the radiologist as showing a herniated cervical
> disc. . . .  Dr. Stone never comment[ed] on the findings noted by
> Dr[s]. Boyle [or Catalano].

*See* Ex. Q at 03767.[39]

After a subsequent unsuccessful termination petition, Royal secured an IME from

Dr. Jack Smith on August 21, 2000.  Dr. Smith noted that Mr. Markle did not recall having a

history of neck problems before the work incident, and when confronted with the 1991 MRI,

the Claimant attributed it to "evaluation for his tremor complaints."  *See id.* at 03997.[40]

In any event, Dr. Smith highlighted a "torticollis . . . on 8/30/92" and a "notation prior to the time

of [work] injury dated 7/03/95 showing range of motion of the neck diffusely decreased with

spasm," "neck pain" and "tremor."  *Id.* at 03998.[41]

---

[39]  Despite the adverse decision, WCJ Guyton declined to find an unreasonable contest:

> The defendants, based on the record as a whole, had a reasonable basis for the
> [t]ermination [p]etition.  Dr. Stone, who had examined the [C]laimant after Dr. Boyle
> had, based on his own review of the diagnostic studies and his own findings on physical
> examination[,] found the [C]laimant to have been fully recovered . . . .

*See id.* at 03769.

[40]  Mr. Markle's tremor complaints likely corresponded with his later diagnosis of torticollis.  *Cf.*
*generally* website at http://www.nlm.nih.gov/medlineplus/ency/article/000749.htm (torticollis is "[the]
prolonged contraction of the neck muscles that causes the head to turn to one side," and its symptoms
include "[n]eck pain" and "[h]ead tremor").

[41]  Dr. Smith's assertion that the July 3, 1995 findings preceded the work injury was erroneous.
*Cf.* Ex. Q at 03997 (noting date of work injury was Oct. 24, 1994).

-74-

Based on these and other findings, Dr. Smith found that the Claimant suffered "a torticollis, limited range of motion, episodic spasm and complaints of neck pain," but that these conditions "existed even prior to the time of his [work] injury." *See* Ex Q. at 03998. As for the work accident, the physician concluded that it caused "a strain [that was] superimposed [over a] chronic [neck] condition." *See id.* at 03999.  Accordingly, he offered an opinion of complete recovery, finding "[no] definite residuals . . . attribut[able] to the [work] accident." *See id.*

Fried Kane filed another termination petition based on Dr. Smith's report, but before it was decided the case settled for $100,000.00.  *See* Ex. 262 (Fried Kane's ltr. to Royal dated Aug. 29, 2001, advising that although Dr. Smith provided "adequate testimony," counsel "believe[d]  . . . it was worth paying this amount to dispose of [the] case").

a.      Issuance of the NCP

Royal's issuance of the NCP was reasonable.  There is no evidence that Mr. Dell or anyone else at Latrobe question the work incident.  Based on the circumstances surrounding the injury (*i.e.*, falling rock), the court finds it more likely than not than an acute event occurred, or that Royal could not have shown otherwise.  Finally, Latrobe's evidence of full recovery, the report of Dr. Smith, identified an acute (if resolved) work injury.  *See* Ex Q. at 03999.

Royal acted reasonably in picking up this claim.[42]

---

[42]  At trial, energy was devoted to the issue of whether Mr. Markle was struck by falling rock as opposed to being injured avoiding it.  *See, e.g.*, Tr. at 129.73-74 (Kornfeind, on cross-exam.); *id.* at 130.7 (Haley, on direct); *id.* at 140.101-105 (Haley, on cross-exam.).  All documentary evidence of record, however, consistently indicates Mr. Markle was injured avoiding the rock.  Even assuming evidence to the contrary exists, there is no credibility issue and the uniformity of the record renders the issue moot.

     b.     The Hearing on the First Termination Petition, the Resulting Adverse Decision, and Royal's Failure to Develop Medical Records Regarding the Prior Injury

Latrobe's theory is as follows.  At the hearing, Dr. Catalano mistakenly testified that the work incident caused a change in the Claimant's neck pathology.  *See* Tr. at 130.9 (Haley). The WCJ credited this testimony, and she discredited Dr. Stone for not knowing of the prior pathology.  *See id.*  We now know that there was no change in pathology, based on Dr. Smith's August 2000 report.  *See id.* at 130.10.  Thus, had Royal developed Dr. Catalano's pre-injury treatment records, it could have shown that the treating physician was mistaken, counsel presumably could have better prepared Dr. Stone, and Royal may or would have won the termination petition in 1998.  *Cf. id.* at 140.109 (Gordon).

As seen below, Latrobe's theory is the product of speculative inference, hindsight, and mischaracterization of the WCJ's decision.  Before reaching these matters, however, the court finds Ms. Haley's testimony not credible.

Ms. Haley attended a hearing in this case on behalf of Royal.  *See* Tr. at 130.13.  She has a direct conflict of interest, and on this basis alone her testimony is discredited by the fact finder.

In addition, Fried Kane lawyer Dale Cable was directly involved in all aspects of the litigation in this case.  *See* discussion *supra*.  Presumably, he attended (or read the transcripts of) Dr. Catalano's deposition, where said physician indicated the existence of pre-work injury treatment and testified that the work incident changed the preexisting pathology.  *See* Ex. Q at 03764 (indicating that Dr. Catalano was offered as witness "by deposition" dated Dec. 9 and 16, 1997).  If anyone on behalf of Royal could have anticipated the relevance of the pre-existing

records, it would have been Mr. Cable.  Likewise, if anyone can be held accountable for failing to adequately prepare Dr. Stone, it would be the Fried Kane lawyer responsible for litigating the case.

Ms. Haley has testified that her former colleagues at Fried Kane were competent and professional workers' compensation lawyers.  In laying blame at the feet of Royal, without considering her former colleague's participation, she renders herself not credible regarding Markle.

Turning to merits of Latrobe's arguments, they are little more satisfying.  First is the presumption that Dr. Catalano erred in testifying that the November 1989 and March 1991 MRIs failed to reveal a herniated disc.  The only indication to the contrary is Dr. Roppolo's reading of the 1997 MRI.  *See* Ex. Q at 6729 (noting "mild increase[s] since the previous exam" in March 1991).  Although Dr. Roppolo's 1997 report infers that Mr. Markle had prior pathology, it does not demonstrate Dr. Catalano was wrong in concluding that the Claimant in 1991 did not have a herniated disc.

