IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ROYAL INSURANCE COMPANY OF AMERICA, an Illinois Corporation, ROYAL INDEMNITY COMPANY, a Delaware Corporation, and AMERICAN AND FOREIGN INSURANCE COMPANY, a Delaware Corporation, | ) ) ) ) ) ) ) | Civil Action No. 00-2128  The Hon. Francis X. Caiazza Chief Magistrate Judge |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| LATROBE CONSTRUCTION COMPANY, | ) ) | |
| Defendant. | ) | |

**BRIEF IN SUPPORT OF MOTION
TO STRIKE TESTIMONY OF GERALD CHIMENTI**

## I. <u>INTRODUCTION</u>

Phase II of the litigation between these parties was to determine: (1) "actual loss" suffered as a consequence of the claims mishandling; and (2) the amount of retrospective premiums due to Royal. (Findings of Fact and Conclusions of Law, 1/6/06, p 103). During Phase II, Royal presented the testimony of Peter Weber, Gerald Chimenti and Diane Leger.

Royal's damage claim is based upon the calculations and testimony of its expert, Gerald Chimenti ("Chimenti"). At the close of Royal's damage case, Latrobe requested that the Court preclude the testimony of Chimenti because his opinions lacked the requisite factual foundation to establish any claim for damages by Royal. The Court agreed to consider this matter upon written Motion and Brief. Accordingly, Latrobe presents this Brief in support of its Motion.

The uncontroverted facts are:

- There is not a single document that Chimenti purportedly relied upon to assess damages in the case that has been authenticated for accuracy.

- There is not a single document that Chimenti relied upon that has been established as a business record maintained by Royal that would address the dispute on damages;

- Chimenti did not address earned premiums, premium payments and/or credits in the retrospectively rated plan years between 1974 and 1980, which Chimenti concedes would be necessary to address the issue of what premiums are due to Royal or, alternatively, returnable to Latrobe;

- There are no business records of Royal, which confirm that which was paid by or on behalf of Latrobe in the form of premiums or, alternatively, which reflect a draw-down of collateral to offset premium demands in the retrospective plan years, nor does Chimenti claim that he has ever reviewed such documents;

- Without a factual basis, Chimenti asserts that a Statement of Account and a 1999 letter (Exhibit AS), both of which were provided to him after he had issued his July 10, 2003 report, allowed him to conclude that premiums earned from retrospectively rated plans between 1980 and 1995 were properly billed, paid and credited to the Latrobe account through 1994, inclusive;

- Without a factual basis, Chimenti assumes that no premiums were received from or on behalf of Latrobe after 1999;

- Without a factual basis and without having reviewed a single claim file, Chimenti assumes that the 2002 loss run, provided to him by Royal's counsel, accurately reflected total incurred values that were actually paid out on the Latrobe claims.

Accordingly, as will be seen below, Royal has offered no evidence that would qualify as a factual foundation for the assumptions that Chimenti has made. As a result, Chimenti's testimony is unreliable.

## II.  STATEMENT OF THE CASE

**A.    The Scope of the Dispute Between the Parties Relates to Retrospectively Rated Plans in Effect from 1974 to 1995.**

For 21 consecutive years beginning September 1, 1974, Latrobe purchased workers' compensation insurance policies from Royal.  The policies were issued annually, but final premiums were based upon a series of 3-year retrospective premium agreements.

Royal unsuccessfully attempted to limit this dispute to the 1980-1995 program years. It was apparent that Chimenti was unaware that Latrobe had objected to the premiums charged in the earlier plan years (1974-1980); that the parties had failed to reach a stipulation that premiums charged between 1974-1980 were properly charged and/or payments properly credited for Latrobe's account; and that this Honorable Court concluded that the scope of the dispute between the parties relates to all retrospectively rated plans in effect from 1974-1995.   (Findings of Fact and Conclusions of Law, 1/6/02, p. 10).

**B.    In Order To Determine Whether Premium is Owed to Royal or, Alternatively, Returnable to Latrobe, One Must Establish the Financial Arrangements and Review Each Retrospectively Rated Plan Year.**

During Phase II of the litigation, the Court once more confirmed its understanding that there remained a dispute with regard to what premiums had been paid by or on behalf of Latrobe and what premiums were actually credited to Latrobe by Royal.  (N.T. 5/2/06, pp. 56-57).

