IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ROYAL INSURANCE COMPANY OF AMERICA, an Illinois Corporation, ROYAL INDEMNITY COMPANY, a Delaware Corporation, and AMERICAN AND FOREIGN INSURANCE COMPANY, a Delaware Corporation, | ) ) ) ) ) ) | Civil Action No. 00-2128 <br><br> The Hon. Francis X. Caiazza <br> Chief Magistrate Judge |
| Plaintiffs, | ) ) ) | |
| v. | ) ) ) | |
| LATROBE CONSTRUCTION COMPANY, | ) ) ) | |
| Defendant. | ) | |

## DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

### INTRODUCTION

The instant action involves a dispute between Royal Insurance Company of America, Royal Indemnity Company, American and Foreign Insurance Company (hereinafter referred to as "Royal") and its insured, Latrobe Construction Company (hereafter referred to as "Latrobe").

The dispute arises out of seven 3-year retrospectively rated plans, spanning from 1974 to 1995. Royal claimed additional premiums were due as a result of loss development in certain plan years. Latrobe's contention is that it had been overcharged premiums, thus resulting in its Counterclaim.

Phase I of this trial concluded with this Court's Findings of Fact and Conclusions of Law, issued January 6, 2006. At that time, the Court identified certain claims which, in the Court's view, were improperly handled. Phase II of the trial, which commenced May 2, 2006, was

scheduled to allow the parties to address the issues of "actual loss" suffered as a consequence of claims mishandling per this Court's January 6, 2006 findings, and, thereafter, attempt to assess the amount of retrospective premiums due to Royal.

During the course of these proceedings, Royal went to great lengths to depict Latrobe's owner, Bruno Ferrari, Sr., as a sophisticated, involved and hands-on businessman. (See Tr. at 146.5-6, Royal's Opening Statement; Exhibit BB, pp. 19, 21; and N.T. 5/3/06, p. 23).   Prior to the litigation, Mr. Ferrari passed away. (N.T. 5/3/06, p. 23). With Mr. Ferrari's passing, Latrobe lost its historical reference.  The Court (and Latrobe) looked to Royal to provide the information central to the determination as to what premiums had been billed and paid.

Throughout the litigation, there have been attempts on the part of Latrobe to discover evidence to establish which would allow Latrobe to determine what premiums had been "earned" by Royal, and the extent to which premium payments had been acknowledged by Royal. (Exhibit BB, pp. 42, 44-45; N.T. 5/3/06, p. 23; and Exhibit AX).

During Phase I, Gerard Chimenti and Jerry Raabe, two experts who are familiar with retrospectively rated plans, were in accord as to how retrospective premiums are to be calculated. Both acknowledged the retrospective formula and confirmed that the variable component of the formula was the incurred loss values for claims incurred within the policy year.  Dianne Leger, Royal's corporate designee for underwriting, concurs.  (Exhibit BB, pp. 23-34).

The Court notes an important distinction between one's ability to calculate retrospective premium and the issue as to whether or not the premiums calculated were actually paid, overpaid or not paid at all.  (See Chimenti testimony, N.T. 5/2/06, p. 63).  For purposes of the Court's Proposed Findings of Fact and Conclusions of Law below, the Court shall reference as "earned premium" the calculation of retrospective premiums which are generated by virtue of the

incurred loss retrospectively rated formula with the inclusion of total incurred values.  As will be noted more fully herein, earned premium does not, necessarily, reflect that which is due.  In order to determine what is due or returnable, one must look to all open plan years, not merely a segment of the plan years.

The Findings of Fact and Conclusions of Law will address whether Royal has met its burden of demonstrating what retrospective premiums are owed to Royal, rather than which was earned for the 1980-1995 plan years.

## FINDINGS OF FACT

1.    In the Court's Findings of Fact and Conclusions of Law issued January 6, 2006, the Court noted that Phase II of the litigation between the parties was to be scheduled to determine (1) "actual loss" suffered as a consequence of claims mishandling, and (2) the amount of retrospective premium due to Royal.  (Findings of Fact and Conclusions of Law, 1/6/06, p.103).

Amount of Retrospective
Premium Due to Royal (If Any)

2.    Between 1974 and 1995, the Plaintiff, Royal Insurance Company of America, Royal Indemnity Company and/or American Foreign Insurance Company (hereinafter referred to collectively as "Royal"), underwrote the Defendant Latrobe Construction Company's (hereafter referred to as "Latrobe") workers' compensation liabilities through the issuance of seven 3-year retrospectively rated insurance programs. (Findings of Fact and Conclusions of Law, 1/6/06, p. 2).

