IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ROYAL INSURANCE COMPANY OF AMERICA, an Illinois Corporation, ROYAL INDEMNITY CO., a Delaware Corporation, and AMERICAN AND FOREIGN INSURANCE COMPANY, a Delaware Corporation, <br><br>Plaintiffs, <br><br>vs. <br><br>LATROBE CONSTRUCTION COMPANY, <br><br>Defendant. | Civil Action No. 00-2128 <br><br>The Honorable <br>Francis X. Caiazza <br>Chief Magistrate Judge <br><br><br>**PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** <br><br><br><br>ELECTRONICALLY FILED |

**PROPOSED FINDINGS OF FACT**

**I.    ACTUAL HARM RESULTING FROM MISHANDLING OF SPECIFIC FILES**

**Peksa**

1. Because she was over 18 years of age as of 1996, when the judicial decision on dependency was reached, if Tiffany Peksa had flunked out or dropped out of college, Royal's obligation to pay benefits to her would have ceased. (TT1, pg. 9, lines 20-24).[1]

2. Royals's maximum workers' compensation benefits obligation to Tiffany Peksa would have been $107.20 per week for 173 weeks or roughly $18,500. (TT1, pg. 10, line 22- pg 11, line 3).

3. An exposure of only $18,500 for workers' compensation benefits is not high enough to require the purchase an annuity by an insurer.  Even with a higher exposure, it would not have been prudent for Royal to purchase an annuity due to the uncertainty as to whether or not Tiffany would stay in school. (TT1, pg. 10, lines 19-21, pg. 11, lines 4-7).

4. Accordingly, there was no actual harm resulting from the limited mishandling of this file identified by the Court in its prior opinion. (TT1, pg. 8, lines 20-23).

---

[1] TT1 refers to the Trial Transcript of May 2, 2006. TT2, refers to the Trial Transcript of May 3, 2006.

**4048192**

**Freed**

5. Mr. Freed's workers' compensation benefits were reinstated some time after the improper termination by Royal, resulting in an obligation to pay twenty-eight (28) weeks of accrued benefits, amounting to $6,650. There was however, no harm associated with this improper termination, as Royal would have been obligated to pay these benefits on an ongoing basis, even if it had not terminated the benefits. (TT1, pg. 13, lines 5-14).

6. The only harm resulting from the improper termination of benefits is the 10% penalty assessed against Royal – amounting to $665.00 and the interest on the lump sum payment –amounting to $102.74 - for a total harm of $767.74. (TT1, pg. 13, lines 15-24).

7. Treating the end of May as a reasonable point in time by which Royal should have petitioned to terminate benefits (rather than August, which is when Royal actually filed the petition), the delay amounts to thirteen (13) weeks. At the appropriate weekly rate, the harm amounts to $3,087.50 of additional supersedeas reimbursement that could potentially have been recovered. (TT1, pg. 13, line 25-pg 14, lines 1-11).

8. The total harm resulting from mishandling of the Freed file is $767.74 plus $3,087.50, which equals $ 3,855.24. (TT1, pg. 13, lines 23-24; pg. 14, lines 3-4 and lines 10-11).

**Jury**

9. The only harm that was suffered as a result of Royal's failure to immediately reinstate benefits was the interest that accrued on the accrued benefits of approximately $2,800 between the date Mr. Jury was fired on May 22, 1991, and when those benefits were reinstated in September, 1991. That interest amounts to $53.17. (TT1, pg. 16 line 21-page 17, line14).

**Depree**

10. Notwithstanding the failure of Royal to properly investigate the claims arising from the May, 1993 "ladder incident," not all of the payments made after that date constitute "harm." (TT1, pg. 20, lines 4-6).

11. With regard to the first two deficiencies, Royal should have timely obtained an independent medical examination, and if it had, it likely would have been able to settle the claim by May, 1994, which would have reduced the benefits period by approximately a year, corresponding to about $12,000. (TT1, pg. 22 line 23 – pg. 24, line 20).

12. As to the third deficiency, if the claim had been settled in May, 1994, as set forth above, rather than in May, 1995, the issue of the claimant having obtained other employment would not have been present to undermine the value of the settlement. (TT1, pg. 25, lines 2-5).

13. The settlement represented about three years worth of benefits, which is not an unreasonable settlement of a claim asserted by a difficult claimant. (TT1, pg. 23, line 23 – pg. 24 line15).

14. The settlement was also reasonable in light of the fact that it cut off the possibility of benefits being reinstated for a period of 500 weeks. (TT1, pg 25, lines 10-14; pg. 34, line 24 – pg. 35, line 3).

15. The actual harm resulting from Royal's deficient handling of this claim amounted to $12,000. (TT1, pg. 25, lines 15 – 21).

## II.  EFFECT OF HARM ON RETROSPECTIVE PREMIUM

**Freed**

16. Mr. Freed's injury was within the 1992 through 1994 three-year retro period. During this period the amount of claims exceeded the retrospective premium maximum. (TT1, pg. 52, lines 8-10; pg. 110, lines 1-3, 8-13[2]).

17. Mr. Freed's claim would have had to exceed $454,131 (which it did not, by any calculation) to affect the premium amount and result in a "harm", because the retrospective premium had reached its maximum allowable amount under the program. (TT1, pg. 52, lines 20-24).

