# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **ROYAL INSURANCE COMPANY OF AMERICA, an Illinois Corporation, ROYAL INDEMNITY CO., a Delaware Corporation, and AMERICAN AND FOREIGN INSURANCE COMPANY, a Delaware Corporation,** <br>         **Plaintiffs,** <br>   **vs.** <br><br> **LATROBE CONSTRUCTION COMPANY,** <br><br>       **Defendant.** | **Civil Action No. 00-2128** <br><br> **The Hon. Francis X. Caiazza** <br> **Chief Magistrate Judge** <br><br> **Royal's Brief in Opposition to Defendant's Motion to Strike Testimony of Gerald Chimenti** <br><br> **ELECTRONICALLY FILED** |

Plaintiffs, Royal Insurance Company of America, Royal Indemnity Co., American and Foreign Insurance Company (collectively, "Royal"), by and through their undersigned attorneys, file this Brief in Opposition to Defendant's Motion to Strike Testimony of Gerald Chimenti, stating as follows.

## I.    Introduction

In its Motion to Strike Testimony of Gerald Chimenti, Defendant Latrobe Construction Company ("Latrobe"), asks the Court to entirely exclude the testimony of Royal's expert witness on damages, Gerald Chimenti, because the factual basis underlying his expert testimony is, allegedly, not sufficiently reliable. In proffering this argument, Latrobe sets forth a plethora of irrelevant facts, many of which are actually belied by the record, and then analyzes these facts in light of decisional law that it either misapprehends or misstates.

Latrobe's  basis for seeking the exclusion of Chimenti's testimony can  be distilled to two points: 1) that the statement of account that Chimenti used to establish a "starting point" for his retrospective premium calculations is not admissible and is unreliable; and 2) that the loss runs upon which Chimenti relied are similarly unreliable. However, there is no merit to either of the asserted bases for excluding Chimenti's testimony.

**II.**	**General Principles Governing  Admissibility of Expert Testimony**

**A.**	**Latrobe Misstates the Requirements for  Admissibility of Expert Testimony**

The requirements for the admission of expert testimony are set forth in Rules 702 and 703 Fed.R.Evid.   Rule 702 provides that an expert may offer expert testimony if:

> (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

<u>Id</u>.

Latrobe's attack on the admissibility of Chimenti's testimony is based solely on its contention that the first prong of this three-part requirement is not satisfied.   As acknowledged by Latrobe however, the "sufficient facts or data" requirement is merely a threshold requirement. (Latrobe Brief at 15). As set forth in *United States v. Salim*, 189 F.Supp. 2d 93, 100 (S.D.N.Y. 2002), under Rule 702, "[t]he threshold inquiry is one of relevance, in that the court must be satisfied that the proffered scientific expert testimony 'is sufficiently tied to the facts' in order to assist the trier of fact to understand the evidence or to determine a fact in issue." As will be shown below, that threshold requirement is easily satisfied here.

4053941

Rule 703 goes on to amplify on the quality of the facts or data that must underlie an expert opinion in order for it to be admissible:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing.  If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted.

Id.

Thus, this provision sets forth two related criteria for the "facts or data" upon which an expert opinion may be based.  First, such facts and data need not be provided to the expert at the hearing; they can be provided to him/her before the hearing.  Second, as long as the facts or data are of a type reasonably relied upon by experts in the field, they need not be independently admissible.  The cases are legion that have recognized and applied the latter requirement. *Seese v. Volkswagenwerk A.G.*, 648 F. 2d 833, 844, n.15 (3d Cir. 1981) explains that:

> In general, whether facts relied on by an expert are in evidence, or ever could be in evidence, is not relevant. The pertinent inquiry under Rule 703 is whether the facts are of a type reasonably relied on by experts in the particular field. The object of this inquiry is of course to determine the reliability of the expert's testimony.

*Id.*

See also *Rossi v. Mobil Oil Corp.,* 710 F. 2d 821, 830 (Temp. Emer. Ct. App. 1983)("[witness] was qualified as an expert witness, and as such, was entitled to rely on inadmissible evidence in forming his opinions. Fed.R.Evid. 703, 704, [and] [t]he only requirement was that the facts or data relied upon be 'of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject.'").

Nevertheless, apparently oblivious to the clearly-stated provision of Rule 703, Latrobe repeatedly refers to the alleged "inadmissibility" of Chimenti's facts and data as a basis for excluding his testimony, while blatantly ignoring the concomitant requirement that they not be of a type reasonably relied upon by experts in the field.  Sometimes Latrobe refers directly to admissibility: "Unfortunately for Chimenti, Mr. Hooper's letter, in addition to being of questionable admissibility…" (Latrobe Brief at 9), other times it speaks in terms of hearsay as a bar to admissibility: "Setting aside for the time being the hearsay objection that was raised by Latrobe to the introduction of this letter…" (Latrobe Brief at 9).[1]  In places, it invokes an alleged lack of authentication as a surrogate for admissibility:   "The 2002 loss runs are not self-authenticating."  (Latrobe Brief at 10).  Yet, nowhere in these ill-founded challenges to admissibility does Latrobe even acknowledge that, in order for the alleged inadmissibility of Chimenti's facts and data to even be significant, there must be proof that the facts and evidence were not of a type reasonably relied upon by experts in the field.  Notably, the record is entirely devoid of such proof.[2]

To the contrary, there is ample evidence that Chimenti's facts and data are precisely the type upon which other experts in his field reasonably rely. Chimenti testified that the documents upon which he relied are "the types of documents that you would routinely review as an expert in determining premium amounts due." (TT1, pg 116, lines 8-12).[3] Latrobe proffered no evidence or testimony refuting Chimenti's testimony on that point. Even more significantly, theses documents are, for the most part,

---

[1] But see, *United States v. Mulder*, 273 F. 3d 91, 102 (2d Cir.2001) (finding that an expert can rely upon multiple hearsay if experts in the same field reasonably rely upon such evidence).

