IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ROYAL INSURANCE COMPANY
OF AMERICA, et al

                                    Plaintiffs

        vs.                         Civil Action No. 00-2128

LATROBE CONSTRUCTION COMPANY

                                    Defendant

PROCEEDINGS

        Transcript of Nonjury Trial on Tuesday, May 2,
2006, United States District Court, Pittsburgh, Pennsylvania,
before Honorable Francis X. Caiazza, District Magistrate.

APPEARANCES:

For the Plaintiff:      Bruce Fox, Esq.

For the Defendant:      Mark Gordon, Esq.
                        Timothy Smith, Esq.

                        Reported by:
                        Michael D. Powers
                        Official Court Reporter
                        Room 5335 USPO & Courthouse
                        Pittsburgh, Pennsylvania 15219
                        (412) 208-7572

Proceedings recorded by mechanical stenography.  Transcript
produced by computer-aided transcription.

1                              I N D E X

2    PLAINTIFF WITNESSES      DIRECT   CROSS   REDIRECT   RECROSS

3    PETER WEBER

4      By Mr. Fox               4
       By Mr. Gordon                    26
5
     GERALD CHIMENTI
6
       By Mr. Fox              40                113
7      By Mr. Gordon                    55                 121

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | P R O C E E D I N G S |
| 2 | (Court convened on Tuesday, May 2, 2006, at 9:50 a.m.) |
| 3 | THE COURT: All right. Good morning, ladies and |
| 4 | gentlemen. |
| 5 | MR. FOX: Good morning, Your Honor. |
| 6 | MR. GORDON: Good morning, Your Honor. |
| 7 | THE COURT: Okay, Mr. Fox, are you ready to |
| 8 | proceed? |
| 9 | MR. FOX: Yes, Your Honor. |
| 10 | In Your Honor's order of December 15th, 2004, in |
| 11 | which Your Honor ordered the bifurcation of this case into |
| 12 | liability phase and damages phase, the Court stated: |
| 13 | If, for example, Royal is able to convince the fact |
| 14 | finder that Royal handled the claims properly under the law, |
| 15 | the only issue that presumably would remain is the proper |
| 16 | amount of retrospective premiums owing. |
| 17 | Well, we are pretty close to that scenario here, |
| 18 | Your Honor. |
| 19 | In Your Honor's phase one opinion, you conclude |
| 20 | that only four of the files out of the twenty-one at issue |
| 21 | evidenced any mishandling. And in each case, the Court was |
| 22 | very specific as to what it felt the deficiencies were. |
| 23 | Therefore, in addition to the basic retrospective |
| 24 | premium calculation contemplated by the Court in its order, |
| 25 | we will first have to make a few minor adjustments into the |

1    underlying claimants for whatever overpayment occurred in
2    these four cases.

3         Our claims expert, Mr. Weber, will opine as to the
4    extent of the harm caused by the mishandling in each of these
5    four cases, that is, the amount by which each of these four
6    claims were overpaid as a result of the specific faux pas
7    identified by the Court.

8         Our damages expert, Mr. Chimenti, after accounting
9    for the overpayment set forth by Mr. Weber, will then do the
10   retrospective premium calculation called for by the Court.

11        So, I think we are looking at a very streamlined
12   and straightforward presentation, Your Honor.

13        THE COURT:  All right.  You may proceed.

14        MR. FOX:  I would like to call Mr. Peter Weber,
15   first of all.

16        THE CLERK:  Please raise your right hand.

17                        *  *  *  *  *

18        PETER WEBER, having first been duly sworn,
19   testified as follows:

20        THE CLERK:  Thank you.  Please be seated.

21        THE WITNESS:  Is this thing on?

22        THE COURT:  It should be, yes.  Try it.

23                    DIRECT EXAMINATION

24   BY MR. FOX:

25   Q    Mr. Weber, have you read the Court's liability decision

1   in this case?

2   A    I have.

3   Q    Have you reviewed the expert report of LuAnn Haley in

4   light of the opinion in phase one?

5   A    I have.

6   Q    Now, please identify the files that you understand are

7   to be addressed at this stage of the case?

8   A    That would be the fatal claim involving Mr. Peksa, the

9   case of Mr. Jury, the other case of Mr. Depree and finally

10  the case of Mr. Freed.

11  Q    Could you please provide a summary of your role, as you

12  understand it, according to the Court's prior decision in

13  phase one of the case?

14  A    My understanding is that I am to provide additional

15  testimony on the specifics of claims handling in these four

16  cases to determine if an act of omission by Royal in the

17  handling of the file resulted in any actual harm, as far as

18  perhaps an overpayment or the payment of interest or penalty

19  because of the faux pas by the Royal claim handler, for lack

20  of a better expression, and then to provide an opinion as to

21  what the dollar value, if any, of that actual harm is.

22  Q    Okay.  Let's move right into Peksa, if we could.

23        Could you provide the Court with a quick outline of

24  the facts underlying the Peksa claim?

25  A    As I indicated previously, this was a fatal claim.  And

 1 │ at the time of Mr. Peksa's unfortunate death in March of
 2 │ 1993, he had one minor child by the name of Tiffany, who had
 3 │ been born in October of 1976, and she was approximately
 4 │ sixteen years, four months old in March of 1993.

 5 │        Royal investigated the accident and the dependency
 6 │ issue and started to paying Tiffany as the only surviving
 7 │ dependent minor.  There was no eligible surviving spouse at
 8 │ that time because the Peksas were no longer together.

 9 │        And subsequent to Royal's commencing the payment
10 │ under a fatal compensation agreement, a second -- well, a
11 │ petition was filed by a second child who was alleged to have
12 │ been the posthumous child of Mr. Peksa's born of his
13 │ girlfriend, Linda Marsh, and that child was apparently born
14 │ in October of 1993.

15 │ Q    That was Tomasina?

16 │ A    And that was Tomasina correct.  And they made a claim
17 │ that Tomasina was the natural child of the decedent and,
18 │ therefore, entitled to share in the fatal dependency benefits
19 │ payable to a minor at the statutory rate.

20 │        And in addition to the claim for Tomasina, there
21 │ was an allegation that two of the Marsh children were also
22 │ dependents, as Mr. Peksa was alleged to have stood in loco
23 │ parentis to those children.  And if they had established
24 │ that, then the number of minor dependents eligible to take
25 │ would have increased from one to four.

1        Eventually, a decision was rendered by the worker's
2   compensation judge in June of '96.  That decision determined
3   that Tomasina was, in fact, the natural child and entitled to
4   take, and there was a division of the benefits payable
5   between the two minor children so that Tomasina was to
6   receive $107.19 per week until she turned eighteen, or if she
7   pursued her education beyond eighteen, to age twenty-three.

8        And, similarly, Tiffany was awarded a benefit rate
9   of $107.20 per week until she turned eighteen or if she
10  pursued higher education, age twenty-three.

11  Q    Please describe Miss Haley's criticism of this file.

12       MR. GORDON:  Your Honor, I am going to object
13  because it is not relevant.

14       THE COURT:  Mr. Fox, what is the relevancy?

15       MR. FOX:  Your Honor, I am just trying to establish
16  a background for your ruling.

17       THE COURT:  Objection is sustained, Mr. Fox.

18  Q    Okay.  Mr. Weber, could you please summarize your
19  understanding of the Judge's findings pertaining to this
20  matter?

21  A    Basically, the two major issues, number one, with
22  respect to the effort to save on the exposure and approach
23  the guardians of the two minors for purposes of purchasing an
24  annuity, the Judge determined that there had been repeated
25  efforts to try to convince the mother of Tomasina, who was

1    the posthumous child, to purchase an annuity, and that she

2    was disinterested or not receptive to the entire concept, and

3    basically believed that Royal had acted reasonably in

4    attempting to reduce the exposure through purchases of an

5    annuity, but was critical of the fact that there had been no

6    effort to contact the guardian or mother of Tiffany, who I

7    believe was Nancy Peksa, to see if there was any interest in

8    an annuity for the balance of the payments due Tiffany.

9         And both of these issues, according to the

10   liability opinion, were areas of approach that would have

11   been reasonable for Royal to pursue after the Judge issued

12   the decision resolving the open dependency issue in June of

13   1996.

14   Q    Do you have an opinion as to whether any actual harm was

15   suffered by Latrobe --

16   A    I do.

17   Q    -- as a result of this?

18   A    I do.

19   Q    Can you describe that opinion to the Court?

20   A    In summary, I don't believe there was any actual harm

21   suffered by the failure to approach Tiffany's guardian for

22   purposes of purchasing an annuity, and I say that for the

23   following reasons:

24        Number one.  If Tiffany had not gone on to school

25   after turning age eighteen, she would have already been

1     eighteen years of age as of the date the Judge rendered the

2     decision on dependency in June of 1996, if my math is

3     correct.

4            And, therefore, she would not have been receiving

5     any ongoing benefits, there would have been no future annuity

6     to approach from -- there would have been no future exposure,

7     so the purchase off annuity would have been a non-issue at

8     that point.

9            If she, as we know after the fact, that she did go

10     on to school and they ended up paying her until she was age

11     twenty-three, that date event occurred in October of 1999.

12     As of October of 1999, she would have ceased getting

13     benefits, and Tomasina would have been the only minor at that

14     point entitled to collect. And we already know that efforts

15     were made to approach the consent of annuity with her

16     guardian, which went nowhere.

17            So, the only exposure that Royal could have

18     adjusted or reduced by purchasing an annuity for Tiffany

19     had -- there were two issues, two sub-issues, if you will.

20            Number one. As of June of 1996, Tiffany is

21     pursuing a higher education degree. At any time that she

22     would have decided to drop out or if she flunked out of

23     college, the obligation to pay benefits would have ceased

24     unless she went to a different college.

25            And with kids of that age, some of them have an

1    epiphany and decide I don't want to go to college.

2              MR. GORDON:  Your Honor, I am going to object to

3    this line of testimony.  It calls for speculation as to what

4    would have happened.  He either knows or doesn't know.

5              THE COURT:  Well, the objection is sustained to

6    this extent:

7              I think you can be more, should I say, factual

8    oriented in your responses, please.  I mean, we're in a

9    very -- some speculation with respect to your answer to the

10   question, which really I do not believe is going to have any

11   impact upon your eventual conclusion.

12             So, I would ask you to be more factual in your

13   response to the question as best you can.  And the Court does

14   understand that what you are attempting to do is give an

15   opinion, and it is necessary to insert somewhere within your

16   testimony, of course, some thoughts that stray from facts.

17   But, please, walk the line just a bit more tightly, please.

18             THE WITNESS:  I will try to do that, Your Honor.

19             It's an uncertainty that would have been considered

20   by a claim handler as to whether or not you should purchase

21   an annuity, bottom line.

22             And if you take the remaining years that she was

23   entitled to get benefits until age twenty-three, that's

24   approximately three years and four months, that it is

25   equivalent of about a hundred and seventy-three to a hundred

1   and seventy-four weeks of benefits.  At her weekly rate of a

2   hundred and seven twenty per week, it's roughly $18,500 of

3   future exposure.

4           I don't believe that exposure is high enough to

5   warrant pursuing an annuity, especially in light of the

6   uncertainty of whether the exposure would last through age

7   twenty-three is the bottom line.

8   Q     I would like to turn to the Freed file.

9           Would you again provide the Court with a short

10  summary of the facts regarding the Freed file?

11  A     Mr. Freed was another individual who has been through --

12  at Latrobe.  He was offered a position to return to work, did

13  not apparently return to work.  But, the claims handler had

14  stopped paying his weekly benefits, which were $237.50 a week

15  because there was not a statutory right to have stopped

16  paying his benefits because he actually did not return to

17  work.

18          There was an exposure in the file to the assessment

19  of interest and penalties by the worker's compensation judge

20  that eventually had jurisdiction over the case.

21          There was also an issue as to whether or not a

22  petition to -- it was initially filed, I believe, as a

23  termination petition and then modified or amended, or this

24  may have been an actual suspension modification to begin

25  with.

1        I know one of the cases involved a petition to
2    terminate that was then amended to be the proper petition.  I
3    don't recall if this was the specific case.  But, in any
4    event, they had to eventually pay approximately twenty-eight
5    weeks of benefits.  They filed a petition, but it was filed
6    two, three months late, later than it should have been.

7        And because of that, even though the Judge -- the
8    worker's compensation Judge ultimately granted the
9    modification suspension petition, the amount of supersedeas
10   recovery that we were entitled to get back, because when the
11   petition was filed, the Judge denied supersedeas, which was
12   what made them pay the accrued benefits and going forward.
13   But, the filing of the petition, as I indicated when I
14   testified in the first phase of the case, that is the date
15   that determines when you can seek supersedeas recovery from
16   the fund.

17       So, there was basically two issues of claim
18   handling from the liability opinion that I was -- I needed to
19   address in this case.  And that was, what interest and
20   penalties were imposed by the unilateral suspension of
21   benefits when Mr. Freed had not actually returned to work?

22       And, two.  What could have the -- what could have
23   been the amount of additional supersedeas recovery that could
24   have been obtained since they eventually prevailed on the
25   case if the petitioned issue had been filed months sooner?

1   Q    Have you reviewed these two issues and reached any

2   conclusion as to the harm, if any, suffered?

3   A    Yes, I have, and I do have an opinion.

4   Q    Could you supply that opinion to the Court?

5   A    The benefits to Mr. Freed were unilaterally stopped, as

6   I indicated, without statutory support. They were eventually

7   reinstated later in that year. And in the interim, there was

8   approximately twenty-eight weeks of accrued benefits that

9   they had to pay, and at Mr. Freed's weekly rate of $237.50

10  per week, that is approximately $6,650 of accrued weekly

11  benefits that they had to pay on the basis that they should

12  have been paying that all along. So, that is not actually

13  part of the harm because that would have had to have been

14  paid regardless.

15        So, the harm, if any, is the 10 percent penalty

16  that the Judge imposed on the accrued benefits, which I

17  calculate to be $665.00. And there is a 10 percent interest,

18  and according to the calculation available through the

19  Bureau -- they have a software program that they made

20  available to people in this business. And I ran that program

21  and the interest that would have been due on that money was

22  $102.74.

23  Q    So, what is the total amount of harm, actual harm?

24  A    $665.00, plus $102.74.

25        And on the second issue, if you assume that the

 1   petition that was filed in August could have been filed end
 2   of May, beginning of June, that's a delay of approximately
 3   thirteen weeks of benefits. And at Mr. Freed's weekly rate,
 4   that's approximately $3,087.50 of additional money that they
 5   potentially could have recovered from the supersedeas
 6   reimbursement fund.

 7   Q    How did you do that calculation?

 8   A    I just took the thirteen weeks where that could have
 9   been -- the petition arguably could have been filed thirteen
10   weeks earlier than it was. I multiplied his rate by thirteen
11   and that ended up being $3,087.50.

12        You could argue it could have been filed eleven
13   weeks earlier, but I thought the end of May -- I mean, he was
14   supposed to return to work the beginning of May. He didn't.
15   I figured by the time the file had been copied, sent to
16   counsel, and the petition generated, could have been a couple
17   of weeks down the road.

18   Q    I would like to turn to the Jury file and ask you if you
19   can briefly summarize the underlying facts of the Jury claim?

20   A    Right. There were a number of issues.

21        Again, Mr. Jury had suffered a work-related injury
22   at Latrobe. In this instance, there was an actual return to
23   work by Mr. Jury. When he did return to work, there was no
24   Bureau document called a supplemental agreement documenting
25   the fact that he had returned to work. And I believe he

1   would have been entitled to be put on a partial disability at
2   that time.

3          And as a result, when Mr. Jury was terminated by
4   Latrobe on May 22nd of 1991, Royal had no statutory basis to
5   resist reinstating benefits under the case law at that time.

6          And as a result of Mr. Jury being let go or fired
7   by Latrobe, he went to an attorney.  That was Mr. Quatrini.
8   Mr. Quatrini filed a reinstatement petition in June of '91.
9   And then in August of '91, there was, I believe, a term
10  petition, which was then amended to a mod suspend, and then
11  there was a subsequent term petition filed later, which
12  wasn't decided by the assigned Judge until October of '94,
13  but that was further down the road.

14         So, as I understand the liability opinion by His
15  Honor, the issue to be addressed in phase two of the case was
16  whether any actual harm was suffered as a result of Royal's
17  failure to reinstate benefits when Mr. Jury found himself out
18  of work in May of '91 and there was no Bureau document
19  protecting the document -- documenting the return to work and
20  partial rate that the claimant was then entitled to receive.
21  Q    What is your understanding of the Court's decision as to
22  what is to be addressed regarding this matter?
23  A    My understanding is limited to what harm, if any, was
24  suffered as a result of the failure to immediately reinstate
25  benefits to Mr. Jury.

1   Q   And have you formed an analysis as to the amount of the

2   harm suffered?

3   A   I have. Number one. As I think I have indicated, the

4   benefits were reinstated because there was a subsequent

5   employer petition filed in August of '91 that generated a

6   supersedeas hearing in September of '91, and the Judge denied

7   supersedeas based upon the claimant's testimony and ordered

8   benefits reinstated. So, his past benefits were paid.

9         Subsequently, in March of '92, the Judge issued a

10   decision which acknowledged that both parties had withdrawn

11   each of their petitions. The reinstatement petition had been

12   withdrawn by Mr. Quatrini and the suspension mod had been

13   withdrawn by counsel for Royal and there was no assessment of

14   penalties. There was no assessment of fees upon a reasonable

15   contest.

16         The worker's compensation Judge merely approved a

17   fee order that permitted the deduction of fees from

18   claimant's weekly benefits in favor of Mr. Quatrini, his

19   attorney, but that wasn't over and above the weekly

20   compensation rate.