Also, the WCJ's opinion leaves little doubt that Dr. Catalano specifically reviewed the prior test results and nevertheless concluded the work injury remained.  *See* Ex. Q at 03767, ¶ 9 (discussing Dr. Catalano's testimony regarding 1989 and 1991 MRIs).   Any discrepancy between the findings of Drs. Catalano and Roppolo (and later Dr. Smith) may be attributed to mere disagreement among the medical professionals.  To conclude that Dr. Catalano was simply wrong would require expert medical opinion that neither the court, Latrobe, nor Ms. Haley can provide.  *Cf.* Tr. at 130.143 & 140.98 (noting Ms. Haley has not been offered as medical expert).

Turning to Dr. Stone, the WCJ's decision reveals that his disagreement with Dr. Catalano was greater than can be explained by his purported inability to review the pre-work injury treatment records:  Dr. Stone opined that there was <u>no</u> current evidence of herniated discs, only soft tissue injuries resulting from the 1994 work incident.  *See* Ex. Q at 03676, ¶ 10.  The WCJ's decision makes clear, moreover, that Dr. Stone reached this conclusion based on test results issued contemporaneously with those seen by Drs. Catalano and Boyle.  *See id.* (citing Dr. Stone's review of test results from December 1994 and February 1996).

In sum, the WCJ did not reject Dr. Stone's opinions because he was unaware of the prior medical reports; rather, she found the treating physicians' assessment of the medical evidence more credible.  *See generally id.*  There is no basis, other than speculation, to conclude that Royal's development of the prior treatment records (through Mr. Cable or otherwise) would have affected the outcome of the hearing.

    c.    <u>Dr. Smith's Opinion of Full Recovery</u>

To the extent Dr. Smith's report of August 2000 reached different medical conclusions that did Drs. Boyle and Catalano, the court fails to see how this renders Royal's previous handling of the claim unreasonable.  Using the report to second guess the findings discussed in WCJ Guyton's 1998 decision would be to engage in evaluation-by-hindsight.  As fact finder, the court declines this approach.

To the extent Latrobe suggests that Mr. Markle was an inaccurate historian or malingerer because he did not recall pre-work injury treatment for a neck condition, the fact finder will attach no such inference.  As seen in Dr. Smith's report, Mr. Markle apparently characterized his

neck tremors as a different ailment than his work-related neck pain. *See* discussion *supra* (noting

Claimant's attribution of 1991 MRI to tremor complaints). Sufficient doubt exists in this regard,

and the court also ultimately questions how this issue is relevant to the reasonableness of Royal's

efforts.

The court also notes that, although Dr. Smith indicated the Claimant was treating for neck

pain up until the time of his work accident, the physician apparently was having trouble keeping

his time line straight. *See* discussion *supra* (noting Dr. Smith's erroneous statement that Jul. 3,

1995 findings reflected pre-work injury condition).

Finally, the court notes with interest that Latrobe does not challenge Fried Kane's having

recommended the settlement of this case for $100,000.00, despite possessing an opinion of full

recovery from the otherwise rarefied Dr. Smith. *Compare, e.g.*, Tr. at 129.135, 130.11 (Haley)

(testifying that Dr. Smith had relationship with, and was "touted" by, WCJs) *with* Ex. 262

(Fried Kane's ltr., advising that settlement was appropriate despite Dr. Smith's testimony).

    d.    <u>Conclusion</u>

Royal did not mishandle this claim, and the insurer has carried its burden of persuasion.

**8.**    <u>**James Moore**</u>

This Claimant was injured at work on April 28, 1993, when he fell off a piece of

machinery and caught himself on an overhead hook, causing his body to dangle in the air.

*See generally* Ex. R at 8801, 8672. Although Royal's NCP identified injury to Mr. Moore's right

shoulder only, *see id.* at 6879, the record reveals that he presented to his chiropractor the day

after the injury complaining of right shoulder and back pain. *See* Ex. 265 at 6901 (Mar. 4, 1996

utility rpt. of Dr. Houseknecht).

Accordingly to Ms. Haley, in June 1996, Dr. Dolecki opined that Mr. Moore had fully recovered from his work-related shoulder condition. *See* Tr. at 130.21. This opinion formed "the basis for [a] petition before" WCJ Guyton. *See id.* (Haley); *see also generally* Ex. 268 (Fried Kane ltr. dated Feb. 14, 1997) (discussing litigation efforts beginning in June 1996). At the hearing, the WCJ found that the Claimant suffered an "ongoing low back problem that related and continued from the alleged [work] injury." *See* Tr. at 130.21 (Haley).

Fried Kane, who represented Latrobe throughout the litigation process, opined that <u>Moore</u> would "be a very difficult case to successfully litigate," and counsel recommended "amicably resolving the claim through a commutation." *See* Ex. 268 at 7175.

a.    <u>The NCP</u>

Royal did not act unreasonably in accepting this claim. Neither Mr. Dell nor anyone else at Latrobe disputed the occurrence of an acute event. On the same day as his relatively extreme work accident, Mr. Moore presented to the Latrobe Area Hospital and was given a prescription for Darvocet. *See* Ex. R at 8796. The court finds it more likely than not that the work injury occurred, or that Royal could not prove otherwise.

b.    <u>Failure to Define and/or Limit the Work Injury</u>

Many of Latrobe's criticisms surround the carrier's coverage of Mr. Moore's back injury, despite the NCP's having been restricted to his right shoulder. As noted above, however, the Claimant presented to his treating chiropractor the day after the accident complaining of both shoulder and back pain. *See* discussion *supra*. The court also finds credible Mr. Weber's

-80-

testimony that it is common for WC claims to extend beyond the specific injury identified in the NCP. *See* Tr. at 125.50-51 ("[i]t[ is] not unusual that, when that NCP is filed, [the carrier is] not aware of all of the injuries that an individual has suffered as a result of the incident"; "I have seen many claims filed where the description on the [NCP] has very little resemblance to what the actual injury turns out to be once the doctors send the reports and the medical providers do their testing").

c.     The Failure to Develop Medical Records Regarding the Claimant's Pre-Existing Back Condition

Mr. Moore had a pre-existing back condition dating to 1979. *See generally* Ex. R at 8801. Latrobe has failed argue or show how the absence of corresponding records harmed its case prior to the litigation beginning in 1996.