It is axiomatic that, in a claim for contractual damages, it is incumbent upon the party claiming damages to establish that to which it is entitled (based on that party's performance), that which the party billed, and that which was received by the other party to the contract.  See,

Technology Based Solutions, Inc. v. Electronics College, Inc., 168 F.Supp.2d 375 (E.D. Pa. 2001); Perry v. Sonic Graphic Systems, Inc., 94 F.Supp.2d 616 (E.D. 2000); Halstead v. Motorcycle Safety Foundation, Inc., 71 F.Supp.2d 455 (E.D. Pa. 1999). Without this factual predicate, where does one start to calculate what is or what is not owed?

In any breach of contract action, plaintiff has the burden of proving damages resulting from the breach. Bostick v. ITT Hartford Group, Inc., 82 F.Supp.2d 376, 378 (E.D. Pa. 2000); Safeguard Scientifics, Inc. v. Liberty Mutual Insurance Co., 766 F.Supp. 324, 334-35 (E.D. Pa. 1991); Spang & Co. v. United States Steel Corp., 545 A.2d 861, 866 (Pa. 1998). As will be evident, Royal's claim should fail because there is no competent evidence of record to establish what Latrobe had paid in response to Royal's request for premiums.

Chimenti testified that in a retrospectively rated program, an insured can make direct premium payments to its insurer; an insured may make premium payments through its broker or through a factor under a premium finance agreement, or, alternatively, an insurer can draw down collateral posted by the insured to offset the claim for premium allegedly owed by the insured. (N.T. 5/2/06, pp. 82-84). Chimenti agreed that he would not have been the right person to inquire as to what Royal maintained in the way of business records that would establish the types of payment relationship that Royal had with its insureds. (N.T. 5/2/06, pp. 84-85). Chimenti offered no testimony that he was specifically aware of financial relationships Royal had with Latrobe with regard to premium payments and/or premium crediting. Chimenti did not know what premiums were directly paid by Latrobe; Chimenti did not know what premiums were paid on behalf of Latrobe through a broker or factor; and Chimenti did not know whether there was collateral in place for the benefit of Royal that would serve to offset Royal's claim for premiums. (N.T. 5/2/06, p. 85).

Financial responsibilities under the seven consecutive 3-year retros are dependent.  The ultimate responsibility for any payment of additional premium or, conversely, any responsibility for return of premium, cannot be determined unless one reviews the extent to which premium was earned in all open retrospectively rated plans; the extent to which premiums were paid by or on behalf of an insured in each of the plan years; and/or the extent to which premium claims are to be offset as a result of collateral draw-down in each of the plan years.  Royal does not dispute this.

Chimenti testified as to what one must do in order to calculate premium obligations in the Latrobe program. (N.T. 2/8/05, p. 103).  To determine how much premium is due from or returnable to the insured, one must look to each of the open retrospectively rated plan years, as loss development in each of the plan years will have a bearing on whether additional premiums are owed or, alternatively, returnable in the given plan year.  Chimenti agreed that where there were multiple retrospectively rated plans in existence, the carrier should issue a statement to its insured, identifying each of the open plan years; what premiums the insurer claimed were due or refundable for each plan year; and then, net out the result.  To this end, Chimenti testified:

> Q:    And then they would net it out, and they say in this year maybe we owe you something, and this year you owe us something, and they [sic] would be a net value?
>
> A:    That's true.
>
> Q:    So that at least in the case of Latrobe Construction Company, to determine whether premiums are actually owed for a particular term, you have to determine whether there is money that is returnable in the prior terms, yes?
>
> A:    To net it out, that's what you have to do.

(N.T. 2/8/05, p. 103). Accordingly, in order to calculate premium obligations of the parties at any date in time, one must review plan data from the initiation of the retrospectively rated programs since 1974. This is the only proper manner to establish the parties' respective net obligations to one another.

Notwithstanding the Court's holding that the 1974-1980 retrospectively rated plan years remained at issue, and the Court's recognition that Latrobe was not stipulating that it had been properly billed for premium and had been properly credited for premium paid, Chimenti concedes that he did not look at the financial data for the 1974-1980 plan years and could offer no opinion regarding what premiums were billed, paid or returnable in said years. (N.T. 5/2/06, p. 64)

By his own testimony, Chimenti effectively concedes that he has failed to do that which he agrees was necessary to address the premium obligations of the parties. This failure, alone, undermines the reliability of Chimenti's testimony.