3.    Royal commenced an action against Latrobe on October 30, 2000, seeking retrospective insurance premiums. Latrobe responded to Royal's Complaint, denying liability.  Further, it filed

a Counterclaim, seeking a return of premium, which Latrobe claimed to have been in excess of that which Royal was entitled to. (Findings of Fact and Conclusions of Law, 1/6/06, p. 3).

4.    This Court accepted the uncontested testimony of Jerry Raabe, who testified that, as of the filing of the lawsuit, all seven of the parties' 3-year retrospective plans remained administratively opened and that, accordingly, an issue as to what premiums were earned, payable and returnable for all 21 years were properly before the Court. (Findings of Fact and Conclusions of Law, 1/6/06, p.10).

5.    During Phase II of the proceeding, this Court once more confirmed that there remained a dispute with regard to what premiums had been paid by or on behalf of Latrobe and what premiums were actually credited to Latrobe by Royal.  (N.T. 5/2/06, pp. 56-57).

6.    Royal conceded through its expert, Gerald Chimenti, that in order to determine how much premium is due or returnable to an insured over the span of multiple open retrospectively rated plans, there is a need for the carrier to determine, for each open year, what premiums the insurer claims are due or, alternatively, are refundable, and thereafter net out the result.  (N.T. 2/8/05, p. 103).

7.    Thus, in order to determine how much premium was payable by Latrobe or, alternatively, returnable from Royal, evidence had to be presented that would establish what premiums were earned by Royal from 1974 and thereafter, based on total incurred values which, in turn, would be applied to the retrospectively rated claims in each program year; how much premium was alleged to have been paid by Latrobe for each of the plan years; and confirmation that all premiums paid by or on behalf of Latrobe were properly credited to Latrobe's account.

8.    Royal's expert, Gerald Chimenti, agreed that in retrospectively rated programs, an insured can make a direct premium payment to an insurer (N.T. 5/2/06, pp. 82-83); premiums

can be paid through a broker (N.T. 5/2/06, p. 83); premiums can be paid through a factor (N.T. 5/2/06, p. 83); and premiums can be credited through a draw-down of collateral.  (N.T. 5/2/06, p. 84).

9.  Mr. Chimenti agreed that he did not know what the financial arrangements were between Royal and Latrobe to fund premium.  (N.T. 5/2/06, p. 84).

10. Mr. Chimenti further agreed that he was not the individual who could address what premiums were confirmed to have been paid by the insured, on behalf of the insured or whether there had been collateral drawn down to fund premiums. (N.T. 5/2/06, p. 85).

11. Mr. Chimenti did not offer an opinion as to what premiums were earned, paid and/or returnable from 1974–1980, as he had not reviewed that information.  In fact, he had never requested that information from Royal.  (N.T. 5/2/06, p. 54).

12. Royal has not produced a witness nor evidence in this case that addressed what premiums were alleged to have been earned by Royal between 1974 and 1980; what premiums were to have been paid by Latrobe for the 1974-1980 plan years; and/or what premiums were credited to Latrobe for the 1974-1980 plan years.

13. In an attempt to overcome Royal's failure to produce evidence for the 1974-1980 plan years, Mr. Chimenti, at least initially, assumed that there were no monies payable or returnable for the 1974-1980 plan years because Royal's counsel purportedly told Mr. Chimenti what premiums had not been paid (N.T. 5/2/06, p. 68) and, further, because counsel had provided him with a letter (Exhibit AS) and a Statement of Account that purportedly allowed him to determine what was paid and received.  (N.T. 5/2/06, p. 68).

14. Based on a 1999 letter (Exhibit AS), Mr. Chimenti assumes that as of 1994, there was a "base line -0-," averring that all retrospective premiums had been paid by Latrobe through that date. (N.T. 5/2/06, p. 56).

15. The Court finds that the information Mr. Chimenti averred that he could rely upon to determine what premiums were payable and returnable between 1974-1980 is unreliable and without merit, for reasons that shall be addressed immediately below.

16. When Mr. Chimenti issued his report on July 10, 2003, he conceded that he was unable to determine how much premium was payable and returnable, because he claimed to have insufficient information to determine that which had been previously paid by or on behalf of Latrobe or credited to the Latrobe account. (N.T. 5/2/06, p. 58).

17. It is apparent to this Court that Latrobe had attempted throughout this litigation to secure documentation that would confirm the extent to which Royal had charged Latrobe with premium and the extent to which Royal had credited Latrobe with premium payments. (See, Leger Depo., 9/16/03, pp. 42, 44, 45; N.T. 5/3/06, p. 23; and Exhibit AX).