18. The errors the Court found with regard to Freed's claim handling resulted in absolutely no change in the amount of retrospective premium owed by Latrobe. (TT1, pg. 52, lines 8-10).

**Peksa**

19. Mr. Peksa's injury fell within the 1992 through 1994 three-year retro period. During this period the amount of claims exceeded the maximum premium allowable under the policy. (TT1, pg. 52, lines 8-10; pg. 110, lines 8-13).

20. Mr. Peksa's claim would have had to exceed $454,131 to affect the premium amount because the retrospective premium had reached its maximum allowable amount under the program. (TT1, pg. 52, lines 20-24).

---

[2] At TT1, pg. 110, lines 8-17 defense counsel conceded that during the 1992 to 1994 retro period the retrospective premium amount had reached its maximum allowable amount under the policy. Specifically he twice concedes that the incurred losses would have to be reduced by over $450,000 before the retrospective premium would fall below the maximum.

21. The errors the Court found with regard to Mr. Peska's claim-handling resulted in absolutely no change in the amount of premium owed by Latrobe. (TT1, pg. 52, lines 8-10).

**Jury**

22. Mr. Weber's testimony that the actual harm, as a result of the mishandling of the Jury claim, is valued at $53.17. Therefore, the retrospective premium amount owed to Latrobe is the de minimus amount of $61.00.  This is based upon the loss conversion factor of 1.10 and the tax multiplier or 1.049. (TT1, pg. 53, lines 4 -16).

**Depree**

23. According to Mr. Weber's testimony, the actual harm as a result of the handling of the Depree claim is $12,000. Considering the actual harm to Latrobe, the total amount of premium that should be reduced is equivalent to approximately $13, 980. (TT1, pgs. 53-54, lines, 19-25 and line 1).

III.    **CALCULATION OF ADJUSTMENTS TO PREMIUMS**

24. In the event the court determines an actual harm contrary to that offered by Mr. Weber, adjustments to premiums may easily be calculated.

25. Adjustment to the retrospective premium may be calculated by multiplying the amount of actual harm by 1.1539. (TT1, pg. 54, lines 2-8).

26. 1.1539 is comprised of the loss conversion factor of 1.10 multiplied by the tax multiplier of 1.049. (TT pg. 54, lines 11-13).

IV.    **AMOUNT OF RETROSPECTIVE PREMIUMS DUE**

    A.    **Facts and Data Relied Upon by Mr. Chimenti in Calculating the Amount of Retrospective Premiums Due**

27.  It is an industry standard to use loss runs to calculate the amount of retrospective premiums owed. Further, it is not industry standard to consult claims files in calculating the retrospective premiums.

28. The documents that were reviewed by Chimenti were the documents that are routinely reviewed when serving as an expert to determine the amount of premiums due. (TT1, pg. 116; lines 8-12).

29. Defendant's own expert, Mr. Raabe, relied on the same information provided by Royal, that was utilized by Mr. Chimeniti in determining the amount of retrospective premiums due Royal.  Mr. Raabe admitted in his expert report dated July 13, 2003

4048192

that the documents that were made available to him by Royal "provided sufficient information to calculate premiums." (TT1, pg. 119, lines 4-7; pg. 124, lines 6-11).

30. Mr. Chimenti relied, *inter alia*, upon a December 1, 1999 letter authored by David Hooper of Royal/SunAlliance, to Eugene A. Giotto, Esquire, stating that all retrospective premiums had been paid by Latrobe through the February 1994 adjustment period. (TT1, pg. 44, lines 9-16).

31. In calculating the retrospective premiums owed by Latrobe, Mr. Chimenti spent approximately a week reviewing a dozen boxes of documents, consisting of business records from Royal including underwriting records, loss control reports and retrospective rating adjustments. (TT1, pg. 66, lines 21-23; pg. 67, lines 21-25; pg. 68, lines 1-3; pg. 79, lines 16-19; pg. 113, lines 13-14).

32. The retrospective adjustment documents reviewed by Mr. Chimenti were the historical records dating back to the inception of the 1980 retro program. (TT1, pg. 114; lines 16-19).

33. The retrospective adjustment documents were business records generated by Royal for the purpose of presentation to Royal's insured on an annual basis. These documents included the retro adjustment, worksheets indicating the method of calculating the premium and the supporting loss runs. (TT1, pg. 115, lines 1-14).

34. Mr. Chimenti found the loss runs he relied upon, provided by Royal, to be reliable and an accurate reflection of what was paid. The loss runs fairly reflect what Royal actually paid on a particular claim, because they are based on the payments made as reflected in the claims file. (TT1, pg. 87, lines 20-21; pg. 88, lines 6-11; pg. 89, lines 16-19; pg. 124, line 24).

35. When calculating the retrospective premiums Mr. Chimenti reviewed each page of every loss run produced from 1980 through 1995 to determine which of the 800 claims being assessed were not to be included in the retro calculations due to the respective employees' job classification. (TT1, pg. 106, lines 19-24).

36. That loss runs accurately reflect the amounts paid on individual claims is assured by the computerization of their generation, which is the way insurance record-keeping systems customarily operate. (TT1 , pg 89, lines16-23)

37. Mr. Chimenti sets forth that loss runs are considered accurate. In fact, loss runs, alone, are typically utilized for ascertaining what amounts are paid on individual claims. (TT1, pg 87 lines, 20-21).