[2] Tellingly, Latrobe's damages expert witness, Gerald Raabe, did not testify in the damages phase of the trial.

[3] " TT1" refers to  the Trial Transcript of May 2, 2006. "TT2" refers to the Trial Transcript of May 3, 2006.

4053941

the very same documents upon which Latrobe's own expert damages witness, Gerald Raabe ("Raabe"), relied.

Chimenti relied on: **1)** the workers compensation policies (Chimenti July 10, 2003 expert report at 1); **2)** the retrospective premium endorsements (Id.); **3)** premium audits (Id.); **4)** loss runs (Id.); **5)** retrospective adjustment worksheets (Id.);  **6)** correspondence (TT1, pg. 213, lines 11-17; pg. 116, lines 13-14.);  and **7)** retrospective rating information (TT1, pg. 115, line 22 – pg. 116, line 4).  Raabe, Chimenti's absent counterpart at Phase II of the trial, relied on: **1)** insurance policies or portions thereof (Raabe July 31, 2003 expert report at 1); **2)** various endorsements to the policies including retrospective premium agreements (Id.); **3)** audits (Id. at 6); **4)** Royal's loss runs (Id. at 7); **5)** worksheets (Id. at 7); **6)** correspondence (Id.); and **7)** all available retrospective rating adjustments (Id. at 1). Hence, it is undisputed that Raabe relied on precisely the same facts and data as Chimenti did. Further, Raabe confirmed that "**the documents that were made available provided sufficient information to calculate premiums I believe to be reasonable and true.**" (Id. at 6).  This concession is determinative of the issue as to whether Chimenti's reliance on the documents was reasonable.  Accordingly, Latrobe cannot credibly contend that Chimenti's facts and data are not of a type reasonably relied upon by experts, when its very own expert has already admitted that they are.

Chimenti's reliance on Royal's Statement of Account – which Latrobe has also assailed – as being the type of facts or data upon which an expert in his field would reasonably rely, is supported by the case law.  *Commissioners of the State Insurance Fund v. Photocircuits Corp.*, 2 Misc. 3d 300, 301, 773 N.Y.S.2d 190, 192 (N.Y. Super.

2003) (granting plaintiff's summary judgment motion based, *inter alia*, on "statement of account showing the balance due.")

In light of the foregoing, Royal respectfully submits that it has met its burden of proving that the facts and data upon which Chimenti relied are of a type that experts in his field reasonably rely upon, pursuant to Rule 703. See *Beswick v. City of Philadelphia*, 185 F.Supp. 2d 418, 432 (E.D. Pa. 2001) ("The proponent of the [expert] testimony does not have the burden of proving that it is scientifically correct, but that by a preponderance of the evidence, it is reliable.") Consequently, the independent admissibility *vel non* of such facts and data is of no consequence, and the Rule 702 requirement that Chimenti's expert testimony be based on "sufficient facts or data" is fully satisfied.

### B. Cases Cited by Latrobe are Entirely Inapposite

In its Brief, Latrobe cites a number of cases concerning the reliability of data supporting an expert's testimony and then attempts to misapply the holdings of those cases to the present facts. A closer look at the facts in each of those cases quickly reveals how inapposite those cases are to the present dispute. In support of its assertion that "[s]peculative expert opinion, unsubstantiated by evidence in the record, cannot satisfy an element of Plaintiffs' cause of action." (Latrobe Brief at 15), Latrobe cites *Borough of Olyphant v. PP&L, Inc.*, No.Civ.A. 03-4024, 2004 WL 1091037 (E.D. Pa. May 14, 2004), a case in which plaintiff's expert's opinion was excluded because he "[did] not cite a single piece of evidence that would support his conclusions, nor [did] plaintiff." *Id.* at *12. In contrast, here, Chimenti cited, *inter alia*, Raabe's expert report, LuAnn

Haley's expert report, David Hooper's letter, retrospective adjustment worksheets, premium audits, the Statement of Account, loss runs and payroll audits in support of his September 16, 2003 Supplemental Expert Report. Similarly, Latrobe also relies on *Tobin v. Haverford School,* 936 F. Supp.284 (E.D. Pa. 1996) for the unremarkable proposition that "[t]he Third Circuit has held, 'the factual predicate of an expert's opinion must find support in the record.'" (Latrobe brief at 15). In that case, however, in stark contrast to Chimenti's situation, the expert "admitted unfamiliarity with the facts and issues in the present case." *Id.* at 291. Thus, while Latrobe's cases certainly set forth the parameters for the factual bases that must support expert opinions, they do little to advance Latrobe's request that Chimenti's testimony be excluded.