21         So, the only harm that would have been suffered for

22   the failure to reinstate benefits would have been the

23   interest that had to be paid on the accrued benefits between

24   the date Mr. Jury was fired on May 22nd of '91, and when

25   those benefits were reinstated in September of '91, probably

1    more towards the end of that month.

2    Q    What was the amount of the interest?

3    A    I, again, did the calculation using the software

4    program, and there would have been -- the interest

5    calculation came out to $53.17.

6    Q    Were there any other actual damages or actual harm?

7    A    No.  Because the fact that they had to pay the weekly

8    benefits would have been a payment that would have had to

9    have been made regardless under the law.  So, that's not, in

10   my opinion, part of the actual harm suffered.

11   Q    Now, is that $53.17 per week?

12   A    No.  That's total interest that would have been payable

13   on the accrued amount, which was around $2,800, as I

14   calculated it, give or take.

15   Q    I would like to turn to the Depree file, if we could.

16        And I would ask you if you could identify the

17   issues reserved by the Judge in the phase one decision?

18   A    Basically, there were three.  Mr. Depree was injured.

19   He did return to work.  He was at work a number of months in

20   the early part of 1993.  He had an episode at work while

21   coming down a ladder where one of his feet apparently slipped

22   and he had a wrenching type injury to his back.

23        The liability opinion and His Honor was critical of

24   the fact that there was a reinstatement of benefits by Royal

25   following this incident with the ladder in May of 1993, I

1    believe it was May 10th or May 11th, without doing the

2    customary three-point investigation with the employee, the

3    health provider and Latrobe, as Royal had demonstrated they

4    had done in many other claims that came out of the Latrobe

5    facility.

6              The Judge was also critical of -- and I'm not

7    trying to paraphrase His Honor -- but, as I understand, he

8    felt that the file seemed to be somewhat in slack-off mode,

9    on auto pilot, and there was -- the claimant was receiving

10   benefits during this entire period until the case settled

11   finally in September of '95.

12             The case actually settled in May of '95, but

13   because there was a complication with a child support issue,

14   it couldn't get to the finalization in the comp system until

15   September of '95.

16             So, you are talking about -- and the Judge

17   comments -- about two years of arguably questionable benefits

18   with little medical management or file management being done

19   by Royal during that period of time.

20             And then finally there was the issue of the fact

21   that when the case did settle, there was a settlement of

22   37,000 reached with the claimant and basically his father,

23   who was very involved in the whole settlement process, as I

24   understand it.

25             They reached a settlement agreement of 37,000.  And

1    at the time of the hearing before the Judge to approve the

2    settlement, which we called at that time a commutation, it

3    was learned that Mr. Depree had by then returned to work,

4    apparently recently, because there is a reference in the

5    report from the attorney for Royal that the claimant was

6    still on the probationary period for this new employer.

7            And there was some information provided about, you

8    know, the fact that the claimant was apparently of the

9    opinion that he was able to tolerate the work, or words to

10   that effect.

11           So, the final issue is whether or not it was

12   reasonable to proceed with the settlement at $37,000.00 when

13   there was no investigation of, what kind of work is the

14   gentleman actually now doing?  Is it heavy labor work, which

15   would be inconsistent with any claim that he has any residual

16   problem arguably?

17           And, further, what is he making?  And if he was

18   making enough money where they would have been entitled to a

19   suspension of benefits, then why pay 37,000?

20           That's my understanding of the issues.

21   Q    Do you have an opinion as to what harm, what actual

22   harm, if any, resulted from the reinstatement and settlement?

23   A    I do.  And if I could explain.

24           I think the file is very clear that there is no

25   documentation, as the Court notes, with respect to doing the

1    three-point investigation on the issue of reinstating

2    benefits when this episode with the ladder occurred.

3           Putting that aside for a moment, because there is

4    nothing I can do about that now, it appears to me that not

5    all of the payments that were made after March of '93 are in

6    the harm category.  And if I could try to be concise and to

7    the point here.

8           The file reflects that the claimant was in a formal

9    physical therapy program by, like, May 20.  He was scheduled

10   to go back to see Dr. Boyle, and Dr. Boyle had been the

11   doctor that had been treating him and released him to go back

12   to work earlier in 1993.

13          He was scheduled to go back.  The claimant had car

14   trouble.  The appointment didn't take place.  He had to

15   reschedule, and he finally went back at the end of June.

16          Dr. Boyle diagnoses him with a lumbosacral strain

17   and sprain, recommends some alterations to the type of

18   physical therapy he is getting, injects him with some kind of

19   a shot into his low back, I think it was Novocaine, or

20   something similar to that, gives him a script for medications

21   and agrees that he should remain out of work, and that is in

22   the report from the doctor dated June 28 of 1993.

23          So, it appears to me that they have verification

24   medically that this gentleman is legitimately out of work, at

25   least in Dr. Boyle's mind at that point.  He's been in

1   therapy since the end of May.

2            They reassign the nurse manager, Mary Hall, to the

3   case.   She meets the claimant on June 9th at his physical

4   therapy.   She also is present when the claimant is examined

5   by Dr. Boyle on June 28 and meets with the claimant and the

6   doctor after that examination.

7            So, I think there was active file management and

8   the file was being addressed.

9            The claimant continues with his therapy.   He is

10  back to see Dr. Boyle at the beginning of September.

11           MR. GORDON:   Excuse me, Your Honor.   I think there

12  has been a judicial determination already that it wasn't

13  being addressed.   And so if this is an opinion that's offered

14  to try to get the Court to reconsider its opinion, I think

15  the issue is whether or not there is any justification in

16  light of the judicial determination that the claim was

17  mishandled as of January, 1993.

18           What I would have assumed, based on the judicial

19  edict here, that there would be a calculation of whatever

20  benefits that were paid out after the claimant executed the

21  final receipt in January of 1993 and indicate that it should

22  be disallowed.

23           It seems to me that we are taking issue with the

24  Court's determination that the claim was mishandled because

25  there was no three-part investigation to confirm that there

1     was actually a ladder incident at work.

2           MR. FOX:  Your Honor, I think that the objections

3     that we just heard are more appropriate for cross.  The

4     witness is just getting to his opinions to the actual harm

5     suffered and he was supplying that information by way of

6     background.

7           I don't think there is any effort here to undermine

8     or question the decision of the Court in the liability phase.

9           THE COURT:  All right.  The objection is overruled.

10    Q     If you could continue, please?

11    A     Yes.  And I will try to get right to the point.

12          The claimant is returned to work at Latrobe in

13    October of '93, and that's based upon Dr. Boyle's release in

14    September of '93.  There is a work-up by Mary Hall with

15    Latrobe.  They go over the job that Latrobe is considering,

16    and I think it is the bin shanty job, but I could be wrong

17    about that.

18          But, in any event, he does go back to work.  He

19    only works a few days.  He is back out and there is a

20    supplemental agreement in the file acknowledging the return

21    to work as of October 11th and then a reinstatement of

22    benefits as of October 15th.

23          I believe at that point, they should have moved

24    forward with an independent medical examination, attempt to

25    get an opinion of full recovery, which they may well have

1   obtained at that point in time because there was not any real
2   objective pathology with respect to this gentleman's low
3   back.

4           He had had MRI imaging.  I believe that even if the
5   IME had imposed restrictions, they could have either had
6   Latrobe make another job offer, or done the vocational
7   work-up that we saw done on many of these files periodically
8   when it had to be, and get the case in a posture where they
9   could have either moved forward with the termination petition
10  or a petition to modify or suspend again based upon
11  restrictions and a vocational work-up and get the case --
12  basically get it to the settlement table.

13          This gentleman was a difficult person to deal with,
14  and I think the Judge acknowledged that in his liability
15  opinion.  Bottom line was to get the case to the settlement
16  table sooner rather than later.

17          And I think if what I just said had been done, they
18  would have been able to settle the case by May of '94, which
19  would have saved Latrobe a year of benefits, which would be
20  roughly $12,000 rounded up.

21  Q    Okay.  What is your opinion as to the $37,000.00
22  settlement?

23  A    I mean, my opinion is that is the equivalent to
24  approximately three years, a little more, of benefits at his
25  temporary disability rate of 227.50 a week.  I don't think

1    that's an unreasonable settlement in a case where you are

2    dealing with a difficult individual.

3         And you have to recall also that what actually

4    happened here is that when Royal, setting aside the amount of

5    the settlement, when Royal settled the case, those

6    negotiations went over a period of five months with a

7    claimant who is basically representing himself at that point.

8         And his father was very involved and there was back

9    and forth, back and forth, back and forth.  And, you know, I

10   think, from what I can see in the file, they were at a point

11   where they just decided, you know, what -- if we can get rid

12   of this for 37,000, we ought to do it and move forward and

13   shut down the exposure.  And that's not an uncommon

14   discussion to be had when you are trying to close down a

15   difficult case.

16   Q    And do you believe that the settlement of 37,000 was

17   reasonable?

18   A    I do.  And if it had settled in May of '94, I still

19   think they would have run into the same problems and delays

20   with getting the child custody issue resolved.

21        I mean, much to his credit, Mr. Depree ended up

22   getting the support order extinguished because he ended up

23   receiving sole custody of the children involved.  He went out

24   and obtained custody and had the support order extinguished.

25   But, that took time.  I think that would have still happened

1   in May of '94.

2   So, I -- you know, the point I was trying to make

3   is, that in May of '94, unlike in the summer of '95, we don't

4   have any indication that Mr. Depree had found a new job at

5   that point in time.

6   So, you don't have the issue of, well, why did you

7   settle the case for 37,000 when you know he's working and he

8   may have been entitled to a suspension of benefits and to

9   shut the whole thing down and not pay anything?

10   And I would note that even if you are at that

11   point, if you get a suspension, you are still run the risk of

12   being reinstated over five hundred weeks and it is not

13   unreasonable to settle that exposure independent of what I

14   said earlier.

15   Q   Okay.  Just so the record is clear, what is your opinion

16   as to the actual amount of harmed suffered as a result of the

17   Depree file?

18   A   I believe it's the fact that a year's worth of benefits

19   they could have saved if the file took a different course

20   after the second attempt to return the claimant to work,

21   which have been roughly $12,000.

22   Q   Are the views that you have expressed for each of these

23   four files formulated to a reasonable degree of professional

24   certainty?

25   A   Yes, they are.

1           MR. FOX:  I have no further questions of Mr. Weber.

2                      CROSS-EXAMINATION

3    BY MR. GORDON:

4    Q    Mr. Weber, while we are on that case and it is still

5    fresh in my mind, I think maybe you confused certain facts

6    that -- the Depree case facts with another case.

7    A    I didn't mean to.

8    Q    I understand that.

9           Are you aware that the claimant was released to

10   return to work without restriction by Dr. Boyle in January

11   of '03?

12   A    I was.

13   Q    So, you had mentioned the fact that he was released in

14   October and went out again in October, four days later?

15   A    I believe he went -- he -- he was released by Boyle in

16   January of '93 and he went back to his regular job, as I

17   understand it.

18   Q    And he signed a final receipt?

19   A    Yes, he did.

20   Q    And he didn't treat until May --

21   A    Correct.

22   Q    -- of '93?

23   A    And that was not initially with Dr. Boyle.  That was

24   with the physical therapy.

25   Q    What happened was, he had slipped on a ladder at work

1    allegedly in May of '93.

2    A    I was aware of that.

3    Q    What is the October dates that he was out only a few
4    days?

5    A    There was a supplemental agreement in the file.  There
6    is work-up reflecting that Dr. Boyle had a visit, and on
7    September 9th of '93, placed restrictions on his return to
8    work.  They worked with Latrobe about getting another job
9    offer, and my understanding, and I believe this is an
10   accurate understanding of this particular file, Mr. Gordon,
11   is that they made it, he was offered a restrictive job.  He
12   did return, but he was only there for a few days and was out
13   again.

14   Q    And you saw a supplemental agreement to that effect in
15   his file?

16   A    Yes.

17   Q    The Judge took issue with the fact that no one ever
18   investigated the ladder incident at work?

19   A    I have already indicated that, Mr. Gordon, that the file
20   does not confirm that any of the three-point contact
21   happened.

22   Q    The medical was ascribing claims of disability to the
23   ladder incident?

24   A    I believe that's a fair statement.

25   Q    Well, if we didn't investigate the case to confirm that

 1   it actually occurred, and the Judge has indicated that that
 2   is part of a three-part contact that would have been required
 3   and the medical supports disability from an alleged ladder
 4   incident in January, excuse me, in May of 1993, would you
 5   agree that if the ladder incident did not occur, there would
 6   be no cause to pay any benefits, medical or indemnity beyond
 7   January, 1993?
 8   A    I think that's a fair statement, except for the fact
 9   that there is still a diagnosis by the doctor of a
10   lumbosacral sprain and strain does put the claimant out on
11   disability.
12   Q    As a result of a ladder incident?
13   A    Right; which purportedly occurred at work.
14   Q    But, we have already agreed, have we not, that the
15   Judge's determination was that there was no three-point
16   contact, and I think that you testified that that would be
17   kind of rudimentary for accepting a claimed?
18   A    I don't think I said the last statement, but I did say
19   there was no three-point contact, and that was something that
20   was in the Royal procedure guidelines.
21   Q    So --
22   A    I am not disputing the issue, Mr. Gordon.
23   Q    So, in any event, there were two and a half years,
24   actually two years and four months of benefits paid out to
25   the claimant after January, 1993.  Would that be about right?

1    A    Between May of '93 and September of '95, I believe.

2    Q    September, '96.  I'm sorry.  '95, correct?

3    A    I believe.

4    Q    Two years and four months?

5    A    I had a hundred and twenty-two weeks.  I don't know if

6    that's roughly the same.

7    Q    Okay.  I believe that's correct.

8             And if we multiply the hundred and twenty-two times

9    the comp rate of 22750, I think you said.

10   A    I get $27,755.

11   Q    Can I have that again?  Twenty-seven thousand?

12   A    $755.00.

13   Q    And then they paid a $37,500 settlement?

14   A    Correct.

15   Q    How many years of benefits was 37,500?

16   A    Slightly more than three.  A hundred and sixty plus

17   weeks.

18   Q    There was -- was there ever an independent medical

19   evaluation done in this case?

20   A    I don't believe so, Mr. Gordon.

21   Q    And so the claimant actually ended up with a period of

22   benefits that covered, if we take the settlement out three

23   years, that covered six years, is that right?

24   A    I don't know what the math is.  I am not disputing it,

25   whatever the totals are.

1  Q   And at the time that the case was resolved, there was no
2  medical that confirmed the claimant had ongoing disability?
3            You had Dr. Boyle, who indicated that the claimant
4  was released, so far as he was concerned, as of 1994 --
5  A   But --
6  Q   Well, let me finish.
7  A   I'm sorry.
8  Q   As of 1994, he said that he could not support claimant's
9  allegations for disability.
10 A   My recollection -- and I am not trying to be
11 difficult -- was that the doctor basically concluded there
12 was nothing more he could do for Mr. Depree.
13 Q   Didn't he also question the claimant's honesty, that
14 these were subjective complaints only, and as far as he was
15 concerned, he could return to work without a prescription?
16           Isn't that what he said?
17 A   I believe in -- I think that's where he was in '94, but
18 he wasn't there in '93 when he first -- when he authorized
19 the claimant to return to work with restrictions in September
20 of '93.
21 Q   But, the Court has indicated that, and I believe the
22 Court had difficulty with the fact that even if you couldn't
23 rely on that opinion, there was no effort to get an
24 independent medical evaluation at that time.
25           Had there been a medical evaluation confirming the

1    claimant was free of any physical restrictions as a result of
2    a work injury or even a non-work related injury, would the
3    claimant have been able to oppose that?

4    A    Well, that's why my opinion earlier, Mr. Gordon, was
5    that when the attempt -- the second time for Mr. Depree to
6    return to work failed in October of '93, they should have
7    moved forward with an IME.

8         And I believe, based upon the testing that had been
9    done on Mr. Depree and the fact that there was no real
10   pathology in his low back to explain, he didn't have, like, a
11   herniated disk, or something like that, that they could have
12   gotten an opinion of full recovery, although Dr. Boyle, in
13   September, was still imposing restrictions on his return to
14   work.

15   Q    In September of '93?

16   A    Right.  And if Boyle was still of that opinion in
17   October of '93, Mr. Depree may have been able to get the
18   doctor to, you know, testify against an opinion of full
19   recovery.

20   Q    By 1993, Boyle also identified the fact that the
21   claimant had preexisting issues?

22   A    Correct.

23   Q    And we don't know what, if anything, Boyle would have
24   done with regard to attributing claimant's disability to
25   preexisting injuries?

1    A    He hadn't done so up to that point, and he did refer the

2    claimant for an neurosurgical consult in the late fall of

3    1993 when the effort to return to work --

4    Q    But, we don't know, because it's never addressed in

5    Boyle's report, when that referral was for a preexisting

6    condition whether it was for the work incident or the ladder

7    incident, do we, because it was never addressed, he just says

8    I am going to send him to a referral, which ultimately proved

9    to be negative?

10    A    And I don't remember specifically the wording of his

11    report in September of '93.

12    Q    If the Court is correct and that case was mishandled

13    because there was no three-prong contact and, accordingly, no

14    way to confirm a work injury, the ladder, 1993 incident, you

15    would agree that any benefits paid beyond January, 1993,

16    should not be charged to the client?

17    A    Let me just make sure I understand your question.

18           If there was no ladder incident and no disability,

19    in fact, then the payment shouldn't have been made.

20    Q    I didn't say whether no disability in fact.  The

21    disability has been -- attributed to a ladder incident is not

22    part of the work injury that is contained in the file.  It's

23    a separate incident?