To the extent Ms. Haley contends that the records would have been useful in the litigation process, *see* Tr. at 130.21-22, her testimony suffers the same credibility problems as in Markle. In addition to her time having been billed out in this case, all litigation efforts were undertaken by her former law firm. If the need for prior records was clear, then her colleagues at Fried Kane would have known to develop them. As professional and competent WC lawyers, Royal's counsel could not rest on the fact that the requisite materials did not already appear in the carrier's case file; they had an obligation to get them.

-81-

Ms. Haley's criticisms cannot convincingly stop short of Fried Kane's participation, and the court has no credible expert testimony to establish that the failure to develop records was unreasonable or caused actual harm.[43]

    d.    <u>Conclusion</u>

For the reasons stated above, Royal's handling of the <u>Moore</u> file was reasonable.[44]

**9.    Robert Newell**

This Claimant's work incident occurred on October 17, 1990, when he injured his back swinging a sledgehammer. *See generally* Ex. S at 11245 (Employer's Report of Occup. Injury or Disease). Mr. Newell gave a written statement indicating that, although he felt pain at the time of the injury, it "continued to get progressively worse throughout the following week." *See id.* at 11262. On the morning of October 24, 1990, the Claimant presented to the Latrobe Area Hospital's emergency room with back pain. *See generally id.* at 11287 (Dr. Brallier's rpt. dated Oct. 25, 1990). According to the Hospital's records, the sledgehammer incident aggravated the Claimant's pre-existing back condition, but the hospital visit was precipitated by a "cough[]." *See id.*

---

[43]  In the alternative, the fact finder concludes that no actual harm resulted from Royal's failure to develop the records. Drs. Wigle and Allison opined that "there was an ongoing low back problem that related and continued from the alleged injury." *See* Tr. at 130.21 (Haley). The pre-existing back condition notwithstanding, there existed clear opinions of work-relatedness, and any suggestion that these opinions would have been overcome by evidence of pre-existing pathology is speculation.

[44]  Although Latrobe initially argued that an IME should have been conducted before the first one in August 1994, Ms. Haley later withdrew this criticism. *See* Tr. at 140.129-130.

On November 1, 1990, treating physician Dr. Holst authored a report stating that the Claimant had suffered "a new herniation . . . caused by the injury [that] occurred at work while [he was] swinging a sledge hammer." *See* Ex. 270. The following day, Dr. Holst performed a discectomy. *See* Tr. at 128.152 (Kornfeind).

On November 7, 1990, an outside firm completed an investigation of Mr. Newell's claim, finding no "evidence [to] contradict[] the [C]laimant's contention that he was injured on the job." *See* Ex. 280 at 11268-69. Among other things, this conclusion was supported by a witness statement confirming the sledgehammer incident and indicating Mr. Newell consequently suffered "some type of problem with his back." *See id.* at 11268.

Royal issued an NCP on November 11, 1990, *see* Ex. S at 11247, and the Claimant returned to work in June 1991. *See* Tr. at 128.152 (Kornfeind).

a.    <u>Acceptance of the Claim; the Coughing Incident</u>

Latrobe's criticisms of this file mostly relate to hospital notes indicating the Claimant's ER visit was precipitated by a coughing incident. *See generally* Ex. S at 11287. According to the insured, Royal should have further investigated and/or denied coverage based on the same. *See, e.g.*, Tr. at 130.30 (Haley); *cf. also id.* at 128.157 (Gordon) (confirming that Latrobe's criticism(s) relate to Royal's decision to accept claim, not claims handling thereafter).

Royal did not act unreasonably in accepting Mr. Newell's claim. The occurrence of an acute event was confirmed by, (a) the Claimant's signed, written statement; (b) the outside firm's investigation, including a witness statement, and (c) treating physician Dr. Holst's opinion of

work-relatedness.[45]

What more Royal should have done to investigate the coughing incident remains unclear. Even assuming the carrier acted unreasonably in failing to make more of the alleged incident, moreover, there is no basis for finding actual harm to Latrobe.  In light of the corroborative evidence referenced above, the fact finder court concludes that the work incident more likely than not occurred, and/or that Royal would not have been able to prove otherwise.

      b.    <u>Failure to Develop Prior Medical Records</u>

Latrobe highlights Dr. Brallier's "reference to a CT scan in 1987 that showed three level[s of] disk involvement."  *See* Tr. at 130.29 (Haley).  According to Ms. Haley, this evidence reveals that "Dr. Holst [was in]correct [in opining] that the [C]laimant had a single dis[c] problem predating [the] work incident."  *See id.*  Had the medical records been developed, Latrobe argues, Royal could have better resisted Dr. Holst's opinion.

Again, Ms. Haley lacks the expertise to second guess Dr. Holst.  Dr. Brallier's notes made clear that Dr. Holst himself evaluated the CT scan taken in 1987.  *See* Ex. S at 11287.  Said physician nevertheless concluded that the sledgehammer incident caused a new disc herniation. *See* Ex. 270.  Royal acted reasonably in relying on Dr. Holst's report, and Latrobe's suggestion that further medical records would have changed the outcome is speculation.

---

[45]  Latrobe has questioned the specific information possessed by Royal at the time it decided to accept Mr. Newell's claim.  *See, e.g.*, Tr. at 141.28-29 (Gordon, cross-exam. of Mr. Weber) (challenging whether Royal had received outside firm's investigation report before issuing NCP).  As fact finder, the court believes it more likely than not that Royal possessed the most critical information, namely the investigation report and Dr. Holst's opinion of work-relatedness, before accepting the claim.  The timing issue also is rendered moot by the actual harm/loss requirement.  *See* discussion *infra*.

c.     Conclusion

As Mr. Weber credibly testified, Royal's handling of <u>Newell</u> was both reasonable and effective.  *Cf.* Tr. at 125.85, 125.87 (noting relatively small cost of claim, and opining Royal achieved "a fantastic result on a case that could have had a long period of wage loss").

**10.     Freddie Nixon**

This Claimant was injured at work on March 17, 1992, when he fell while carrying a steel plate and injured his left knee and back.  *See generally* Ex. T at 11439 (Employer's Report of Occup. Injury or Disease).  Mr. Nixon continued to work for some time, but eventually was placed on disability in April 1992.  *See id.* at 11441 (NCP).