**C.    Chimenti's Assumption, that All Premiums Billed to Latrobe Between 1980 and 1995 Were Reasonable, Properly Billed, Properly Paid and Properly Credited to Latrobe as of 1994, is Not Supported by Evidence of Record.**

Notwithstanding Chimenti's claim that he had reviewed "boxes of documents,"[1] at the time he issued his July 10, 2003 report, he concedes that he was unable to determine how much premium was payable or returnable, because he did not have sufficient information to determine what had been previously paid by or on behalf of Latrobe or credited to the Latrobe account.

---

[1] For the time being, Latrobe shall put aside the fact that Royal has not offered any evidence as to the authenticity, validity or reliability of any documents reviewed by Chimenti.

-6-

(N.T. 5/2/06, p. 58). Before Chimenti could calculate the amount of premium owed, it was necessary for him to have an understanding as to what premiums were allegedly earned by Royal and billed by Royal; what premiums were paid by or on behalf of Latrobe; and/or what was credited to the Latrobe account. To this end, Chimenti claims to have received two documents from Royal's counsel.[2] (N.T. 5/2/06, p. 68). These documents purportedly satisfied him that all premiums earned by Royal from 1980 and thereafter had been properly billed, paid and credited through 1994, inclusive.[3]

The evidence relied upon by Chimenti included a 1999 letter purported to be from a David Hooper[4] of Royal to Royal's former attorney, Gene Giotto[5] (Ex. AS), and a Statement of Account, which was alleged to have been a summary completed by some unknown person, at some unknown point in time, presumably from some unidentified corporate documents, that Chimenti claims to have utilized to reach his conclusion that each of the parties had met their financial obligations to one another through 1994. As will be seen below, Chimenti's reliance on these documents is not warranted.

Dianne Leger's testimony in this regard is significant. Ms. Leger, Royal's corporate designee for underwriting, offered testimony by way of deposition on September 16, 2003, and offered trial testimony in Phases I and II of the litigation. Ms. Leger testified that Royal maintains ledgers that would confirm the extent to which earned premiums were received and booked for an account. (Ex. BB, Leger Depo., 9/12/03, p. 42). She further testified that such ledgers and other documentation that confirm the extent to which premiums have been credited to an account are provided by the Premium Accounting Service Department. (Ex. BB, Leger

---

[2] Mr. Fox did not testify.
[3] As noted above, Chimenti never addressed the remaining open programs from 1974-1980.
[4] Mr. Hooper did not testify.

Depo., 9/12/03, p. 45). Ms. Leger, herself, was not able to testify as to what the ledger documents look like. (Ex. BB, Leger Depo., 9/12/03, p. 43). She was not able to produce such documentation, noting that evidence of that which has been paid and credited by Royal is something that would be provided by the Premium Accounting Service Department. (Ex. BB, Leger Depo., 9/12/03, p. 45). However, no representative of that department offered testimony in this case, nor have the ledgers ever been produced.

Chimenti, himself, has never seen the ledgers. (N.T. 5/2/06, p. 61). Nor has he ever spoken to any individual in the Premium Accounting Service Department. Rather, he assumes that the Statement of Account that had been provided to him by some unknown person, without authentication and not subject to cross-examination, allows him to determine what was actually received from or on behalf of Latrobe.

The testimony of Dianne Leger, Royal's corporate designee, belies such a contention. In her deposition, she concedes that the Statement of Account would not reflect that which was actually paid by or on behalf of Latrobe and when it was paid. (Ex. BB, Leger Depo., 9/12/03, pp.58-60).[6]

Even if the Statement of Account had contained information that purported to confirm what premiums were received and properly credited to the Latrobe account, there was no evidence offered by Royal that this Statement of Account was a business record, reliable or accurate. Latrobe was denied the opportunity to inquire regarding the details of the Statement of Account. Chimenti, himself, did not know who at Royal had prepared the Statement of Account.