18. Ms. Leger testified that Royal maintains ledgers which document such information. She concedes that she has not produced any payment ledgers (Exhibit BB, p. 42; N.T. 5/3/06, p. 26). Likewise, Mr. Chimenti has not reviewed any payment ledgers, nor have any been offered as evidence in this trial. (N.T. 5/2/06, p. 63).

19. Leger concurred that if one does not have information regarding what premiums were earned, what was billed and what had been paid by or on behalf of an insured, one cannot indicate how much premium is owing. (N.T. 5/3/06, p. 24). The Court accepts this premise.

20. The documents which Mr. Chimenti claims to have relied upon to establish what premiums were owed, and which documents were provided by Attorney Fox, included a 1999

letter purported to be from a David Hooper of Royal addressed to Royal's former attorney, Gene Giotto. (Exhibit AS). Royal did not offer the testimony of Mr. Hooper or Mr. Giotto to authenticate this document. Moreover, nothing in the letter allows this Court to determine that Latrobe had not overpaid premiums in 1974 and thereafter. Nor can the Court determine from this letter whether Royal had properly credited Latrobe for all premiums paid by Latrobe or by some entity on behalf of Latrobe. Rather, the letter in question simply indicates that, as of 1994, Royal had no problems with Latrobe's payments of premiums. The letter does not address whether premiums paid were equal to that which had been earned, nor what has been paid or credited since the letter was authored.

21. At one point in his testimony, Mr. Chimenti, in an attempt to overcome the fact that he had not been provided information that would address the extent to which premiums were paid and credited to the Latrobe account, alleged that he had relied on Jerry Raabe's report, suspecting that Mr. Raabe had more information regarding payments than Mr. Chimenti had been provided. (N.T. 5/2/06, p. 63). However, in a turn of events, Mr. Chimenti ultimately agreed that he did not rely on Mr. Raabe's report. (N.T. 5/2/06, p. 125).

22. Mr. Chimenti's retraction is bolstered by the concessions made by Mr. Chimenti when he testified on May 3, 2006. Mr. Chimenti conceded that Mr. Raabe had established incurred claim values from information that was provided to him by Royal, i.e., the 2002 loss run. (N.T. 5/3/06, p. 37-38).

23. The Court finds that there is little significance to Mr. Chimenti's contention that Mr. Raabe's report mirrors his own with regard to "premiums earned" for the 1980-1995 plan years, in light of the fact that both experts used incurred values that were provided by Royal in the retrospective calculations. (N.T. 5/3/06, p. 37).

24.  The second document upon which Mr. Chimenti relies, the Statement of Account, also is insufficient to allow him to conclude what premiums were actually earned by Royal, paid by Latrobe, and/or whether payments made by or on behalf of Latrobe were properly credited.  First of all, the Statement of Account does not address the 1974-1980 plan years.  Mr. Chimenti concedes that the Statement related only to amounts that were allegedly due between 1980-1995. (N.T. 5/2/06, p 70). Further, he conceded that he did not know the identity of the individual who had prepared the Statement of Account (N.T. 5/2/06, pp. 70 and 72); that he was uncertain as to when the summary had been prepared (N.T. 5/2/06, p. 71); that he did not know what records the summary was prepared from (further conceding that someone from Royal would have to address that issue) (N.T. 5/2/06, p. 72); and that he did not know what business records, if any, were reviewed to assist in the preparation of the summary (N.T. 5/2/06, p.73).

25.  Further undermining Mr. Chimenti's attempt to utilize the Statement of Account to verify what premiums were earned, paid and credited, Dianne Leger, Royal's corporate designee for underwriting, testified that the Statement of Account would not reflect that which was actually paid by or on behalf of Latrobe, nor when it was paid.  (N.T. 5/3/06, P. 25; Exhibit BB; Leger Depo., 9/12/03, pp. 58-60).

26.  The Court accepts Mr. Chimenti's testimony that, as of July 10, 2003, he would have been unable to determine how much premiums were due to Royal as he did not have sufficient information to determine what premiums were due or returnable prior to 1994.

27.  To the extent that Mr. Chimenti claims that he could rely on the document that purports to be a letter from Hooper to Giotto (Exhibit AS) to determine how much premium was due or returnable as of the date the letter was issued, the same is rejected as lacking credibility. Contrary to the assertions of Mr. Chimenti, the letter does not address whether Royal had properly charged

Latrobe for premiums paid prior to 1994; whether Royal had received more premiums than otherwise it was entitled to; nor whether Royal had properly credited Latrobe's account for premiums paid directly by Latrobe or on Latrobe's behalf. Rather, as this Court has found above, the author claims only that he had no problem with Latrobe's payment of premiums until 1995.