38. In cases where there is some uncertainty as to the accuracy of the information contained in a loss run, it might be necessary to review the underlying files, but there was no evidence in the present case of any such problems; it was, therefore, unnecessary to undertake such a review.  (TT1, pg 94, lines11-25).

4048192

39. Mr. Chimenti also reviewed Royal statements of account that reflect all of the charges and credits on Latrobe's account. (TT1, pg. 68, lines 20-21; pg. 70, line 1-2 and 5-7).

40. Royal employees informed Mr. Chimenti that the statements of account accurately reflected the credits and charges on Latrobe's account. (TT1, pg. 70, lines 10-21).

41. In the absence of any information to the contrary, having been prepared from Royal's other business records, the statement of account can be considered accurate. (TT1, pg 76, lines 16-19, 71, lines 22-24, pg. 75, lines 12-13).

42. The statements of account were more than mere summaries; they were the business records of Royal, used to record the charges and credits that applied to various policy periods. (TT1, pg. 71, lines 7-10, 18-24; pg. 75, lines 12-13; pg. 76, lines 9-11).

43. Although the amount calculated by Royal was quite possibly higher than the calculations Mr. Chimenti reached, in an effort to be fair and give the benefit of doubt to Latrobe, Mr. Chimenti eliminated any charges in his calculations that did not coincide with the statements of account. (TT1, pg. 70, lines 19-24).

44. In the large volume of documents reviewed by Mr. Chimenti, he determined that Latrobe owed approximately $361,000 in 1994, that was paid by Latrobe in ten installments resulting in the baseline of zero. (TT1, pg. 56, lines 3-5).

45. Mr. Chimenti was satisfied that all premiums were paid by Latrobe as of 1994 and that the documentation that he relied upon to calculate the retrospective premiums was sufficient. This included the statements of account that do not reveal any over-payment by Latrobe. (TT1, pg. 59, lines 16-18; pg. 67, lines 4-5; pg.74, lines 19-21; pg. 75, lines 1-4).

46. When reaching the individual calculations for each year, Mr. Chimenti utilized the 1994 baseline of zero and calculated each year's retrospective premiums due independently, as opposed to relying on a cumulative calculation over a period of years. (TT1, pg. 56, lines 13-23).

47. Mr. Chimenti was very thorough in reaching his calculations. Aside from calculating the individual years independently, he went back and re-calculated the premiums for all of the years where the premiums had not been paid to determine if there was money owed or if a return of premium to the policyholder was due. (TT1, pg. 68, lines 12-15).

48. Mr. Chimenti accurately explains that in the event Latrobe did overpay a payment in past years,[3] (a contention that Plaintiff vehemently denies), utilizing a baseline of zero for 1994 coupled with the dynamics of the loss runs would result in the figures self-correcting and the payment would be appropriately credited. (TT1, pg. 55, lines 17-20; pg. 58, lines 15-18; pg. 60 lines 1-2, 17-21).

---

[3] A proposition that Defendant raised for the first time during Phase II, but has not supported by any evidence.

4048192

49. Mr. Chimenti found no evidence whatsoever indicating that there had been an overpayment of premium by Latrobe. (TT1, pg. 119, lines 2-3).

50. Latrobe's expert witness, Gerald Raabe, also relied on Royal's loss runs in doing his computation of the retrospective premiums, and did not question their accuracy in any way.  (July 31, 2003 Expert Report of Gerald L. Raabe, at pg. 7 ("The established claim values were obtained from the worksheets and Royal's loss runs.")).

51. Latrobe's expert, Mr. Raabe, was of the opinion that "the documents that were made available [which included the loss runs] provided sufficient information to calculate premiums I believe to be reasonable and true." (July 31, 2003 Expert Report of Gerald L. Raabe, at pg. 6).

52. The documents reviewed by Mr. Chimenti in formulating his expert opinion as to the amount of retrospective premiums owed by Latrobe to Royal, including the statements of account and the loss runs, are the types of documents that, in general, he would reasonably rely upon in forming an opinion on that subject. (TT1 pg. 116, lines 8-12).

B.     The Effect of Mr. Chimenti's Reliance on the Hooper Letter

53. In performing his retrospective premium calculations, Mr. Chimenti used 1995 as the starting point, by treating Latrobe's payments as having been current through the 1994 premium adjustment. (TT1, pg. 42, lines 17-19; pg. 59, lines 16-17, 23-25; pg. 67, lines 6-10).

54. In order to establish the foregoing "starting point", Mr. Chimenti relied on a December 1, 1999 letter from David M. Hooper from Royal/SunAlliance to Eugene A. Giotto, Esquire. (TT1 pg 44, lines 9-16; pg. 65, line 13; pg. 81, lines 9-12).

55. Treating Latrobe's premiums as having been paid through the 1994 retro adjustment allowed Mr. Chimenti to establish a baseline for his computations. (TT1, pg. 58, lines 12-14, pg. 60 lines 13-16).  Having established such a baseline, it is a simple calculation to compute the charges and credits going forward from that point in time. (TT1, pg. 59, lines 2-5; pg. 74, lines 9-13).