**III.    Latrobe's Disparagement of the Statement of Account and the David Hooper Letter as a Basis for Excluding Chimenti's Testimony is a Red Herring**

The first of Latrobe's two lines of attack on the facts and data underlying Chimenti's opinion centers on the fact that Chimenti took the 1994 retrospective adjustment as the starting point for his retrospective premium calculations. As described by Chimenti, "[s]o, at that point in time, neither Royal owed return premium to Latrobe, nor did Latrobe owe additional premium to Royal." (TT1, pg. 42, lines 14-16). In order to arrive at this starting point for his calculations, Chimenti considered two documents. The first was a December 1, 1999 letter from David Hooper of Royal to Eugene Giotto, one of Royal's former attorneys. (Attached hereto as Exhibit 3) This letter states that as to Latrobe's account, "the premiums were all paid and historically been paid over a long relationship that started in 1950, and all of the retrospective premiums through the

4053941

February, 1994 adjustment had been paid." (TT1, pg. 44, lines 13-16).  The second document was Royal's Statement of Account, which "is a record of all the credits and payments that are still outstanding on the account." (TT1, pg. 76, lines 9-11) and which shows that as of the 1994 retro adjustment, Latrobe had paid all outstanding premiums, and that Latrobe's account balance was zero.

> **A.    The Statement of Account Contained All the Information Chimenti Required**

Latrobe assails Chimenti for relying on the Statement of Account to determine at what point Royal and Latrobe were "even," in terms of premium.  In doing so, it erroneously claims that Chimenti was obligated to "go behind" the Statement of Account and consider Royal's ledgers, which form the basis of the Statement of Account.  The reason that Latrobe proffers for this incorrect statement is that the Statement of Account "would not reflect that which was actually paid by or on behalf of Latrobe and when it was paid." (Latrobe Brief at 8).  While it is true that the Statement of Account does not show all of Latrobe's individual payments, it does show the *net* amount owed by Latrobe to Royal or by Royal to Latrobe at any point in time, and of course, that is all that Chimenti needed it to do.   The only thing that Chimenti required was a starting point; he did not need to have the entire billing and payment history that led up to that starting point.

Latrobe is also carps that Chimenti confirmed the information in the Statement of Account by reference to the Hooper letter, which also states that through the 1994 retro adjustment, there was no money owed either way.  Latrobe's objection to this letter is that it fails to establish that "the historical payments made by or on behalf of Latrobe were properly credited to the Latrobe account." (Latrobe Brief at 9).

4053941

**B.      Latrobe Fails to Comprehend the Significance of the Statement of Account and the Hooper Letter**

Thus, Latrobe argues that neither the Statement of Account, nor the Hooper letter proves that all of Latrobe's payments were "properly credited to the Latrobe account" by Royal, and that these two documents could not, therefore, properly have been relied upon by Chimenti in establishing the starting point for his calculations.  In making this argument, however, Latrobe has entirely missed the point.   Chimenti's treatment of the 1994 retro adjustment as the "starting point," conceptually involves two components.  First, it is an admission by Royal that, as of that point in time, it was asserting no claim at all against Latrobe for unpaid premiums.  In other words, it is a waiver by Royal of any claim for unpaid pre-1994-retro-adjustment premiums that Royal might have had against Latrobe.  Certainly, Latrobe cannot be heard to complain about the waiver by its adversary of any category of claims against it.  Latrobe also cannot object, therefore, to Chimenti using such waiver as an element of the facts and data upon which he bases his expert opinion.

The second aspect of Chimenti's establishment of the 1994 retro adjustment as the starting point for his calculations, is an assertion that, at that time, Latrobe had no countervailing claim against Royal for premiums that it had paid to Royal that were not "properly credited to the Latrobe account."   Although Latrobe fails to acknowledge it, this "failure to credit" contention is really more properly characterized as either a defense to Royal's claim for retrospective premiums or as a counterclaim.  There are, of course, legal ramifications that flow from either of these characterizations.

**C.      Whether Treated as an Affirmative Defense or as a Counterclaim, Latrobe Cannot Prevail on its Failure-to-Credit argument**

4053941

If Latrobe's failure-to-credit argument is considered a defense, it must be considered as the affirmative defense of "payment." <u>See</u> Rule 8(c), Fed. R. Civ. P., because its essence is that some or all of the amounts claimed by Royal have already been paid by Latrobe, although not properly credited. Because "payment" is an affirmative defense, Latrobe was obligated to affirmatively plead its failure-to-credit theory in its Answer. A review of Latrobe's Answer demonstrates that Latrobe failed to include any mention of its failure-to-credit allegations anywhere therein.[4] The effect of this failure is that Latrobe must be deemed to have waived this defense. <u>See</u> *Security Services, Inc. v. K Mart Corp.*, 996 F.2d 1516, 1519, n. 2 (3d Cir. 1993)("K Mart, however, failed to assert this affirmative defense and therefore has waived it. Fed.R.Civ.P. 8(c).").[5] As Latrobe has waived its failure-to-credit claim, Chimenti's establishment of a "starting point" devolves to nothing more than Royal's concession that it has no unpaid-premium claims that arise before 1995 – a concession that Latrobe lacks standing to contest.