24    A    But, it would have still been during Royal's coverage

25    period.

1  Q    But, there was no file or claim set up for that incident
2  and no investigation for that?

3  A    It was treated as a recurrence by Royal.

4  Q    But, it's not a recurrence, is it?  There was no
5  evidence medically that there was a recurrence.  They were
6  treating it as a ladder incident.

7  A    I mean, it probably is more akin to, you know, a new
8  issue that caused injury to his back because there was a
9  wrenching episode that occurred when his foot slipped, but it
10 was treated by Royal as a recurrence.

11 Q    I understand what they did.  That is the issue that
12 relates to the damages.

13 A    But while, from my standpoint, from a claims-handling
14 standpoint, I don't think there would have been a difference
15 in his comp rate.  The medical treatments would have been the
16 same regardless.

17        I don't see any perceived difference, from a claims
18 standpoint, treating it as a recurrence or new injury.  There
19 is a difference in the impact that would have on a retro.  I
20 am not here to offer an opinion on it.

21 Q    If, in fact, the injury occurred at work?

22 A    Correct.

23 Q    But, that's not been investigated?

24 A    As I said, there was no three-point contact.

25 Q    But, you would agree that if the Court were to disallow

1    benefits from -- from May, 1993, through the settlement, you

2    are talking about 27,755 for indemnity an additional 37,500

3    for the settlement, and we would also be talking about

4    $2,117.00 in medical expenses?

5    A    I -- I -- the medical payment made between -- I took the

6    medical payment paperwork out of the Depree file and had my

7    comptroller run a tape on it.

8    Q    What did they come up with?

9    A    $13,048.96.

10   Q    Is that the whole thing or just after --

11   A    It is the one in my file.

12   Q    Do you know if that's as a result -- post-January, 1993?

13   A    Yes.

14   Q    So, it is 13,000?

15   A    The medical services that are paid.

16   Q    I think I understand why.

17   A    I think I reversed pre versus post.  It's 13,048.96.

18   Q    So, if we were -- just to be clear, if the Court were to

19   disallow that claim 27,755 for indemnity, 37,500 for the

20   settlement and $13,048.96 with medical expenses post-January

21   1993 --

22   A    Those are the numbers.

23   Q    Let's go back to the first claim.

24   A    Although, as I indicated in my direct, Mr. Gordon, I

25   don't think it would have been inappropriate to settle the

1    case even if they were entitled to a suspension when they did
2    settle it in September of '95 to eliminate the exposure of a
3    reinstatement for the next five hundred weeks.

4    Q    But, there really was, assuming that the final receipt
5    was in place executed by the claimant in February of '93
6    evidencing a full release, an unrestricted release and return
7    to regular employment in January of 1993, if one takes into
8    consideration that the claimant had an intervening episode of
9    disability, which one can't say with any certainty was work
10   related, if one also takes into consideration preexisting
11   medical issues, and if one also takes into consideration that
12   you have a treating physician that basically thinks his
13   client is a liar because he has had subjective complaints
14   only, and he now finds his own patient to be incredible, if
15   you take all of those into consideration, are you telling me
16   that you would have still paid this claim and the two years,
17   two and a half years after he had returned to his regular
18   employment and had an intervening incident sometime in May of
19   1993, that you would pay three years of benefits to settle
20   his claim?

21   A    I didn't say that, sir.  I said there would be a value
22   that would be appropriate to shut down the future exposure,
23   because the fact remains that they were paying benefits to
24   this gentleman for two and a half years.

25            That final receipt has no legal effect, in my

1    opinion, after they reinstated benefits.

2    Q    That's a good point, because they reinstated benefits

3    and because we don't know whether or not it was proper, we

4    are stuck with a 37,500 settlement because we were paying

5    benefits up until that point, and that would make a good

6    decision, notwithstanding the fact that the claimant had no

7    medical evidence to show ongoing disability.

8    A    Is that a question?

9        MR. FOX:   I am going to object.   I don't believe

10   that's a question, Your Honor.

11       MR. GORDON:   I will move on, Your Honor.

12       THE COURT:   Well, I think it's becoming

13   argumentative now, gentleman, so move on to the next claim,

14   please.

15   Q    Peksa.   Did you review the file to see whether or not

16   Tomasina ever -- was Tiffany -- Tiffany was the older child?

17   A    Yes.

18   Q    Did Tiffany go to college?

19   A    My understanding is she did.   There is reference in the

20   claims notes that they thought she was going to graduate, I

21   think she was getting an education degree, in May of '99.

22   But, it turned out she had to re-do her student teaching and

23   she had to go an additional semester.

24   Q    She was perceived to have been the only dependent child?

25   A    Initially.   But --

1   Q    How much money did she get as the sole dependent child?

2   What was her benefit?

3   A    $160.00 and change.

4   Q    So, once there was an establishment that there was a

5   second child entitled, her benefits, that is, Tiffany's

6   benefits had to be reduced to $107.00?

7   A    Correct.

8   Q    There was no credit taken for that, was there?

9   A    The Judge disallowed it and that went on appeal to the

10  Appeal Board.

11  Q    And what recourse was Royal given?

12  A    I don't think they were -- I don't think they were

13  allowed to take the credit.

14          They were not given any benefit for having paid

15  Tiffany the wrong amount of money, because it turned out that

16  she wasn't the only minor dependent, even though there was no

17  way for Royal to have known that.

18  Q    I stand corrected.  I didn't realize that there was a

19  disallowance of a credit.

20  A    Yes.

21  Q    And they sought the credit for Tiffany.

22  A    Yes.

23  Q    Freed.  Did you figure out, Mr. Weber, how many weeks of

24  benefits Freed was actually entitled to, number of weeks?

25  A    Well, the number of weeks that they eventually had to

1  pay him to catch him up because they had improperly stopped
2  paying benefits --

3  Q    No.  No.  I meant, if one looks now retrospectively at
4  how many weeks of benefits --

5  A    Total?

6  Q    Totaled to be paid for lost wages to Freed.  I think the
7  Court indicated in a decision that the claimant's date of
8  injury -- let's see.  I did the math here.

9        What was the date of injury?  January 15, 1993, I
10  think he was paid on the fifteenth.  So, January 16, 1993,
11  Mr. Weber, through May, and I have a date there also,
12  May 4th, I think it was, 1994, that was the period of
13  disability.  And I have concluded that that's a period of 67
14  and one-seventh weeks.  I am not going to ask you to do the
15  math.  But, does that seem to be about right, 67 and
16  one-sevenths?

17  A    I don't understand what the relevancy of the calculation
18  is to the Judge's liability determination.  I am not
19  disputing your math.  You are probably as weak a
20  mathematician as I am.

21  Q    I hope not.  But, what you are saying is that of the
22  indemnity that's been identified by Royal as having been
23  paid, you would deduct from that figure, I think you
24  indicated $3,855.24?

25  A    That has to do with the -- if they had filed the

1  petition sooner, they would have enlarged the supersedeas
2  reimbursement, which would have increased the credit to the
3  file by that amount, which I think I am saying the same thing
4  you are saying.
5  Q   Right.  So, if I take the 67 and one-seventh weeks of
6  benefits and I add up -- I add to that the $3,855.24 that you
7  are disallowing, those two figures should equal that which
8  was paid out on the claim previously now subject to a
9  reduction because of the errors?
10 A   Plus as the additional reduction that was actually
11 granted by the supersedeas reimbursement of some 28,000 plus.
12 Q   No.  No.  I already included that.
13 A   I don't know if you have, Mr. Gordon.
14 Q   I don't remember.
15         MR. GORDON:  All right.  I don't have any further
16 questions.
17         MR. FOX:  No further questions of this witness,
18 Your Honor.
19         THE WITNESS:  May I be excused?
20         THE COURT:  Yes.  Do you have any objection to
21 having him excused, Mr. Gordon?
22         MR. GORDON:  None at all.
23 (The witness was excused.)
24         MR. FOX:  I would like to call Jerry Chimenti.
25         THE COURT:  Let's take about ten minutes.  Okay?

```
 1            MR. FOX:  Okay.
 2    (Court recessed at 10:50 a.m.)
 3    (Court reconvened at 11:10 a.m.)
 4            THE COURT:  Okay, Mr. Fox.
 5            MR. FOX:  Thank you, Your Honor.
 6            We wish to call Jerry Chimenti.
 7            THE CLERK:  Good morning.
 8            THE WITNESS:  Good morning.
 9            THE CLERK:  Please raise your right hand.
10                        *  *  *  *  *
11            GERALD CHIMENTI, having first been duly sworn,
12    testified as follows:
13            THE CLERK:  Thank you.  Please be seated.
14                        DIRECT EXAMINATION
15    BY MR. FOX:
16    Q    Now, Mr. Chimenti, have you read the liability decision
17    of the Court?
18    A    Yes, I have.
19    Q    What do you understand your role to be in phase two of
20    this case?
21    A    To present the retrospective premium calculations that
22    apply to the policies from 1983 through 1995.
23    Q    What material have you reviewed to prepare for your
24    testimony today?
25    A    I reviewed my original report, my supplemental report,
```

1    Mr. Raabe's report, the loss runs that were issued subsequent
2    to my initial reports in order to calculate the retrospective
3    premiums.

4    Q    You said you reviewed the phase one opinion?
5    A    Yes, I did.
6    Q    And did you listen to Mr. Weber's testimony?
7    A    Yes.
8    Q    Do you have a copy of each of your reports with you?
9    A    Yes.
10   Q    Do you have a copy of Mr. Raabe's reports with you?
11   A    Yes, I do.
12   Q    Can you explain, in general terms, your method of
13   analysis and, in particular, how it relates to your prior
14   reports?
15   A    When I calculated the retrospective premiums, I started
16   with the 1995 retrospective adjustment.  I had a
17   correspondence -- was given a correspondence from Royal which
18   indicated that all of the premiums were paid up through --

19             MR. GORDON:  I am going to object here, Your Honor.
20   If he was given documentation, I would like to have a
21   foundation as to how it was supplied, whether it is accurate,
22   whether it was provided by somebody who would have firsthand
23   knowledge.

24             So, my objection is, that I don't believe that
25   there will be a foundation laid.

1          MR. FOX:  I think the objection is certainly

2    premature and it's for cross, Your Honor.  The witness was

3    about to identify the nature of the information that he

4    reviewed.

5          THE COURT:  All right.  The objection is overruled.

6    You may continue.

7    Q    Mr. Chimenti, you were identifying the nature of the

8    documents --

9    A    Yes.

10   Q    -- that you reviewed.

11   A    Yes.  There is a letter that indicated that all of the

12   retrospective premiums had been paid by Latrobe Construction

13   up through the adjustment that was made in 1994.

14         So, at that point in time, neither Royal owed

15   return premium to Latrobe, nor did Latrobe owe additional

16   premium to Royal.

17         So, my calculations then started with the 1995

18   calculation to current to calculate the additional premium

19   due or the refunds due Latrobe.

20   Q    And how did you do your actual computations?

21   A    I used the basic premium factors, the tax multipliers,

22   the loss conversion factors, the minimum and maximum premium

23   factors for the various retrospective rating periods, and

24   I -- it's just a mathematical computation to arrive then at

25   the retrospective premium for each of the policy years and

1   also the three-year segments.

2   Q   Please tell the Court what your conclusion was as to the

3   total amount of retrospective premiums owed by Latrobe.

4   A   Again --

5            MR. GORDON:  Your Honor, I am going to interpose an

6   objection on the grounds that there is no foundation laid.

7   There is documentation which apparently he is relying upon

8   which I have not seen and subject to hearsay objection.

9            THE COURT:  What documentation are they referencing

10  to, Mr. Gordon?

11           MR. GORDON:  Your Honor, it is our position that

12  Mr. Chimenti has no firsthand knowledge of what was actually

13  paid, and if he is relying on a communication that was

14  provided to him after he was deposed, we do not have such

15  communication, and I don't know who authored it and I don't

16  know how reliable it is and I don't know what it is based

17  upon.

18           THE COURT:  Mr. Fox, can you respond to that

19  comment of Mr. Gordon?

20           MR. FOX:  Yes.  I believe Mr. Chimenti has

21  testified that he has relied upon information in the file,

22  including Mr. Raabe's report, which makes reference to the --

23  which admits in effect the amount of the premiums that had

24  been paid and which were due.

25           And he's further testified that he relied upon

1    documentation supplied to him by Royal in doing his

2    calculations, which is perfectly reasonable for an expert to

3    do.

4              The objection that this is somehow hearsay is

5    totally unfounded, given that he is an expert.

6              THE COURT:  Mr. Chimenti, what documentation did

7    you rely upon in formulating your opinion and what is the

8    source of that information?

9              THE WITNESS:  Your Honor, it's a letter dated

10   December 1st, 1999, from Mr. David M. Hooper at Royal

11   SunAlliance, that's directed to Eugene A. Giotto,

12   G-i-o-t-t-o, at Dickie McCamey, in which he sets forth the

13   fact that the premiums were all paid and historically been

14   paid over a long relationship that started in 1950, and all

15   of the retrospective premiums through the February, 1994

16   adjustment had been paid.

17             THE COURT:  Okay.  Is there any dispute that

18   premiums were paid through 1994, Mr. Fox?

19             MR. FOX:  I don't believe there is, Your Honor.

20   And, in fact, Mr. Raabe admits it in his report.

21             MR. GORDON:  Mr. Raabe will indicate, if he were to

22   testify, that payment ledgers confirming what was paid, how

23   it was paid, how it was credited, were never provided.  And

24   if one has to calculate damages, Your Honor, one has to

25   determine the foundation here is -- you have to demonstrate

1  what's actually been credited to the account, whether it was

2  credited properly.  And our position is they have no method

3  for doing that, Your Honor.

4         We had asked in requests for discovery that they

5  produce the documents for the payment and credit ledgers.

6  They have never been provided.  This is a letter of 1999.

7  Mr. Hooper is not here.  I don't know what he is relying

8  upon.

9         It only goes to show what was paid in 1999.  It

10  doesn't show that it was correctly ascertained or whether he

11  had any credible information upon which to rely.

12         THE COURT:  So, we can't stipulate as to the fact

13  that with respect to the premiums paid through 1994?

14         MR. GORDON:  Correct; nor whether or not they were

15  actually earned, Your Honor.

16         THE COURT:  All right.  The Court is going to treat

17  this as a credibility issue, Mr. Gordon.  You can cover that

18  during cross-examination and when you present your own

19  expert, you may.

20         You may proceed, Mr. Fox.

21         MR. FOX:  Okay.

22  BY MR. FOX:

23  Q    Mr. Chimenti, you testified that you read Mr. Raabe's

24  report, is that correct?

25  A    Yes.

1    Q    And did he not say, on page six of his report under

2    calculations, the documents that were made available provided

3    sufficient information to calculate premiums I believe to be

4    reasonable and true?

5              MR. GORDON:  Your Honor, that is taken out of

6    context.  It assumes -- it assumes something that Raabe could

7    not -- if they wish to call Mr. Raabe, I don't know how they

8    can do that.

9              THE COURT:  The Court is going to acknowledge your

10   objection, Mr. Gordon, and overrule it.

11             Please continue, Mr. Fox.

12   Q    Did you review Mr. Raabe's calculations, Mr. Chimenti?

13   A    Yes.

14   Q    And what did you determine from your review?

15   A    That his calculations were, in large part, consistent

16   with the Royal calculations and also my calculations of the

17   retrospective premiums, notwithstanding the reductions that

18   he then made for the various scenarios for the mishandling of

19   claims.

20             In other words, his baseline where he started, then

21   made the deductions from, were, in essence, consistent with

22   both my calculations and also Royal's calculations of

23   premiums.

24   Q    What was the amount that he calculated for the baseline?

25   A    Well, he calculated various -- you know, for each of the

1    years.

2          But, for instance, for 1980 for that retrospective

3    rating adjustment, I came up with a premium of $203,891,

4    where Mr. Raabe came up with $204,156, difference of $265.00.

5    He was actually higher than my calculation.

6          But, for 1992 --

7    Q    Go through each, please.

8    A    In his report, he indicates that the retro premium was

9    $331,282 as does it agrees with my report.

10         In 1986, his report indicates a retrospective

11   premium of $183,710, which agrees with my report.

12         The 1987 period, his report indicates a

13   retrospective premium of $177,465, and it agrees with my

14   report.

15         The 1988 premium, Mr. Raabe has $67,695, which

16   agrees with my calculations.

17         The 1989 period, Mr. Raabe has $619,018, which

18   agrees with my calculation.

19         The 1990 policy period, Mr. Raabe has $110,185 for

20   his calculation, which agrees with my calculation.

21         The 1991 period, Mr. Raabe has $759,350, which

22   agrees with my calculation.

23         And then we are in agreement on the calculations

24   for the last three-year segment which meet -- which the

25   calculations actually exceeded the maximum premium.

1          So, the maximum premium for the last three years,
2     we are in agreement on.

3     Q    Okay.  Now, what was your conclusion as to the total
4     amount of retrospective premiums owed by Latrobe, again,
5     based on the assumption that there had been no mishandling of
6     any claims?

7     A    Prior to the phase one trial, I calculated the amount of
8     premium due to be $851,549.

9     Q    Does that number appear in either of your reports?
10    A    Yes.  That would be Exhibit 2, page five, of my
11    September 16th, 2003 report.

12    Q    So, how did Mr. Raabe's no mishandling numbers, if you
13    will compare with your no mishandling numbers --

14              MR. GORDON:  Your Honor, again, I have to object.
15    It is taken out of context.  It is clearly hearsay.
16    Mr. Raabe indicates --

17              MR. FOX:  Your Honor, I can withdraw the question.
18    I believe that it may be repetitive anyways.

19              MR. GORDON:  Your Honor, it is the same objection I
20    have.  It is clearly hearsay.  Mr. Raabe will provide
21    testimony, but it is based on assumptions that cannot be met
22    here, Your Honor.