When it became apparent there would be a wage loss, Royal initiated the three-point contact system.  *See generally* Ex. 274 (Royal's contact sheet).  Mr. Dell confirmed the circumstances surrounding the work injury.  *See id.*  Mr. Nixon advised that he had "lost time" in the past for a pinched nerve in his back, and he noted a prior ankle injury.  *See id.*  There was no reference to prior knee pathology.  *See id.*  On this information, along with confirming diagnoses of a treating chiropractor, Royal issued an NCP.  *See* Ex. T at 11441.

On April 23, 1993, Dr. Androkites conducted an IME.  *See* Ex. T at 11680-83.  Among other things, the physician questioned the Claimant's ability to return to his former positions, and he agreed with an unspecified source's recommendation of knee surgery.  *See id.* at 11682.

Knee surgery apparently was undertaken in 1993, although the documentary record before the court does not confirm when.  *Cf. generally* Tr. at 125.57 (Weber) (suggesting surgery was done in March 1992); *id.* at 126.49 (Weber) ("Dr. Williamson" operated in March 1993);

*id.* at 130.36-37 (Dr. Wheeling conducted surgery at unspecified time).

Thereafter, the case settled for $75,000.00. *See* Tr. at 125.60 (Weber); *id.* at 128.63

(Kornfeind).

Many of Latrobe's criticisms center around medical reports developed well after the

claim was accepted. First is the February 1992 report of Dr. Hill, which predated the work injury

but only was obtained by Royal in 2000. *See* Ex. T at 00674. The report stated:

> [Mr.] Nixon . . . is on seasonal lay off . . . [, and h]e presents with
> painful crepitus in his left knee[, a symptom that] has been present
> for about six or eight weeks. . . .
>
> [Based on a review of the medical evidence, t]here is obviously
> something causing a mild painful crepitus in Mr. Nixon's left knee
> and I can't identify the pathology. . . . I have offered Mr. Nixon an
> arthroscopy . . .[,] as I think that would really be the only way of
> . . . making a diagnosis . . . . However, he is about to return to
> work . . . and can[not now] give up the time . . . . [W]e will see
> him in the future on an as needed basis only.

*See id.*

Next is the report of Dr. Develin, authored April 1, 1992 and obtained by Royal in

June 1993. *See* Ex. T at 11574. The report stated:

> [Mr. Nixon] . . . presents with complaints of knee pain. . . .
> [H]e works as a welder on high rise buildings[, and] . . . is down on
> his knees a fair amount of the time and has fallen on several
> occasions . . . . The patient [saw] Dr. Hill several weeks ago[,
> who] told him he would need to operate . . . to evaluate [his
> condition]. . . .
>
> [Mr. Nixon] states [that] in the [F]all of [19]91 he fell about 20
> feet and twisted his knee[,] putting a lot of stress on the MCL. . . .
> [O]ccasionally his knee gets red and hot[, and] now it gives him
> some pain when he walks.

-86-

*See id.*

    a.    <u>Issuance of the NCP</u>

Royal did not act unreasonably in accepting this claim.  As seen above, Mr. Dell

confirmed the acute event and did not question it.  *See* discussion *supra*.  Neither Mr. Nixon nor

his treating chiropractor gave any indication that the Claimant suffered prior knee pathology.

Once again, the insurer cannot be faulted for failing to develop prior medical records when it had

no indication that a pre-injury condition existed.

    Otherwise, there was no obvious indication of malingering, as Mr. Nixon returned to

work after the incident and only later was placed on disability.  In addition, the record confirms

that the Claimant was able to work for three years before the work incident, despite his prior

medical conditions.

    Absent the benefit of hindsight, there was no basis for Royal to question this claim.

Issuance of the NCP was proper.

    b.    <u>The Later Developed Medical Records</u>

    Latrobe highlights that Dr. Develin's notes of April 1, 1992 made no reference to the

work injury, despite his having examined the Claimant only a couple of weeks after it occurred.

*See generally* Tr. at 130.33 (Haley).  Royal only acquired the report in 1993, however, over one

year after the reasonable issuance of an NCP.  Latrobe has offered no convincing explanation

why Royal should have become privy to the report sooner and, as was true in <u>Baird</u>, it was of

little practical use after the fact.  *Cf.* discussion *supra* ("[W]hat are they going to do with this

information?  Are they going to file a petition to set aside the [NCP] a year after the fact?  I don't

think so.").[46]

Next are the notes from Dr. Hill, which predated the work injury and recommended exploratory surgery on Mr. Nixon's knee. As referenced above, these notes only were developed by Royal in 2000. Assuming *arguendo* they should have been developed sooner, the fact finder declines the implications suggested by Latrobe. *See generally* Tr. at 130.34-35 (Haley).

The insured would appear to suggest that Mr. Nixon knew he needed surgery, nevertheless went back to work, and then secured WC coverage for same. Irrespective of the Claimant's intent, Latrobe would likely argue, this was precisely what happened. *Cf. id.* at 130.37 (suggesting Royal paid for "the very surgery" recommended before work incident).

A careful examination of Dr. Hill's notes, however, reveals the contrary. Mr. Nixon went to the physician complaining of "mild painful crepitus."[47] The physician suggested exploratory surgery to determine the cause of the condition, and the Claimant declined, citing the need to secure income through work. *See generally* discussion *supra*. Dr. Hill gave no indication that the crepitus was a serious, limiting condition; he in fact suggested the contrary. *See id.* ("we will see him in the future on an as needed basis only").

---

[46] As to the substance of the report, the fact finder agrees that it is somewhat unusual the work injury was not referenced in Dr. Develin's notes. In light of the Claimant's storied past, however, it is not entirely surprising that the alleged work incident went unmentioned and/or unreported. *See generally* Ex. T at 11574 ("as a welder on high rise buildings," Mr. Nixon was "down on his knees a fair amount" and had "fallen on several occasions"); *cf. also id.* at 00675 ("[h]is past history is significant in the sense that . . . he has been in rodeos, knocked off, hit by bulls, hit by cars, stabbed, in fights and was thrown off horses"). Even assuming reasonableness would have compelled the timelier development of Dr. Develin's notes, moreover, the fact finder is not prepared to say that Royal's acquisition of the notes would or should have had a material effect on claims handling.

[47] "Crepitus (in the knees) is a fine crunching noise, usually on bending the knee from standing . . . . There is no clear consensus as to the mechanism of production of the sound." *See generally* website at http://www.kneeguru.co.uk/html/dictionary/crepitus.html.