---

[5] Mr. Giotto did not testify.
[6] It would appear that Chimenti recognized this flaw, for when pressed on the extent to which premiums were paid and credited to Latrobe, Chimenti claimed, on the one hand, that he relied on Raabe's report, whom he assumed had more information than that which he had been provided. "I can only assume that he relied upon other Latrobe

(N.T. 5/2/06, p. 72). He did not know what, if any, actual business records were reviewed to calculate that which was contained therein. (N.T. 5/2/06, p. 73). The best that Chimenti could state was that *if* the Statement of Account was prepared from Royal's business records, it should be accurate. (N.T. 5/2/06, p. 76). However, Royal offered no testimony (nor could Latrobe cross-examine) to establish how the document was prepared, by whom it was prepared, whether the document was accurate and whether it was, in fact, prepared from documents kept in the ordinary course of business by Royal.

Chimenti's reliance on the 1999 letter is also misplaced. Setting aside for the time being the hearsay objection that was raised by Latrobe to the introduction of this letter, Chimenti would have the Court believe that the letter, purportedly issued by David Hooper of Royal to Attorney Gene Giotto, establishes that premiums were properly billed to Latrobe for the 1980-1995 plan years; and that prior to 1995, there had been no dispute by either party regarding the legitimacy of the billings and the extent to which premiums were credited. Chimenti must so contend, for if there is no competent evidence to establish that the parties agreed prior to 1994 that premiums were properly billed, paid and credited, he cannot establish what premiums are actually owed secondary to "loss developments" in each of the open program years. Unfortunately for Chimenti, Mr. Hooper's letter, in addition to being of questionable admissibility, suggests only that Royal had no problems with the insured paying premiums until the adjustment valued in 1995. (Ex. AS). Contrary to Chimenti's representations, the Hooper letter does not confirm that the historical payments made by or on behalf of Latrobe were properly credited to the Latrobe account. Certainly, Latrobe's reluctance to pay premium for the 1995 adjustment and its filing of

---

records or independently verified the amount that Latrobe paid." (N.T. 5/2/06, p. 63). In a turn of events, Chimenti ultimately claims that he did not rely on Raabe's report. (N.T. 5/2/06, P. 125).

its Counterclaim in these proceedings establishes that Latrobe did not believe that Royal had treated it fairly.

Chimenti's attempts to assert that prior to 1995, Latrobe agreed that it had been properly billed premium and that Royal had properly credited Latrobe for all prior retrospectively rated premiums that were paid and/or credited through a draw-down of collateral. No such agreement exists. Moreover, even if one were to rely on the 1999 letter (Ex. AS) for the premise that no premium was due and owing and/or returnable as of 1999, Royal has offered no testimony that it did not receive additional premiums since 1999 and/or had not drawn down collateral to offset premiums claimed since 1999.  Chimenti simply assumes that no additional payments were received or credited since that time, without factual foundation, i.e., no one appeared at trial to establish that which had been received or credited as of the time of trial.


### D.     A Further and Fatal Flaw in Chimenti's Expert Testimony is his Reliance upon the Accuracy of the Incurred Loss Values as Reported in the 2002 Loss Runs.

There is no dispute that the "total incurred values" constitute the most substantial and variable financial component of the calculation of earned premium. (Findings of Fact and Conclusions of Law, p. 5; Exhibit BB, Leger Depo., p. 33).  Ironically and fatally, Royal did not offer any witness who could justify Chimenti's reliance on the total incurred values contained in the 2002 loss runs to calculate the earned premium for the 1980-1995 retrospectively rated claim years.[7]  The 2002 loss runs are not self-authenticated.  Testimony was required, and it was not presented.

---

[7] Royal chose not to offer loss run data for any retrospectively rated years other than the 1983-1986 programs. (See Exhibits 5, 45, 46, 51, 51 and 66).

Both at trial and in deposition, Chimenti admitted that he is not in a position to offer an opinion as to the adequacy of Royal's conduct with regard to the investigation, management and settlement of claims. Further, he concedes that he never reviewed the claims that are the subject matter of this contest. (N.T. 5/2/06, p. 94).

To determine the extent to which premiums were earned by Royal for the 1980-1995 retrospectively rated plans, Chimenti relied upon "total incurred values" that were contained in the 2002 loss runs. (N.T. 5/2/06, p. 86). He did not consider the possibility that the total incurred values provided to him contained inaccuracies. (N.T. 5/2/06, p. 86). He did, however, agree that he has no first-hand knowledge that the information provided to him by Royal was accurate. (N.T. 5/2/06, p. 94).