28. Even if this Court were to have accepted Mr. Chimenti's testimony that the Hooper letter to Giotto established that all premiums charged prior to 1995 were properly billed, paid and credited, the letter does not address what premiums were owed, if any, at the time of trial, as neither Mr. Chimenti, nor any other representative from Royal, had presented evidence in this case to establish that Latrobe had failed to pay premiums since 1999, either directly, to a third party or via a draw-down of collateral, which Mr. Chimenti indicates are the methods to be used for payment of premium in retrospectively rated programs. (N.T. 5/2/06, pp. 82-84).

29. Mr. Chimenti did not know what premiums were paid by Latrobe between 1974-1995 and thereafter. (N.T. 5/2/06, p. 85).

30. Ms. Leger testified that the information that was requested by Latrobe to prove actual payment of premiums by or on behalf of it has not been made available. (N.T. 5/3/06, pp. 25-26).

31. According to Ms. Leger, Royal's records that verify what has been paid or credited on behalf of an insured would be maintained by Royal's Premium Accounting Service Center. (N.T. 5/3/06, p. 24). At trial, Royal did not offer the testimony of any representative of that department.

32. Despite ample opportunity, Royal has not provided sufficient factual evidence – a foundation – to justify Mr. Chimenti's reliance upon either the Hooper correspondence (Exhibit AS) or the Statement of Account.

33. In a light most favorable to Royal, and assuming that Mr. Chimenti had the right to rely on the data contained in the 2002 loss run, the Court finds that Mr. Chimenti's testimony establishes only what premiums were earned by Royal in the 1980-1995 plan years. Such does not, however, establish that which was actually earned or returnable in all open claim years. Nor would this establish a basis for calculating that which is actually owed.

34. Mr. Chimenti's calculations regarding retrospective premiums are predicated on the loss runs of 2002, which he assumed to have been accurate. (N.T. 5/2/06, p. 87).

35. Mr. Chimenti must rely on the accuracy of the loss runs, as he never reviewed the claim files to review documentation that would support payments on any of the claims. (N.T. 5/2/06, p. 94).

36. The Court is not comfortable with Mr. Chimenti's reliance on the accuracy of the loss runs, upon which he relied to calculate premium earned in plan years 1980-1995. To this end, the Court cites the cross-examination of Mr. Chimenti on the <u>Augustine</u>, <u>Freed</u> and <u>Younker</u> claims, during Mr. Chimenti's testimony in Phase II on May 2, 2006.

37. In the 2002 loss run, <u>Augustine</u> reflected indemnity paid of $167,934.00. (Exhibit AT). Peter Weber and LuAnn Haley, the parties' claims experts, both concluded that the claimant had been released to his time of injury job by September 2006, some 22 months after the alleged work injury, and which this Court so found. (Findings of Fact and Conclusions of Law, 1/6/06, p. 37). Accordingly, Augustine was to receive indemnity pay-outs totaling approximately $46,000.00 (N.T. 5/2/06, p 98). Mr. Chimenti could not reconcile this discrepancy. (N.T. 5/2/06, p. 99-100).

38. In an attempt to rehabilitate Mr. Chimenti's reliance on the 2002 loss runs for the <u>Augustine</u> claim, Dianne Leger, conceding that she had not actually reviewed the claim file, and

in an apparent disregard of the testimony offered by the two claims experts who had actually reviewed the <u>Augustine</u> file and in disregard of this Court's previous Findings of Fact, contended that Royal properly paid an additional $122,000.00 of indemnity benefits on the file. She claimed that the file had been re-opened in 1997 and, thereafter, closed in 2000. (N.T. 5/3,06, p. 11).

39. This Court finds Ms. Leger's testimony, wherein she attempts to justify reliance on the 2002 loss run, to lack credibility. Ms. Leger did not see the actual claim file. She claims that substantial benefits were paid out between 1997 and 2000. Yet, she offers no explanation as to how two highly credentialed experts, both of whom had reviewed the <u>Augustine</u> claim in 2003, had no awareness that there had been a re-opening and closing of the claim previously with a pay-out that dwarfed the amount that this Court confirmed to have been properly paid out on the claim, per the Court's January 6, 2006 Findings of Fact. Further, to the extent that Ms. Leger's testimony was based on review of documents, said documentation was neither produced by Royal in discovery, nor offered as evidence in this matter. Her testimony in this regard will be disregarded.

40. Mr. Chimenti was also asked to review information relating to the claim of <u>Younker</u>, a Latrobe employee. (N.T. 5/2/06, pp. 100-106).

41. Mr. Chimenti indicated that the 2002 loss run showed a 1995 exposure on <u>Younker</u> that exceeded $49,000.00. (N.T. 5/2/06, p. 102).