56. If, in fact, there had been any errors in the pre-1994 premium billings, payments or credits, those errors would have been corrected by the subsequent retrospective premium adjustments. (TT1, pg. 58, lines 15-18; pg. 59, line 25 – pg. 60, line 2; pg. 60, lines 17-21).

57. The statements of account are Royal's record of all the payments and credits on an account. (TT1, pg. 76, lines 9-11).

58. Royal's statements of account would have reflected any overpayment of premium made by Latrobe and because the statements of account never showed any such overpayment. There is no evidence of overpayment by Latrobe. (TT1, pg. 74, lines 19-21; pg. 74, line 25 – pg. 75, line 7).

59. In the absence of any evidence that they are inaccurate, the statements of account, which are prepared from Royal's regularly kept business records, must be deemed accurate. (TT1, pg 75, lines 8-13; pg. 76, lines 16-19).

C.     **The Reliability of the Loss Runs**

1.     The Safeguards in Place to Assure the Reliability of the Loss Runs

60. Royal's loss runs are generated from data extracted form its live claim handling system called CLASS, which can extract various information from the claims file, including financial data, the name of the adjuster, (and match the name with a telephone number for the adjuster), dollar amounts paid, types of payments in total, names of claimants and dates of loss. (TT2, pg. 4, lines 8-14)

61. From a systems standpoint, Royal conducts five different, random data audits on a monthly basis to assure that the loss runs accurately reflect what is in the claims files. (TT2, pg 4, lines 15-23).

62. Royal also has all of the required Sarbanes-Oxley controls in place. (TT2, pg. 4, lines 8-14).

63. Royal has a system of self-auditing where by each claims adjuster regularly reviews his/her own files for accuracy. (TT2, pg. 5, lines 6-7).

64. Additionally, Royal claims adjusters perform peer reviews, where they inspect each others' files to validate information, including payments that have been made, the strategy for closing the claim or other disposition plan as well as handling techniques. (TT2, pg. 5, lines 8-12).

65. Each Royal claim manager is required to review ten claim files per month for each adjuster. (TT2, pg. 5, lines 13-15).

66. Royal also has a claim audit team that audits each claim office once a year. (TT2, pg. 4, lines 15-17).

67. Royal also has an internal audit that reviews all functions within the organization, but focuses on financial transactions. (TT2, pg.5, lines 19-22).

68. The internal audit involves sampling a large number of claims to assure that every payment reflected in the system has a back-up document in the file that has been

    validated and to check that amount against the loss runs. (TT2, pg. 5, line 22 – pg. 5, line 1).

69. To ensure accuracy, Royal requires that two people be involved in the issuance of a check (or a similar transaction) – one individual to do the entry and the other to do the authorization. (TT2, pg. 6, lines 5-8).

70. Individuals in the organization have different and specific levels of authorization for transactions that cannot be exceeded. (TT2, pg. 6, lines 8-15).

71. Each Royal manager is required to generate two different error reports on a weekly basis and every error must be addressed and corrected. (TT2, pg.6, lines 16-19).

72. There are also a series of external audits that assure that Royal's information is accurate. (TT2, pg. 7, lines 9-11).

73. Royal's independent auditor reviews Royal's entire organization annually. (TT2, pg. 7, lines 11-12).

74. Royal's reinsurance treaty panel periodically audits Royal's claim files to make sure that payments are appropriate, that the files are being handled properly and that Royal is disposing of them in a reasonable and equitable manner. (TT2, pg. 7, lines 12-16).

75. Each state in which Royal does business performs periodic audits, generally every two to three years. Because Royal does a high volume of business in Pennsylvania, the state randomly audits its files every 18 months. (TT2, pg. 7, line 17 – pg. 8, line2).

76. Royal is not on any reinsurer claim-handling watch list, nor is it on any regulatory claims-handling watch list. (TT2, pg. 8, lines 3-12).

77. The Internal Revenue Service recently completed an exhaustive two-and-a-half year review of everything that has transpired in Royal's organization for the past eight years and concluded that Royal's record is clean. (TT2, pg. 7, lines 15-21).

78. As a result of the foregoing audits, reviews and safeguards, absent specific (of which there is none) information suggesting a specific problem with particular records of Royal, Royal's records must be considered reliable and accurate.

    2.    <u>Specific Evidence of the Reliability of the Loss Runs</u>

79. Out of the more than 800 claims at issue in this action and out of the 21 files that Latrobe specifically investigated, Latrobe attempted to adduce evidence as to three of these files to show that there were inaccuracies in Royal's loss runs, claiming that its counsel "only had time to look at three of them," that "they are the first three that

came up," that "we have looked at just three claims" and that "we looked at just the first three." (TT1, pg. 96, lines 6-7; lines 9-10; pg. 110, lines 13-14, 15).

80. The first of these files was the Augustine file, for which Latrobe asserted that benefits of $487.32 per week had been paid to the claimant for a period of ninety-four and one-seventh weeks, for a total benefit of $45,934.18, which was inconsistent with the indemnity paid for this claim as reflected in Royal's 2002 loss run of $167,934. (TT1, pg. 96, line 13 – pg. 99, line 15).

81. The apparent inconsistency asserted by Latrobe was, however, not an inconsistency at all, because the Augustine file was reopened four months after the settlement upon which Latrobe relied to show the inconsistency. (TT2, pg. 9, lines 17-23).