Even if Latrobe is not deemed to have waived this defense entirely, at a minimum, it bore the burden of proving it. *Moore v. Kulicke & Soffa Industries, Inc.*, 318 F. 3d

---

[4] Latrobe's reference to "the Court's holding that the 1974-1980 retrospectively rated plan years remained at issue" (Latrobe Brief at 6) constitutes one of the most blatant of Latrobe's misstatements of the record. There has never been such a holding. Rather, this "holding" is nothing more than the Court's inquiry as to what <u>Latrobe's position is.</u>
THE COURT: "So I can understand better, is it your position, Mr. Gordon, that there is a dispute
           with respect to the premiums that were paid through 1994?"
MR. GORDON; "And what was credited, Your Honor."
(TT1, pg 56, line 24 – pg 57, line 2).
[5]       In its Ninth Affirmative Defense, found at paragraph 48 of its Answer, Affirmative Defenses and Counterclaim, Latrobe does include a perfunctory mention of "payment." This is not, however, sufficient to satisfy the pleading requirement of Rule 8(c). <u>See</u>, <u>Woodfield v. Bowman</u>, 193 F.3d 354, (5th Cir. 1999)("a defendant nevertheless must plead an affirmative defense with enough specificity or factual particularity to give the plaintiff "fair notice" of the defense that is being advanced....In the instant case, however, Nationwide's baldly "naming" the broad affirmative defenses of "accord and satisfaction" and "waiver and/or release" falls well short of the minimum particulars needed to identify the affirmative defense in question."); *Ingraham v. United States,* 808 F.2d 1075, 1079 (5th Cir.1987) ("A defendant should not be permitted to 'lie behind a log' and ambush a plaintiff with an unexpected defense.")

4053941

561, 566 (3d Cir. 2003) ("Once the plaintiff has met this burden, the defendant may proceed with the affirmative defense.  At this point, the defendant has both the burden of production and the burden of persuasion for the affirmative defense."); *Prostko v. Rand*(*In re Pizazz Disco & Supperclub, Inc.*), 114 B.R. 104, 108 (Bankr. W.D. Pa. 1990) ("The burden of proving an affirmative defense is upon the party asserting it.").  Cf. *Four Star Comics Corp. v. Kable News Co.*, 289 F. 2d 632, 636 (2d Cir. 1961) ("the publishers, in spite of their prior tacit assent, may attack the accounts by evidence of errors therein, but have the burden of showing in what manner the accounts are incorrect.").  Although Latrobe's case during the Phase II trial contained a wealth of innuendo that Royal had failed to properly credit payments,[6]  Latrobe adduced absolutely no actual evidence at all of such failure to credit.   In fact, Chimenti "found no evidence whatsoever in any of the documents that [he] reviewed that there was any overpayment of premium." (TT1, pg 119, lines 2-3) and Gerald Raabe made no reference anywhere in his expert report suggesting that premiums had been overpaid by Latrobe. (Id. at lines14-17).[7] Consequently, Latrobe's entire failure-to-credit argument evaporates, leaving only Royal's concession of having no claim for pre-1995 premiums.

If, instead, failure to credit is considered a counterclaim, rather than an affirmative defense, Latrobe fares no better.  If it is a counterclaim, it is undoubtedly a compulsory counterclaim under Fed. R. Civ. P. Rule 13(a), because it arose out of the same transaction as Royal's claim for retrospective premiums – the provision of workers'

---

[6] Q: "There wouldn't be any adjustment going forward if there was a mistake in terms of how the premiums were credited…?" (TT1, pg. 60, lines 3-5); Q:  "Mr. Chimenti, if you received evidence that from 1974 to 1995 there had been overpayment by Royal [sic] of $600,000…?" (Id. Lines 22-23);  Q: "So, you are assuming that the statement of account gives you all the information that you would have required to determine what was earned what was paid and properly credited from 1980 to 1995?" (TT1, pg. 71, lines 18-21)

[7] Despite the representation to the Court by Latrobe's counsel that "Mr. Raabe will provide testimony"(TT1, pg. 48, lines 20-21), Mr. Raabe did not testify.

compensation insurance by Royal to Latrobe. Thus, Latrobe's failure to so much as mention its present failure to credit argument in its Answer, is just as fatal to that argument if it is viewed as a counterclaim if it is viewed as an affirmative defense.

Assuming, *arguendo*, that Latrobe is not entirely barred by its failure to plead it from raising this counterclaim, just as was the case when it was treated as an affirmative defense, Latrobe bears the burden of proof. *Peoples Mortgage Company, Inc. v. Federal National Mortgage Assoc.*, 856 F.Supp. 910 (E.D. Pa. 1994), (Defendant bears the burden of persuasion at trial as to its counterclaim).[8]   Thus, again, Latrobe's failure to adduce a single shred of evidence of a failure to credit is fatal to its counterclaim, as well as to its argument that Chimenti's testimony should be stricken.[9]

### IV.     Royal's Loss Runs are Reliable Business Records of a Type Reasonably Relied Upon by Experts in Chimenti's Field

Latrobe's second avenue of attack on Chimenti's facts and data has to do with his reliance on Royal's loss runs for the incurred loss values that went into his retrospective premium calculations. Latrobe claims that the loss runs are not self-authenticating and, therefore, testimony was required for their admission. (Latrobe Brief at 10). However, authentication is only a prerequisite for admissibility and, as set forth above at 3-4, the

---

[8] Ironically, Latrobe is keenly aware of Royal's burden of proving Royal's entitlement to recover retrospective premiums (Latrobe Brief at 4), but unaware of its own, parallel burden of proof. Royal respectfully submits that, unlike Latrobe, Royal has satisfied the burden of proof on its claim.