23              THE COURT:  Again, the Court acknowledges what your
24    objection is, Mr. Gordon, at this point, I am going to treat
25    the objection as to going to issues of credibility.

1              Please continue, Mr. Fox.

2    BY MR. FOX:

3    Q    Now, Mr. Chimenti, have you had the opportunity to

4    update your calculations to reflect premium adjustments that

5    have occurred since you issued your prior reports?

6    A    Yes.

7    Q    Can you tell me what you have done in that regard?

8              MR. GORDON:  Your Honor, I am going to object.

9    There has been no report filed.  There is no new information

10   that has been provided to us since September 16, 1993, which

11   was the date of the second report.  There is no information

12   that has been provided to us after the Court had issued its

13   decision on liability.

14             I have no indication where the loss development is,

15   or why it is, or even whether or not it was even predicated

16   on errors that was made.  That should have been done in the

17   liability phase of the trial, Your Honor.

18             So, I can't comment.  The only thing that really is

19   here, Your Honor, is that he looked at loss runs in 2002 and

20   he has set a value as of 2002 what are the premiums owed.

21             If there have been loss development or if there has

22   been -- which is a deterioration, or a loss development had

23   actually shown improvement, that's an issue for another day,

24   because we have never seen the claim documents that would

25   justify that, and that I would have to go to our liability

 1 | witnesses to determine if that's whether -- truly earned
 2 | premium.

 3 |        MR. FOX:  Your Honor very clearly directed us to
 4 | restrict this phase of the trial to damages calculations.
 5 | Your direction was very clear, that we were to cover
 6 | liability issues and claims handling issues in phase one.
 7 | And all we are doing today is addressing calculations based
 8 | upon Your Honor's findings and just doing the math
 9 | essentially to come up with the amount of premium due, and it
10 | is not based upon hearsay.  It's completely consistent with
11 | the testimony of their expert.

12 |        MR. GORDON:  Judge, if it is based upon the Court's
13 | findings, the Court made findings about materials that will
14 | be provided to us and upon which our liability witnesses have
15 | testified.

16 |        For them to now spring on us additional damages
17 | based on developments that we have never seen before and that
18 | we have not had our liability witnesses address would be
19 | inappropriate.

20 |        THE COURT:  What are the additional damages that
21 | you are making reference to, Mr. Gordon?

22 |        MR. GORDON:  I am sorry?

23 |        THE COURT:  What are the additional damages that
24 | you are making reference to?

25 |        MR. GORDON:  Well, if, in fact, they are claiming

1    now that there is more premium owed than what they claimed

2    was due in the trial phase, in the liability phase, I mean, I

3    have no way to address that because, one, those issues were

4    never provided to us.  File materials that would justify

5    payment on those cases has never been reviewed.

6              So, I mean, it is just like throwing additional

7    damages on wall and saying there is more damages here.

8              MR. FOX:  I don't understand the objection, Your

9    Honor.

10             We were to address damages in this phase of the

11   case.  We weren't to address it in phase one.  And that's

12   what we are doing based upon the documentation that is out

13   there.

14             MR. GORDON:  There is no documentation.  It's never

15   been provided to us.

16             THE COURT:  The Court is basically concerned with

17   the fact that we have four cases here, four cases in which

18   the Court has found that there has been some mishandling of

19   the claim.  The figures that are related to those particular

20   four claims impact upon the amount of money that's owed to

21   your client, Mr. Fox, okay?  That's what the Court is

22   interested in.  That is the testimony the Court wants to hear

23   from this witness.  Okay?

24             MR. FOX:  Okay, Your Honor.

25             THE COURT:  Can you restrict your questions with

 1  respect to that particular narrow issue?

 2            MR. FOX:  Absolutely I can.

 3  BY MR. FOX:

 4  Q    With regard to the Peksa file, you have heard the

 5  testimony and you have reviewed the Judge's opinion on that

 6  file, correct?

 7  A    Yes.

 8  Q    Did the errors that the Court found with regard to the

 9  Peksa claim handling result in any change in premium?

10  A    No.

11  Q    Why is that?

12  A    Well, you can take both the Peksa and Freed claims, they

13  occurred during the 1992 to 1994 three-year retro period

14  which the indicated retrospective premium exceeded the

15  maximum premium allowable under the program.

16            The indicated retro premium was $3,376,454.  And

17  the maximum retro premium they could charge Latrobe

18  Construction was $2,742,396, which is a difference of

19  $534,058.00.

20            So, in essence, with the loss conversion factor of

21  1.12 and tax multiplier of 1.05, the claims for that

22  three-year period would have to total in excess of $454,131

23  for the Peksa and Freed claims to have any effect whatsoever

24  on the premium.

25  Q    You are referring to the Freed claim as well?

1    A     I said the Peksa and Freed claims, yes.

2    Q     Would the errors with regard to the Jury claim have any

3    effect upon the amount of premium due?

4    A     Yes.  The Jury claim happened during the 1989 to '90

5    period.  And if the Court is to accept Mr. Weber's testimony

6    that the harm as a result of the Jury claim is $53.17, the

7    retrospective premium attributable to that would be $61.00.

8    Q     And how did you do that calculation?

9    A     The loss conversion factor for the '89, '90 period was

10   1.10.  The tax multiplier was 1.049.  And if you take the

11   $53.17 and multiply it by the loss conversions factor, then

12   again by the tax multiplier, you would have roughly $61.00

13   and some change.

14   Q     So, what is the aggregate reduction of premium owed?

15   A     For -- as a result of the Jury claim, it would be $61.00

16   in premium reduction.

17   Q     What about the Depree file?

18   A     The Depree claim occurred during the 1991, '92 policy

19   period.  Again, if the Court was to accept Mr. Weber's

20   testimony that the harm on the Depree claim was $12,000, by

21   reducing the incurred losses by $12,000, it would reduce the

22   retrospective premium by $13,847.

23   Q     So, what is the total amount of premium that should be

24   reduced based upon all the calculations that you have done?

25   A     It would be 13,847, plus the $61.00, which would be

1   roughly $13,980.

2   Q    Now, how should the Court approve this adjustment if it

3   determines that it's some amount different than that to which

4   Mr. Weber testified as to the amount of harm on these two

5   files occurred?

6   A    What the Court could do if they are going to accept some

7   numbers other than the $53.17 and the 12,000, simply take the

8   amount of the harm and multiply it by 1.1539.

9             THE COURT:  One what?

10            THE WITNESS:  1.1539?

11  Q    How do you get that number?

12  A    That is the loss conversion factor of 1.10 times the tax

13  multiplier of 1.049.

14            So, if you would just do the math on the reduction

15  and the claim amount, that would give you the retrospective

16  premium that you, so to speak, back out that Latrobe would

17  not be responsible for.

18  Q    Did you do an interest calculation?

19  A    Yes.

20  Q    What was it?

21  A    I used a simple interest at six percent annually from

22  February 1st, 1996, through May 1st of 2006, and the total

23  interest came to $539,003.43.

24            MR. FOX:  I have no further questions for this

25  witness.

```
 1              THE COURT:  Mr. Gordon.

 2                     CROSS-EXAMINATION

 3   BY MR. GORDON:

 4   Q    Mr. Chimenti, the calculations that you did were based

 5   on a 2002 loss run, is that right?

 6   A    The 851,000 number?

 7   Q    Right.

 8   A    Yes.

 9   Q    So, what basically you were asked to do is to take a

10   look at loss runs as of 2002 and determine how much premium

11   was payable as of that date?

12   A    I was asked to calculate the amount of premiums that

13   would either be due Royal or refundable to Latrobe

14   Construction and --

15   Q    As a result of loss runs that you reviewed in 2002?

16   A    That's what I initially did, yes.

17   Q    And loss runs are dynamic in the sense that if there are

18   claim dynamics, as claims may deteriorate in earlier years,

19   there would be changes in the loss run value, correct?

20   A    Correct.

21   Q    And if claims were approved because the losses weren't

22   as substantial as were anticipated, or otherwise there is

23   some type of a reimbursement and subrogation of some form of

24   credit, then the loss runs would also change dynamically?

25   A    Yes.
```

1   Q    In 1995, there wasn't $851,000 worth of premium owed,
2   was there?
3   A    No.  I believe in, actually 1994, there was, like,
4   316,000 or 361,000 owed that was then paid in ten
5   installments.
6   Q    Okay.  So, that was paid already.
7           But, what I am trying to say is, that you come to a
8   conclusion based on review of 2002 loss runs that there was
9   800, and I think you said 51,000.  Is that about right?
10  A    Yes.
11  Q    $851,000 worth of premium due -- there wouldn't be
12  $851,000 of premium due in 1995, would there?
13  A    No.  In 1995, in order to calculate the amount of
14  premium due in 1995, it would be a very simple matter of
15  looking at the retrospective premium from 1994 and then
16  compare it to the retrospective premium adjustment from 1995
17  and seeing what that difference is.
18           And what I did in my calculations was, I went
19  through the -- each year, did those calculations, used 1994
20  as the baseline zero since all of the premiums, the
21  retrospective premiums were paid through that date, and then
22  it's just simply a matter of every year after that, '95, '96,
23  '97, and so forth.
24           THE COURT:  So I can understand better, is it your
25  position, Mr. Gordon, that there is a dispute with respect to

1    the premiums that were paid through 1994?

2          MR. GORDON:  And what was credited, Your Honor?  I

3    don't think that, and we are going to get into that, Your

4    Honor, number one.  But, number two is, they are adding

5    interest on $851,000 in 1995, but the $851,000 is based on a

6    2002 calculation.

7          THE COURT:  All right.  You may continue.

8          MR. GORDON:  Okay.

9    BY MR. GORDON:

10   Q   Mr. Chimenti, you have to make a number of assumptions

11   today.  You have to assume that all premiums that were billed

12   to Latrobe were actually earned.  You have to assume that all

13   premiums that were owed were actually paid between 1980 and

14   1995, is that correct?

15         MR. FOX:  Your Honor, could I just object in that I

16   was restricted in my direct to addressing the specific amount

17   of the offsets for the individual claims that Your Honor

18   found were mishandled, and the Court sustained the objection

19   of Mr. Gordon on that basis.

20         He is now attempting to go into that other area

21   beyond the issues that the Court has circumscribed for this

22   phase of the trial.

23         MR. GORDON:  Judge, there is a question of how much

24   premium is owed, and all of my questions are relevant.  I

25   think the witness would testify that you can't determine what

 1  was owed until you go back to all the retro programs and find
 2  out what was previously billed and paid.
 3          THE COURT:  All right.  Your objection is
 4  overruled, Mr. Fox.  Continue.
 5  BY MR. GORDON:
 6  Q   You would agree with me that you cannot determine -- in
 7  fact, you couldn't determine how much premium was either
 8  payable or returnable when you wrote your initial report on
 9  July 10, 2003, because you had no information that would tell
10  you what was paid, what was credited, and what remained
11  outstanding, isn't that true?
12  A   That's true.  But, the -- as long as the 1994 retro
13  premiums were calculated, billed and paid, that would
14  establish a baseline.
15          Now, whether there were even errors made pre-'94,
16  in losses that were used, that would correct itself as long
17  as the '95 information, '96 information, '97 information was
18  correct.
19          In other words, just for argument sake, let's say
20  that in the 1994 retro calculations which were calculated by
21  Royal, billed to Latrobe and paid by Latrobe, that there was
22  a $10,000.00 overstatement of a claim value, just for
23  argument sake.  When the 1995 retro adjustment is then done,
24  if the correct claim amount is then used, it is not
25  overstated by $10,000.00, then that would produce a credit to

1  Latrobe.

2          So, as long as you start at zero for 1994, it's

3  very simple to go ahead from that point forward and to figure

4  out all of the charges and credits on the various retro

5  programs.

6  Q    But, you had to know that it was zero in 1994.  You

7  can't make a calculation as to what's due today unless you

8  know that all the prior programs prior to 1980 when -- prior

9  to 1995 were zeroed out.

10          And you don't have that information.  You have to

11  rely on Royal to tell you what was received at 1995 and what

12  was previously billed, don't you?

13          MR. FOX:  I am going to object.  It's a multiple,

14  compound question.

15          THE COURT:  All right.  Overruled.

16          THE WITNESS:  I was satisfied that as of 1994, all

17  the premiums were paid.

18  Q    How?  A letter in 1999?

19          MR. FOX:  Your Honor, could I ask that the witness

20  not be interrupted?

21          THE COURT:  Let him answer the question.  Answer

22  the question.

23          THE WITNESS:  In order to make the calculations, if

24  all the premiums were paid as of the 1994 adjustment, you

25  can -- I can assume that.  Then going forward, we can make

1  the retro adjustments.  And even if there were mistakes made,
2  it would true up those numbers.

3  Q    Not in terms of what was billed and paid though.  There
4  wouldn't be any adjustment going forward if there was a
5  mistake in terms of how the premiums were credited or how
6  much was actually billed, would it?

7            You are talking about errors in reserves, aren't
8  you?

9  A    I am not talking about errors in reserves.  It would
10  self-correct itself every -- whenever an adjustment is made
11  if there had been a mistake in the previous year.

12  Q    If the mistake is caught?  If the mistake is caught?
13  A    What I am saying is, that if you take the 1994 premiums,
14  the retrospective premiums that were calculated and you
15  establish that those premiums are paid, you have a baseline
16  of then zero.

17            If there are any mistakes whatsoever in any of the
18  prior year calculations, when you do your next retro
19  adjustment, it is going to be the difference between the 1995
20  retrospective premium versus the 1994 retrospective premium
21  which was paid.

22  Q    Mr. Chimenti, if you received evidence that from 1974 to
23  1995, there had been an overpayment by Royal of $600,000, for
24  argument sake, would they still owe 851,000?

25  A    I am not sure I understand your question as to how they

1  would have come to overpaying by $600,000 without having a

2  retrospective adjustment to rely upon.

3  Q    If in the course of doing business, there has been a

4  determination that there has been a payment made that was not

5  accurately credited or properly credited, and it comes to

6  $600,000, your opinion today would be that that has to be

7  factored into what's actually owed, correct?

8  A    I am not aware of any overpayments of the premiums that

9  were made.

10  Q    Well, that's a good point.  Because there are business

11  records at Royal that cover that which has been paid, that

12  which has been received and that which has been credited, are

13  there not?

14        There are business records.  They are called

15  payment ledgers.  Did you read Diane Leger's testimony?

16  A    I -- I don't recall if I read her testimony or not, no.

17  Q    There are ledgers for each insured that confirm that

18  which has actually been paid and which has been credited.

19        Have you seen those ledgers?

20  A    No, I haven't seen those ledgers.

21  Q    And, in fact, those are the business --

22        MR. FOX:  Excuse me, Your Honor.  The witness has

23  not completed his answer.

24        THE COURT:  All right.  Complete your answer,

25  please.

| | |
|---|---|
| 1 | THE WITNESS: What I did see in my review those -- |
| 2 | Q    I asked if you saw those records. |
| 3 | A    And I said no, I haven't seen those records, but -- |
| 4 | Q    You answered my question. |
| 5 | THE COURT: Let him answer the question. |
| 6 | THE WITNESS: I think, to clear up the point |
| 7 | whether or not there was overpayments or not of premiums, |
| 8 | Mr. Raabe has in his report the Royal retrospective premiums |
| 9 | on page twenty-nine of his report. |
| 10 | Then right next to that for each of the years, he |
| 11 | has the amounts Latrobe paid. |
| 12 | Q    No. He has the amounts based on the work sheets what |
| 13 | somebody at Latrobe in the adjustments reflected what may |
| 14 | have been paid. |
| 15 | That is the same thing you did, isn't it? |
| 16 | A    No. I am not assuming that that is what Mr. Raabe did. |
| 17 | Q    Well, what did he do? |
| 18 | A    He has Latrobe paid for each of the policy periods an |
| 19 | amount. |
| 20 | Q    But, that is what you did based on documents, which are |
| 21 | not the business records, to show which actually has been |
| 22 | received, rather, that's documents that were created by |
| 23 | someone at Royal who you do not know, which is just a |
| 24 | worksheet that establishes what the adjustment would be for a |
| 25 | successive year, the retro adjustment. |

1    You were able to do that from those worksheets,
2    weren't you?
3         MR. FOX:  I am going to object.  These are multiple
4    questions and they are getting very argumentative.
5         THE COURT:  Okay.  Overruled.
6    Q    The business records for Royal that shows what has been
7    paid and what has been paid on behalf of an insured, have you
8    seen them?
9    A    No.  I mean, what I assumed from Mr. Raabe's report when
10   he has Latrobe paid, I can only assume that he relied upon
11   either Latrobe's records or independently verified the
12   amounts that Latrobe paid.
13   Q    And if he said that he didn't, we have a problem here,
14   don't we, because we don't have Royal's business records to
15   show what was credited, do we?
16   A    I am not sure we have a problem.  I think the whole
17   purpose of this phase of the trial was to calculate the
18   retrospective premiums.
19   Q    But, you can't determine what retrospective premiums are
20   unless you know what was actually paid and what was earned in
21   prior years?  You can't do it?
22   A    No.  I can calculate the retrospective premiums.  What
23   you are presenting is a whole other issue as to whether or
24   not those premiums that we calculated were actually paid,
25   overpaid, or not paid at all.