These are different circumstances than were reported in Dr. Androkite's post-work injury report. By April 1993, the physician was discussing "burning" pain and "buckling," offering an "impression" of "[l]eft knee meniscal [cartilage] tear." *See* Ex. T at 11681. And though Dr. Androkites also discussed arthroscopic surgery, he contemplated surgical "intervention" that may have yielded "some improvement." *See id.* As fact finder, the court rejects Ms. Haley's assertion that this was the same surgery contemplated before the work incident. *See* Ex. T at 00674 (contemplating "diagnos[tic]" arthroscopy).[48]

In the end, the fact finder concludes that the Claimant's failure to reveal, and Royal's inability to more timely discover, Dr. Hill's notes did not result in the nefarious and/or unduly prejudicial scenario contemplated by Latrobe. Nor is there any basis to conclude that a sooner discovery of the notes would have changed the outcome.

    c.    <u>Conclusion</u>

Royal has carried its burden with respect to Mr. Nixon.

## 11. **<u>Donald Overly</u>**

At trial, <u>Overly</u> was cited more often as an example of a properly handled file than one containing errors. *See, e.g.*, Tr. at 125.146-47, 129.125-26, 130.61-62. Latrobe offered no expert testimony regarding the alleged mishandling of this claim, and Royal has carried its burden of persuasion. *Cf. generally* discussion *supra* (concluding that Mr. Weber's testimony, along with

---

[48] "Arthroscopy is a surgical procedure by which the internal structure of a joint is examined for <u>diagnosis</u> <u>and/or</u> <u>treatment</u> using a tube-like viewing instrument called an arthroscope." *See generally* website at http://www.medicinenet.com/arthroscopy/article.htm (emphasis added).

absence of criticism by Ms. Haley, was sufficient to carry Royal's burden).[49]

12.    **Thomas Peksa**

Mr. Peksa suffered a work fatality in March 1993. *See* Ex. V at 11892 (Employer's Report of Occup. Injury or Disease). In 1996, it was determined through litigation that two of the Decedent's children should receive benefits. *See generally* Ex. V at 11967-68. The only criticism leveled by Latrobe is that Royal should have secured annuities on behalf of the children rather than continuing to pay benefits. *See generally* Tr. at 130.48-49 (Haley); *see also generally id.* at 125.64-66 (Weber) & 130.44 (Haley) (providing background testimony regarding annuities/structured settlements).

In March 1996, Mr. Kornfeind asked claims handler Sheila Breitfeld to consider securing an annuity in Peksa, as was done in Werder (a filed discussed *infra*). *See* Ex. V at 11991. He reiterated this sentiment in March 1997, and Ms. Breitfeld has testified that, as of that point, nothing had been done. *See* Tr. at 132.102; *see also* Ex. 290 (computer notes regarding Peksa) at 13-14. Indeed, the first time Royal followed up on the matter was in March 2001, when Ms. Breitfeld contacted one of the dependent's mothers, Linda Marsh, regarding a potential annuity. *See* Ex. 290 at 11.

Over the next couple years, Ms. Marsh was contacted repeatedly regarding the annuity, but she kept putting Royal off. *See id.* at pg. 9-10. While Ms. Marsh never formally rejected the

---

[49] In her expert report, Ms. Haley raised some concerns regarding "reserves posted" in Overly. *See id.* at un-number pg. 13. In light of Latrobe's failure to revisit this criticism at trial, it is deemed waived. Alternatively, the insured has introduced no source evidence establishing that the stated concern resulted in an unwarranted inflation of incurred losses. *Cf. generally* discussion *supra* (rejecting similar argument in Freed regarding supersedeas reimbursement).

annuity, the court as fact finder concludes she was non-receptive and/or disinterested.  *See id.*

The mother of the second dependent, Nancy Peksa, was never contacted regarding an annuity.  *See generally* Tr. at 140.146 (Haley).[50]

a.    Whether Reasonableness Compelled Pursuit of an Annuity, and Mr. Kornfeind's
      Instruction to Consider the Same

The court is not prepared to say that an insurer acts unreasonably in failing to seek the entry of annuit(ies) in a WC fatality claim.  As referenced above, there are too many variables in the individual cases to make such a generalized ruling.

Nor does the court agree with Latrobe's suggestion that the reasonableness standard compelled Royal to consider purchasing an annuity "internally" when a guardian otherwise was uncooperative.  *See generally* Tr. at 125.66 (Weber) *and id.* at 128.168 (Kornfeind) (acknowledging that representative of dependent must agree to annuity, and they will not always do so); *cf. also id.* at 130.48, 140.149-150 (Haley) (discussing "internal" annuities).  This goes more to the level and degree of expertise and/or seeks an inappropriate micro-management of the claim.

But once Mr. Kornfeind specifically recommended annuit(ies) and his claims handler(s) failed to diligently follow up, <u>Peksa</u> begins to look more like a case of "slacking off."

Thus, to the degree that Royal waited over four years after Mr. Kornfeind's instruction to approach Ms. Marsh, and never contacted Ms. Peksa, the insurer did not act reasonably in

---

[50]  There is a letter in the record indicating that, before the dependency issues were resolved, Ms. Peksa was hostile toward Latrobe and refused to discuss a commutation.  *See* Ex. 275 (indicating Ms. Peksa was "quite bitter" and wanted "the [j]udge to decide").  Although Royal appears to suggest that this evidence shows Ms. Peksa would not have been interested in discussing a post-litigation annuity, the fact finder will not adopt this inference.

handling the claim.

b.     Ms. Marsh

Even though Royal mishandled the situation with this guardian, her subsequent disinterest precludes a showing of actual harm to Latrobe.  As fact finder, the court has no reason to believe that Ms. Marsh's response in 1996 would have been any different than in 2001.  The court also declines Latrobe's position that the annuity was not rejected by Ms. Marsh.  *Cf.* Tr. at 140.145 (Haley).  Royal's notes reveal a situation known in common experience as being "blown off." Had Ms. Marsh been inclined to meaningfully consider an annuity, she had ample opportunity to do so.

Royal has carried its burden of persuasion by introducing evidence that Ms. Marsh would not have accepted the annuity irrespective of when it was offered.  The reasonableness standard did not compel the insurer to establish an internal annuity, and Latrobe loses with respect to Ms. Marsh.

c.     Ms. Peksa

This guardian is another story.  Royal has introduced no evidence that Ms. Peksa was offered an annuity and rejected it.  Thus, the court has no basis for finding a lack of harm to Latrobe.