Not having actually reviewed claim files, Chimenti could not determine whether the amounts reflected as paid in the claim files can be reconciled against the loss data provided in the 2002 loss runs. (N.T. 5/2/06, p. 94). Cross-examination of Chimenti in Phase II established that his reliance on the accuracy of the 2002 loss runs was misplaced.

Chimenti was asked to review the 2002 loss run for the Augustine claim. Augustine sustained a work injury in November of 1994. The Augustine claim file was produced to Royal's liability expert and to Latrobe's liability expert in 2003. Both experts, and thereafter this Court, noted that Augustine had been released to return to work in September of 1996, at which time the claim closed. Evidence produced in Phase II established that Augustine would have received an indemnity pay-out of approximately $46,000.00. (N.T. 5/2/06, p. 98). Chimenti testified that he would have expected the loss run to have reflected a similar value. However, when reviewing the 2002 loss run for the Augustine claim, he conceded that the indemnity pay-out was $167,934.00. (N.T. 5/2/06, p. 99, Exhibit AT) Chimenti further conceded that to confirm

the reliability of the indemnity value set forth in the loss run, it would be necessary to review the Augustine claim file. (N.T. 5/2/06, p. 98). Notably, Chimenti could not explain the $122,000.00 discrepancy. (N.T. 5/2/06, p. 100).[8]

Likewise, Chimenti was asked to review the 2002 loss run for Younker, who had filed a claim for cancer resulting from alleged exposure to silica under the 1995 policy year. The 2002 loss run reflected an indemnity reserve value of over $48,000.00. (N.T. 5/2/06, p. 102, Exhibit AV). Chimenti learned, however, that the 1995 claim had been denied in 1997 by the workers' compensation judge on the grounds that the claimant could not offer evidence to establish causation. (Exhibit AU). Chimenti could not explain why Royal maintained the $48,000.00 reserve. He had no explanation for this discrepancy. (N.T. 5/2/06, p. 103).

Next, Chimenti was asked to reconcile the amount that was payable in indemnity on the Freed claim versus that which was confirmed to have been paid on the 2002 loss run. (Ex. AW). Taking into consideration the overpayment that was documented in the loss runs as a result of the failure of Royal to timely request a supersedeas and the amount that was charged to Royal and Latrobe in the form of a penalty for violating the law, Chimenti could still not reconcile that which was payable versus that which was contained in the loss run. Again, Chimenti offered no explanation for this difference. (N.T. 5/2/06, pp. 108-109).

In an attempt to rehabilitate Chimenti's reliance on the 2002 loss runs, Royal presented Ms. Leger's testimony. Ms. Leger indicated that, sometime in the late 1980's, Royal developed a computer system referred to as CLASS. (N.T. 5/3/06, p. 12). Apparently, Ms. Leger was attempting to demonstrate for the Court that any monies referenced in the loss run would have

---

[8] No one on behalf of Royal reviewed the claim other than Peter Weber, who could confirm only 22 months of disability in the reports which he generated in 2003 and in the testimony proffered to the Court in 2005, upon which this Honorable Court relied.

actually been paid out on the claim. Ms. Leger's testimony fails, for multiple reasons. She asserts that the CLASS system was not installed for Latrobe until the late 1980's. The vast majority of Latrobe's claims occurred prior to the 1980's. (N.T. 5/3/06, p. 12). No testimony was offered by Ms. Leger to establish that loss run values for those claims handled prior to the implementation of CLASS would have accurately reflected that which was actually paid on claims that pre-dated the late 1980's. As for Ms. Leger's contention that actual pay-outs made on claims which occurred in the late 1980's and thereafter under the CLASS system would be accurately reflected in the loss runs, such is implausible. Ms. Leger would have this Court believe that the $122,000.00 of additional total incurred indemnity values on the Augustine claim, reflected in the alleged loss run of 2002, accurately depicted that which Royal actually paid out. She seeks to have the Court accept this premise, notwithstanding the fact that she freely conceded that she had not reviewed the claim file and could not provide the Court with an explanation as to how it was that the two claims experts, who actually reviewed the Augustine claim, testified that the Royal file evidenced only a 20-month pay-out. (N.T. 5/3/06, pp. 13-14).