42. Thereafter, Mr. Chimenti was asked to review a decision, which was rendered by a workers' compensation judge on the 1995 <u>Younker</u> claim. (Exhibit AU). Mr. Chimenti confirms that the claim had been dismissed in 1997 by the workers' compensation judge. (N.T. 5/2/06, p. 102).

43. Mr. Chimenti agreed that he could not reconcile the Court's decision with the loss run because he had not reviewed the claim file. (N.T. 5/2/06, p. 103).

44. Ultimately, Mr. Chimenti expressed uncertainty as to whether the data in the loss run was inclusive of everything that should be included or not. (N.T. 5/2/06, p. 110).

45. In an attempt to rehabilitate Mr. Chimenti's inability to reconcile data contained in the loss runs with actual pay-outs on the claim files, Royal offered the testimony of Dianne Leger. (N.T. 5/3/06, pp. 4-34). Insofar as Ms. Leger's testimony was based upon information neither produced in discovery nor introduced into evidence, it will be disregarded.

46. Ms. Leger reviewed Exhibit AY, which was the workers' compensation judge's decision that established that the claimant had sustained an injury on September 30, 1999 in the nature of silicosis/ occupational lung disease from exposure to silica and dust. (N.T. 5/3/06, pp. 17-18).

47. Ms. Leger acknowledged that the <u>Younker</u> claim had settled and that the pay-out was "pretty close" to the reserves in the 2002 loss run. (N.T. 5/3/06, p. 18).

48. Royal appears to have paid out six years of benefits for a 1999 work injury claim and imputed the loss to the 1995 program. (N.T. 5/3/06, p. 18).

49. Leger conceded that Latrobe was not insured by Royal in 1999. (N.T. 5/3/06, p. 19).

50. Royal has offered no evidence to satisfactorily explain why it paid Younker's widow for a 1999 work injury when Royal did not insure Latrobe in 1999. <u>Id.</u> Nor does it offer evidence to explain why the pay-out ultimately issued in 2001 was charged in the 1995 plan per the 2002 loss run. <u>Id.</u>

51. Dianne Leger speculated that there could be an apportionment between insurers in the Commonwealth of Pennsylvania, that would have justified a payment by Royal. (N.T. 5/3/06, p. 19).

52. The Court finds that there is no apportionment between insurers under the law of Pennsylvania, which will be addressed in the Court's Conclusions of Law below.

53. Similarly, the Court notes that even if Royal took into consideration errors that it had made in its handling of the <u>Freed</u> claim, the anticipated pay-out on the claim does not equate to that which has been evidenced in the 2002 loss run. (N.T. 5/2/06, p. 109-110).

54. Dianne Leger offered no testimony with regard to the discrepancy as to what should have been paid on the <u>Freed</u> claim taking into consideration the errors and the 2002 loss run values.

55. The Court will not assume that Royal's "computer system" accurately captured financial data from claim files and generated loss runs. Such a premise is without foundation as:

    a)      The CLASS system was not in effect for the Latrobe program until the late 1980's. (N.T. 5/3/06, p. 12);

    b)      With CLASS, one does not know whether an amount was properly or improperly paid; only that a charge was made against a claim. (N.T. 5/3/06, p. 14); and

    c)      Claims reviewed, presumably with CLASS in place (<u>Augustine</u>, <u>Freed</u> and <u>Younker</u>) contain loss run values that could not be reconciled.

56. The Court finds that Mr. Chimenti's reliance on the 2002 loss runs for his calculations of premiums earned in the 1980-1995 plan years is unreliable.

57. Pending before this Court is the Motion and Brief filed by Latrobe seeking to strike the testimony of Gerald Mr. Chimenti, upon whom Royal relies in establishing the premium obligations of Latrobe.

58. In support thereof, the following points have been established by Latrobe:

    a)      Mr. Chimenti has agreed that, in order to establish what premiums are owed or returnable, one has a need to review the financial data for all open retrospectively rated plan years for the purpose of addressing that which has been billed, that which Royal believes to have been paid, and that which has been credited.

b) Mr. Chimenti has not addressed any of the financial data with respect to the 1974-1980 plan years, which remained open, per this Court's Finding of January 6, 2006.

c) Neither Mr. Chimenti nor a Royal representative has offered any testimony as to what Royal contends the aggregate earned premiums were between 1974 and the present, based on retrospectively rated plans between 1974 and 1995.

d) Neither Mr. Chimenti, nor any other representative of Royal, has established for the Court what premiums were actually paid by Latrobe, on behalf of Latrobe and/or credited to Latrobe from 1974 to the present.