82. After the file was reopened on January 17, 1997, Royal made additional payments for recurring treatment, for court reporters, and for further legal investigation,[4] until the file was ultimately closed in April, 2002, and none of these additional payments were reflected in the calculations proffered by Latrobe in support of its inconsistency claim. (TT2, pg. 11, lines 8-16).

83. A review of the electronic information available on Royal's CLASS system revealed that, in fact, the indemnity payments reflected in Royal's 2002 loss run were 100% accurate, because the amount reflected in the 2002 loss run was exactly the same as the amount that appears in the CLASS system. (TT2, pg. 11, lines 17-18; pg. 13, lines 12-15; pg. 14, lines 6- 10).

84. The detailed investigation of Royal's record-keeping undertaken by Latrobe in the Augustine file serves to solidify the accuracy and reliability of the Royal loss runs. Therefore, Latrobe's attempt to demonstrate inaccuracy or inconsistency is unsupported by the evidence.

85. The second file for which Latrobe attempted to prove an inaccuracy with the loss run was the Younker file as to which Latrobe adduced evidence that the claim had been dismissed in 1997, but that nonetheless, Royal still showed a reserve of $48,905 in the 2002 loss run. (TT1, pg., 101, line 13 – pg. 102, line 20).

86. The apparent inconsistency asserted by Latrobe was, however, not an inconsistency at all, because, just as was the case with the Augustine file, the Younker file was reopened shortly after the claim dismissal upon which Latrobe relied, when the claimant re-filed with a new doctor, a new attorney and a new causal relationship. (TT2, pg. 11, line 19 – pg. 12, line 3).

87. Review of the CLASS system revealed that Royal actually made additional payments on the claim after it was initially dismissed and then re-filed, and that the amount of such payments was approximately the same as the reserve amount in the 2002 loss

---

[4] In calculating the retrospective premiums only the additional payments for recurring treatment were considered.

**4048192**

run, thus proving that there was no inconsistency in the loss run. TT2, pg. 12, lines 3-4; pg. 18, lines 14-20).

88. Thus, far from proving any inaccuracy or inconsistency in Royal's loss runs, the detailed investigation of the record-keeping in the Younker file undertaken by Latrobe also serves to confirm the accuracy and reliability of the loss runs.

89. The third file for which Latrobe attempted to prove an error in the loss run was the Freed file. However, the perception of such an error was simply the result of Latrobe's counsel misreading the loss run and, in fact, no such error existed. (TT1, pg. 108, lines 8-21; TT2, pg. 9, lines 2-16).

90. Accordingly, whether the three files cited by Latrobe were, in fact, "the first three that came up," or whether, instead, they were carefully selected by Latrobe out of all the available files, the scrutiny of these files buttresses the conclusion that Royal's loss runs are accurate and reliable, and that it was entirely appropriate for Mr. Chimenti to rely on them in performing his retrospective premium calculations, as did Latrobe's own expert, Mr. Raabe.

91. In fact, although Latrobe supplied copious innuendo that Royal's loss runs were inaccurate, it ultimately adduced absolutely no evidence to that effect.

**D.      Amount of Retrospective Premiums Owed by Latrobe**

<u>1.      Retrospective Premiums Due as of Phase I</u>

92. As set forth in his report of September 16, 2003, and reaffirmed at trial, Mr. Chimenti's conclusion as to the total amount of retrospective premiums owed by Latrobe to Royal is $851, 549. (TT1, pg. 48, lines 3-11).

93. Mr. Chimenti began his calculation of the retrospective premiums with the 1995 retrospective adjustment. (TT1, pg. 41, lines 15-16).

94. The December 1, 1999 Hooper letter demonstrating that Latrobe's premiums had been paid through the 1994 retro adjustment was relied on by Mr. Chimenti, establishing a baseline of zero commencing the 1995 retro adjustment period. (TT1, pg. 41, lines 15-18; pg. 42, lines 11-13; pg. 44, lines 9-16).

95. Mr. Chimenti began with the 1995 calculation then moved forward through current years to calculate and discern either premium due to Royal or refunds due to Latrobe. (TT1, pg. 42, lines 17-20).

96. Utilizing the basic premium factors, tax multipliers, loss conversion factors, the minimum and maximum premium factors for the various retrospective rating periods, Mr. Chimenti calculated the retrospective premium for each of the policy years and also the three-year segments. (TT1, pg. 42, lines 21-25; pg. 43 line 1).

97. Royal has conceded that all premiums owed by Latrobe were paid as of the end of the 1994 adjustment period.

98. Mr. Chimenti reached calculations that in large part were equal to the calculations reached by Latrobe's own expert, Mr. Raabe. (TT1, pg. 46, lines 15-19).

99. Mr. Raabe, utilized a baseline of zero to calculate the 1995 retro adjustment period. Therefore, he too acknowledged that in 1994 all premiums had been paid and no debit to Latrobe existed. (TT1, pg. 46, lines 20-23).

100. Mr. Raabe, Mr. Chimenti and Royal, while undergoing independent examinations, all reached similar calculations for the amount of retrospective premiums owed to Royal in spite of the reductions that Mr. Raabe factored in as a result of Royal's alleged mishandling. (TT1, pg. 46, lines 14-23). [5]

101. The amount of retrospective premiums owed to Royal, prior to Phase I, were in the amount of $851, 549. (TT1, pg. 48, lines 7-8; Chimenti Expert Report, September 16, 2003, pg. 5).