[9] Latrobe's entire Brief is laced with complaints about Royal's alleged failure to produce all the documents requested of it and how Latrobe's current inability to prove anything has resulted. Two responses are in order. First, Royal categorically denies that it has failed to produce anything that it was obligated to produce. Second, even if Latrobe's allegations were true, Latrobe was obligated to file a motion to compel in order to redress the alleged non-production and it too late to complain about it in a post-trial brief after the second part of a bifurcated trial. See, *Hayes v. Invigorate International, Inc.,* No. Civ.A.04-1577 at *4, 2005 WL 2491582 (E.D. Pa. Oct. 5, 2005)("If AFB failed to respond to Paramount's discovery requests, Paramount should have filed a motion to compel within the applicable discovery period….the fact remains that Paramount is unable to meet its burden at the summary judgment stage."); *Tuman v. Genesis Associates*, 935 F.Supp. 1375 (E.D. Pa. 1996) (Plaintiff required to file motion to compel to obtain treatment notes necessary for Plaintiff's expert to testify. Failure to file Motion to Compel precludes Plaintiff from objecting to Defendant's assertion that the treatment notes were necessary for the expert's testimony.)

4053941

facts and data upon which Chimenti relied don't have to be admissible, so Latrobes's asserted authentication requirement is untenable.  Latrobe is, therefore, left with nothing to argue except that the loss runs are unreliable:  "[T]here is no reason for the Court to conclude that Chimenti's assumption, that the 2002 loss runs accurately reflected that which was actually paid out by Royal, is founded in fact." (Royal Brief at 14.) Epitomizing the ambiguity of Latrobe's position is its subsequent assertion that "[h]is reliance is simply unreliable." (*Id.*).

>     A.    **The Multitude of Measures Employed to Assure the Accuracy and Reliability of the Loss Runs Guarantee That They are Sufficiently Reliable**

In order to establish the accuracy and reliability of the loss runs, Royal proffered the testimony of Dianne Leger, one of Royal's third-party administrator relationship managers.  Ms. Leger testified extensively about the many layers of oversight and review that occur at Royal, both internally and externally, to assure that all of Royal's records, including the loss runs, are accurate and reliable.  Her testimony included the following points:

1.   Royal's loss runs are generated from data extracted form its live claim handling system called CLASS, which can extract various information from the claims file, including financial data, the name of the adjuster, (and match the name with a telephone number for the adjuster), dollar amounts paid, types of payments in total, names of claimants and dates of loss. (TT2, pg. 4, lines 8-14)

2.   From a systems standpoint, Royal conducts five different, random data audits on a monthly basis to assure that the loss runs accurately reflect what is in the claims files. (TT2, pg. 4, lines 15-23).

3.   Royal also has all of the required Sarbanes-Oxley controls in place. (TT2, pg. 4, lines 8-14).

4.   Royal has a system of self-auditing whereby each claims adjuster regularly reviews his/her own files for accuracy. (TT2, pg. 5, lines 6-7).

5. Royal claims adjusters perform peer reviews, where they inspect each others' files to validate information, including payments that have been made, the strategy for closing the claim or other disposition plan as well as handling techniques. (TT2, pg. 5, lines 8-12).

6. Each Royal claim manager is required to review ten claim files per month for each adjuster. (TT2, pg. 5, lines 13-15).

7. Royal also has a claim audit team that audits each claim office once a year. (TT2, pg. 4, lines 15-17).

8. Royal also has an internal audit that reviews all functions within the organization, but focuses on financial transactions. (TT2, pg.5, lines 19-22).

9. The internal audit involves sampling a large number of claims to assure that every payment reflected in the system has a back-up document in the file that has been validated and to check that amount against the loss runs. (TT2, pg. 5, line 22 – pg. 5, line 1).

10. To ensure accuracy, Royal requires that two people be involved in the issuance of a check (or a similar transaction) – one individual to do the entry and the other to do the authorization. (TT2, pg. 6, lines 5-8).

11. Individuals in the organization have different and specific levels of authorization for transactions that cannot be exceeded. (TT2, pg. 6, lines 8-15).

12. Each Royal manager is required to generate two different error reports on a weekly basis and every error must be addressed and corrected. (TT2, pg. 6, lines 16-19).

13. There are also a series of external audits that assure that Royal's information is accurate. (TT2, pg. 7, lines 9-11).

14. Royal's independent auditor reviews Royal's entire organization annually. (TT2, pg. 7, lines 11-12).

15. Royal's reinsurance treaty panel periodically audits Royal's claim files to make sure that payments are appropriate, that the files are being handled properly and that Royal is disposing of them in a reasonable and equitable manner. (TT2, pg. 7, lines 12-16).