1    Q    All right.  You are not in a position today -- and let
2    me digress for a moment.
3                You asked for information 1980 to 2000 -- excuse
4    me -- to 1995, is that right?
5    A    Yes.
6    Q    You have offered no opinions in this case regarding the
7    retrospectively rated program '74 through 1980?
8    A    No.
9    Q    And there has been a judicial confirmation that those
10   program years were opened.  Are you aware of that?
11   A    There has been no claim for any premium for those policy
12   periods.
13   Q    How do you know that?  You didn't look at any of the
14   data?
15   A    Royal's complaint begins in 1980.  It does not address
16   anything pre-1980.
17   Q    But, the counterclaim does include all of the retro
18   programs and the Court has already determined that all were
19   open.  Did you know that?
20   A    I was under the impression that the counterclaim was
21   dismissed.
22   Q    You were?
23                Can you make a determination by looking only at the
24   data '80 to '95, what premiums today are payable without
25   knowing what happened between 1974 and 1980?

1  A    Yes.

2  Q    How would you do that if you haven't looked at any of

3  the data?

4         MR. FOX:  Objection.  Mischaracterizing his

5  testimony.

6         THE COURT:  All right.  Overruled.

7         THE WITNESS:  Well, I know from the information

8  that I was provided that for the period 1980 through 1995,

9  that those premiums were all paid as of the 1994 adjustment.

10  Q    How do you know that?

11  A    Because --

12  Q    What are you relying on?

13  A    I am relying upon the letter from Mr. Hooper.

14  Q    Can I see that letter?

15  A    Yes.

16         MR. GORDON:  May I approach the witness?

17         THE COURT:  Yes, you may.  Tell you what.  It's

18  approaching noon.  Let's take our noon recess at this time

19  and we will reconvene at one-thirty this afternoon.

20  (Court recessed at 11:55 a.m.)

21  (Court reconvened at 1:30 p.m.)

22         THE COURT:  Okay, Mr. Gordon, you may continue.

23                     CROSS-EXAMINATION

24  BY MR. GORDON:

25  Q    Mr. Chimenti, did you review any of the actual claims in

1    the twenty-one year program?

2    A    No.

3    Q    And I think in one of your reports, do I recall

4    correctly that you thought there were about eight hundred

5    claims?

6    A    I am not sure if that was in my report.  I don't believe

7    so.

8    Q    When you were retained on behalf of Royal, you assumed

9    that the only program here that was at issue based on the

10   complaint were the 1980, '95 program years?

11   A    That's correct.

12   Q    And you were not asked to advise on payment issues and

13   receipt issues prior to 1980?

14   A    No.

15              THE COURT:  Prior to what year, Mr. Gordon?

16              MR. GORDON:  Prior to 1980.

17              THE COURT:  Prior to '80?

18   Q    Was the information that you had received prior to

19   July 10, 2003, sufficient for you to render an opinion as to

20   what additional premiums were payable or returnable?

21   A    I reviewed probably a dozen boxes of documents, business

22   records from Royal Insurance, and it probably took me a week

23   to go through.

24              Those included the underwriting records, loss

25   control reports, retrospective rating adjustments.  There

1    were claim files, although I didn't review the claim files

2    per se, but I did go through all those boxes to identify the

3    materials that were in those.

4              And the information that I received was sufficient

5    for me to calculate the retrospective premiums.

6    Q    But, in your report, you indicate that you -- the

7    amounts indicated as premium owed are based on the assumption

8    that all prior retrospective premiums were paid in full.

9    Isn't that true?

10   A    That's correct.

11   Q    And at the time you issued your report, I think in your

12   deposition you indicated that, absent that information, you

13   were not able to render an opinion as to what was owed and/or

14   what was returnable until you could determine what, in prior

15   years, was earned and paid, isn't that true?

16             MR. FOX:  I am going to object.  It's a

17   mischaracterization of the report.

18             THE COURT:  Overruled.

19             You can answer the question.

20   Q    Isn't that true?

21   A    When I first wrote my report and calculated the then

22   current retrospective premiums --

23   Q    And you indicated --

24             MR. FOX:  The witness, I believe, was continuing

25   his answer.

1           MR. GORDON:  Oh, I'm sorry.

2           THE WITNESS:  Yes.  Then I was advised that there

3    were prior years' premiums that had not been paid.  That's

4    when I authored my supplemental report to bring it up to

5    date.

6    Q    Who told you that?  Who told you that the premiums had

7    not been paid?

8    A    I don't know -- probably Mr. Fox.

9    Q    So, Mr. Fox told you that prior premiums had not been

10   paid and that allowed you then to conclude how much premium

11   was owed?

12   A    What I did is, I went back and calculated the premiums

13   for all of the years where the premiums had not been paid to

14   see whether there was money owed or whether there was return

15   premium to the policyholder.

16   Q    Right.  But, you need some additional information.  You

17   needed to know what had previously been paid.  And Mr. Fox

18   was the source of that information that allowed you to enter

19   into the supplemental report?

20   A    What he gave me was the statement of account from Royal

21   Insurance.

22   Q    Well, the statement of account was attached to the

23   complaint.  You already had that.

24   A    Yeah.  But, it wasn't explained to me from the statement

25   of account that was attached to the complaint that what I was

1  asked to do originally was to go back all the way to '94.

2  What I was asked to do originally -- and it wasn't

3  from Attorney Fox. It was from another attorney in the

4  firm -- was simply to calculate the current retrospective

5  premiums, which for me to do that would simply be, which I

6  did calculate the retrospective premium as of that date and

7  compare them to the premiums from the prior retrospective

8  adjustment, which would then bring the premium current for

9  that program.

10  Subsequent to that, I was asked to go back and

11  calculate and verify all the amounts on the statement of

12  account, which is what I did.

13  Q  And who asked you to do that?

14  A  That would have been Attorney Fox.

15  Q  And you said that someone had to explain to you what the

16  statement of account was. Who did that? Mr. Fox?

17  A  No, they didn't explain to me what it was, just that the

18  retrospective premiums would have to be calculated from a

19  different start point than where I had started from.

20  Q  And who told you that?

21  A  Mr. Fox asked me to go through the statement of account

22  to verify all those amounts that were being claimed by Royal

23  Insurance.

24  Q  But, the statement of account doesn't reflect what's

25  been paid and when it's been paid, does it?

1   A      It reflects all of the charges and all of the credits on
2   Latrobe's account.

3   Q      It reflects what credit some -- by the way, what is the
4   statement of account?  Do you know what that is?

5   A      That would be Royal's record of the premiums that were
6   charged and the credits for the various policies in that
7   program.

8         So, it's their record of the amounts that are due
9   under that program from 1980 to '95.

10  Q      Who told you that?  Who told you the statement of
11  account is Royal's records that reflect what has been paid
12  and what it paid?  Who told you that?

13  A      Well, I had conversations with a few different people at
14  Royal.

15  Q      And who told you that?

16  A      Um, the lady's name was Dianne, who is not Dianne Leger.
17  It was another Diane, who I do not recall her last name, that
18  I spent the better part of the day going through all those
19  numbers, numbers where even I had questions about that we
20  needed to verify so that my calculations -- if there is a
21  number on that statement of account that did not match any of
22  my calculations, then my point was, I would have to
23  disqualify that number if it was a charge to be fair to all
24  concerned.

25  Q      The statement of account that you reviewed was a summary

1    that was prepared on what date?

2    A    I don't have that statement of account with me, so I

3    can't tell you the date it was prepared.

4    Q    It's a summary of all the prior years, 1980 through

5    1995, as to what was charged and allegedly what was received?

6    Is that what it is a summary of?

7    A    I think it's probably more than a summary.  It's their

8    record of the charges for the premiums for the various policy

9    periods and also the credits that would apply to those policy

10   periods.

11   Q    But, you didn't review Diane Leger's testimony that

12   indicates that you can't determine what was paid or received

13   from the --

14           MR. FOX:   That's a complete misrepresentation of

15   her testimony, Your Honor.

16           MR. GORDON:   Well, she is here and she is going to

17   testify.

18   Q    So, you are assuming that the statement of account gives

19   you all the information that you would have required to

20   determine what was earned, what was paid and properly

21   credited from 1980 to 1995?  Is that your assumption today?

22   A    It's not my assumption.  My answer is, the statement of

23   account is all of the charges and credits as of the date the

24   statement was prepared according to Royal's business records.

25   Q    Well, how do you know it was according to Royal's

1   business records?

2   A    Because they prepared it.  They had to prepare it from

3   something.

4   Q    From what?

5   A    From their records.

6   Q    What is the records they prepared it from?

7   A    That you would have to ask Royal.  But, it would be from

8   their Accounting Department, the billings that they would

9   bill and the payments that were received, whatever is

10  outstanding, would be outstanding would be on Latrobe's

11  account.

12  Q    So, somebody looked at Royal's business records and

13  prepared a summary which you call the account?

14  A    The statement of account.

15  Q    Right.  And you don't know who prepared that summary?

16  A    The individual, no.

17  Q    And you don't know what documents they looked at to

18  prepare that?

19            MR. FOX:  Objection.  Asked and answered.  He

20  identified the documents.

21            THE COURT:  Overruled.

22  Q    You don't know who prepared it?

23  A    No.  The individual that I know that was -- I don't want

24  to say --

25  Q    Do you know who prepared it, Jerry?

```
 1   A    No, I don't know who prepared it.

 2   Q    That's all.

 3             MR. GORDON:   Judge, could you please ask him to

 4   answer the question?

 5             THE COURT:   I think he is doing the best he can.

 6   Q    You don't know who prepared it?

 7   A    No.  But, I mean, the source of the record that we

 8   received it from would have been Mr. Hooper.

 9   Q    Did you meet with Mr. Hooper?

10   A    No.

11   Q    You tried to meet with Mr. Hooper?

12   A    I didn't try to meet with him.  We attempted to speak on

13   several occasions.

14   Q    You never could?

15   A    Then I spoke to someone else in his area.

16   Q    And in addition to not knowing who prepared the

17   document, you don't know what actual business records were

18   reviewed and to calculate what was actually received?

19   A    I didn't prepare the account.  That was prepared by

20   Royal.

21   Q    Now, at no time in your report, in either report, do you

22   address earned premium, payments and credits for 1974 to

23   1980, have you?

24   A    No.

25   Q    That's still part of the retro program that's at issue
```

1  in this case, is it not?

2  A    Not to my knowledge.  The only years at issue are 1980

3  through '95.

4  Q    So, your assumption as to what premium is due is

5  predicated on the assumption that as of 1995, all premium

6  that was earned was paid and that the program lasted from

7  1980 to 1995?

8        That is how you calculated premiums, correct?

9  A    I calculated the premiums based on the fact that,

10  according to Royal's records and admission that all of the

11  premiums were paid up through 1994.  So, it wasn't necessary

12  for me to go back prior to 1994 to calculate the

13  retrospective premium from 1995 to the current date.

14  Q    Okay.  That was the letter that basically tells you that

15  all the premiums that were billed were paid.

16        It doesn't indicate, however, how much premium or

17  credit over and above what was billed was retained by Royal,

18  does it?

19  A    That would have come out on the statement of account if

20  there was a payment over and above what they would have

21  billed, and that just simply didn't exist.

22  Q    Well, when you say it didn't exist, you don't even know

23  the records that were reviewed to compile the statement of

24  account, do you?

25  A    What I am telling you is, that there is no payment over

1    and above what was billed to Latrobe on Royal's statement of

2    account.  And that the statement of account would have

3    included all of the credits for payments made and all the

4    charges for the premium.

5              So, if there was something over and above what was

6    billed paid by Latrobe, then it would appear on that

7    statement of account.

8    Q    Are you telling me that the statement of account is a

9    business record that's kept in the ordinary course of

10   business of Royal for its insureds?

11             Are you telling me that's the case?

12   A    It's my understanding that that was prepared from their

13   business records that are kept for their policyholders.

14   Q    And who told you that?  Mr. Fox?

15   A    No.  In my discussions with the Diane, not Dianne Leger,

16   at Royal.

17   Q    So, just so that I am clear on this and we will move on,

18   you received a summary from someone named Diane, whose last

19   name you do not know, who basically purported to represent to

20   you that the statement of account is a summary of all prior

21   billings between 1980 and 1995 and establishing also a credit

22   for what has been paid?

23   A    I didn't say that.

24   Q    Well, can you say that?

25   A    No.  I wouldn't say that, no, because that is not what

1  I've testified.

2          THE COURT:  As I recall, what he said was, the

3  statement of account shows what was earned, paid and credited

4  during that particular period.

5          Is that what you said?

6          THE WITNESS:  Your Honor --

7          THE COURT:  Is that how you have defined the

8  statement of account?

9          THE WITNESS:  No.  The statement of account is a

10  record of all of the credits and payments that are still

11  outstanding on the account.

12          THE COURT:  All right.

13  BY MR. GORDON:

14  Q    You have no firsthand knowledge as to how accurate that

15  is, though?

16  A    I would say it's accurate if it was prepared from

17  Royal's business records.

18          I have no information that would lead me to believe

19  that it's not accurate.

20  Q    But, you have no information that would establish that

21  it is accurate?  You're not the custodian of that record, are

22  you?

23  A    I am not the custodian of that record.

24  Q    And you played no role in the preparation of that

25  document?

1    A    No, sir.

2    Q    Your opinions as to what premiums are owed as of today

3    are related in substantial part to the 2002 loss run?

4    A    What I did to prepare per the --

5          MR. GORDON:   Judge, could I have an answer to that

6    question?

7          THE WITNESS:   I am answering your question.   And

8    the way you phrased your question, I am going to reply.

9          THE COURT:   Time out.   This isn't a barroom.   This

10   is a courtroom.   Ask your question again.

11         MR. GORDON:   Yes.

12   Q    The calculation of retrospective premiums are tied into

13   the 2002 loss run?

14   A    That's not even a fair question because they are

15   sensitive as to time.   So, they are not tied into exclusively

16   the 2002 loss run.

17         These programs, as you had indicated before the

18   break, are dynamic, that they change from year to year.   So,

19   in order -- to answer your question and in order to prepare

20   for my testimony today, per the order issued by the Court

21   asking for expert testimony on the retrospective premiums

22   due, what I did is, I obtained the current loss runs valued

23   in '06.

24   Q    But, you haven't testified to that.

25   A    Can I answer the question?   You asked me the question

1   and I am just going to give you my answer.

2              What I did is, I calculated those premiums, the

3   retrospective premiums since they are dynamic in nature and

4   brought them to date and --

5              MR. GORDON:  Judge --

6              THE WITNESS:  And based on my --

7              THE COURT:  Just a second.  Please continue.

8              MR. GORDON:  He is trying to get in current loss

9   run data.  He has already given an opinion as to $851,000.

10  That's what I am asking him about.

11             THE COURT:  Well, let him finish.  Go ahead.  You

12  can continue.

13             THE WITNESS:  Thank you, Your Honor.

14             Since these programs are dynamic and they change

15  with time, based on the current loss runs valued as of

16  February, 2006, the retrospective premium for the program

17  would be $943,670.

18             MR. GORDON:  Your Honor, I would ask, for the same

19  reason as before, we have never been provided this

20  information.  We have never seen any of the claim

21  documentations.  We can't comment on whether or not that's

22  fair, reasonable.  Okay?

23             The question that I had is what he concluded how

24  much premium was due?  Did he rely on the 2002 loss run?  His

25  response was not responsive at all.

1    THE COURT:  Answer that question.

2    THE WITNESS:  I understood your original question

3    to be, for my preparation to testify today, did I rely on the

4    2002 loss runs, which is not true.

5    When I authored my report back in 2003, I relied on

6    the 2002 loss runs which would bring the retrospective

7    premium as current as possible.  To prepare for today, that

8    would not be fair to Royal, nor to Latrobe, if Latrobe was

9    owed money.

10   BY MR. GORDON:

11   Q   As I understand it, the information that you had

12   requested that allowed you to calculate in 2003 what premiums

13   were payable was the -- or owed or returnable, was the

14   statement of the account and the 1999 letter that was issued

15   by a gentleman by the name of Hooper to Attorney Giotto?

16   A   Those weren't the only thing that I relied upon.

17   As I stated, there were boxes, stacked on end,

18   would be twenty feet long, that I relied on, that I reviewed

19   to come to my final analysis of the premiums.

20   Q   But, you had had those boxes previously and that was not

21   sufficient for you to issue a decision on what was owed as of

22   July 10, 2003.  You said that you needed more information,

23   and the information that you received that allowed you to

24   reach your opinion that $851,000 was owed was the statement

25   of account which had been previously provided to you, but you

1    weren't sure that you could understand it, and a letter in

2    1999?

3              MR. FOX:  Your Honor, I am going to object at this

4    attempt to summarize all this testimony.

5              MR. GORDON:  It is important, Your Honor.

6              THE COURT:  The objection is overruled.  Go ahead,

7    Mr. Gordon.

8    BY MR. GORDON:

9    Q    That's correct, that was the new evidence that you got?

10   A    No.  It's just a matter of the difference between what I

11   was originally asked to do and what I was subsequently asked

12   to do.

13             MR. GORDON:  Do you have -- I would like to make a

14   copy of the 1999 letter that you have relied upon to

15   establish that they were -- the parties were paid, I guess,

16   up to date through 1995, I would like to make that an exhibit

17   in this case.  Your Honor, I don't have that --

18             MR. FOX:  Your Honor, I am going to object to the

19   use of that letter since it does involve attorney-client

20   privilege and it's a letter between counsel and the client.

21             MR. GORDON:  Well, then I don't believe he can rely

22   on that communication, Your Honor, and I would ask that the

23   testimony then be stricken.

24             THE COURT:  What does the -- this is part of your

25   report?