The insurer has failed its burdens of persuasion, and the Peksa file may be revisited at Phase II.[51]

---

[51]  The court questions whether the claims experts are best equipped to determine the actual harm if any that may have resulted from the confirmed mishandling referenced above.  *Cf.* Tr. at 125.65-66 (Weber) (disclaiming expertise and knowledge of interest rates to calculate potential savings resulting from

13.    **Dennis Schardt**

This Claimant was injured at work on November 1, 1992, when he strained his back

while working on airplane equipment. *See generally* Ex. W at 15617 (Royal's contact sheet).

Upon completion of the three-point contact system, Royal picked up the claim. *See id.*

Mr. Schardt returned to Latrobe in January 1993, but he suffered a recurrence and went

off again in April 1993. *See generally* Tr. at 128.173 (Kornfeind).

The Claimant submitted to an FCE in July 1993, and the results showed a capacity for

medium work. *See* Ex. W at 15827. Mr. Schardt was placed in a "Work Recovery Program" in

August 1993, but he exhibited open hostility toward Latrobe and the prospect of returning to

work there. *See id.* at 15831 (Claimant "hated [Latrobe supervisor] John Masters and [Nurse]

Hall," and "he would not go back to Latrobe . . . under any circumstances").

In a report dated November 2, 1993, Dr. Wigle noted the Claimant's assertion that he

could perform only "sedentary work," and the physician "strongly suggest[ed that Royal] find

this man a job within his stated capacities as the prospects of . . . returning to his original

employment . . . [we]re remote").

In December 1993, Mr. Schardt agreed to settle his claim for $25,000.00.

*See* Tr. at 125.93 (Weber).

a.    The NCP

Royal's acceptance of this claim was reasonable. Latrobe did not question the acute

event, and the three-point contact system properly was implemented. In addition, Mr. Schardt

---

annuities). The parties should be prepared to present witnesses with sufficient knowledge and expertise
to address the issue, or otherwise face the possibility of having their evidence disqualified or discredited.

returned to work within two months of the injury, and he remained there until suffering an exacerbation in April 1993.

b.    Claims Handling Generally, and the Favorable Settlement

Between April and August 1993, Royal made reasonable efforts to assess this Claimant's condition and try to return him to work. *See generally* discussion *supra* regarding FCE and "Work Recovery Program." The insurer was greeted with an openly hostile individual who had no desire to cooperate. *See id.*

Then, in November 1993, Dr. Wigle issues a report that essentially endorsed the Claimant's alleged restriction to sedentary work. *See id.* Notwithstanding, Royal convinced this person in his mid twenties to settle his WC rights for $25,000.00. *See id.*

The court finds credible, and therefore adopts, the opinion of Mr. Weber that this was a reasonable result:

> [T]he case was settled for $25,000[,] which is a *de minimis* settlement in my opinion. . . . [Y]ou're dealing with someone who is relatively young who could have been a problem claimant for a long time in the future. [To g]et rid of a case like that for $25,000 is not inappropriate claims handling.

Tr. at 125.92.

Any disagreement Latrobe expresses with the way this claim was handled goes more to the level and degree of Royal's expertise, not its slacking off or lacking diligence.

c.    Conclusion

Schardt was a difficult file that was reasonably handled to a favorable conclusion.

-94-

14.    **Larry Werder**

This Claimant suffered a work fatality on May 15, 1992.  *See* Ex. X at 16472 (Employer's Report of Occup. Injury or Disease).  At the time of the accident, Mr. Werder had two natural children from a prior marriage, and there appears no dispute that these individuals were entitled to WC benefits.  *See generally* Tr. at 125.69 (Weber).

The Claimant was married to a second wife, Jaci Werder, at the time of his death. *See id.*  There was some question whether Jaci was engaged in a meretricious relationship, thereby making her ineligible for benefits.  *See id.* at 125.70-71 (discussing evidence that Decedent had moved out of family home not long before accident).

Jaci Werder also had two children from a prior marriage.  *See id.*  Questions arose regarding whether these individuals were eligible for benefits under the *in loco parentis* theory. *See id.* at 125.69-70.

On December 9, 1992, Royal referred the <u>Werder</u> file to Fried Kane lawyer and named-partner Joseph Grochmal.  *See* Ex. AD at 16737.  Mr. Grochmal was retained to "try [and] negotiate with the attorney handling the estate on how the division of . . . [b]enefits should be made, and be prepared to stipulate to these issues prior to filing [a] petition."  *See id.*

On August 25, 1993, Mr. Grochmal advised Royal that he had spoken to the lawyer representing the dependent(s) and believed the parties could "resolve the issues amicably." *See* Ex. Z at 16797.  He also noted that the Decedent's natural children were alleging that Jaci Werder was living with another man, thereby "rais[ing] the spect[e]r of a possible meretricious relationship."  *See id.* at 16798.  Mr. Grochmal assured Royal, however, that "[w]e will make certain that all of the alleged dependents . . . are put to their burden of proof to

establish liability and actual dependency upon the earnings of the [D]eceased." *See id.* at 16797; *see also id.* at 16798 ("[p]lease be assured that we will do everything possible to bring this matter to a satisfactory and expeditious conclusion").

Royal also employed the services of a private investigator to look into Jaci Werder and her possible meretricious relationship. *See generally* Tr. at 132.38-40 (Breitfeld). The investigator kept the insurer apprized of his findings, which suggested but did not firmly establish that Ms. Werder was so involved. *See* Exs. AJ & AM.

On February 1, 1994, Mr. Grochmal advised Royal that counsel for the putative dependents were "close to [amicably] resolving the matter." *See* Ex. AO. In January 1996, the WCJ approved a stipulation resolving the dependency issues. *See generally* Tr. at 125.78 (Weber).

a.     <u>Mr. Grochmal's Participation and Ms. Haley's Lack of Credibility</u>

Ms. Haley concedes that this claim was handled reasonably until the time her former partner, Mr. Grochmal, outlined the dependency issues in his August 25, 1993 letter. *See* Tr. at 130.63. She goes on to imply that Royal, not the Fried Kane lawyer who assumed responsibility for the case, should be faulted for securing less investigation than Latrobe believes appropriate. *Cf. id.*

Again, Ms. Haley's attempt to stop criticism short of her former colleague makes this expert's testimony incredible. She mischaracterizes the evidence in suggesting that Mr. Grochmal assumed less than full responsibility to ensure that the appropriate dependency inquiries would be made. *See* discussion *supra* ("[w]e will make certain that all of the alleged

dependents . . . are put to their burden[s] of proof," and "[p]lease be assured that <u>we</u> will do everything possible to bring this matter to a satisfactory and expeditious conclusion") (emphasis added).  Had Royal's investigative efforts truly been unreasonable, the concededly competent Mr. Grochmal was capable of ensuring the acquisition of further information.