With regard to the Younker claim, Ms. Leger attempts to explain the pay-out by contending that the 1995 claim was "re-opened." (N.T. 5/3/06, pp. 11-12). However, the trial evidence does not support this premise. Latrobe offered two decisions that reflected the agreements of Younker's Estate and Royal. (Exs. AY and AZ). Those decisions revealed that Royal had agreed to pay the Estate of Younker for a 1999 silica claim with Younker's resultant death in 2001. (N.T. 5/3/06, pp. 17-18). No explanation was offered as to why a pay-out - on a 1999 claim - was reflected in the 2002 loss runs under a 1995 claim. (N.T. 5/3/06, p. 19). Moreover, Ms. Leger could not explain why Royal paid any monies to the Estate for a 1999 injury claim, as she concedes that it last insured Latrobe in 1995. (N.T. 5/3/06, p. 19).

Ms. Leger offered no testimony in an attempt to reconcile the apparent differences between that which was paid out in the <u>Freed</u> claim and that which was reflected in the loss run.

In summary, there is no reason for the Court to conclude that Chimenti's assumption, that the 2002 loss runs accurately reflected that which was actually paid out by Royal, is founded in fact. His reliance is simply unreliable.

## III. <u>ARGUMENT</u>

A threshold requirement for the admissibility of expert testimony is that it must be based upon sufficient facts or data. Fed. R. Evid. 702. Instantly, it is the burden of the plaintiffs to establish the reliability and fit of Chimenti's testimony by a "preponderance of the proof." See Fed. R. Evid. 702; <u>Soldo v. Sandoz Pharmaceutical Corp.</u>, 244 F. Supp. 434 (W.D. Pa. 2003); <u>In Re TMI Litigation</u>, 193 F.3d 613, 663 (3rd Cir. 1999). Recently, the Eastern District explained the roles of both the testifying expert and the party attempting to offer expert testimony:

> "It is the obligation of the expert to formulate an opinion based on reliable data and his own expertise. The burden rests upon the party putting forward the expert opinion to establish its reliability."

<u>Out-A-Sight Pet Containment, Inc. v .Radio Systems Corp.</u>, 330 F.Supp. 535, 538 (E.D. Pa. 2004) *citing* <u>In Re Paoli R.R.Yard PCB Litigation</u>, 35 F.3d 717, 774 (Ed Cir. 1994). In this matter, Chimenti has failed to base his opinion upon reliable data. Through its submission in Phase II of this case, Royal has failed to present an adequate factual foundation to establish the reliability of Chimenti's damage opinion.

Speculative expert opinion, unsubstantiated by evidence in the record, cannot satisfy an element of Plaintiffs' cause of action. See <u>Borough of Olyphant v. PP&L, Inc.</u>, 2004 U.S. Dist. LEXIS 8958 (E.D. Pa. May 14, 2004). The Third Circuit has held, "the factual predicate of an expert's opinion must find some support in the record." <u>Tobin v. The Haverford School</u>, 936 F. Supp. 284 (E.D. Pa. 1996); <u>Pennsylvania Dental Ass'n. v. Medical Service Ass'n. of Pennsylvania</u>, 745 F.2d 248, 262 (3rd Cir. 1984)(*citing with approval* <u>Merit Motors, Inc. v. Chrysler Corp.</u>, 569 F.2d 666 (D.C. Cir. 1977). As the Supreme Court has observed, an expert should be able to explain the link between the facts and the result:

> Conclusions and methodology are not entirely distinct from one another. Trained experts commonly extrapolate from existing data. But nothing in Daubert or the Federal Rules of Evidence require a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion offered.

G.E. v. Joiner, 522 U.S. 136, 146, 118 S.Ct. 512, 519, 139 L.Ed.2d 508 (1997). Here, Chimenti could not explain the gaps between the relied-upon data and his opinions. Chimenti arbitrarily began his calculations with the 1980 program year, ignoring the earliest six years of the retrospectively rated programs that remained open for the company, and based his opinions on unreliable data.

When considering a challenge to expert testimony under Rule 702 and 703, the Court must assess whether there are "good grounds" to rely on the data adduced in support of the expert's opinion. In Re Paoli Railroad Yard PCB Litigation, 35 F.3d 717, 748-49 (3rd Cir. 1994). If a Court finds an absence of "good grounds on which to find the data reliable", the expert's testimony must be excluded. See Id. at 748; See also, In Re TMI Litigation, 193 F.3d at 697.