e) Mr. Chimenti's reliance on a Statement of Account, which he claims allows him to calculate premiums due, is unreliable, as the Statement of Account did not address the 1974-1980 plan years. Further, Dianne Leger, Royal's corporate designee for underwriting, acknowledged that one could not determine the extent to which premiums were paid and credited.

f) Latrobe takes issue with Mr. Chimenti's reliance on the 1999 communication, purportedly directed from David Hooper to Gene Giotto, to establish that, prior to 1995, there was no dispute between the parties and that all premiums earned were paid, no more and no less. Firstly, the letter has never been authenticated. Secondly, in reviewing the letter in a light most favorable to Royal, it establishes only that Royal had no objection to Latrobe's payment of premiums. It did not address whether Latrobe took issue with how it was being charged; nor did it address whether Royal had properly credited Latrobe's premium account.

g) To the extent that Exhibit AS were construed by the Court to have established a base line for the calculation of damages in 1995 and thereafter, no evidence has been offered by Royal that it did not receive additional premium or draw-down collateral, or, in some other fashion, credit Latrobe's account after the 1999 letter was issued.

h) None of the documents that were purportedly reviewed by Gerald Mr. Chimenti to reach his opinions have been authenticated. The Statement of Account, upon which Mr. Chimenti relies to establish what premiums were purportedly paid, is flawed. Mr. Chimenti did not know who prepared the document, what information was reviewed, and/or whether the Statement of Account was comprised of financial records from Royal, retained in the ordinary course of business by Royal. Nor did the Statement of Account address the 1974-1980 claim years.

i) Mr. Chimenti, who had never reviewed the claim files, could not reconcile incurred loss values contained in the loss runs, upon which he relied, when compared to information that was actually emanating from the claim files.

59. To the extent that Mr. Chimenti's opinion is offered by Royal to establish that which is premium owed, the same is rejected. Royal has offered no evidence with respect to what premiums were actually earned between 1974 and 1980, the extent to which premiums were received by or on behalf of Latrobe, nor evidence that premiums were properly applied to the Latrobe account. Even if this Court were to be satisfied that Exhibit AS established that there was a -0- premium base line as of 1995 based on the alleged 1999 communication between Hooper and Giotto, Royal has offered no evidence to establish that premiums were not paid and/or credited to the Latrobe account after 1999. The Court has not received evidence as to what premiums were actually earned between 1974 and the present, what was paid by Latrobe and/or what was credited to the Latrobe program. The Court cannot speculate on these issues.

60. While experts may testify from documents typically utilized by experts in the same field, the Court finds that Mr. Chimenti's reliance upon the documents, purportedly used by Mr. Chimenti to opine as to premiums owed, is misplaced. The documents identified by Mr. Chimenti do not address the issues and premises for which he claimed they were used for.

61. This Court finds that Royal has not met its burden of proof to demonstrate that additional premium is owed to Royal by Latrobe.

"Actual Loss"

62. While the Court is convinced that Royal did not meet its burden of establishing what premiums, if any, are owed, the Court had previously found that errors were committed that impact Royal's claim to earned premium for the 1980-1995 plan years.

63. In Phase I, the Court determined that Royal had not reasonably handled the Depree, Freed, Jury and Peksa claims. (Findings of Fact and Conclusions of Law, 1/6/06, p.99).

64. Peter Weber, Royal's claims analyst, attempted to address the financial impact of the errors identified by this Court in the Court's Findings of Fact and Conclusions of Law issued January 6, 2006.

65. It was Mr. Weber's opinion that Latrobe did not sustain damages as a result of Royal's failure to secure an annuity to fund the benefits of Tiffany Peksa. (N.T. 5/2/06, p. 11).

66. Mr. Weber testified that the errors in the Jury case led to interest charges of $53.17. (N.T. 5/2/06, p. 17).

67. Mr. Weber testified that errors committed on the Freed case created a $665.00 penalty and unwarranted interest payments of $102.74, and there was a failure to recover $3,087.50 as a result of a delayed filing for supersedeas relief. These damages totaled $3,855.24. (N.T. 5/2/06, pp. 13-14).

68. With regard to the Depree case, Mr. Weber testified that, after January 1993, Royal reinstated benefits which resulted in a pay-out of weekly indemnity payments totaling $27,755.00, a $37,500.00 settlement by way of commutation, and an additional medical pay-out of $13,048.96. (N.T. 5/2/06, pp. 29 and 34).

69. The Court finds that the payments in Depree post-January 1993 were improperly paid out, as Royal had not undertaken a three-pronged investigation, which led to a gross pay-out after January 1993 of $78,303.96.

70. The uncontroverted testimony of Mr. Chimenti is that to determine premium charges, one takes the dollars that are paid out and multiplies that by 1.1539. (N.T. 5/2/06, p. 54).