2.  Retrospective Premiums Due, to Date

102. Further, Mr. Chimenti obtained the current loss runs valued in 2006 to assist in his calculations to determine the present retrospective premiums due to Royal. (TT1, pg. 77, lines 22-24).

103. Mr. Chimenti consulted the retrospective adjustment documents dating back to 1980, in order to calculate the standard premium, and in turn the first retro adjustment through the most recent adjustment in order to ensure the value as of February 2006 of $943, 670 for the retrospective premium program was accurate. (TT1, pg. 114, lines 16-24; pg. 115, lines 17-21).

104. As was conceded by Defendant, the retrospective premiums are dynamic; therefore, Mr. Chimenti brought them to date utilizing the current loss run value, as of February 2006. Using current loss run values, Mr. Chimenti calculated the retrospective premium for the program to be $943, 670. (TT1, pg. 78, lines 16-17; pg. 120, lines 2-18).

E.   **Interest Owed by Latrobe**

---

[5] Conformity between the retrospective premium calculations between experts is remarkable. Each of Mr. Chimenti and Mr. Raabe's calculations for 1986 through the last three year segment prior to the 1994 adjustment period, where the baseline was determined to be zero, a total of eight years, were in conformity. (TT1, pg. 47, lines 1-25).

4048192

105. Based on the date of the demand letter sent to Latrobe on January 29, 1996, Mr. Chimenti began to calculate the interest on the retrospective premium payments due to Royal. (TT1, pg. 120, lines 22-23; Exhibit 200-A).

106. For the sake of simplicity, Mr. Chimenti began his interest calculations as of February 1, 1996, forbearing two days of interest to the benefit of Latrobe. (TT1, pg. 120, lines 24-25).

107. In order to determine the interest owed to Royal, Mr. Chimenti summarized the credits and premium charges for each year to determine the retrospective premium due. Then, based on the retrospective premium due for each year, individually, Mr. Chimenti calculated the amount of interest owed per year, based upon the statutorily mandated six percent interest. (TT1, 2-9).

108. Mr. Chimenti utilized this method of individual calculation for years 1996 through 2005. (TT1, pg. 120, lines 7-11; pg. 122, lines 14-22).

109. For the year 2006, Mr. Chimenti utilized the February 2006, retro adjustment to calculate the amount owed by Latrobe through May 2006. (TT1, pg. 120, lines 12-13).

110. The total amount of interest owed to Royal, as of May 1, 2006, utilizing the statutory simple interest rate of six percent, is $539,003.43. (TT1, pg. 120, line 11; line 15).

### F.  Total Damages

111. The amount of damages owed Royal as of May 2006 is $1,473,673. The total retrospective premiums due to Royal are in the amount of $943,670 and the interest upon this amount totals $530,003. (TT1, pg. 120, lines 17-19).

## PROPOSED CONCLUSIONS OF LAW

### I. ACTUAL HARM RESULTING FROM MISHANDLING OF SPECIFIC FILES

a. Two lines of evidence are appropriate for Phase II**:** 1) expert testimony regarding the "actual loss" or harm resulting from such mishandling; and 2) expert testimony regarding the amount of retrospective premiums due. (Op. at 103).[6]

b. Peter Weber is an expert qualified to offer expert testimony regarding the first of these two lines of inquiry. (2/8/05 Phase I Tr., pg. 132, lines16-17;[7] TT1, pg. 5, lines 14-21).

---

[6] Op. refers to the January 6, 2006, Findings of Fact and Conclusions of Law.
[7] Phase I Tr. refers to the trial transcript of Phase I beginning on February 8, 2005.

c.  Four of the twenty-one files considered in Phase I, were mishandled to some extent. Those are the Peksa, Jury, Freed and Depree files. (Op. at 99; TT1, pg. 5, lines 6-10).

**Peksa**

d.  With regard to the Peksa file, Royal mishandled the claim only to the extent that it failed to recommend to Ms. Peksa a potential advantage of purchasing an annuity to pay benefits to her child, Tiffany. (Op. at 91-2).

**Freed**

e.  As to the Freed claim, there were two aspects of the handling of the file that were deficient. First, Royal unilaterally terminated benefits, which was improper. Second, Royal delayed unnecessarily in seeking suspension of benefits. (Op. at 51-52; TT1, pg 12, lines 17-25).

**Jury**

f.  The only deficiency present in Royal's handling of the Jury claim was the failure to immediately reinstate Mr. Jury's benefits once he was terminated. (Op. at 67, 72, n. 38; TT1, pg 15, lines 14-20.)