16. Each state in which Royal does business performs periodic audits, generally every two to three years. Because Royal does a high volume of business in Pennsylvania, the state randomly audits its files every 18 months. (TT2, pg. 7, line 17 – pg. 8, line2).

17. Royal is not on any reinsurer claim-handling watch list, nor is it on any regulatory claims-handling watch list. (TT2, pg. 8, lines 3-12).

14

18. The Internal Revenue Service recently completed an exhaustive two-and-a-half year review of everything that has transpired in Royal's organization for the past eight years and concluded that Royal's record is clean. (TT2, pg. 7, lines 15-21).

In the face of this overwhelming body of evidence as to the extraordinary efforts taken to assure the accuracy and reliability of Royal's records, Latrobe nevertheless asserts that "Royal, however, has no evidence to support that the total incurred values that it utilized for the retrospective formula, and which were relied upon by Chimenti to calculate the premiums, accurately and fairly reflected what the total incurred values should have been for these claims." (Latrobe Brief at 20).[10]  One can only posit that Latrobe's counsel was absent from the courtroom during Ms. Leger's testimony.

In its Brief, Latrobe unsuccessfully attempts to undermine Ms. Leger's testimony, claiming that "Ms. Leger's testimony fails, for multiple reasons." (Latrobe brief at 13). None of these "multiple reasons" can, however, withstand scrutiny.  Latrobe claims that Ms. Leger "asserts that the CLASS system was not installed for Latrobe until the late 1980's." and then disingenuously contends that "[t]he vast majority of Latrobe's claims occurred prior to the 1980's." (Latrobe Brief at 13).  While it may be true that a large number of Latrobe's claims (but certainly not "the vast majority") originated prior to the 1980's, that fact is irrelevant here. What is relevant is that none of the claim payments made by Royal that are at issue in this litigation, date from the 1980's, much less the pre-1980's period.  As set forth above, Royal's claim for retrospective premiums begins with the 1995 retrospective adjustment.  As to Latrobe's failure-to-credit affirmative defense/counterclaim, Latrobe may believe that such claims date from the 1970's, but, as

---

[10] Latrobe's demand that Royal affirmatively prove the accuracy of the incurred loss values in its loss runs would effectively require Royal to prove a negative: *i.e.* that there are no errors in the loss runs.  Rather, it is Latrobe that bears the burden of proving that there are errors in the loss runs – something which it failed to do. See, infra at 18-22.

4053941

set forth above, Latrobe has waived and/or failed to prove these claims. Consequently, they are not part of this litigation and cannot possibly support Latrobe's contention that "the vast majority of Latrobe's claims occurred prior to the 1980's."

> **B.      Recent Case Law Confirms that the Loss Runs Should be Treated as Being Accurate and Reliable**

A case decided but ten weeks ago is also useful in disposing of Latrobe's attack on the reliability of the loss runs. In *Reliance Insurance Co. v. Safeharbor Employer Services I, Inc,* No.6:04CV1236ORL-31JGG, 2006 WL 822527 (M.D. Fla. March 24, 2006) an insurer sued its insureds to recover retrospective premiums on workers' compensation policies. As part of their defense, the insureds questioned not plaintiff's method of calculation of the retrospective premiums, but rather, the dependability of the underlying data – i.e. the loss runs. The court recognized –as is true in the present case, as well – that the loss runs are created in the ordinary course of the insurer's business and that they "reflect a summary of each claim made during the policy year, its status (open or closed), the reserve established and amounts paid." Id. at *2.

The court then went on to describe the methods that the insurer had in place to assure the accuracy of its loss runs:

> Before the loss information was entered into Reliance's computer, Reliance's "Corporate Systems Department" or "Data Integrity Department" reviewed it, comparing it to the previous loss information to insure the integrity and accuracy of the information… Reliance also conducted random audits of its claims adjusters and the state guaranty associations to insure the accuracy of the information being provided….
>
> In addition to checking the data underlying the retrospective premium calculations, Reliance had an internal "check and balance" system designed to insure that the calculations themselves were accurate. For example, after a retrospective calculation was done, a manager would review it, the accounting department would review it, and in some cases

16

(including this one), the underwriter for Defendants' policies would review the factors and the calculation to insure their accuracy before the calculation was sent to Defendants.

Id. at *3.

The above-described data-integrity measures sound remarkably like Royal's procedures, except, if anything, Royal's are even more comprehensive and robust. These measures were sufficient to give the *Reliance* court comfort that the loss runs before it were dependable, and Royal's analogous measures should also be deemed adequate here.

The *Reliance* defendants' attempted proof of the loss runs' supposed inaccuracy was described as follows:

> At trial, Defendants offered only anecdotal evidence that some of the data underlying Reliance's premium calculations might have been inaccurate. Defendants' in-house counsel and corporate representative questioned some of the data based on his recollection of several claims. He testified, for example, that a few "open" claims should have been closed. In one instance, this would have had the effect of reducing a particular converted loss by $105,000.
>
> As to other payments, Defendants simply questioned their accuracy. No proof was offered that any claim amount reflected in the loss runs was in fact erroneous.

Id. at *3.