1              MR. GORDON:  It's not, Your Honor.

2              THE WITNESS:  No, Your Honor, it is not part of my

3    report.  It was part of the premise of my report, though, to

4    establish the baseline as to when the retrospective premiums

5    were paid in full with no premium due nor returned premium

6    owed to the policyholder, so -- to establish that baseline

7    for me then to do the subsequent retrospective adjustments

8    for '95, six, seven to current.

9              THE COURT:  All right.  How does the letter factor

10   into this opinion?

11             THE WITNESS:  All it does, Your Honor, it

12   establishes when Latrobe's account was at zero.  Then all --

13   it's --

14             THE COURT:  Can we read parts of that letter into

15   the record?  If there was some communications between counsel

16   that you would consider to be confidential, perhaps we can

17   keep them out of the record.

18             MR. GORDON:  Well, Your Honor --

19             MR. FOX:  I would be happy to do that, Your Honor.

20             MR. GORDON:  Your Honor, in light of the fact that

21   he's relying on the letter that, that he has testified from

22   the letter, I hardly think that there is an

23   attorney-client -- besides it's been disclosed to the expert.

24             THE COURT:  I haven't read the letter.  I have no

25   idea what it says.

1             MR. FOX: Your Honor, to cut through this, I am

2 happy to agree to the admission of the letter so long as

3 counsel will stipulate that we are not waiving

4 attorney-client privilege as to anything extending beyond the

5 letter.

6             THE COURT: That solves our problem.

7             MR. GORDON: I would like to offer it, Your Honor.

8             THE COURT: We'll have it marked, please.

9             MR. GORDON: This is A as in Albert, S, Your Honor.

10             And I don't have a copy of it, and I would ask that

11 David, later on perhaps we could --

12             MR. FOX: We have a copy marked. Give us a second.

13             MR. GORDON: Why don't I leave the witness with a

14 copy.

15 BY MR. GORDON:

16 Q    To the best of your knowledge, when this letter was

17 issued, the '74, '80 programs were not at issue, is that

18 correct? There was a lawsuit involving '80 to 1995?

19 A    That would be correct.

20 Q    Mr. Chimenti, insureds move premiums through insurance

21 companies in a variety of ways, do they not?

22 A    Could you repeat the question?

23 Q    Sure. Let me give you some examples.

24             An insured can make a direct payment to an insurer,

25 correct?

```
 1    A    That's correct.
 2    Q    The broker can establish an account with a carrier and
 3    make the payment on behalf of the client, correct?
 4    A    That's true.
 5    Q    Do you know what a factoring arrangement is?
 6    A    It would be probably a financing arrangement.
 7    Q    And you are familiar with those as well?
 8    A    Somewhat.  I have not been directly involved in those,
 9    though.
10    Q    That's a way that premiums are oftentimes moved to
11    insurers, correct?
12    A    Like I say, I don't have firsthand experience on those
13    things.
14    Q    But, you understood what a factoring arrangement was?
15    A    Yes.  But, again, I am not here to testify regarding
16    that.
17    Q    Loss sensitive programs, programs such as retro
18    programs, the insurance company in those types of programs is
19    effectively fronting monies that ultimately the insured may
20    have to reimburse in whole or in part, correct?
21    A    There are loss sensitive programs where, yeah, the
22    insurance carrier is going to charge a basic premium plus the
23    claim payments for the indemnity and medical and a factor for
24    their expenses on the claims.
25    Q    Well, but I think my question is, the insurance company
```

 1  is essentially going to start fronting the losses that

 2  ultimately are going to be reimbursable by the insured in

 3  whole or in part?

 4  A    To a certain extent, that would be true.

 5  Q    The insurance company can protect itself by securing

 6  collateral?

 7  A    With a retrospective program?

 8  Q    Yeah.

 9  A    I am not familiar with retrospective programs myself

10  where the -- well, I suppose I have had maybe one or two

11  where the carrier requested some collateral, but --

12  Q    As in the form of?

13  A    It could be a letter of credit.  Some type of

14  arrangement.

15  Q    What are the documents, the business documents that

16  Royal retains, what are the names of those documents that

17  address monies which are paid directly by the insured, monies

18  that come to an insured on behalf of the broker, monies that

19  are paid under a factoring arrangement or collateral

20  accounts, do you know?

21  A    I'm not sure I understand your question.

22  Q    Well, does Royal have a business record or business

23  records that established those types of payment

24  relationships?

25  A    I think I am probably the wrong person for you to ask

1   those questions.  I don't know what Royal has.

2   Q    And so the business records that confirm payments by or

3   on behalf of an insured or whether there is collateral or

4   draw down, you are not the proper person to address that

5   issue?

6   A    No.

7   Q    Do you know whether premium paid by Latrobe between

8   1974, 1995 and/or thereafter, was ever paid on Latrobe's

9   behalf by a broker?

10  A    That I don't know.

11  Q    Do you know if it was ever paid by a factor?

12  A    No.

13  Q    Do you know whether or not there was collateral that

14  would support the premiums in the event that the premiums

15  were not paid?

16  A    No.

17  Q    When we began this case in February of '05, we had a

18  seminar, if you will, from both you and Mr. Raabe on the

19  mechanics of the incurred loss retrospectively rated program,

20  and there was some discussion as to the importance of the

21  total incurred value in the formulation of the retrospective

22  premium.  Do you recall that?

23  A    I -- I don't recall the seminar, to tell you the truth,

24  no, so --

25  Q    You don't recall testifying in Court about the

1    importance of a total incurred value and plugging it into
2    the --

3    A    I thought you meant a seminar --

4    Q    I meant a seminar for the benefit of the Court.

5    A    No.  No.  I thought you meant a seminar that me and
6    Mr. Raabe attended somewhere.

7    Q    Remember we had a lesson from you and Mr. Raabe talking
8    about the mechanics and the incurred loss retro program?

9    A    Yes.

10    Q    And I think you indicated that total incurred values are
11    the values that would have the greatest significant impact on
12    what premium is earned because that is the value that's going
13    to fluctuate, it is going to be the variable part of the
14    equation.

15    A    It would be the variable part of the equation.

16    Q    Now, in light of the fact that you have not reviewed the
17    actual claims, would it be fair to state that you are relying
18    on the fact that the total incurred values contained in the
19    loss run accurately reflect that which has been paid,
20    medical, that which has been paid out in indemnity, and that
21    which has been paid out in litigation expenses?

22    A    Yes.  And I think that that was all resolved through
23    phase one of the trial.

24    Q    Well, no.  That's a damage issue.  That is not phase one
25    of the trial.

1  A    I guess to clarify my answer, that Royal's records, as
2  far as their total incurreds, are accepted.
3  Q    No, they have not.  We haven't even talked about the
4  total incurred values.
5       All that we have talked about is whether the claim
6  was handled correctly.  We never talked about how much was
7  actually paid out and whether that is accurately reflected in
8  the loss run.  That's a damage issue here.
9       MR. FOX:  I am going to object.  Is that a question
10 or a statement?
11      MR. GORDON:  I was just identifying that for the
12 witness since he seemed to be confused on the issue.
13      THE WITNESS:  My function here today, in response
14 to the order from phase one, was to offer my calculations for
15 the retrospective premiums.
16 Q    Right.  The calculations, though, are now predicated on
17 the loss run of 2002 because you did not go into the file to
18 determine what was paid within the file, you accept that the
19 information contained in the loss run is accurate?
20 A    Well, I think loss runs would be accurate.  What else
21 would we go by?  If there were issues regarding the total
22 incurreds and what was paid, it's my understanding that those
23 would have been claim handling issues, if claims were
24 overpaid, that they would not be part of today's proceedings.
25 Q    Mr. Chimenti, I am not contending on the claims that

1   we've already discussed that there has been any over or

2   underpayment.

3           What I am asking you is, whether or not you have

4   reconciled the information on the loss run?  We haven't

5   discussed with the Court the loss run.

6           Does the loss run fairly reflect that which was

7   actually paid in the case?  Do you know?

8   A    I would have to say yes.

9   Q    How do you draw that conclusion?

10  A    Because the loss runs are produced from the payments

11  that were made on the claim files.

12  Q    Somebody then takes the claims information, inputs that

13  into data that becomes the loss run?

14  A    It's all done through computerization.

15  Q    Right.

16  A    Yes.

17  Q    Was it all done by computerization in 1974 and 1990 and

18  1994?

19  A    I would have to say yes.  I'm just going back through my

20  own personal experience.

21  Q    With Royal?

22  A    Not with Royal.  My own personal experience that the

23  companies that I worked for had a computer system that

24  recorded claim payments.  That information was then used to

25  produce loss runs.

1  Q    You don't know in the instant case whether Royal had

2  such a computer or who inputted the information to devise the

3  loss run, do you?  Do you know?

4  A    Mr. Gordon, if you are trying to say that Royal didn't

5  have a computer back in 1980 --

6  Q    No.  I am just asking you.

7  A    I think we are way past reality here.

8  Q    I am asking you, do you know whether or not there was a

9  computer system that transferred, paid on a particular file

10  into the loss runs that were used for you?

11  A    That would be the whole design of the computer system to

12  do that.

13  Q    Do you know whether Royal had that in place?

14  A    I would have to say yes.  From the records that I

15  reviewed, I would have to conclude that yes, that they did.

16  Q    And so your assumption is that the information in the

17  2002 loss runs accurately depict that which was actually paid

18  out in these claims?

19  A    Yes.

20  Q    And the assumption is made because you think they would

21  have a computer and that the computer would accurately take

22  on that task?  That's your assumption?

23  A    That is the way that insurance systems operate.

24  Q    Yes.  Mr. Chimenti, as part of -- you are the principal

25  of American Adjustments Services, or Management Services?

1  A    American Risk Management Services, Incorporated.

2  Q    And part of your role, is it not, is to make sure that

3  insureds who have statistical information filed with the

4  Bureau have their statistical information filed accurately?

5  A    That's correct.

6  Q    And you make substantial dollars in fees by identifying

7  mistakes, reporting mistakes where insurance companies have

8  provided data to the Rating Bureau, and the Rating Bureau

9  miscalculates or misinterprets or is misinformed about the

10 value, the total incurred value on a claim?

11 A    I would say that what I find is, either error is made in

12 the calculations of the experienced modification factors by

13 the Bureau, or that there may be more than one way of

14 reporting data or that the data reported was not accurate.

15 Q    So, there is, in your world, unreliability of the data

16 at times as being reported to the Bureau, you identify those

17 errors that compels the Bureau to recalculate experienced

18 modification factors, and then when that is done, there is a

19 return of premium which you share with the client?

20 A    True.

21 Q    And the data that you review typically comes from the

22 loss runs that are being provided by the insurer to the

23 Bureau?

24 A    Don't really come from the loss runs.  Those are -- it's

25 data that's provided on unit statistical reports to the Data

1  Bureau.

2  Q    So, what does the insurer do?  The insurer doesn't go

3  through every single file and review all the data to fill out

4  the statistical reports, they go to the loss runs, don't

5  they?

6  A    Well, it's information that would be captured from their

7  computer system.  It may be slightly different from the same

8  system that would produce loss runs for an insured.

9        But, there are other areas that I find in my

10 practice where, although the data may have been reported

11 correctly at one level to the Rating Bureau, in prior levels

12 it may not have been reported accurately, which would then

13 pose a situation where I would then go to the insurer and the

14 Rating Bureau and ask that those values be revised.

15 Q    But, the total incurred values that have been reported

16 to you, one way or another, may not accurately reflect what

17 the losses were and we need to modify those correctly?

18 A    Well, let me just give you an.  Example this way, I

19 think everyone would understand.

20        For instance, let's say that there was a claim that

21 was reported to the insurer that was denied, but they

22 establish a $50,000 reserve for their exposure on that claim.

23 That $50,000.00 would be used in the calculation of the

24 experienced modification factor.

25        If this claim is litigated for two or three years,

1   that $50,000 value would be reported to the Bureau and used

2   in the calculation of the policyholder's experience rating.

3            If that claim -- I wasn't done.

4   Q    Sorry.

5   A    If that claim is then found to be non-compensable, what

6   the carrier is to do is to file a correction report with the

7   Rating Bureau.

8            Now, the value when it was originally reported at

9   $50,000 was correct and accurate.  The value subsequently the

10  following year at level two when it was reported to the

11  Rating Bureau at $50,000 was correct and accurate.

12           Then if the claim is found to be non-compensable at

13  level three, the carrier reports zero.  But, they are also

14  required to go back and correct level one and two, not

15  because the information was incorrect when it was reported.

16  It's just in -- after the fact, a claim was declared

17  non-compensable which, according to the Rating Bureau rules,

18  they now need to go and correct that value to zero.

19  Q    But, that's only a limited -- that is only a limited

20  basis for refiling statistical cards, that is not what --

21  that's not all you do at the Rating Bureau.  There are

22  transmittal errors all the time that you are looking for, are

23  there not?

24  A    Let put it this way:  There are claim values that are

25  reported to the Rating Bureau.

1    Q    Right.

2    A    That simply can't be challenged.

3    Q    But, there are some that are reported that you will

4    challenge?

5    A    Very few.  There has to be a reason within the Rating

6    Bureau rules to revise those values.  Otherwise, although I

7    may not agree with the values personally, it really doesn't

8    matter because there is no Rating Bureau rule that would

9    allow the Bureau to revise those values.

10   Q    Oh, yeah.  Typographical errors are, in fact, a basis --

11   in other words, when the Bureau is confronted with a

12   statistical card where there has been a typographical error

13   where the carrier has misreported the value of the client,

14   the rating Bureau has a rule for that --

15   A    That's one of the three reasons, yes.  What I am saying

16   is, if you simply don't agree with the value that the carrier

17   reports, there is no rule.

18   Q    I am not talking about agreeing with the value.  I am

19   talking about the misreporting of values.

20         In fact, that occurs with frequency where there is

21   a specific regulation that allows the Bureau to accept a

22   refiling of the information based on the real value of the

23   claim that was actually paid rather than what was reported,

24   true?

25   A    If there was a clerical error made, yes.

1  Q    And that's one of the things that you would look for,

2  clerical errors?

3  A    It not a big area of errors found.

4  Q    But, they do occur?  They created a regulation for it,

5  didn't they?

6  A    Well, I'll tell you what.  I am not going to say that

7  they don't occur because, I mean, something could happen

8  where a value is misreported for whatever reason.

9  Q    Do you have the 2002 loss runs available?

10  A    I don't believe so.

11  Q    But, you would agree with me that if the -- if the

12  information contained on the loss runs creates some

13  uncertainties as to whether errors were made, that it would

14  undermine your ability to render an opinion on premiums

15  within a reasonable degree of professional certainty, that is

16  to say, garbage in, garbage out?

17  A    If there was any evidence that it was a garbage in,

18  garbage out system, then I would be concerned about that.

19       But, in my review of the records, I did not find

20  that concern.

21  Q    But, you didn't look at the files or read carefully the

22  decisions to determine whether or not the values contained in

23  the loss runs could be justified?  You didn't do that yet,

24  have you?

25  A    I didn't feel that was necessary, no.

1              MR. GORDON:  Your Honor, could I bring up the

2    easel?

3              THE COURT:  Yes.

4    Q    Mr. Chimenti, the reason I come up with this is that I

5    had reviewed your deposition testimony, and it was among the

6    things that you, at least I thought you did, was you reviewed

7    statistical data with the Bureau to see whether those reports

8    were accurate.

9              And it kind of got me thinking.  And I would like

10   to talk to you about a couple of the claims that I just

11   reviewed last night.

12             MR. FOX:  Your Honor, I think we are going far

13   afield if we are addressing claims and claims handling issues

14   at this point.

15             MR. GORDON:  Your Honor, it's what we were

16   charged --

17             THE COURT:  I guess it depends on what claims we

18   are talking about.

19             What claims are we talking about, Mr. Gordon?

20             MR. GORDON:  The Augustine one.

21             MR. GORDON:  What is at issue is whether or not

22   premiums -- this is an issues and to whether or not -- there

23   is testimony here that he used the 2002 loss run and assumed

24   they were accurate and they accurately reflect that which was

25   paid.

1          And what I would like to do is to go over your

2    decision in this case and figure out how he can reconcile the

3    figures in the loss runs.

4          THE COURT:  Okay.  How many of these cases do you

5    intend to review?

6          MR. GORDON:  I only had time to look at three of

7    them, Your Honor.  One as we were working today during

8    Mr. Weber's testimony.

9          So, I am going to get three.  For example, they are

10   the first three that we came up.

11         THE COURT:  Well, go ahead, Mr. Gordon.

12   BY MR. GORDON:

13   Q    There has been a judicial determination that Augustine

14   was handled prudently, Mr. Chimenti.

15         This is a case that was closed in 1996, and it's a

16   case where Mr. Augustine received benefits from November 17,

17   1994, through September 9, 1996.  That's a period, I think

18   you will agree -- and if I put it up on the board, let me see

19   if I can get a felt tip -- It's a period of less than -- can

20   the Court see this?  -- it's a period of less than two years.

21   And actually last night, we contacted the Bureau ourselves.

22   That is ninety-four and one-sevenths weeks.  Would that be

23   about right?

24         Would you dispute that if I told you it was

25   ninety-four and one-sevenths weeks?

1    A    I guess we will accept that for illustration purposes.

2    Q    And I am going to tell you that, based on documents that

3    were submitted in this case by Royal, that there is an

4    average weekly wage here that would derive a benefit rate of

5    487.32.

6            MR. FOX:  Counsel is trying to testify now, Your

7    Honor.

8            MR. GORDON:  I will show him the document.  These

9    are --

10           MR. FOX:  Can I have a copy, please?

11           MR. GORDON:  Sure.  And actually, Your Honor, your

12   decision indicated that the claimant was disabled on that day

13   and released to his regular employment and executed a

14   suspension in September of '96.