In light of Ms. Haley's failure to acknowledge her former colleague's participation in <u>Werder</u>, Latrobe proceeds without the benefit of credible expert testimony.

b.     <u>The Reasonableness of Royal's Claims Handling</u>

None of Latrobe's criticisms demonstrate that Royal slacked off or acted with less than reasonable diligence.  Mr. Weber testified credibly regarding how difficult it was to prove a meretricious relationship.  *See* Tr. at 125.74 ("in addition to proving that there was cohabitation" and "a reputation in the community as being in a meretricious relationship or acting as husband and wife, . . . you also had to prove intimacy, sexual relations").  Royal conducted an investigation, and it was not unreasonable merely because Latrobe would have done more.  *See generally* discussions *supra*.  Indeed, some of Latrobe's suggestions for improvement, to this fact finder, approach the realm of fancy.  *Compare, e.g.*, Tr. at 130.67-68 (Haley) (suggesting that Royal should have sought Ms. Werder's gynecological records to investigate meretricious relationship) *with id.* at 132.40 (Breitfeld) ("I don't know why I would get gynecological records"; "[i]t wouldn't prove who she was sexually intimate with or that she had a relationship"); *cf. also generally* <u>Peisach v. Antuna</u>, 539 So.2d 544, 546-47 (Fla. App. 1989) (reversing trial court's denial of protective order regarding discovery of gynecological information based on invasion of privacy concerns; "discovery of relevant, non-privileged

information may be limited or prohibited in order to prevent annoyance [or] embarrassment").

As to the *in loco parentis* relationship, Latrobe and Mr. Weber disagree regarding whether the Decedent's provision of Christmas presents to his step-children was sufficient evidence of the same. *Compare* Tr. at 125.69 (Weber) *with id.* at 130.68 (Haley). Disagreement between the experts is not the appropriate standard for measuring reasonableness. *See* discussions *supra*. In addition, Mr. Grochmal assured Royal that sufficient inquiry would be made regarding the dependency issues before the case was resolved. *See* discussions *supra*; *see also* Tr. at 126.75 (Weber) ("I can't believe [a] competent defense attorney is going to agree to pay all these benefits without information verifying the dependency"); *compare also, e.g., id.* at 130.71 (Haley) ("there should have been additional investigation . . ., and I believe there was overpayment for [the step-children], who may not have been . . . dependents") *with* Mr. Grochmal's ltr. of Aug. 25, 1993 ("[w]e will make certain that all of the alleged dependents . . . are put to their burden[s] of proof").

Finally, there is no basis to conclude the stipulation/settlement regarding dependency was untimely. The interested parties enjoyed legal representation, and the court finds credible the explanation that acquiring agreement and approval of these matters would take time. *See generally* Tr. at 125.78-79 (Weber) (confirming "complicated nature" of dependency issues in <u>Werder</u>) *and* Ex. AO (Mr. Grochmal's letter, explaining that WCJ assigned to case "recently [had] suffered a heart attack," and "[h]is convalescence status [was] uncertain").

c.    <u>Conclusion</u>

Royal has carried its burden of persuasion regarding <u>Werder</u>.

## VII.  SUMMARY OF FINDINGS AND CONCLUSIONS REGARDING THE INDIVIDUAL CLAIMS FILES

As seen above, Royal has carried its burden of persuasion regarding the following claims files:

Ralph Augustine

Merle Baird

Dennis Garland

Paul Markle

James Moore

Robert Newell

Freddie Nixon

Donald Overly

Dennis Schardt

Larry Werder

The files containing confirmed instances of unreasonable claims handling are:

Eric Depree

Harry Freed

William Jury (*de minimis*)

Thomas Peksa

These files will be revisited, but only to the extent described above, at Phase II.  *See* discussions *supra* and *infra*.

## VIII.  PHASE II OF THE TRIAL

### A.  Latrobe's Counterclaim

In connection with Latrobe's counterclaim, the parties anticipated determining whether the twenty-one claims files "constitute a statistically reliable sampling" of the hundreds of claims handled under the Policies, and whether Latrobe properly may "challenge its payment of premiums attributable to claims [it] did not review."  *See* "General Background," *supra*. The court reserved these matters for Phase II, explaining:

> [T]he extent to which the claims handling findings may, or may not, be extrapolated to the larger group of 800-plus workers' compensation files [remains to be seen]. . . .
>
> [B]ifurcating the claims handling issues for initial resolution should serve to streamline and/or simplify [this determination in] . . . . the second phase of the litigation.  If, for example, Royal is able to persuade the factfinder that it handled the claims properly under the law, the only issue that presumably would remain is the proper amount of retrospective premiums owing.  If, on the other hand, Latrobe's claims-handling evidence carries the day, the court and parties will not be forced to address the damages-related issues in a vacuum.  Either way, an initial determination regarding claims handling/liability should substantially illuminate the damages-related issues that remain in [P]hase [II].

*See* Dec. 15th Order at 2, 3-4.

The court's findings at Phase I have, indeed, "substantially illuminate[d] the damages-related issues" regarding the counterclaim.  Unfortunately for Latrobe, however, those findings preclude a recovery.

As seen above, the court has concluded as a matter of both fact and law that Royal's claims handling practices must be considered on an individualized basis.  This approach is

mandated by a number of considerations, including:  the need to evaluate the reasonableness of

claims handling on a case-by-case, and even event-by-event, basis (and the corresponding

insusceptibilities to global proofs); the court's finding of fact that Ms. Haley's criticisms do not

establish widespread, systematic claims handling problems; and the need to determine the actual

loss or harm resulting from any confirmed incidences of unreasonableness.  *See generally*

discussions *supra* at § IV(A).