When a trial judge analyzes whether an expert's data is of a type reasonably relied on by experts in the field, he or she should assess whether there are good grounds to rely on this data to draw the conclusion reached by the expert. If the data underlying the expert's opinion is so unreliable that no reasonable expert could base an opinion on it, the opinion must be excluded. Thus, the key inquiry is reasonable reliance and that inquiry dictates that the trial judge must conduct an independent evaluation into the reasonableness of the facts or data upon which reliance is placed. In Re TMI Litig., 193 F.3d 613, 697 (3d Cir. 1999) quoting In Re Paoli R.R. Yard PCB Litigation, 35 F.3d 717, 748-749 (3d Cir. 1994).

In this matter, Royal has not presented sufficient evidence to demonstrate that Chimenti's reliance upon the Hooper correspondence, the Summary of Account or the loss runs is justified. No evidence was presented to either authenticate these documents or to permit an inquiry as to the merits of Mr. Chimenti's reliance before the Court.  Based upon the trial record, there are not good grounds for Chimenti's reliance.

The Third Circuit Court of Appeals supports the exclusion of expert testimony that is based upon an insufficient or unreliable factual foundation.  See Montgomery County v. Microvote Corporation, 320 F.3d 440 (3d Cir. 2002).  In Montgomery, the Third Circuit affirmed the exclusion of expert testimony when the proffered expert did not know the source or basis of documents upon which his opinion was based.  See Montgomery, 320 F.3d at 448-449. This is precisely what this Honorable Court is presented in the instant case.

The Montgomery action was commenced following the malfunction of an electronic voting system. The county brought action against the entities that designed and sold the system. At trial, one of the defendants attempted to offer videotaped expert testimony to support the defendant's position that the system met or exceeded the Federal Election Commission's standards.  See Montgomery, 320 F.3d at 448.  Upon challenge, the District Court barred the testimony of the expert, who conceded that he did not know the source or basis of the documents upon which his opinion was based.  These concessions led the District Court to believe that the expert's testimony should be barred because it did not rest on sound data.

Citing the U.S. Supreme Court's decision in Kumho Tire Co., 526 U.S. 137 (1999), the trial judge held that the expert's testimony was unreliable, specifically noting:

> I'm a little concerned about some of the things that were
> shown to him.  He didn't seem to know where they

> were from or what the source of them were.  <u>That, I find</u>
> <u>disturbing</u>.

<u>Montgomery</u>, 320 F.3d at 348 (emphasis added).

On appeal, the Third Circuit for the U.S. Court of Appeals agreed with the District Court, noting that the trial judge was correct in its election to preclude the expert's testimony on the grounds that his opinions were unreliable in the face of these concessions.

The holding and rationale of <u>Montgomery</u> are particularly applicable to this case. Instantly, an examination of the documents supporting Chimenti's opinions likewise demonstrates their unreliable nature.  Essentially, to reach his opinions, Chimenti relies upon a "summary of account" and the 2002 loss runs.  The summary was purportedly prepared by the Plaintiff and provided to Chimenti by counsel for Royal.  Chimenti does not know who prepared the "summary" nor does he know what the source documents were.  Royal offered no evidence to justify any reliance upon this summary to indicate when it was prepared, who prepared it, or what was utilized to prepare it.[9]  As to the loss run, an examination of three of the claims demonstrated that reliance is unfounded.  Similarly to the expert in <u>Montgomery</u>, <u>supra.</u>, neither Chimenti nor any Royal witness reviewed the <u>actual data</u>—the claims files—to reconcile any loss run information against the activity as reflected in the claims file.

Historically, district courts have excluded expert testimony relating to damage calculations when not based upon a proper factual foundation.  See <u>Benjamin v. Peters Farm Condominium Owners Association</u>, 820 F.2d 640, 643 (3rd Cir. 1987); <u>Gumbs v. International Harvester, Inc.</u>, 718 F.2d 88, 98 (3rd Cir. 1983).  In each of these actions, the Third Circuit held

---

[9] Further, as noted above,  Ms. Leger's concessions undermine Chimenti's reliance, wherein she testified that one could not determine from the Statement of Account what premium was properly credited to the account and when.

that an expert's lost future earnings opinion was too speculative to be presented to the jury because of its insufficient factual foundation.