71. Accordingly, the Court finds that premiums earned for the 1980-1995 plan years claimed by Mr. Chimenti should be offset by a value of $94,864.85.

72. Based upon the evidence presented and for reason articulated in Latrobe's Brief filed on June 6, 2006, Royal is not entitled to an award of prejudgment interest.

## CONCLUSIONS OF LAW

1. Royal presents a breach of contract action against the Defendant. In order to recover, Royal must prove: (1) the existence of a valid and binding contract to which the Plaintiffs and Defendant were parties; (2) the essential terms of the contract; (3) that Plaintiffs complied with the contract's terms; (4) the Defendant breached a duty imposed by the contract; and (5) that damages resulted from the breach. Technology Based Solutions, Inc. v. Electronics College, Inc., 168 F. Supp.2d 375 (E.D. Pa. 2001); Perry v. Sonic Graphic Systems, Inc., 94 F. Supp.2d 616 (E.D. Pa. 2000); Halstead v. Motorcycle Safety Foundation, Inc., 71 F. Supp.2d 455 (E.D. Pa. 1999). In any breach of contract action, Plaintiff has the burden of proving damages resulting from the breach. Bostick v. ITT Hartford Group, Inc., 82 F. Supp.2d 376, 378 (E.D. Pa. 2000); Safeguard Scientifics, Inc. v. Liberty Mutual Insurance Co., 766 F. Supp. 324, 334-35 (E.D. Pa. 1991); Spang & Co. v. United States Steel Corp., 545 A.2d 861, 866 (Pa. 1988).

2. Damages are not recoverable if they are too speculative, vague or contingent, and are not recoverable for loss beyond an amount that the evidence permits to be established with reasonable certainty. Restatement (Second) of Contracts, § 352. Comment A to Section 352 makes clear that a party cannot recover damages for breach of contract for a loss beyond the amount that the evidence permits to be established with reasonable certainty. Id. Further, courts have traditionally required greater certainty in the proof of damages for a breach of contract than in the proof of damages for a tort. Id., Comment A.

3. To prove damages, a plaintiff has to provide the fact-finder evidence upon which it could base a calculation of damages to a "reasonable certainty." ATSCS Corp. v. TransRoyal

-17-

Communications, Inc., 155 F.3d 659 at 668.  There, the Third Circuit defined "reasonable certainty" as that which embraces a rough calculation that is not too speculative, vague or contingent upon some unknown factor.  Id. at 669.  Royal's failure to offer evidence to establish the total premiums earned from 1974 to the present, based on the 1974-1995 plan years, coupled with the amount it claims it has received from Latrobe, undermines the ability of Royal to claim that it provided sufficient evidence upon which a calculation of damages could be made to a "reasonable certainty."  Royal's claim for damages further fails because it has offered no evidence to establish what has been purportedly paid by Latrobe, on behalf of Latrobe and/or credited to Latrobe's account since 1999.

     4.     It was the burden of the Plaintiff to establish the reliability and fit of Mr. Chimenti's testimony by a "preponderance of the proof."  Fed. R. Evid. 702; Soldo v. Sandoz Pharmaceutical Corp., 244 F. Supp. 434 (W.D. Pa. 2003); In Re TMI Litigation, 193 F.3d 613, 663 (3rd Cir. 1999).

     5.     Royal had the burden to establish the reliability of its expert's opinion.  Out-A-Sight Pet Containment, Inc. v Radio Systems Corp., 330 F.Supp. 535, 538 (E.D. Pa. 2004).  To prove its claim for damages, the plaintiff must present sufficient evidence for the fact-finder to make an intelligent estimation, without conjecture, of the amount to be awarded.  A.G. Cullin Construction, Inc. v. State System of Higher Education, 2006 Pa. Commw. LEXIS 128 (Cmmw. Ct. March 15, 2006).  The Court finds that Mr. Chimenti's attempt to establish what premiums were due was unreliable as he did not review the 1974-1980 claim years; and offered no testimony as to how much premium had been earned by Royal from 1974-thereafter, nor how much had been paid and credited to Latrobe.  Further, it relied on documents that were not properly authenticated and which, on their face, did not support the premise he was utilizing the

documents for.  Finally, in the face of the evidence submitted, this Court found his reliance on the loss runs for Mr. Chimenti to calculate premiums earned between 1980 and the present for the 1980-1995 plan years to lack merit.