**Depree**

g.  Mr. Depree's claim "arguably presented somewhat of a 'nightmare' scenario (*i.e.*, a hostile unmotivated employee with just enough medical evidence to make a suspension or termination somewhat difficult." (Op. at 48).

h.  Royal's handling of the Depree claim was deficient in three respects: 1) Royal reinstated benefits after the "ladder incident" without having undertaken an adequate investigation of the claim; 2) the ongoing investigation/monitoring during the period during which benefits were being paid was inadequate; and 3) the $37,000 settlement reached in May, 1995 was not, on its face, reasonable, given that the claimant had procured other employment by the time the settlement was reached. (Op. at 48-49; TT1, pg. 17, line23 – pg. 119, line 20)

II.   **AMOUNT OF RETROSPECTIVE PREMIUMS DUE**

i.  Two lines of evidence are appropriate for Phase II **:** 1) expert testimony regarding the "actual loss" or harm resulting from such mishandling; and 2) expert testimony regarding the amount of retrospective premiums due. (Op. at 103)

j.  Jerry Chimenti is an expert qualified to offer expert testimony regarding the second of these two lines of inquiry. (2/8/05 Phase I Tr, pg. 69, line 18 – pg. 73, line 5; TT1, pg. 40, lines 21-22).

   A.   **General Principles Governing the Admissibility of Expert Testimony**

k.  The requirements for the admission of expert testimony are set forth in Rules 702 and 703 of the Fed. R. Evid. Rule 702 provides that an expert may offer expert testimony if:

> (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

*Id*.

l.  The "sufficient facts or data" requirement is merely a threshold requirement. (Latrobe Brief at 15). *U.S. v. Salim*, 189 F. Supp. 2d 93, 100 (S.D.N.Y. 2002) (Under Rule 702, "[t]he threshold inquiry is one of relevance, in that the court must be satisfied that the proffered scientific expert testimony 'is sufficiently tied to the facts' in order to assist the trier of fact to understand the evidence or to determine a fact in issue.").

m.  Fed. R. Evid. 703 amplifies the quality of the facts that must underlie an expert opinion in order for it to be admissible,

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted.

*Id*.

n.  As long as the facts or data are of a type reasonably relied upon by experts in the field, they need not be independently admissible. The cases are legion that have recognized and applied the latter requirement. *Seese v. Volkswagenwerk A.G.*, 648 F. 2d 833, 844, n.15 (3d Cir. 1981) ("In general, whether facts relied on by an expert are in evidence, or ever could be in evidence, is not relevant. The pertinent inquiry under Rule 703 is whether the facts are of a type reasonably relied on by experts in the particular field. The object of this inquiry is of course to determine the reliability of the expert's testimony.")

o.  Latrobe has questioned the admissibility of much of the facts and data upon which Chimenti relied, but nowhere in its challenges to admissibility does Latrobe even acknowledge that, in order for the alleged inadmissibility of Chimenti's facts and data to even be relevant, it had to be accompanied by proof that the facts and evidence were not of a type reasonably relied upon by experts in the field. Notably, the record is entirely devoid of such proof.

p.  The facts and data upon which Chimenti relied are of a type reasonably relied upon by experts in the field. (TT1, pg. 116, lines 8-12; Raabe July, 2003 Expert Report at 6.).

q.  "The proponent of the [expert] testimony does not have the burden of proving that it is scientifically correct, but that by a preponderance of the evidence, it is reliable." *Beswick v. City of Philadelphia*, 185 F. Supp. 2d 418, 432 (E.D. Pa. 2001)

### B. The Facts and Data Upon Which Mr. Chimenti Relied

r.  A statement of account is a document upon which an insurer can properly rely to show the balance due by an insured, for purposes of computing retrospective premiums owed. *Commissioners of the State Insurance Fund v. Photocircuits Corp.*, 2 Misc. 3d 300, 301, 773 N.Y.S.2d 190, 192 (N.Y. Super. 2003) (granting plaintiff's summary judgment motion based, *inter alia* on "statement of account showing the balance due.")

s.  Business records created in the ordinary course of an entity's business are considered reliable. *Rock v. Huffco Gas & Oil Co.*, 922 F. 2d 272, 279 (5th Cir. 1991); *Scaife Co. v. Rockwell-Stand. Corp.*, 446 Pa. 280, 291, n5 285 A.2d 451 (1971); McCormick on Evidence § 306.

t.  Loss runs are documents that are created in the ordinary course of an insurer's business *Reliance Insurance Co. v. Safeharbor Employer Services I, Inc.*, No. 6:04CV1236ORL-31JGG at *2, 2006 WL 822527 (M.D. Fla. March 24, 2006).

u.  Mere anecdotal evidence of the existence of inaccurate data underlying retrospective premium calculations is insufficient to establish the inaccuracy of such data. *Id*. at *3.

v.  Merely questioning the accuracy of the claim amounts reflected in the loss runs, without offering any proof as to the lack of accuracy is insufficient to establish the inaccuracy of the loss runs. *Id*.

w.  The testimony of Dianne Leger, concerning the multiple, redundant safeguards, both internal and external, to insure the accuracy of all of Royal's business records, including the loss runs, coupled with the failure of Latrobe to adduce any evidence to suggest that there was any inaccuracy in Royal's records, generally, and in the loss runs, in particular, requires that all of the data underlying Mr. Chimenti's retrospective premium calculations be deemed reliable. See, *Reliance Insurance Co. v. Safeharbor Employer Services I, Inc.*, No. 6:04CV1236ORL-31JGG at *3, 2006 WL 822527 (M.D. Fla. March 24, 2006) ("Before the loss information was entered into Reliance's computer, Reliance's 'Corporate Systems Department' or 'Data Integrity Department' reviewed it, comparing it to the previous loss information to insure the integrity and accuracy of the information .…Reliance also conducted random audits of its claims adjusters and the state guaranty associations to insure the accuracy of the information being provided…In addition to checking the data underlying the retrospective premium calculations, Reliance had an internal 'check and balance' system designed to insure that the calculations themselves were accurate.")