This too sounds remarkably like the present case, except that Latrobe has not even offered anecdotal evidence of inaccuracy, relying solely on unfounded inferences of inaccuracy[11] and on its failed attempt to prove errors in the loss runs that is described below. Thus, for all the reasons that the Reliance court upheld the reliability of the loss

---

[11] For example, Latrobe contends that "[n]ot having reviewed the claims files, Chimenti could not determine whether the amounts reflected as paid in the claim files can be reconciled against the loss data provided in the 2002 loss runs." (Latrobe brief at 11). Given the sophisticated and robust data-integrity procedures described by Dianne Leger, there is no reason why Chimenti would have any reason to go and check claim files.

17

runs, plus some that were not present there, this Court should likewise reject Latrobe's attack on the reliability of Royal's loss runs.

### C.     The Investigation of Particular Claims During Trial Confirms the Accuracy and Reliability of the Loss Runs

Out of the more than 800 claims at issue in this action and out of the 21 files that Latrobe specifically investigated, at trial, Latrobe, claiming that its counsel "only had time to look at three of them," that "they are the first three that came up," that "we have looked at just three claims" and that "we looked at just the first three." (TT1, pg. 96, lines 6-7; lines 9-10; pg. 110, lines 13-14, 15), Latrobe then attempted to adduce evidence as to three of these files to show that there were inaccuracies in Royal's loss runs.  As shown below, however, Latrobe's attempt backfired and ended up serving to buttress, rather than undermine, the conclusion that the loss runs are accurate and reliable.

#### 1.     The Augustine File

The first of these files was the Augustine file, for which Latrobe asserted that benefits of $487.32 per week had been paid to the claimant for a period of ninety-four and one-seventh weeks, which culminated in a settlement and the closing of the claim file.  The total benefit paid by Royal during this period was $45,934.18.  Latrobe pointed out that this amount appeared to be inconsistent with the indemnity paid for this claim as reflected in Royal's 2002 loss run of $167,934. (TT1, pg. 96, line 13 – pg. 99, line 15).  Latrobe claimed that this inconsistency proved the flaws in Royal's record-keeping generally, and in the loss runs, specifically.

Despite Latrobe's efforts to prevent her from addressing this issue (TT1, pg. 127, line 2 – pg. 129, line 11), Ms. Leger's testimony established that the apparent inconsistency asserted by Latrobe was, in fact, not an inconsistency at all.  She explained that the Augustine file had been reopened four months after the settlement upon which Latrobe relied to try to prove the inconsistency. (TT2, pg. 9, lines 17-23).  That reopening came too late to be reflected in the claim file that was produced to Latrobe and which formed the basis for its assertion that the total payout on the claim was only $45,934.18.

Ms. Leger also testified that after the file was reopened on January 17, 1997, Royal made additional payments for recurring treatment, for court reporters, and for further legal investigation,[12] until the file was ultimately closed in April, 2002.  None of these additional payments were reflected in the calculations proffered by Latrobe in support of its inconsistency claim. (TT2, pg. 11, lines 8-16).

She testified further that a review of the electronic information available on Royal's CLASS system revealed that, in fact, the indemnity payments reflected in Royal's 2002 loss run were 100 % accurate, because the amount reflected in the 2002 loss run was exactly the same  as the amount that appears in the CLASS system.  (TT2, pg. 11, lines 17-18; pg. 13, lines 12-15; pg. 14, lines 6- 10).   Thus, Latrobe set out to prove that the loss runs were inaccurate and ended up proving just how accurate they are.

In a feeble attempt to avoid this unpleasant reality, Latrobe, referring to the $168,00 amount shown in the loss run and the $46,000 amount it computed based on the incomplete claim file, disingenuously claims that "[n]otably, Chimenti could not explain

---

[12] In calculating the retrospective premiums only the additional payments for recurring treatment were considered.

the $122,000 discrepancy." (Latrobe Brief at 12), while simultaneously ignoring the fact

that Ms. Leger had completely explained the "discrepancy."

> Similarly, Latrobe argues that:

> Ms. Leger would have this Court believe that the $122,000 of
> additional total incurred indemnity values on the Augustine claim,
> reflected in the alleged loss run of 2002, accurately depicted that
> which Royal actually paid out.  She seeks to have the Court accept
> this premise, notwithstanding the fact that she freely conceded that
> she had not reviewed the claim file and could not provide the Court
> with an explanation as to how it was that two claim experts, who
> actually reviewed the Augustine claim, testified that the Royal file
> evidenced only a 20-month pay-out.

(Latrobe Brief at 13).

> Three points of response are in order.  First, in fixating on the fact that Ms. Leger

never reviewed the voluminous claim file, for Augustine Latrobe has entirely missed this

point of this entire exercise – that due to the extraordinary care that Royal takes in its

record-keeping, it is unnecessary to go back to the claim file in order to be confident that

the loss runs are accurate. Second, Latrobe's statement that Ms. Leger "could not provide

the Court with an explanation as to how it was that two claim experts, who actually

reviewed the Augustine claim,  testified that the Royal file evidenced only a 20-month

pay-out" is deliberately misleading, because she was never asked to provide such an

explanation. Third, the explanation for the $122,000 difference between the 20-month

payout of  $46,000 set forth by the experts and the $168,000 total payout shown in the

loss run is simple.  The versions of the claims file that were in the hands of the experts

were obsolete.  They had been produced prior to the time the claim was reopened, so they

couldn't possibly have reflected any post-reopening activity. This explanation is

confirmed by the July 9, 2003 expert report of Peter J. Weber.  At pages 2-4 of that

report, Mr. Weber lists the documents contained in Royal's claim file for Ralph

4053941

Augustine.  The last document in Royal's file was the September 9, 1996 Supplemental

Agreement under which Mr. Augustine returned to work.  *Id*. at 4.   This was well before

the claim was reopened and proves that the explanation for the "discrepancy" is simply

an out-of-date claims file.