15   Q    And I think, just so that I can show the witness, can

16   you determine the weekly comp rate there, is that correct, at

17   487.32?

18   A    487.32.

19   Q    Okay.  And I tell you that I did the math.  And if we

20   multiply that by 487.32 -- I think I did the math -- but I

21   don't see it in front of me right now.  Oh, 45,000?

22           THE COURT:  So, you didn't do the math.  He did the

23   math.

24           MR. GORDON:  Actually, I did it, but then he took

25   my script and he did a typed copy for me.

1          THE COURT:  All right.

2    Q    You see that?

3    A    Yes, sir.

4    Q    And I realize that you don't have a calculator, I can

5    give it to you if you want to check on that, but I think

6    that --

7          THE COURT:  That's okay.

8          MR. GORDON:  Okay.

9    Q    The 2000 -- I am going to show you a copy of the 2002

10   loss run.

11         Based on your assumptions, you would expect that

12   the indemnity would be 45,934.18, would you not?

13   A    I would have to have the claim file to be able to give

14   you an answer to that.

15   Q    Really?  The Judge's decision in this case, this Judge's

16   decision allocated that this was what ultimately was paid out

17   in the case.

18         If, in fact, if, in fact, the retro -- the excuse

19   me -- the 2002 loss run is accurate reflects that which

20   should have been paid to the claimant, this was not a

21   contested claim, it was paid, you would expect to see a

22   figure of 45,934 in the loss run received, wouldn't you?

23         MR. FOX:  Your Honor, these questions are more

24   appropriate for Mr. Weber, not this witness.  He testified he

25   hasn't reviewed the claims files.

1      MR. GORDON:  Your Honor, he is calculating premium.

2   He is using it on a document.  Okay?

3      THE COURT:  Go ahead.

4   Q   I'm going to show you Bates stamp are 00007 provided by

5   Royal, which is the 2002 loss run.  And I am going to show

6   you Augustine, and would you tell the Court what the

7   indemnity paid on that closed file was?

8      MR. FOX:  Could I have a copy, please?

9   Q   Do you see it?

10  A   Yes.

11  Q   It's $167,934, is that right?

12  A   That's correct.

13  Q   Can you reconcile that with the Court's decision?

14  A   Not sitting here, no.  I mean, that would take some

15  analysis.

16  Q   Well, you would have to look at the claim file, wouldn't

17  you?

18  A   Well, let's put it his way:

19      I'm also looking at, there were expenses paid of

20  $18,154.  I don't know what that was for.  There was a

21  recovery of $3,659.  I don't know what that was for.

22  Q   Right.  But, the indemnity certainly isn't $45,934, is

23  it?

24  A   I am only going by what you are giving me.

25  Q   I am giving you what the Court -- basically what Webber

1    testified to that the Court indicated that the claim was paid

2    out until Mr. Augustine was able to return back to work.

3              It was a closed file and paid ninety-four and

4    seventh-weeks of benefits and 45,934.18.  I just looked at it

5    last night.

6    A    I guess for what you are putting there and what is here,

7    there is a difference, although I am not in a position to

8    explain why this number would be different from whatever

9    number you have.

10   Q    I understand that.  Okay.  There is some question -- I

11   mean, you need to reconcile this, don't you?

12   A    If you are going to ask me to reconcile it, then I would

13   have to reconcile it.

14   Q    I'm sorry?

15   A    If you are asking me to reconcile --

16   Q    You can't reconcile.  You haven't seen the claim file,

17   have you?

18   A    No.  What I am saying is, I can't reconcile without

19   having information.

20   Q    Another case that we talked about was the Younker case.

21   And it was interesting in preparing for today, we had

22   commented and the Court the commented on the fact that there,

23   Younker was an issue with regard to how expenses were

24   allocated.

25              And my recollection is, Mr. Chimenti, is that you

1  testified that, that to do your retro calculations, you

2  incorporated litigation expenses, is that true, as part of

3  your retro calculation?

4  A    No.

5  Q    The allocated loss expenses is not a part of your retro?

6  A    No; just the incurred loss.

7  Q    The medical and indemnity and not the expenses?

8  A    Not the expenses, no.

9  Q    You didn't include any of the expenses?

10  A    No.

11  Q    One of the things that was confusing for us -- I wonder

12  if you saw this because it was on the 2002 loss run.

13        MR. GORDON:  Can you see the claim for Younker?  I

14  think that is the second claim.

15        And can we give Mr. Fox a copy?

16  Q    In 2002, there was a reserve on the Charles Younker

17  case.  This was a silicate case, is that right, occupational

18  disease case?

19  A    Yes.  From the description, that's what it would sound

20  like to me.

21  Q    Remarkably, although we didn't ask for it, Mr. Chimenti,

22  among the Younker documents provided us are 01055, an exhibit

23  which I have marked for identification purposes as AU, a

24  decision on the Younker case that was issued October 15,

25  1997.  Could you review that, please?

```
 1              Mr. Chimenti, I trust you're done?
 2    A    I am completed.
 3    Q    Now, would you agree that the loss run reflect as 1995
 4    loss, that shows that there are payments for indemnity and I
 5    think some payments for medical -- I don't have the loss run
 6    in front of me.  I think you have it -- and outstanding
 7    reserves?
 8    A    There were no payments for indemnity, $446.00 paid in
 9    medical and a reserve of 48,905.
10    Q    And that's a 2002 loss run?
11    A    That's correct.
12    Q    And would you tell the Court what happened in 1997 to
13    that claim?
14    A    The --
15              MR. FOX:  I am going to object, just for the
16    record.  It's beyond the witness -- way beyond the scope of
17    his testimony in this case.
18              THE COURT:  All right.  Overruled, Mr. Fox.
19              THE WITNESS:  The claim was dismissed by the
20    worker's compensation judge.
21    Q    And if you were consulting the insured at that time,
22    would you have gone to the carrier to make sure that the
23    reserves were adjusted appropriately and that statistical
24    files, statistical cards were filed with the Bureau to
25    reflect that the company had prevailed?
```

 1 │ A    If it was warranted.  I mean, I am not sure if there was
 2 │ any other claim associated with this or if this was his only
 3 │ claim that he was presenting.
 4 │ Q    That was in 1995.  A silicosis claim or silicate
 5 │ exposure claim that resulted in sinus surgery, is that right?
 6 │ A    That's what the --
 7 │             MR. FOX:  Your Honor, I would just like to make a
 8 │ further objection.  This isn't one of the files that was at
 9 │ issue in the case, so we are not even dealing with the file
10 │ that was within the scope that we agreed to discuss.
11 │             THE COURT:  It could be a damage question.  That is
12 │ the issue here.
13 │ BY MR. GORDON:
14 │ Q    So, in any event, you can't reconcile this decision with
15 │ the loss run, can you?
16 │ A    Well, I don't have benefit of the file to be able to
17 │ tell why they may have kept the reserve on this claim file.
18 │             I guess the answer to that is, I don't know why
19 │ they would have done that.
20 │ Q    Well, and just for your edification, it does say that
21 │ the claimant conceded, the claimant's attorney, that they
22 │ couldn't make a causal connection and they withdraw the
23 │ claim, didn't they?  They didn't withdraw it, they took the
24 │ Judge's decision on it?
25 │             THE COURT:  Does a reserve, in any way, impact the

 1    retrospective premium that's owed?

 2              MR. GORDON:  Oh, yes.  And actually the point I am

 3    trying to make here, Your Honor, is that if you are using

 4    loss runs here --

 5              THE COURT:  I understand your point.

 6              MR. GORDON:  If you are using loss runs, they

 7    better be accurate.

 8              THE COURT:  I understand.

 9    BY MR. GORDON:

10    Q    And what you really didn't need is -- you did need to

11    review that claim file, is that right?

12    A    To answer your question or to do the retro calculation?

13    Q    Well, to do the retro, to reconcile this claim, you have

14    to review the claim file?  The claim file figures to have

15    more accurate information than is on that loss run, does it

16    not?

17    A    Well, let's put it this way:

18              If I was Latrobe Construction or their risk

19    manager --

20    Q    Well --

21              MR. FOX:  Well, Your Honor, could I ask that

22    witness be allowed to finish his answer?

23              THE COURT:  Yes, you can finish.

24              THE WITNESS:  Excuse me.  Can I answer the

25    question?  Because if I answer it and explain it, maybe it

1    will help the Judge.

2         If I had a question regarding a reserve on a claim

3    that there was no further exposure on?

4    Q    Right.

5    A    And I am the risk manager for Latrobe Construction, what

6    I would then do is call the carrier and discuss that with him

7    and find out why that reserve is still there.  If they have a

8    satisfactory answer, then the reserve would stand.

9         If they say it's an oversight on our part, we are

10   going to close it, then they would do that and then Latrobe

11   Construction would not get charged for that portion of the

12   incurred loss.

13   Q    That incurred loss is five years after the case was

14   dismissed because claimant's attorney conceded that he could

15   not, or she could not make out a prima facie case of

16   entitlement?

17   A    And that's why I would call the carrier and say, can you

18   please explain to me why there is still a $48,000 reserve on

19   this file?

20   Q    Okay.  In any event, your calculations took into

21   consideration the reserve on this case?

22   A    In 2002, it would have.  I would have to go look at the

23   current loss runs to see if that has since been removed,

24   because if it has been removed, then they would have received

25   credit for that.

1  Q    But, that is not part of your $851,000 assessment today?

2  A    If it was on the 2002 loss run, chances are it was.

3  Q    Included in your 850 --

4  A    Unless he was in a job classification that was not

5  subject to the retrospective rating.

6  Q    You didn't use the 2002 loss run, did you in --

7  A    Then none of that would have been included in the retro

8  calculation even when I did them in 2003.

9  Q    In fact, some of the employees are not subject to the

10  retrospective calculation, is that right?

11  A    That's correct.

12  Q    And did you go through each one of the employees of the

13  800 claims to determine which ones were included that should

14  not have been included?

15  A    Yes.

16  Q    You did?

17  A    Yes.

18  Q    All eight hundred claims?

19  A    What I did is, I went through every page of every loss

20  run from 1980 through 1995 and I identified those claims.

21  Some of them were already identified.  The ones that were

22  not, if it appeared to be a claim that was in a

23  classification that should not be included, then I followed

24  up on that.

25          MR. GORDON:  Let me have -- let me have the Freed

 1  claim?

 2  Q     The Freed claim is --

 3          MR. GORDON:  Oh, and I would like to offer into the

 4  record --

 5          Your Honor, at this time, I would offer into the

 6  record AT, AU and AV.

 7          MR. FOX:  No objection, Your Honor.

 8          THE COURT:  The offers are admitted.

 9          MR. GORDON:  And I think we did -- did we

10  previously move this?

11          Your Honor, I don't know if the Court has accepted

12  AS, which is the Royal and SunAlliance letter.

13          THE COURT:  Yes.  I think that Mr. Fox withdrew his

14  objection.

15          MR. GORDON:  Oh, okay.

16  BY MR. GORDON:

17  Q     This morning we had some discussions on the Freed claim.

18  And I am going to show you what has been identified as

19  R00035, it looks like, and this is a loss run, and let me

20  identify this as an Exhibit A --

21          THE COURT:  Dave, let me see that loss run, please?

22  (Off the record discussion.)

23  BY MR. GORDON:

24  Q     And Freed is the second from the bottom.  And I would

25  ask you if, in looking at that, you can determine for us what

1    the amount of the indemnity was paid on Freed?

2    A    The indemnity paid was $49,244.

3    Q    What was it?  49,000?

4    A    Two forty-four.

5    Q    Now, you've indicated that expense is not included in

6    the retro calculation, is that right?

7    A    That's correct.

8    Q    In the loss run, do they show the return from the

9    supersedeas fund going into the expense column?

10   A    There is a recovery indicated of $28,873, if my eyes are

11   accurate.  These numbers are kind of small.

12   Q    Recovery in the expense?

13   A    Well, it is not an expense.  It's a recovery --

14   Q    Yeah.  But, it's put under the expense column?

15   A    It's put under the recovery column.

16   Q    Doesn't say expense there?

17   A    No.  It says recovery on my page.  The expenses paid

18   would be the top number.  The recovered would be the second

19   number.

20   Q    Okay.  All right.

21   A    So, that's under the recovered, not the expense.

22   Q    Okay.  Now, we've already had testimony, so we have

23   just -- if we make another page here, and this is an exercise

24   I tried this morning.  So, let's see if I can get this

25   correct right now.  49,244 was actually paid.  There was a

1   recovery of $28,870 -- does it say three or five? Three.

2   And when we subtract the two, we have $20,371. That is a net

3   pay, is that right?

4   A    That would be correct.

5   Q    Now, we've already had a concession by Mr. Weber that

6   that 3,855.24 should have been deducted from this amount

7   because of the delay in the supersedeas fund's application

8   and in some form of penalty. And that figure he gave us was

9   3,855.24.

10         And if I subtract that, then what is alleged that

11  should have been paid and which would have then fairly been

12  reflected on the loss run is $16,515.76.

13         Now, if you review the Freed decision, the total of

14  67 and one-sevenths weeks was paid, and I can do the math for

15  you, but actually that comes to $15,946.43.

16         If this is, in fact, the net that's written on the

17  statistical information upon which you rely on the loss run

18  of 2002, and this is the deductions by virtue of the error,

19  then theoretically this figure here has to be 67 and

20  one-seventh's weeks of workers' compensation benefits, but it

21  is not, and they paid out 67 and one-seventh's weeks of

22  benefits.

23         Without looking at the claim file, can you

24  reconcile that?

25  A    I can't reconcile that. But, what I can tell you is

1   that the Freed claim, along with the Younker's claim that we

2   just discussed a minute ago, were all in the '92 to '94 retro

3   period that was maxed out.

4   Q    But, that is not the point.

5   A    My point being --

6           THE COURT:  Whoa.  Whoa.  Whoa.  Whoa.  Just a

7   second go ahead.  Continue.

8           THE WITNESS:  My point being is, you would have to

9   reduce the incurred losses by over $450,000 before the

10  retrospective premium --

11  Q    I agree.

12  A    -- goes below the maximum.

13  Q    I agree.  But, the point here is, that we have looked at

14  just three claims, and the data upon which you are relying on

15  over eight hundred claims, we just looked at the first three,

16  and you can't reconcile what was payable in those claims

17  versus what your loss run shows?

18          MR. FOX:  I am going to object.  Counsel has

19  elected three claims and the witness hasn't had the benefit

20  to review the files.

21          THE COURT:  It's a weight issue.

22  Q    So, you don't know whether the data in your loss run is

23  accurate, do you?

24  A    I guess I don't know if the figures that you are using

25  are inclusive of everything that should be included or not.

1        In other words, there might have been interest due
2   on an award, or something of that nature.

3   Q    You can't --

4   A    There might have been some other allowable expenses that
5   would make up that difference.

6        What I am saying is, from what you are providing to
7   me, I can't tell you what the answer is, or whether their
8   number is correct, okay, your number is correct.  I can only
9   go by their numbers when I calculate the retrospective
10  premium, and I don't have any reason to believe that their
11  numbers are not accurate.

12  Q    Other than the fact that you show $167,000 were paid on
13  a claim of disability for less than two years?

14  A    Again, I don't have the benefit of going --

15  Q    I can only tell you, Mr. Chimenti, what was provided to
16  me.

17       I can't tell you -- I mean, I can only rely on
18  documents that Royal provided me and which the experts
19  addressed.  I don't know that there are other documents out
20  there.  They have not been provided, so I can't help you
21  there either.

22  A    Right.  And this goes back to my point that I just made
23  a few minutes ago, that if Latrobe had any questions
24  whatsoever about the values that were recorded on their loss
25  runs, there were plenty of people at Royal that were in

1   contact with the principals at Latrobe Construction where

2   they could have gone over these numbers.

3          This was an annual exercise that they did.  And if

4   there were questions about values on loss runs, they could

5   have addressed those and gotten their answers, which they may

6   have done.  I don't know that that wasn't done.

7          MR. GORDON:  Your Honor, I would offer AW, which is

8   just the loss run data for the Freed claim.

9          MR. FOX:  No objection, Your Honor.

10         THE COURT:  All right.  The offer is admitted.

11  Q   Do you know whether medical expenses in any of the

12  actual claims correlate with the medical expenses that are

13  shown on the 2002 summary or loss run that you have?

14  A   Could you repeat that question?

15  Q   Do you know whether or not -- whether medical expenses

16  actually incurred on the twenty-one claims received correlate

17  to the medical expenses that were revealed on the 2002 loss

18  run?

19  A   I did not go through the medical expenses that were

20  paid.

21         But, again, going back to my previous answer

22  regarding insurance company operations, I would have to say

23  that they would correlate.

24         MR. GORDON:  I don't have any other questions, Your

25  Honor.

 1          THE COURT:  All right.  We'll take about a

 2   ten-minimum recess.

 3   (Court recessed at 2:25 p.m.)

 4   (Court reconvened at 3:15 p.m.)

 5          THE COURT:  Okay, Mr. Fox.

 6                    REDIRECT EXAMINATION

 7   BY MR. FOX:

 8   Q    Mr. Chimenti, you testified that you reviewed boxes and

 9   boxes of documents in doing your analysis on the amount of

10   premium due.

11          Could you describe, just so the record is clear,

12   what documents you reviewed?

13   A    There were underwriting files, retrospective rating

14   adjustments, claim files.

15          The underwriting files contained some of the policy

16   information, contained a correspondence between the

17   underwriter and the broker.  There was a wealth of

18   information.  It was the --

19          MR. GORDON:  Your Honor, if I might, we have

20   requested the underwriting files in this case in discovery

21   and we were told that they did not exist.