The evidence at Phase I also establishes that the claims reviewed by the experts are not a

representative sampling of the remaining files.  As Latrobe itself asserts, the twenty-one claims

files were selected because they "remained open and, more particularly, [were] those claims

which drove Royal's request for additional premiums."  *See* Latrobe's Findings & Conclusions

at 2, ¶ 4.

Any notions of typicality also are undermined by the credible testimony of Mr. Weber,

who explained that Ms. Haley's conclusions regarding the number of claims that should have

been denied or further litigated well exceeded the percentages reported by Pennsylvania's

Workers' Compensation Bureau.[52]

---

[52]  Mr. Weber testified:

> The bureau in Harrisburg . . . say[s] 95 percent of the cases in the system are handled at
> the administrative level with never seeing litigation of any nature.  That means of the
> total cases in the system, five percent see litigation, and that includes all forms of
> litigation, not just where they are seeking to be put on benefits, but where I'm trying to
> maybe cut them off or reduce their benefits.

Q.     Is that low percentage of litigation consistent with the legislative intent of the act in your view?

A.     I think it is.

Tr. at 124.156 (Weber).

Latrobe has offered no evidence to refute Mr. Weber's testimony in this regard. The only logical response would be that these were <u>not</u> run-of-the-mill WC cases, a concession that further undermines Latrobe's request for extrapolation. *See, e.g.*, Tr. at 129.79 (Weber) (noting that most of fourteen cases criticized by Latrobe involved claimants with prior injury, often to same anatomical region). In fact, Ms. Haley appears to have made the best case against extrapolation:

> Q.  There has been an indication that there were . . . 886 workers' compensation claims [filed against Latrobe] from 1974 through 1995. . . . [We]re all of these claims lost time[, *i.e.*, indemnity] claims?
>
> A.  No.
>
> Q.  <u>[Do] you know approximately what percentage of these claims actually involved lost time claims</u>?
>
> A.  <u>It's my understanding about twenty percent</u>.
>
> Q.  <u>Is there a distinction between medical-only files and lost time claims with regard to how these claims were typically valued</u>?
>
> A.  <u>Typically, the lost time claims are of more significant value</u>.

*See* Tr. at 129.113-14 (Haley) (emphasis added). In light of this testimony, the court cannot imagine how extrapolation may be appropriate in this case.[53]

---

[53] This conclusion finds support in both science and the law. *See generally, e.g.*, <u>Arch v. American Tobacco Co.</u>, 175 F.R.D. 469, 493 (E.D. Pa.1997) (rejecting use of statistical evidence to overcome need to prove individual damages in putative class action); <u>Broussard v. Meineke Discount Muffler Shops, Inc.</u>, 155 F.3d 331, 343 (4th Cir. 1998) (finding damages "too dependent upon consideration of the unique circumstances pertinent to each class member," and rejecting plaintiffs' attempt to substitute "hypothetical or speculative evidence, divorced from any actual proof of damages, for the proof of individual[ized harm]") (citations and internal quotations omitted); Donald L. Harnett & James L. Murphy, <u>Statistical Analysis for Business and Economics</u> at 320 (1985) ("convenience" samples, ones selected because they easily can be obtained, are "considered the least representative and least scientific sampling technique"; "[c]onvenience sampling is not widely used in circumstances other than preliminary or exploratory studies, [ones] where representativeness is not a crucial factor"). In the alternative, the court likewise rejects Latrobe's damages theory sitting as the finder of fact. *See*

For all of the reasons stated above, the findings and conclusions made herein preclude the damages theory proposed in support of Latrobe's counterclaim. Latrobe suffers no prejudice from the court's decision not to reserve this determination for Phase II, as all of the legal and factual underpinnings were established, by necessity, at Phase I. Relatedly, no amount of further testimony or legal discourse can resuscitate Latrobe's theory; it cannot withstand the analyses above.

## B. **Remaining Damages Analyses at Phase II**

Having concluded that some of the claims files were not reasonably handled, the parties now must assess the impact these findings have on the damages determination. In the court's view, two lines of evidence are appropriate: (1) expert opinion regarding the "actual loss" or harm suffered as a consequence of the confirmed mishandling; and (2) expert opinion regarding the amount of retrospective premiums due.

As to the need for further claims handling testimony, neither party can be faulted for having failed to elicit more substantial evidence at Phase I. As reflected in the court's December 15th Order, opposing counsel did not anticipate the "actual harm" analysis in proposing how the phases of trial should proceed. Nor did the court, having failed identify the inquiry in its discussion of the two phases. *See generally* Doc. 118 at 1-4.

Even had the issue come into focus earlier, the court's frequent likening of Phase II to a "damages" inquiry reasonably would have led the parties to believe it appropriately was reserved

---

*generally* <u>Omicron Sys., Inc. v. Weiner</u>, 860 A.2d 554, 564-65 (Pa. Super. 2004) ("[t]he determination of damages is a factual question to be decided by the fact-finder," who "may not render a verdict based on sheer conjecture or guesswork") (citation and internal quotations omitted).

for the second phase. *Cf., e.g.*, Tr. at 129.22, 129.160-61, 130.71 (court) (sustaining objections to valuation inquiries regarding incurred losses in specific claims files).

In any event, the "actual harm" issue has arisen through the courts analyses above, and to ignore it now would be error. The court notes, moreover, that reserving the issue for Phase II should yield substantial economy, as the experts now may restrict their testimony to the claims files found to have been improperly handled.

Once this testimony has been proffered, the court and parties may proceed to expert evidence regarding the calculation of retrospective premiums and, to the extent appropriate, interest due.

## IX.  CONCLUSION

The foregoing facts and conclusions hereby are adopted regarding Phase I of the trial. Shortly, chambers will contact counsel to schedule a status conference to discuss Phase II and whether settlement discussions or mediation may prove fruitful.[54]

IT IS SO ORDERED.

January 6, 2006

Francis X. Caiazza
U.S. Magistrate Judge

---

[54] The parties should hold in abeyance any anticipated filings pending the conference.

-104-

cc:

Bruce C. Fox, Esq.
Yarone S. Zober, Esq.
Obermayer, Rebmann, Maxwell & Hippel
500 Grant Street, Suite 5240
Pittsburgh, PA  15219-2502

Mark Gordon, Esq.
Timothy R. Smith, Esq.
Pietragallo, Bosick & Gordon
One Oxford Centre, 38th Floor
Pittsburgh, PA  15219