Pennsylvania District Courts continue to exclude expert damage testimony that is not based upon a reliable or sufficient factual basis. See, for example, <u>Out-A-Sight Pet Containment, Inc. v .Radio Systems Corp.</u>, 2004 U.S. Dist. LEXIS 13256 (Eastern Dist. Pa.,  July 9, 2004). There, the trial court examined the soundness of the expert's reliance upon a business plan prepared by the plaintiff.  In excluding portions of the expert's testimony, the trial court held that the requisite "good grounds on which to find the data reliable" did not exist. <u>Id.</u> at p. 9.

Other Courts of Appeals have similarly excluded expert opinions not grounded in the facts of a case.  See, e.g., <u>Quinones-Pacheco v. American Airlines, Inc.</u>, 979 F.2d 1, 6 (1st Cir. 1992) (because the expert's analysis was predicated on an assumption not supported by the record, the district court did not err in excluding the proffer.)

It is apparent that the Federal Rules require expert testimony to be accompanied by a sufficient factual foundation.   An expert opinion, without sufficient or reliable factual foundation, has the ability to mislead the fact-finder and does not comply with the "fit" requirement of Rule 702.

## IV. **CONCLUSION**

The factual foundation for Chimenti's expert testimony on damages fails on several fronts.

Initially, Chimenti wrongly ignores the activity in the program from 1974 to 1980, which he effectively concedes was necessary to determine what premiums are payable versus that which are returnable. Secondly, no factual support was introduced to justify reliance upon the 1999 correspondence of Mr. Hooper or the summary of account. Finally, both parties are in accord that the total incurred values posted by Royal on the Latrobe claims by Royal's adjusters constituted a substantial and variable factor in determining whether premiums were due from and/or owing to the insured under the retrospectively rated program. Royal, however, has no evidence to support that the total incurred values that it utilized for the retrospective formula, and which were relied upon by Chimenti to calculate the premiums, accurately and fairly reflected what the total incurred values should have been for these claims. To the contrary, Latrobe has demonstrated that grounds for reliance do not exist.

Despite ample opportunity to do so, Royal failed to produce documents to support its contention that premiums are due and owing. Royal was given ample opportunities to do so. First, in discovery, Royal failed to produce documents which had been requested that would evidence that which was actually received from Latrobe, on Latrobe's behalf and/or credited to the Latrobe account. In her deposition Ms. Leger was questioned about these documents; yet, again, neither she nor Royal produced any documents. Finally, at trial, Royal was given the opportunity to produce documents to support its premium claims; yet, it did not do so.

Royal's failure to come forward with required documentary evidence and witnesses who could authenticate them undermines its case in two manners. First, there is no basis for its

expert's testimony.   Second, Latrobe's due process right of cross-examination has been eliminated. This Court cannot and should not countenance such failures.

If one were to assume that the Hooper letter relied upon by Chimenti was sufficient to establish that premiums were owed and unpaid through the date of the letter in 1999, Royal has offered no evidence to establish that there has been no premiums received in the form of payment and/or draw-down of collateral since that time.

Finally, even if Chimenti's testimony was admissible under the most lenient of standards, his testimony should be accorded no weight because of its obvious unreliability.

As such, Chimenti's testimony should be stricken or, alternatively, ruled inadmissible.

Respectfully submitted,

PIETRAGALLO, BOSICK & GORDON LLP


By:   /s/ Mark Gordon
        Mark Gordon, Esq.
        Timothy R. Smith, Esq.

One Oxford Centre, 38th Floor
Pittsburgh, PA 15219
(412) 263-2000 - phone
(412) 261-5295 – facsimile
MG@PBandG.com
TRS@PBandG.com

Counsel for Defendant/Counterclaim Plaintiff,
Latrobe Construction Company

## CERTIFICATE OF SERVICE

I hereby certify that on May 26, 2006, I electronically filed the foregoing **MEMORANDUM IN SUPPORT OF MOTION TO STRIKE TESTIMONY OF GERALD CHIMENTI** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

Bruce C. Fox, Esq.
Obermayer Rebmann Maxwell & Hippel LLP
US Steel Tower
600 Grant Street, Suite 5240
Pittsburgh, PA 15219
*Counsel for Plaintiffs*


PIETRAGALLO, BOSICK & GORDON


By:    /s/ Mark Gordon
      Mark Gordon, Esq.
      Timothy R. Smith, Esq.

Counsel for Defendant/Counterclaim Plaintiff,
Latrobe Construction Company