6.    Speculative expert opinion, unsubstantiated by evidence in the record, cannot satisfy an element of the plaintiff's cause of action.  See Borough of Olyphant v. PP&L, Inc., 2004 U.S. Dist. LEXIS 8958 (E.D. Pa. May 14, 2004).  The factual predicate of an expert's opinion must find some support in the record. Tobin v. The Haverford School, 936 F. Supp. 284 (E.D. Pa. 1996); Pennsylvania Dental Ass'n. v. Medical Service Ass'n. of Pennsylvania, 745 F.2d 248, 262 (3rd Cir. 1984)(citing with approval Merit Motors, Inc. v. Chrysler Corp., 569 F.2d 666 (D.C. Cir. 1977).  Here, there are no evidence offered by Royal to establish what it has earned, nor what it has received from, or on behalf of, Latrobe in the open plan years.  Indeed, Royal has ignored the 1974-1980 plan years.  Royal has not offered evidence to establish that no premiums were earned or returnable as of 1999 per the letter allegedly written by Hooper, nor evidence that no premium has been received from or on behalf of Latrobe since 1999.

7.    Expert testimony shall be excluded upon insufficient or unreliable factual foundation.  Montgomery County v. Microvote Corporation, 320 F.3d 440 (3d Cir. 2002).  In Montgomery, the Third Circuit affirmed the exclusion of expert testimony where the expert did not know the source or basis of documents upon which his opinion was based. In Montgomery, the trial judge held that the videotape was inadmissible because it was unreliable, noting that:

> I'm a little concerned about some of the things that were shown to him. He didn't seem to know where they were from or what the source of them were.  That, I find disturbing.

Montgomery, 320 F.3d at 448-449. Here, Mr. Chimenti attempts to conclude what premiums were actually paid by or on behalf of Latrobe through a Statement of Account. Aside from the fact that Dianne Leger, Royal's corporate designee, indicated that the Statement of Account did not address that issue, and without regard for the fact that the Statement does not purport to cover the 1974-1980 plan years, Royal's expert did not know who prepared the Statement of Account, when it was prepared, nor did the expert state what records were reviewed to facilitate the preparation of the document. Accordingly, the Court must reject Mr. Chimenti's testimony to the extent that he attempts to offer an opinion as to what is actually owed or returnable.

8.     Where a claim is for pecuniary damages, the evidence must fix the actual loss with reasonable precision through witnesses with knowledge of the facts. Forrest v. Buchanan, 203 Pa. 454, 53 A. 267. Here, Mr. Chimenti testified that he did not know the financial arrangements between Latrobe and Royal, noting that this was information that one would have to get from Royal's personnel. The Court finds that the failure to confirm that which has been billed and, thereafter, paid, precludes the Court from determining that Royal has met its burden to demonstrate an actual loss with reasonable precision.

9.     Where a plaintiff's evidence as to damages is contested and placed in doubt, it is within the fact-finder's power to decide that the plaintiff has not met his burden of proof and to award no damages. Lasoon v. Yellow Cab Co., 195 Pa. Sup. Ct. 470, 171 A.2d 877 (1961).

10.     Royal has failed to meet its burden of proof to establish damages in these proceedings.

11.     There is no provision under the Pennsylvania Workers' Compensation Act that called for apportionment among different insurers underwriting the same insured. To the contrary, where the employer has successive insurance carriers, the liability to defend and pay

the claim is placed upon the carrier at risk as of the last the moment of last exposure. Bucyrus-Erie Co. v. WCAB (Gourn), 525 A.2d 881 (Pa. Commw. 1987); Ertz v. Glen Nan, Inc., 371 A.2d 533 (Pa. Commw. 1977). Accordingly, this Court rejects the testimony of Dianne Leger, wherein she posed as a possible explanation for the benefit pay-out on the Younker claim (1999 injury), that two or more insurers may have been responsible to make payments on an occupational disease claim in the Commonwealth of Pennsylvania under the theory of apportionment.

Respectfully submitted,

PIETRAGALLO, BOSICK & GORDON LLP


By:    /s/ Mark Gordon
   Mark Gordon, Esq.
   Timothy R. Smith, Esq.
One Oxford Centre, 38th Floor
Pittsburgh, PA 15219
(412) 263-2000 - phone
MG@PBandG.com
TRS@PBandG.com
Counsel for Latrobe Construction Company

## CERTIFICATE OF SERVICE

I hereby certify that on June 6, 2006, I electronically filed the foregoing **DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

Bruce C. Fox, Esq.
Obermayer Rebmann Maxwell & Hippel LLP
US Steel Tower
600 Grant Street, Suite 5240
Pittsburgh, PA 15219
*Counsel for Plaintiffs*


PIETRAGALLO, BOSICK & GORDON


By:  ___/s/ Mark Gordon_____
        Mark Gordon, Esq.
        Timothy R. Smith, Esq.

Counsel for Defendant/Counterclaim Plaintiff,
Latrobe Construction Company