### C. The Effect of Mr. Chimenti's Reliance on the Hooper Letter

x.  Mr. Chimenti's reliance on the December 1, 1999, letter authored by David Hooper as establishing the "baseline for his calculations, can properly be viewed as comprising two components:  1) the concession that Royal did not have any claims against Latrobe for

4048192

unpaid premiums for any period prior to 1995 and 2) the assertion that Latrobe did not have any counterclaim for overpayment of premiums for that same period. (*See*, e.g. TT1, pg 64, lines 11-19).

y.  To the extent that Latrobe disagreed with Mr. Chimenti's assertion that it had no pre-1995 counterclaim, Latrobe was free to introduce evidence of the existence of such counterclaim.

z.  Because Latrobe adduced no evidence whatsoever of a counterclaim for overpaid pre-1995 premiums, such counterclaim must be deemed nonexistent and, coupled with Royal's concession that it possessed no claim for unpaid pre-1995 premiums, renders entirely appropriate Mr. Chimenti's treatment of the 1994 policy year as his baseline for retrospective premium calculations.

## III. THE AWARD OF PREJUDGMENT INTEREST IS APPRORIATE

aa. In Pennsylvania, prejudgment interest is available as a matter of right on money owed under a contract. *McDermott v. Party City Corp.,* 11 F. Supp. 2d 612, 632 (E.D. Pa. 1998).

ab. The concept of liquidated damages is "implicit" in Restatement (Second) of Contracts § 347(a) (1981)[8], adopted by Pennsylvania courts for the purpose of determining when a party is entitled to prejudgment interest. *Black Gold Coal Corp. v. Shawville Coal Co.,* 730 F.2d 941, 944 (3d Cir. 1984).

ac. A plaintiff is entitled to prejudgment interest in the following circumstances: (1) a defendant commits a breach of contract to pay a definite sum of money; or (2) a defendant commits a breach of contract to render a performance the value of which in money is stated in the contract; or (3) a defendant commits a breach of contract to render a performance the value of which is ascertainable by mathematical calculation from a standard fixed in the contract; or (4) a defendant commits a breach of contract to render a performance of the value of which in money is ascertainable from established [*sic*] market prices of the subject matter. Restatement (Second) of Contracts § 347(a) (1981).

ad. The legal right to prejudgment interest begins at the time payment is withheld after it has been the duty of the debtor to make such payment. *Fernandez v. Levin,* 519 Pa. 375, 548 A.2d 1191, 1193 (Pa. 1988).

ae. Breach or discontinuance of the contract arises at the precipitation of an event where the damages are then ascertainable by computation and in spite of the fact that a bona fide dispute may exist as to the amount of the indebtedness. *Palmgreen v. Palmer's Garage, Inc.,* 383 Pa. 105, 108, 117 A.2d at 722.

af. The rate of prejudgment interest is calculated as simple interest at a rate of six percent per year. 41 P.S. § 202 (2005).

---

[8] Formerly, Restatement of Contracts § 337(a) (1932).

**4048192**

ag. In the event a party is not entitled to prejudgment interest as a matter of right pursuant to § 337(a), "prejudgment interest may be awarded on a claim involving unliquidated damages at the discretion of the trial court." *Krain Outdoor Displays Inc. v. Tenn. Continental Corp.,* 1986 U.S. Dist. 21740 (E.D. Pa. 1986); *See also, Feather v. United Mine Workers of America,* 711 F.2d 530, 540 (3d Cir. 1983); *Montgomery County v. Microvote Corp.,* No. 97-6331, 2001 U.S. Dist. LEXIS 8737 (E.D. Pa. 2001).

ah. Latrobe breached its contract to pay a definite sum in the form of premiums to Royal; satisfying the first prong of *Black Gold.* Further, the prejudgment interest owed to Royal can easily be calculated utilizing a mathematical calculation established from Pennsylvania law and generally accepted in the business of insurance carriers.

        Respectfully Submitted,

        OBERMAYER REBMANN
        MAXWELL & HIPPEL LLP

Dated: June 6, 2006        By: _s/Bruce C. Fox_____
        Bruce C. Fox, Esq.
        bruce.fox@obermayer.com
        Pa. I.D. No. 42576
        Rudy A. Fabian, Esq.
        rudy.fabian@obermayer.com
        Pa. I.D. No. 56703
        One Mellon Center, Suite 5240
        500 Grant Street
        Pittsburgh, PA  15219
        (412) 566-1500
        F: (412) 566-1508

        Counsel for Plaintiffs Royal Insurance
        Company of North America, *et al*.

**4048192**

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that he has on the 6th day of June, 2006, served a copy of the within *Plaintiff's Proposed Findings of Fact and Conclusions of Law* on the person and at the address listed below via U.S. Mail, First Class, postage prepaid:

Mark Gordon, Esq.
Timothy Smith, Esq.
Pietragallo, Bosick & Gordon
One Oxford Centre, 38th Floor
301 Grant Street
Pittsburgh, PA 15219-1407

s/Bruce C. Fox_____
Bruce C. Fox, Esquire

**4048192**