Hence, despite Latrobe's efforts, the exploration of the Augustine file stands as

powerful evidence of the reliability of the loss runs.

.        2.        The Younker File

 Latrobe adduced evidence that the claim had been dismissed in 1997, but that

nonetheless, Royal still showed a reserve of $48,905 in the 2002 loss run. (TT1, pg. 101,

line 13 – pg. 102, line 20).

The apparent inconsistency asserted by Latrobe was again, however, not an

inconsistency at all.  Ms. Leger testified that, just as had been the case with the Augustine

file, the Younker file was reopened shortly after the claim dismissal upon which Latrobe

relied.  At that time, the claimant re-filed with a new doctor, a new attorney and a new

causal relationship. (TT2, pg. 11, line 19 – pg. 12, line 3).

Ms. Leger's review of the CLASS system revealed that Royal actually made

additional payments on the claim after it was initially dismissed and then re-filed, and

that the amount of such payments was approximately the same as the reserve amount

shown in the 2002 loss run, thus proving that there was no inconsistency in the loss run.

(TT2, pg. 12, lines 3-4; pg. 18, lines 14-20).  Thus, far from proving any inaccuracy or

inconsistency in Royal's loss runs, the detailed investigation of the record-keeping in the

Younker file undertaken by Latrobe again confirmed the reliability of the loss runs.

4053941

3.    The Freed File

Latrobe's desperate struggle to discredit the loss runs by attempting to introduce evidence of an inconsistency in the Freed file was ill-founded and disposed of quickly when Mr. Chimenti alerted Latrobe's counsel to his mistake of construing a recovery as an expense. As conceded by Latrobe, the error in interpreting the Freed file was simply a case of Latrobe's counsel's confusion. (TT1, pg. 108, lines 8-20). If we have learned anything from the investigation of the Augustine and Younker files, it is that the loss runs and the corresponding claims files truly are consistent with each other, notwithstanding superficial appearances to the contrary.

**V.    Conclusion**

In the Phase II trial, Latrobe did not even attempt to introduce any evidence in support of its view of what the damages should be as a result of the Court's decision in Phase I.  In stark contrast to Royal, Latrobe offered no documents into evidence in support of its damage calculations, it called no fact witnesses, and it called neither its damages expert nor its claims handling expert.  See, *Burton v. Bowen*, 704 F. Supp. 599, 605 (E.D. Pa. 1989) ("Given the unambiguous and uncontroverted conclusion of the vocational expert that *no jobs* were available for a person with plaintiff's characteristics, the Secretary [of Health and Human Services] has clearly not met his burden."). Consequently, Latrobe has no affirmative case upon which to rely.

Instead, Latrobe's strategy was to attack Royal's damages expert witness, not only to undermine the weight of his testimony, but, as it turns out, in an effort to have his testimony excluded, entirely.  However, for the reasons clearly set forth above, Latrobe has fallen far short of establishing a basis for the exclusion of Chimenti's testimony.

4053941

Further, due to Latrobe's resounding failure to place affirmative evidence in the record,
Royal respectfully submits that Latrobe must now accept Royal's proof of damages as
well as an adjudication that Royal is entitled to a judgment for damages against Latrobe
in an amount consistent with the uncontroverted evidence adduced by Royal.

Respectfully submitted,

OBERMAYER REBMANN MAXWELL &
HIPPEL LLP

Dated: June 6, 2006                          By: _s/Bruce C. Fox_____
                                                 Bruce C. Fox, Esq.
                                                 bruce.fox@obermayer.com
                                                 Pa. I.D. No. 42576
                                                 Rudy A. Fabian, Esq.
                                                 rudy.fabian@obermayer.com
                                                 Pa. I.D. No. 56703
                                                 One Mellon Center, Suite 5240
                                                 500 Grant Street
                                                 Pittsburgh, PA  15219
                                                 (412) 566-1500
                                                 F: (412) 566-1508

                                                 Counsel for Plaintiffs Royal
                                                 Insurance Company of North
                                                 America, *et al.*

4053941

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that he has on the 6th day of June, 2006, served

a copy of the within *Brief in Opposition to Defendant's Motion to Strike Testimony of*

*Gerald Chimenti* on the person and at the address listed below via U.S. Mail, First Class,

postage prepaid:

Mark Gordon, Esq.
Timothy Smith, Esq.
Pietragallo, Bosick & Gordon
One Oxford Centre, 38th Floor
301 Grant Street
Pittsburgh, PA 15219-1407

s/Bruce C. Fox_____
Bruce C. Fox, Esquire

4053941

4053941