22          THE COURT:  Okay.

23          MR. FOX:  Your Honor --

24          THE COURT:  Is this an objection?

25          MR. GORDON:  It is an objection.

1            THE COURT:  Asking what?

2            MR. GORDON:  Well, any testimony that he is going

3    to offer right now based on an underwriting file that we

4    asked --

5            THE COURT:  We haven't gotten there yet.  He just

6    said he saw a couple.  So, if you want to raise an objection

7    with respect to a separate question in which he refers to a

8    claim file, I think that would be the appropriate time to

9    interject the objection.

10           Continue, Mr. Fox.

11           MR. FOX:  Yes.

12   Q    Mr. Chimenti, you testified that you reviewed retro

13   adjustment documents?

14   A    Yes.

15   Q    Can you describe those and what they consist of?

16   A    The retro documents that I reviewed were from 1980

17   through 1995 and they were the historical records from the

18   very inception of the retro.

19           In other words, take the 1980 retro, for instance.

20   There was information there where I was able to calculate the

21   standard premium, then a record of the first retro

22   adjustment, a record of the second retro adjustment, the

23   third, fourth, fifth, all the way through the twentieth

24   adjustment, so to speak, to bring it up to current.

25   Q    Now, how were those documents generated, those retro

 1 | adjustment documents?

 2 | A    Those were generated by Royal Insurance.  They are
 3 | records that would have been sent to the insured every year
 4 | when their retro adjustment was calculated.  They would
 5 | include the retro adjustment, worksheets that show exactly
 6 | how the premium was calculated, and also the supporting loss
 7 | runs that would be attached to the retrospective rating
 8 | worksheets.

 9 | Q    Were they business records of the company?

10 |         MR. GORDON:  Objection, Your Honor.  He is not
11 | qualified to talk about what the business records of the
12 | company are.

13 |         THE COURT:  Overruled.

14 |         THE WITNESS:  Yes.

15 | Q    And for what purpose did you review the retro adjustment
16 | sheets?

17 | A    What I did is, I went back and calculated each of the
18 | retrospective rating periods starting from initial adjustment
19 | to the current year for each of the retrospective policy
20 | periods just to make sure that the amounts that Royal had on
21 | their documents were correct.

22 | Q    What was the volume of the documents that you reviewed?

23 |         MR. GORDON:  Judge, I would object on relevancy,
24 | and also he says he reviewed many boxes.  So, what's the
25 | relevance?

1                THE COURT:  All right.  Overruled.

2                THE WITNESS:  It was probably four boxes of

3   documents.  That would be just for the retrospective rating

4   information.

5   Q    Were there any documents that you wanted to review or

6   had asked to review that were not supplied to you?

7   A    No.

8   Q    Were the types of documents that you reviewed that you

9   describe documents that -- the types of documents that you

10  would routinely review as an expert in determining premium

11  amounts due?

12  A    Yes.

13  Q    You testified that you reviewed correspondence files.

14  A    Yes.

15  Q    Did that include correspondence from Mr. Gordon and his

16  law firm, is that correct?

17  A    There were some letters that were --

18               MR. GORDON:  Your Honor, this goes outside the

19  scope of both direct and cross.

20               THE COURT:  What about the letters, Mr. Fox?  What

21  are we getting into here?

22               MR. FOX:  Just the issue has been raised for the

23  first time today that there may have been some amount of

24  premium that had been overpaid despite the fact that's never

25  been alleged before.  There is no documentation in the

1  record --

2          THE COURT:  Well, we can go on and on about rooms

3  full of documents that he has reviewed.

4          I think perhaps you can restrict your questions to

5  things that he may have reviewed that relate to some of the

6  issues that were raised by Mr. Gordon during the course of

7  his cross-examination of Mr. Chimenti.

8          The letters might be one example of something that

9  have very little bearing whatsoever on his cross-examination.

10          MR. GORDON:  Your Honor if I might also, the

11  counterclaim, there has been an alleged misrepresentation of

12  the premium.

13          THE COURT:  Certainly we covered that, to some

14  extent, in the liability phase of the case.

15          MR. GORDON:  But, it has been raised.

16          THE COURT:  It's been raised.  There is no question

17  about it, it's been raised.  But, I think that issue was

18  covered during the testimony of your expert -- I forget her

19  name at this point.

20          MR. FOX:  LuAnn Haley.

21          THE COURT:  LuAnn Haley.

22          MR. GORDON:  In terms of how much premium was paid,

23  Your Honor?

24          THE COURT:  Well, there was some issue with

25  respect, I think, to, as I recall reading the transcript, and

1    there was some issue that was raised during the course of her

2    testimony, and I don't recall with particularity what that

3    was at this particular point.

4           But, I realize it was raised in the counterclaim

5    and it wasn't pursued too vigorously certainly during the

6    liability aspects of the case.

7           MR. GORDON:  Your Honor, how much money is due or

8    return --

9           THE COURT:  It is a liability issue, I understand.

10   I understand why you are doing it at this point.  You are

11   raising these issues at this point because it relates to a

12   damage question.

13          MR. GORDON:  Right.

14          THE COURT:  I understand that.  What I am trying to

15   do is cut through this because we are going to be able -- you

16   can conduct your redirect examination of Mr. Chimenti with

17   respect to the documents that he may have reviewed that were

18   reasonably raised by Mr. Gordon during his cross-examination

19   of Mr. Chimenti.

20          So, with that guideline in mind, please continue.

21          MR. GORDON:  Sure.

22   BY MR. FOX:

23   Q    In considering all the documents you reviewed,

24   Mr. Chimenti, including the reports of Mr. Gordon's expert,

25   Mr. Raabe, did any of those documents support any claim that

1   Latrobe had overpaid on its premium?

2   A    I found no evidence whatsoever in any of the documents

3   that I reviewed that there was an overpayment of premium.

4   Q    Now, Mr. Raabe, in his report dated July 31st, 2003,

5   stated, documents that were made available provided

6   sufficient information to calculate premiums I believe to be

7   reasonable and true.

8            Did you review that language from the report?

9            MR. GORDON:  Your Honor, that has been previously

10  asked and answered and it doesn't relate to any of the

11  cross-examination.

12            THE COURT:  All right.  Overruled.

13            THE WITNESS:  Yes, I reviewed that in his report.

14  Q    And did Mr. Raabe make any reference anywhere in his

15  report that suggest -- suggesting that premiums had been

16  overpaid by Latrobe?

17  A    No, not at all.

18  Q    Now, you testified regarding your interest calculation

19  earlier, and I believe that Mr. Gordon inferred that you

20  calculate interest in a way that I don't think is correct.

21            But, not to quibble with Mr. Gordon, can you just

22  describe for me specifically how you did the interest

23  calculation?

24  A    What I did -- Mr. Gordon had assumed what I did was to

25  take the $851,000 figure from my 2003 report and simply

1   calculate interest on that amount from 1996 coming forward.

2          What I actually did was, I summed up the credits

3   and premium charges for the retrospective adjustment in 1996,

4   and I came up with a retro premium due of $926,998.  And then

5   I calculated the six percent interest for one year on that

6   amount, which came out to $55,619.88.

7          Then I took the cumulative total of the retro

8   premiums for the '97 adjustment, which was $785,415, again,

9   calculating the six percent on that amount.

10          I did that for the '98, '99, '00, '01, '02, '03,

11   '04 and '05 policy periods for six percent for one year.

12          And then I took the February, '06 retro adjustment

13   and calculated the interest at six percent for three months.

14   And the total of the interest, at six percent simple interest

15   from February 1st, 1996, to May 1st, 2006, is $539,003.43.

16   Q   And what does that make the total claim?

17   A   The -- excuse me.  The retrospective premiums due would

18   be $943,670 to date.  The interest would be $530,003, and the

19   total would be $1,473,673.

20   Q   Now, how -- when you calculated the interest, how did

21   you determine when the interest started to run again?

22   A   There was a demand letter that was sent on January 29th,

23   1996, and I used that date as the start date.

24          Actually, I used February 1st just for simplicity

25   sake rather than January 29th.

```
 1    Q    I would like to show you what's been marked as
 2    Exhibit 200-A.  It is actually a global exhibit.
 3             MR. GORDON:  Do you have an extra one?
 4    Q    I would ask you if you could identify the demand letter
 5    that you referred to?
 6    A    It would be about the sixth page through the set of
 7    documents.  It's a letter dated January 29th, 1996, from
 8    Royal, Richard Fuller, the underwriting manager, in which he
 9    asked for $546,709, which was owed on the adjustment, and the
10    $281,000 that was owed from the previous year.
11    Q    And you started the interest rate calculation from that
12    date forward?
13    A    Within two days.  I used February 1st, 1996.
14             MR. FOX:  I would move to introduce Exhibit 200-A
15    into evidence.
16             MR. GORDON:  Your Honor, I would object on hearsay
17    grounds.
18             THE COURT:  All right.  The offer is admitted.
19             MR. FOX:  I have no further questions of
20    Mr. Chimenti.
21             MR. GORDON:  Just two.
22                     REDIRECT EXAMINATION
23    BY MR. GORDON:
24    Q    The amount in interest is predicated on 2006, is that
25    right?
```

1          In other words, you didn't -- the interest

2    calculation that you provided to the Court along with the

3    amount of principal is predicated on 2006 loss runs and not

4    on 2002?

5    A    They were -- the interest from the 2006 loss runs would

6    only be interest for six months, from February 1st until to

7    date.

8    Q    But, the principal you used in the calculation was what

9    you claimed to be due as of 2006 based on the 2006 loss runs?

10   You used the $900,000, didn't you?

11   A    No.   What I used was --

12   Q    You didn't use the 851.

13   A    No, I did not use the 851.

14          What I did use was the retrospective premium that

15   was due on February 1st, 1996, based on the February 1st,

16   1996 loss runs.

17   Q    Right.   But, you valued the claims as of 2006?

18   A    No.   They were valued as of 1996.

19   Q    That's it?

20   A    That's it.

21   Q    So, your testimony is, it was $900,000 due based on what

22   the outstanding values were in 1996?

23   A    No.   The interest --

24   Q    I am not talking about the interest --

25   A    Well, we were just talking about the interest.

1   Q     But, the principal you used was more than 851,000, so

2   you were using the 2006 loss runs, weren't you?

3   A     No.

4   Q     No?

5   A     The principal amounts in the interest calculations is

6   based on the cumulative retrospective premiums for the years

7   1980 through 1995 valued as of February 1st, 1996, for one

8   year.   Then I used the loss runs valued as of February 1st,

9   1997.

10  Q     Let's cut to the chase.

11  A     I am getting to the chase.

12          MR. FOX:   I object, Judge.

13  Q     The chase is, did you use any loss runs beyond 2002?

14          THE COURT:   Just answer that question, please.

15          Can you answer that question with a yes or no?

16          THE WITNESS:   You had to in order to calculate the

17  retrospective premiums that were due in 2003, four, five and

18  six.

19          MR. GORDON:   Your Honor, we have never gotten that

20  documentation, nor have we gotten claims information on that,

21  despite the fact that it's also been an issue.

22          So, it's objected to.

23          THE COURT:   Pardon me?

24          MR. GORDON:   It's objected to.

25          THE COURT:   Well, the objection is overruled.

1  BY MR. GORDON:

2  Q    You assumed that Mr. Raabe, when he was doing the

3  calculations, assumed that which was -- was taking

4  information that you, yourself, had.  These are the

5  adjustments with the loss runs attached, is that right?

6  A    I didn't assume anything that Mr. Raabe did in his

7  report.  Mr. Raabe relied upon the records, what he states in

8  his report here, that the documents that remain available

9  provided sufficient information to calculate premiums I

10 believe to be reasonable and true.  That is what he relied

11 upon.  That's what he states in his report.

12 Q    Right.

13 A    I am not going to assume anything that he put in his

14 report.  I can only tell you what his report says.

15 Q    You don't know what he was relying on?

16 A    He was relying on the information provided to him to

17 calculate the premiums which he believed to be reasonable and

18 true.

19 Q    And those are the loss runs?  Do you know?  Do you know

20 what he was relying on?

21 A    He relied upon whatever information he felt was

22 sufficient for him to calculate the retrospective premiums.

23 Q    And as did you, and that was the loss runs?

24 A    I relied on the loss runs.  And where I had questions

25 about the loss runs, I asked questions.

1    Q    You didn't rely at all on Raabe's report, did you?

2    A    No.

3    Q    He didn't provide you with anything that you didn't

4    have?

5    A    I don't think -- no, he didn't provide me with anything.

6    Q    Do you know if he had any documentation that you,

7    yourself, didn't have?

8    A    He may have had documentation from Latrobe Construction

9    that I didn't have.

10   Q    But, you don't know?

11   A    I would only assume that he probably did because his

12   report has premium amounts that Latrobe paid, so I would have

13   to say he probably had that available to him, which I did not

14   have available -- I didn't have Latrobe Construction's

15   records available to me.

16            I'm sure he, as their expert, had their records

17   available to him.

18   Q    Do you know that?  Do you know that, Mr. Chimenti?  Do

19   you know?  Did you talk to him?

20   A    I didn't talk to him.

21            What I am saying is, he has information in his

22   report that I don't have in my report because it wasn't

23   available to me, which would only leave it that's the only

24   place where I would think to logically conclude he had gotten

25   it from.

```
 1  Q    Doesn't he indicate in his report where he got his
 2  information from?
 3        Doesn't it indicate that this is all based on
 4  information provided by Royal?
 5  A    I am not sure that that's what that says.
 6        MR. GORDON:  No further questions, Your Honor.
 7        THE COURT:  All right.  Thank you, Mr. Chimenti.
 8  You may step down.
 9        THE WITNESS:  Thank you, Your Honor.
10  (The witness was excused.)
11        MR. FOX:  Your Honor, I believe we just have one
12  further witness, Diane Leger.  And what I would like to do is
13  put her on first thing tomorrow morning and I intend to
14  complete her very quickly.
15        I think that if we do that, we can address some of
16  the issues that were raised for the first time on cross today
17  with regard to some of these calculations that were done.  I
18  am hopeful, at least, that we can address that.
19        THE COURT:  Any problem with that, Mr. Gordon?
20  It's a quarter to four.  Would you like to end today or
21  continue?
22        MR. GORDON:  I would like to continue.
23        THE COURT:  How many witnesses do you have?
24        MR. GORDON:  I may have one.  I may have none.
25        THE COURT:  Okay.  How long will it take for the
```

 1   next witness?

 2           MR. FOX:   Dianne Leger is my only remaining

 3   witness.

 4           THE COURT:   How long will it take?

 5           MR. FOX:   Probably fifteen minutes tomorrow

 6   morning.

 7           THE COURT:   Cross-examination, Mr. Gordon?

 8           MR. GORDON:   Maybe -- I don't know what.   Maybe ten

 9   minutes.

10           THE COURT:   It's quarter after four.   Let's do it

11   now.

12           MR. FOX:   Your Honor, my point is, we need to do

13   some research on the issues that were raised for the first

14   time with regard to these loss runs.   And I --

15           THE COURT:   What type of research?

16           MR. FOX:   There may be explanations that there was

17   miscoding which we can easily determine.   We may be able to

18   easily determine by checking data at Royal as to whether

19   certain of the entries on the loss runs were miscoded and

20   that would show that there was no prejudice to Latrobe.

21   Those are really the only issues that --

22           THE COURT:   We have what?   How many loss runs do we

23   have to get into here?

24           MR. FOX:   We would have to get into Augustine.

25   That's the only issue we need to explore because that is the

1    only one of interest. We may very well do it in fifteen
2    minutes. We have been really blind-sided by this. It hasn't
3    been raised in any of their interrogatories or briefs, or
4    even by their experts, until today, and Mr. Gordon was trying
5    to testify as an expert witness on those issues.

6          MR. GORDON: Your Honor, there was a -- the burden
7    here is to demonstrate what premiums are due. We have had
8    testimony that there was reliance on the 2002 loss runs.

9          All I did was demonstrate for him, based on the
10   Court's decision, what was paid out, what should have been
11   paid out on Augustine and how that can be reconciled. That
12   is not -- that doesn't raise rebuttal.

13         There was no -- I just asked him whether or not he
14   could reconcile that. It is not rebuttal.

15         THE COURT: Well, he can't reconcile it. There is
16   some question with respect to the loss runs and the accuracy
17   of those loss runs. I think that is the issue here.

18         MR. GORDON: But, wasn't that the --

19         THE COURT: But, what you pointed out during the
20   course of your cross-examination was the loss runs basically
21   conflicted with the amount of money that was paid out on the
22   claim. Those loss runs, of course, relate directly to the
23   amount of retrospective premiums that are due.

24         MR. GORDON: I agree.

25         THE COURT: So, you know, I guess I was taught a

1    long time ago, and I am going to follow that lesson in this

2    case, in any lawsuit there is always a search for the truth,

3    and if there can be some reconciliation in what appears in

4    the loss run and the amount of money paid out to

5    Mr. Augustine, the Court would be in error if it didn't hear

6    that testimony.

7                MR. GORDON:  I agree, Your Honor.  The issue is --

8                THE COURT:  The issue is whether or not we are

9    going hear her testimony today or tomorrow.

10               We will hear it tomorrow.  Nine-thirty tomorrow

11   morning.  Declare a recess, please.

12   (Court recessed on Tuesday, May 2, 2006, at 3:45 p.m.)

13                              *  *  *  *  *

14               I certify that the forgoing is a correct transcript

15   from the record of proceedings in the above-entitled matter.

16

17                                   S/Michael D. Powers
                                     Michael D. Powers
18                                   Official Reporter

19         *****NOT CERTIFIED WITHOUT ORIGINAL SIGNATURE*****

20

21

22

23

24

25