IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

---

ROYAL INSURANCE COMPANY
OF AMERICA, et al

                                    Plaintiffs

        vs.                    Civil Action No. 00-2128

LATROBE CONSTRUCTION COMPANY

                                    Defendant

---

PROCEEDINGS

        Transcript of Nonjury Trial on Wednesday, May 3,
2006, United States District Court, Pittsburgh, Pennsylvania,
before Honorable Francis X. Caiazza, District Magistrate.

APPEARANCES:

For the Plaintiffs:        Bruce Fox, Esq.

For the Defendant:         Mark Gordon, Esq.
                           Timothy Smith, Esq.


                           Reported by:
                           Michael D. Powers
                           Official Court Reporter
                           Room 5335 USPO & Courthouse
                           Pittsburgh, Pennsylvania 15219
                           (412) 208-7572


Proceedings recorded by mechanical stenography.  Transcript
produced by computer-aided transcription.

1                          I N D E X

2  PLAINTIFF WITNESS    DIRECT   CROSS   REDIRECT   RECROSS

3  DIANNE LEGER

4      By Mr. Fox          3
       By Mr. Gordon               12
5
   DEFENDANT WITNESS    DIRECT   CROSS   REDIRECT
6
   GERALD CHIMENTI
7
       By Mr. Gordon      36
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Leger - Direct

```
 1                    P R O C E E D I N G S
 2   Court convened on Wednesday, May 3rd, 2006, at 9:45 a.m.)
 3              THE COURT:  Okay.  Good morning, ladies and
 4   gentlemen.  Mr. Fox.
 5              MR. FOX:  Your Honor, I would like to call Dianne
 6   Leger.
 7              THE CLERK:  Good morning.
 8              THE WITNESS:  Good morning.
 9              THE CLERK:  Please raise your right hand.
10                        *  *  *  *  *
11              DIANNE LEGER, having first been duly sworn,
12   testified as follows:
13              THE CLERK:  Please be seated.
14                    DIRECT EXAMINATION
15   BY MR. FOX:
16   Q    Good morning, Ms. Leger.
17   A    Good morning.
18   Q    Could you just refresh us what your position is at
19   Royal?
20   A    My current position is a TPA, or a third-party
21   administrator relationship manager.  I manage third-party
22   administrators who are handling our claims.  I manage the
23   business side of that proposition.
24              THE COURT:  All right.  Ms. Leger, I suggest you
25   either move forward or bring the microphone closer to you,
```

 1   please.

 2           THE WITNESS:  Is that better?

 3           THE COURT:  Can everybody hear?

 4           MR. FOX:  Yes.

 5           THE WITNESS:  The chair doesn't move.

 6   Q    Ms. Leger, can you describe how loss runs are generated

 7   for Royal?

 8   A    Loss runs are generated from data extracted from our

 9   live claim handling system called CLASS.  I can't remember

10   what that stands for, but it's C-L-A-S-S.  It will extract

11   the financial data.  It will extract the name of the

12   adjuster.  It will match it with a telephone number for the

13   adjuster, dollars amounts, types of payments in total, name

14   of the claimant, date of loss; that type of information.

15   Q    Does Royal have internal controls which relate to the

16   loss runs?

17   A    Yes, we do.

18   Q    Can you describe them, please?

19   A    From a system's standpoint, we have five different data

20   audits that were done every month where they will -- you

21   know, what do you call it?  At random, select various claims

22   to check to see what came out on the loss run versus what's

23   showing up, what's in CLASS.  They have all of the

24   Sarbanes-Oxley controls in place.  There are external

25   reviews, other things that were done, but I don't know how

1  much you need.

2  Q    I was asking you about internal controls.

3        Is there a claim audit team that performs an audit?

4  A    Yes.

5  Q    Internal?

6  A    Well, there are peer reviews done where, first of all,

7  claim adjusters do a self-audit through their own files.

8  Then they do peer audits where they will look at each other's

9  files and validate the information that is in the file, the

10 payments that have been made, the strategy for closing the

11 claim or disposition plan, what the handling techniques are

12 to make sure that things are done well.

13       Each manager, claim manager is required to review

14 ten files every month for every adjuster on staff to do a

15 physical review looking for all of those same things.  We

16 have a claim audit team that audits each claim office once a

17 year.

18       They will be looking for basically the same thing

19 the manager looks for.  And then we have internal audit,

20 which is -- reviews all different functions within the

21 organization, but they concentrate primarily on financial

22 transactions.  They will take a large sampling of claims and

23 make sure that every payment that's showing up in the system

24 has a back-up document in the file and has been validated,

25 that they are coming out the same, and they will check that

1    against the loss runs, that sort of thing.

2    Q    Are there system controls in place, as well, at Royal?

3    A    There are -- if I can look at this.  At a high level --

4    Q    You are looking at your notes on that subject?

5    A    These are my notes on just quick, high level.  You have

6    to have two different people involved in the transaction to

7    issue a check to make a payment.  One person does the entry.

8    Another person has to do the authorization sign off.  There

9    are controls.  There are delegated authorities, dollar levels

10   and payment types that each adjuster and manager throughout

11   the organization has.

12            The system has a control in place that you can't

13   exceed your authority.  It will not let you enter or

14   authorize something unless you have been granted that

15   authority.

16            There is an error report that has to be run by --

17   two error reports actually, that have to be run by every

18   manager every week, and every error has to be addressed and

19   corrected.

20   Q    What are the nature of the errors that are covered by

21   the error report?

22   A    The error reports will cover everything from dollar

23   amounts that didn't match, what came through what we call a

24   bill review.  There is a vendor that we use that authorizes

25   medical payments.  It will take the medical bills and it will

Leger - Direct

```
 1   match them and limit them at whatever the statutory fee
 2   schedule is for any particular state.
 3          And if anything doesn't match, the error report
 4   will kick out and it will have to be addressed and corrected.
 5          Miscodings, if something that's clearly a medical
 6   payment is coded to indemnity, it will kick it out.
 7   Q    If it is miscoded on a loss report?
 8   A    Yes.
 9   Q    Does Royal have a system of external audits to insure
10   that the information it maintains is accurate?
11   A    We do.  We have our independent auditor who is hired to
12   review our entire organization every year.  Our reinsurance
13   treaty panel will come in and audit our claim files to make
14   sure that the payments are appropriate, that we are handling
15   the files correctly, that we are disposing them in a
16   reasonable and equitable fashion.
17          Each of the states that we do business in, which is
18   all fifty states, will come in and do market conduct reviews.
19   Every state sets their own schedule for how often they review
20   a carrier.
21          Most of them review a carrier every two to three
22   years unless you have a very high volume in a particular
23   state.  Like we had a very high volume in Pennsylvania, the
24   state of Pennsylvania came in and reviewed our claim files.
25   And it's a random selection.  Whatever files they pick, we
```

1  have to produce.  They go through it, but they would come in

2  at least once every eighteen months.

3  Q    Is Royal on any regulatory watchlist for poor or

4  inadequate claim handling?

5  A    No, we are not.

6  Q    Is Royal on any reinsurer's watchlist for poor claim

7  handling?

8  A    We are not on any reinsurer watchlist for our direct

9  handling.  We have a couple of third-party administrators who

10  are handling some claims that some of the reinsurers have

11  decided they want to watch them and they have put them on a

12  watchlist.

13  Q    Has the IRS conducted any extensive reviews of the Royal

14  organization?

15  A    The IRS came in and they spent the last two and a half

16  years -- in fact, they just completed -- I think it was about

17  eight weeks ago -- completed their review of everything

18  that's gone on in the organization for the last eight years

19  and they walked out.  We have got a clean record.  They

20  reviewed every financial transaction.  Everything that went

21  on.

22  Q    As a consequence of all the internal control systems,

23  system controls, external audits and regulatory review that

24  you describe, are you aware of any problems with Royal's

25  database and its generation of loss control data?

1    A    No.

2    Q    Have you had the opportunity to review the Freed file?

3    A    I reviewed a limited amount of information that was

4    available to me.  But, yes, I did.

5    Q    And what did you conclude from your review?

6    A    What I concluded from my review was that, I believe

7    Mr. Gordon had misread our loss run, that he thought we were

8    taking a credit against expenses rather than, you know,

9    giving a credit that would have applied to maybe a reduction

10   in the claim value that could have benefitted his claim.

11   But, what was there was, in fact, a recovery.  It was coded

12   as a recovery.  And I believe the coding --

13            MR. GORDON:  For the record, I accepted that

14   yesterday, Your Honor.  I have reviewed that as an expense.

15   And when it was pointed out that it was under a recovery

16   column underneath expenses, I would agree.

17   Q    Let's move on to the Augustine file.

18            Have you reviewed the Augustine file?

19   A    Yes, I did.

20   Q    What have you determined?

21   A    I determined that the file was, in fact, closed, a

22   settlement had been reached and that the file reopened four

23   months later.  He was re-treating for the same injury.

24   Q    And what was the results of that?

25            MR. GORDON:  Your Honor, these are based -- Your

1    Honor --

2            MR. FOX:  Your Honor --

3            MR. GORDON:  Your Honor, this goes beyond -- this

4    is apparently some type of claims review documents that have

5    not been provided.  She is not a claims expert.  And so if

6    she is going to explain to us what she reviewed, at least we

7    should have the documents that were reviewed.

8            MR. FOX:  Your Honor, Mr. Gordon can testify as an

9    expert.  I suppose that's all right, but, we can't respond

10   with our witness who has knowledge of the claims files.

11           THE COURT:  Did he testify as an expert in this

12   case?

13           MR. FOX:  I thought he was effectively yesterday,

14   Your Honor.

15           MR. GORDON:  Your Honor, I just indicated that the

16   documents that were provided can't reconcile any of the

17   claims.  No one has bothered to reconcile on eight hundred

18   claims paid versus what's been established in 2002 loss runs.

19   That's the point I made yesterday.

20           No one has presented evidence on that issue.

21           MR. FOX:  Your Honor, Mr. Gordon has attacked our

22   analysis on the claim basis that these few files had

23   correct -- were incorrectly reflected in the loss runs.  We

24   have a very simple explanation for that.

25           As Your Honor stated yesterday, we are simply

1    trying to clear up the record, and this is really just a

2    quest for truth on this issue.

3             MR. GORDON:  Your Honor, I don't know that.  How do

4    I cross-examine when there are no exhibits?

5             THE COURT:  Let's see where he is going with this.

6    The objection is overruled.

7    BY MR. FOX:

8    Q    Could you continue with your answer regarding the

9    Augustine file and what you determined?

10   A    I determined that the file reopened in January,

11   January 17th, I believe, 1997, for recurring treatment, and

12   payments were made for this recurring treatment.

13   There were, it looked like payments made for Court Reporters,

14   further legal investigation, and ultimately the file was

15   closed in April of 2002.  2000.  There were additional

16   payments made.

17            So, the monies that were showing up in the system

18   were, in fact, accurate.

19   Q    Okay.  Did you review the Younker's file?

20   A    Yes, I did.

21   Q    What did you determine from your review?

22   A    I determined from my review that, also, his attorney had

23   withdrawn the claim, which I think was already established,

24   saying he couldn't make a causal connection of some sort.

25   The claim was reopened two weeks later with a note in the new

Legel - Cross

1    reserves that just said, new attorney, new doctor, causal

2    relationship, and the file was handled and went forward from

3    there.  I don't know how it was handled, but there were

4    payments made.

5    Q    Thank you.

6              MR. FOX:  I have no further questions.

7                    CROSS-EXAMINATION

8    BY MR. GORDON:

9    Q    When did CLASS come into operation?

10   A    The CLASS system was built in 1983, 1984.  It came on

11   line sometime in 1984.  There were -- if I may finish.  There

12   were several large clients like Latrobe that we did not

13   immediately move into CLASS.  We continued handling them

14   in -- and I forget the name of the system that we had at that

15   time.  They were handled in that system and then they were

16   migrated into CLASS sometime in the late eighties.

17   Q    And when did you become -- I think now -- you now have a

18   TPA directorship, is that right?

19   A    Yes.

20   Q    Before that, you were an underwriter?

21   A    Yes.

22   Q    When did you move from underwriting to the third-party

23   segment?

24   A    In August 1st of 2005; last August.

25   Q    And the documents -- you had indicated I think before

1    that financial data -- well, let me ask it another way:

2           Prior to 2005, any inquiries regarding the

3    financial components of the program you said had to be

4    referred to another department, is that right?

5    A    No, not the financial components of a program.

6    Q    Well, didn't you indicate that, in terms of establishing

7    what was paid and credited and what was billed, that you had

8    to go to a different department?

9    A    I said if you wanted to know why it was done, you would

10   have to go to -- you would have to go to a claim handler or a

11   claim expert to find out why it was paid.

12   Q    If Augustine, what did you review in the Augustine file?

13   A    What I reviewed was a limited amount of electronic data

14   that's available in CLASS which told me the amount of

15   payments that had been made.  And in cases where we issued a

16   check, as opposed to a journal entry, it would tell you the

17   name of who was paid.

18   Q    You didn't review the file itself?

19   A    I did not review the physical file, no.

20   Q    And so you can't tell us today whether the $120,000 or

21   so on indemnity that was shown on the 2002 loss run are

22   reflected on actual payments in the claim file, can you?

23   A    I can tell you that a check was physically issued.

24   Q    I know that.

25   A    And the check number and who it was made out to, that it

1   was made out to the claimant and the dollar amount.

2   Q    But, you can't determine -- for instance, you just know

3   that checks were paid out on a claim, you don't know whether

4   or not they can be reconciled with the loss run because you

5   don't have the file?

6   A    Well, I do know that what shows up on the loss run is

7   exactly what's in CLASS because I did compare the two

8   numbers.

9   Q    Was CLASS -- so, you know that money was paid?

10  A    Yes.

11  Q    But, you don't know precisely why it was paid?  You

12  can't tell us whether it was paid properly or improperly

13  because you haven't looked at the claim file?

14  A    That would be probably an accurate statement.

15  Q    And you had indicated before when we had looked at

16  Freed, that the issue with Freed is that -- and I am looking

17  at it right now -- it was $15,946 that was payable, but the

18  loss run shows $16,515.

19          You didn't attempt to reconcile that?

20  A    No.  I thought your issue was the expense, period.

21  Q    Did you know that in the Younker case that the benefits

22  that were paid out in Younker were paid out on a 1999 claim

23  and not a 1995 claim?

24  A    I am sorry?

25  Q    You said that Younker opened up again?

1    A    Yes.

2    Q    Did you know that the benefits were actually paid out on

3    a date of injury of 1999, not 1995?

4    A    I took the claim number from the loss run that you asked

5    about and that was what I reviewed.

6    Q    But, you never saw the file to figure out what injury

7    was being paid for, did you?

8    A    No, not beyond what I told you.

9    Q    And, in fact, did you know that you could ask the Bureau

10   to send documentation on decisions?

11   A    Yes.  In fact, most bureaus have a website you can go

12   into and pull it up yourself.

13   Q    Right.  And I want to show you a document, okay, that

14   indicates what it is that you folks paid under --

15          THE COURT:  Let's mark that at least for

16   identification purposes.

17          MR. GORDON:  Yes.  At for identification purposes,

18   it would be AY, Your Honor.

19   BY MR. GORDON:

20   Q    And I ask you to look at -- this is the CLASS system.

21          Was this case handled under the CLASS system?

22   A    Yes.

23   Q    If the findings of fact, first finding of fact, which

24   would be found on page three of the decision, could you read

25   into the record what the injury was that Royal was paying

1    for?

2    A    What part of this do you want me to read?

3    Q    Paragraph one of the finding of fact.

4    A    On February 14th, 2001, the claimant suffered an injury

5    in the nature of death from silicosis/occupational lung

6    disease.

7    Q    And the payments that are documented in this settlement

8    agreement, would this be reflected in the final loss run

9    establishing what was paid out in 2002 to Mr. Younker?

10         In other words, the benefits here that are awarded

11   via settlement agreement would be reflected in your loss run,

12   would it not?

13   A    They should be if we paid the entire settlement.

14   Q    Right.  But, it's reflected as a 1995 injury claim and

15   the Court indicated that the injury was in 2001.

16   A    No.  The Court -- excuse me.  The Court indicated that

17   he suffered death in 2001 --

18   Q    Okay.

19   A    -- and an occupational disease injury, and I know this

20   as an underwriter.

21   Q    Right.

22   A    In an occupational disease injury, it will vary by

23   jurisdiction.  Sometimes it is over the period of time that

24   you worked for the organization.  Some states it's the last

25   date that you worked in the exposure.  Death and the injury

Leger - Cross

1   on occupational disease don't always occur at the same time.

2   Q    And, in fact, it's a good point.  The other case was

3   withdrawn on causal connection.

4         I am going to show you what I have marked as

5   Exhibit AZ.  And this is the refiling of a claim from which

6   the death case was paid out.  And would you read paragraph

7   one into the record?

8   A    Charles Younker, Sr.?

9   Q    Yes.

10        MR. FOX:  Could the witness have a moment to review

11  the document rather than just read a paragraph into the

12  record?

13        MR. GORDON:  Sure.

14        THE COURT:  No problem.

15        MR. FOX:  I note that neither document was marked

16  as an exhibit.

17        THE COURT:  I believe it has been marked for

18  identification purposes, is that right?

19        MR. GORDON:  It has, Your Honor.

20        The first Exhibit I showed her was AY, which is the

21  settlement, and the second is the claim that led to the

22  settlement.

23        THE WITNESS:  This findings of fact, paragraph one,

24  says:

25        On September 30th, 1999, the claimant suffered an

1  injury in the nature of silicosis/occupational lung disease
2  from exposure to silica and dust.
3  Q    Now, Ms. Leger, you said that you reviewed financial
4  data?
5  A    Yes.
6  Q    And that financial data would establish for us what was
7  paid on the 1995 claim.  Do you have that with you?
8  A    What?
9  Q    The financial data that shows what was actually paid out
10  on the Younker claim.
11  A    No, I don't.
12  Q    You said you reviewed it?
13  A    I reviewed it on line.
14  Q    And do you remember how much was paid out?
15  A    I did not write that down.  Well, let me -- I think the
16  loss runs are in here.  And I do remember checking to see
17  what was on the -- what is on the loss run.  Well, here it
18  showed a reserve.

19          I don't remember the specific dollars, but I know
20  it's closed pretty close to the reserves.

21  Q    Right.  The amount of payment on the Younker claim was a
22  six-year -- according to the settlement that was reached, for
23  a 1999 injury, was an amount that would pay the claimant six
24  years under some type of a structured settlement at the rate
25  of 46376.

1        And if I told you that that is the amount of money

2   in your CLASS system, would you accept that, or you don't

3   know?

4   A    I don't know.  I don't have the system in front of me

5   right now.

6   Q    And the reason -- so, you don't know actually what's

7   been paid out.  Even if this were a 1995 claim, you can't

8   tell us today whether the amount of money in the system

9   reflects what was awarded, can you?

10  A    Not without opening up a computer and dialing in and

11  looking in the system, no.

12  Q    And if the benefits were paid for the 1999 injury, which

13  appears to be the case, you would have no way of

14  understanding how that would have found its way into the 1995

15  loss run?

16  A    No.  But this -- this would look like, based on the fact

17  that this is addressed to both Rockwood and Globe Indemnity,

18  that this covered multiple years and probably ended up being

19  shared.

20  Q    You can share an occupational disease claim in

21  Pennsylvania?

22  A    I don't know in Pennsylvania.  In most jurisdictions,

23  absolutely.

24  Q    You didn't insure Latrobe in 1999, did you?

25  A    No, we didn't.

1          MR. GORDON:  Your Honor, I would offer into the

2   record AY and AV.

3          MR. FOX:  No objection, Your Honor.

4          THE COURT:  The offers are admitted.

5   Q    Now, you indicated that you had all of these audits put

6   in place.  I take it, that was the result -- the independent

7   audit all came as a result of Sarbanes?

8   A    No.  No.  Those have been in existence for as long as I

9   have been with Royal.  What Sarbanes obviously did for us is,

10  actually make us do a better process of documentation in

11  maintaining the records.

12         But, these audits had always been done.

13  Q    Now, audits were done because mistakes were made and

14  they had to be found and corrected, is that correct?

15  A    Audits are done to find mistakes because we are all

16  human and occasionally we make mistakes.

17  Q    And you didn't have a checklist to find out which files

18  were actually reviewed of Latrobe's between 1974 and 1995 and

19  to determine whether they were audited and whether mistakes

20  were found?

21  A    No, I did not.  I wasn't --

22  Q    You weren't part of that team and it wasn't your role up

23  until 1995 -- until 2005, correct?

24  A    Yes.

25  Q    And who were the individuals that correlate whether or

1  not payments in a program corelate to loss reserve data?  Who

2  as of 2005?

3          MR. FOX:  I am going to object.  I don't think the

4  question is understandable.

5          THE COURT:  Do you understand the question?

6          THE WITNESS:  No, I don't.

7  BY MR. GORDON:

8  Q    Who were the individuals at Royal that attempted to

9  correlate whether or not the amounts that are documented in

10 the claim files as actually paid and payable are accurately

11 reflected in the loss runs?  Who are those individuals?

12 A    By name?

13 Q    Yeah.

14 A    Well, let's see.  There is a system team, an audit team

15 in systems that will look to see that what's shown in CLASS

16 is showing up in the loss runs.  And there is internal audit

17 that does the same thing.  They kind of look over what

18 systems does and they look over their own stuff and they look

19 deeper into the claim files.

20 Q    Are you a part of that team?

21 A    No.

22 Q    Who else will do that?

23 A    Let's see.  I am trying to think.  It was Tony

24 Simone(Spelled Phonetically) and Bruce Miller were managing

25 that.  They've both gone in the last two months.  So, it's

1    Melkeena(Spelled Phonetically) Little.  I know I am going to
2    leave off a lot of names.  I will just try to hit the
3    managers, if you will.  Internal audit, it's David
4    Pacer.(Spelled Phonetically).
5    Q    You are not part of the internal audit team?
6    A    No.
7         MR. FOX:  I think the witness was completing her
8    answer when she was interrupted with the last question.
9         THE COURT:  I don't think so.  Do you have anything
10   else to say?
11        MR. FOX:  I just thought she was identifying the
12   list of people.
13   BY MR. GORDON:
14   Q    Ms. Leger, do you recall being deposed in August of '03?
15   A    Yes.
16   Q    And did you recall getting a list of documents that you
17   were to bring with you per the notice of deposition?
18        I show you what's been marked as AX.
19        MR. FOX:  Can I have a copy of that?
20   A    Yes, I do remember this.
21   Q    And did you tell -- at the time you were deposed, do you
22   recall telling us that you had come onto this account
23   sometime, as an underwriter, in '93 or '94?
24   A    Yes.  In '94, I believe, but it could have been '93.
25   Q    Okay.  And do you recall that your impression was that

1   Bruno Ferrari, Sr., was a hands-on guy?

2   A    Yes.

3   Q    And did you learn from Mr. Fox that for several years,

4   we were trying to secure from Royal documents that would

5   confirm payments and credits to Latrobe?

6          MR. FOX:  I am going to object to a question which

7   calls for communications with my client.  Attorney-client

8   privilege.

9          MR. GORDON:  Well, Your Honor, I think she already

10   testified at the deposition that she was told that there was

11   an effort to try to get confirmation of what had been paid

12   and credited to Latrobe.

13          THE COURT:  All right.  The objection is overruled.

14   Q    Do you recall that?

15   A    Yes.

16   Q    And you were aware also that Mr. Ferrari had died in

17   2000, the hands-on guy?

18   A    Yes.  Well, I didn't know when he died, but I knew he

19   was --

20   Q    About that time?

21   A    I didn't know when he passed.

22   Q    And part of our ongoing effort to get the payment

23   information that Latrobe had paid between 1974 to 1995 was

24   specifically requested of you per the deposition notice, is

25   that right?

1   A     Confirmation as to the amount of premiums paid by
2   Latrobe Construction, is that what you are asking about?
3   Q     Yes.
4   A     Yes.
5   Q     Right.  And at the time -- well, let me digress for a
6   moment.
7           Without information confirming the extent for which
8   premiums were earned, received by or on behalf of an insured,
9   would you agree that you can't calculate what the claim is
10  for outstanding premiums?
11  A     I'm sorry?
12  Q     Sure.  I will take it slowly.  If you don't have
13  information regarding what premiums were earned, what was
14  billed and what has been paid by or on behalf of an insured,
15  you can't indicate how much premium is due?
16  A     This is a general question?
17  Q     Yes.
18  A     I probably have to say yes.
19  Q     Okay.  Good.  In response to my request for documents
20  that verified what had been paid or credited, either from the
21  insured directly, the broker, a factor, or any draw-down, did
22  you indicate that that was an issue that we would need to
23  deal with at Royal's Premium Accounting Service Center?
24  A     I said that was where the records were kept.
25  Q     And did you, in preparation for your deposition,

```
 1   indicate for us that you had contacted them and that you had
 2   received a record that was purportedly sufficient to satisfy
 3   that request, a record which is referred to as the summary or
 4   statement of outstanding account, summary of statement of
 5   outstanding account?
 6   A    Is there a document you are referring to?
 7   Q    Sure.  I'd refer you to -- what is this, the exhibit --
 8        I am going to show you what was previously marked
 9   at your deposition and which we now refer to as
10   Defendant's BA.
11        Do you remember providing that to us in your
12   deposition?
13   A    Yes, I do.  It is called Statement of Account for
14   Latrobe Construction.
15   Q    And you heard Mr. Chimenti testify that he has relied
16   upon that document to address what's been earned, paid and
17   credited, et cetera?
18   A    He relied on this to determine what we said was still
19   outstanding.
20   Q    But, I think it is fair to state that that document
21   doesn't address for us what was actually paid and credited,
22   does it?
23   A    No.  What this indicates is what we said has not been
24   paid to us.
25   Q    But, the information that we requested that is the proof
```

1   of actual payment, the premiums by or on behalf of the

2   insured by -- through a draw-down, you indicated was not

3   available?

4   A    That's true.  You were asking us to go back to the

5   1950's.

6   Q    You did not?

7   A    Can't do it.

8   Q    No.  We said 1974 through 1995.

9   A    In 2000, you couldn't go back to 1974.  Why would we

10  keep those records if we didn't feel there was any money

11  outstanding?  Or let me rephrase that.

12          It is not, why would we keep those records?  We

13  don't have those information -- that information in any

14  readily available, easy format.  It would -- if we had it, if

15  the documents had not been destroyed, it would have taken an

16  army of ten thousand to even search and find it.

17  Q    But, you told me that there were premium ledgers?

18  A    There are premium ledgers in an electronic version that

19  are not printable, yes.  And in our premium ledger, they

20  reconciled it and came up with, this was what we billed, this

21  is what we paid, this is what was paid and credited.

22  Q    And who prepared that document?  Do you know that?

23  A    Would have done in premium accounting.

24  Q    But, you don't know who did it?

25  A    Which year?

1  Q    Well, that's just a summary.  That's not an -- that's a

2  summary that was prepared for this case, wasn't it?

3  A    Yes.

4  Q    That's not a regular business document of Royal, is it?

5  A    We prepare this type of summary very often for our

6  clients when they ask for it, yes.

7  Q    Well, it was prepared for this litigation.  It was based

8  on a review of corporate documents?

9  A    Yes.  Corporate records.

10 Q    Corporate records?

11       And we had asked for the production of the

12 corporate records.

13 A    We produced what we could.

14 Q    But, so you just produced a summary that someone

15 provided from corporate documents, but the corporate

16 documents were never produced by you since the deposition?

17 A    Correct.

18       MR. FOX:  I am going to object, for the record.  I

19 don't think this witness necessarily has knowledge of

20 everything that was produced in this case.

21       We have had multiple productions, boxes of

22 documents over a series of years and --

23       MR. GORDON:  Your Honor, I am going to offer

24 Ms. Leger's testimony in this case by way of deposition, in

25 addition to this cross-examination, to establish that when we

Leger - Cross

1   asked for this documentation, they told us there were premium
2   ledgers.  They indicated that if they had them, they would
3   produce them for us.  And Ms. Leger's testimony was that you
4   could not determine what was paid or credited by the
5   documentation that was provided to us.
6           MR. FOX:  Well, then this should have been
7   addressed in a motion to compel in advance of the trial, Your
8   Honor.  We shouldn't be rearguing --
9           THE COURT:  Right.  The objection is overruled.
10  Continue, please.
11          MR. GORDON:  Thank you, Your Honor.
12  BY MR. GORDON:
13  Q    Now, you were aware that retros were in effect between
14  1974 and 1995?
15  A    Yes.
16  Q    It's interesting.  You heard Mr -- by the way, you were
17  the global underwriter for Royal?
18  A    No.  I was a referral underwriter.
19  Q    Okay.  And as such, would you have some control over the
20  underwriting file for Royal, for Latrobe, rather?
21  A    The direct underwriting file, no.
22  Q    Who would have had that?
23  A    That would have been with the underwriter in Pittsburgh
24  or New York, depending on what year and where it was being
25  handled at the time.

1   Q    Was that ever produced?

2   A    The underwriting files?

3   Q    Yes.

4   A    To the best of my knowledge, yes.

5   Q    And to whom and by whom?

6   A    You would have to ask our attorney.

7   Q    Is the premium ledger?  Are the premium ledgers that

8   document what has been received and paid, credited to an

9   account, is that the business record that is retained by

10  Royal that is used to reference them?

11       Is that the document that's kept in the regular

12  course of business by Royal to demonstrate credits and

13  payments?

14  A    There is not a document -- maybe you need to understand

15  how the money flows.

16       The money comes into the bank.  The money -- the

17  checks are deposited in the bank.  What is deposited is

18  transmitted to us electronically with whatever data, document

19  back-up that they have.  We will then go in and credit

20  against what we know we have billed, the appropriate numbers.

21       Like, for example, if it came in from a broker and

22  they said this is paying for policy A, B, C, X, Y, Z and, one

23  two, three --

24  Q    Right.

25  A    -- then we would apply that against those policies.

```
 1   Q     Have you reviewed those documents in preparation for
 2   today's testimony?
 3   A     No.  I --
 4   Q     Did you have any discussions with Jerry Chimenti between
 5   July 10, 2003, and September 16, 2003, wherein he indicated
 6   to you that he needed some additional documentation to
 7   establish how much money had actually been paid and credited?
 8   A     I don't -- I don't believe I ever spoke to Mr. Chimenti
 9   until shortly before phase one of the trial.
10   Q     Did you review his deposition testimony in this
11   proceeding where he indicated that he got information from
12   you?
13   A     From me or from Royal?
14   Q     From Diane Leger.
15   A     I don't remember.  Bruce could have asked me for
16   something and I could have given it to him and maybe he
17   provided it to Jerry.  I don't know.
18   Q     Did you provide Mr. Fox or Mr. Leger with any
19   documentation, other than the document that's been
20   referenced, which provides a summary of the account?
21         I am sorry.  Let me withdraw that question.  Oh, I
22   am sorry.
23         Did you provide, Ms. Leger -- do you recall
24   providing -- after you testified, did you provide any
25   additional documentation either to Mr. Fox or Mr. Chimenti?
```

1   A    Relating to?

2   Q    Premiums, credits, financials.

3   A    I believe this statement of account, we updated it.  I

4   provided that to them.

5   Q    Anything else?

6   A    I honestly don't recall.

7   Q    You are not, nor have you ever been, the custodian of

8   the financial records that would have reflected payments and

9   credits from Latrobe?

10  A    No, I'm not.

11  Q    You are not the custodian of records of loss runs?

12  A    No.

13  Q    You didn't prepare any of the loss runs in this case?

14  A    No, I did not.

15  Q    Did you advise Mr. Chimenti, or someone acting on his

16  behalf, that he needed to secure relevant information from

17  the Premium Account Service Center if he wanted to understand

18  more about the financials of the program?

19  A    I'm not sure I understand your financials of the

20  program.

21  Q    What's been paid, billed, received, was that something

22  that you directed Chimenti to the Premium Account Service

23  Center for?

24  A    I -- if he asked me questions about that, yes, I

25  probably would have sent him to PASC.

Leger - Cross

1   Q    Would the Royal earned premium ledgers, if you took the
2   time to go through that information, establish monies that
3   are paid by an insured directly to Royal?
4   A    You keep referring to this like it's a single document
5   for one person, and it was electronic data that was fed to us
6   and, yes, we matched it up, client to payment or policy to
7   payment is more what came in.  Yes.
8   Q    It would also tell us what was paid on behalf of an
9   insured by a broker or a factor?
10  A    Yes.
11  Q    And it would also allow us to take into consideration
12  what was drawn down in some form of a collateral?
13  A    That would not show up in the premium record.
14  Q    Where would that be?
15  A    It would show up as a journal entry in the premium
16  record if we had drawn on a letter of credit.
17          The letter of credit draw would be information --
18  information would have been kept in Financial Services.
19  Q    Is that your department?
20  A    No.  Mr. Gordon, if it helps you understand, we were an
21  organization of over seven thousand people at the time we
22  were writing Latrobe --
23  Q    I do.  But, if it helps you understand, these were
24  documents that had been requested since discovery's inception
25  in this case in 2000.  But, you didn't know about that until

1    the day before your deposition, is that right?

2            In other words, you weren't informed that we were

3    looking for documents that were specifically on the notice of

4    deposition until the day before your deposition.

5            Do you recall testifying to that?

6    A    Me, personally?

7    Q    Yes.

8    A    No, I did not.

9    Q    Do you recall testifying to that?

10   A    I believe I said something to that nature.

11   Q    Do you recall also indicating that if the documents were

12   available, you would look for them and then make them

13   available?

14   A    Yes, I did.

15   Q    And you have never made those documents available?

16   A    They weren't available in terms of anything that could

17   be provided to you.

18            MR. GORDON:  I have no further questions.

19            MR. FOX:  I have no further questions.

20            MR. GORDON:  Your Honor, I would like to offer into

21   the record the deposition testimony of Dianne Leger, who has

22   been offered as a corporate designee for Royal.  It covers a

23   lot of issues that I am not going to spend an inordinate

24   amount of time with today, but it has been covered, okay, and

25   I would offer that as BB.

1    Can I give you a copy of the original?

2    THE COURT:  Yes.  Any objection, Mr. Fox?

3    MR. FOX:  I have no objection, Your Honor.

4    THE COURT:  All right.  The offer will be admitted.

5    What about exhibit BA, Mr. Gordon?

6    MR. GORDON:  It's a statement of account.  I am

7    sorry, Your Honor.  It is attached to the deposition

8    transcript of -- thank you, David -- it's attached to the

9    deposition transcript of Dianne Leger.

10    MR. FOX:  Is it on your copy?  Because it is not on

11    the copy I got.

12    MR. GORDON:  Oh, I'm sorry.  I'll offer it.  I

13    thought it was.

14    And, Your Honor, also, actually, I know what it

15    was.  It was an action which was the notice of deposition

16    with request for documents, Your Honor, which was part of it.

17    THE COURT:  All right.

18    MR. FOX:  No objection.

19    THE COURT:  All right.  These documents are

20    admitted into evidence.

21    THE COURT:  Mr. Fox.

22    MR. FOX:  Your Honor, we rest.

23    THE COURT:  Mr. Gordon.

24    MR. GORDON:  Go ahead.

25    MR. SMITH:  Your Honor, at this time, we make a

1  motion to strike the testimony of Gerald Chimenti as lacking

2  the appropriate factual foundation pursuant to the Federal

3  Rule of Evidence 702.

4      Mr. Chimenti testified that to reach his opinion,

5  he believed that the loss runs were authentic, were

6  reasonable, were accurate, that the summary that he relied

7  upon was accurate and was authenticated.

8      Royal has not produced that information or that

9  evidence to support the factual foundation for Mr. Chimenti.

10  Once we receive the court transcript of the proceedings of

11  yesterday, we will be happy to brief this issue.

12      MR. FOX:  Your Honor, we oppose the motion.  I

13  believe there has been ample evidence presented documenting

14  the loss runs and their accuracy and documenting

15  Mr. Chimenti's opinion.

16      He looked at a tremendous volume of information

17  over an extended period of time and the information that he

18  relied upon consists of the business records.

19      There has been no significant attack on his

20  credibility or the reliability of the documents that he

21  looked at to formulate his opinion, and we would certainly

22  oppose the motion, and would also prepare responsive brief if

23  the motion is filed based upon the record.

24      THE COURT:  All right.  The Court will issue an

25  order with respect to your motion.  Okay.

1           MR. GORDON:  Your Honor, I would just, in the

2 interest of truth, I would like to ask that Mr. --

3           THE COURT:  Hey, in the interest of truth.  I like

4 that.

5           MR. GORDON:  Borrowing from yesterday, Your Honor.

6           But, I would like to have Mr. Chimenti called as a

7 witness for one question.

8           THE COURT:  All right.  You remain under oath,

9 Mr. Chimenti.

10           THE WITNESS:  Yes, sir, Your Honor.

11                * * * * *

12           GERALD CHIMENTI, having first been duly sworn,

13 testified as follows:

14                DIRECT EXAMINATION

15 BY MR. GORDON:

16 Q   Mr. Chimenti, in response to questions yesterday, you

17 made certain assumptions as to what Mr. Raabe had and was

18 basing his opinions upon.

19           Do you recall that?

20 A   Could you be more specific about that?

21 Q   Yes.  You had indicated that you assumed that Mr. Raabe

22 had more information than you and had documents and was

23 basing his opinions on perhaps more information that had been

24 made available to you.

25           Do you recall that?

Chimenti - Direct

1   A    I believe when I was answering that there was
2   information in his report where he made conclusions in his
3   report, that was more information than I had available to me.
4   Q    Or that you discerned from the records that were
5   provided to you?
6   A    I don't -- I did not have that information provided to
7   me.
8   Q    You said you had many, many boxes of documents and you
9   can't recall all of what you had to review?
10  A    I don't remember seeing the sort of information in the
11  boxes that I reviewed that Mr. Raabe had in his report.
12  Q    But, you quoted from his report yesterday upon what you
13  assumed that he would have relied upon to establish the
14  calculation of premium and specifically the total incurred
15  values, correct?
16  A    Yes.  I indicated that his retrospective rating
17  calculations were very closely accurate to both my
18  calculations and also Royal's.
19  Q    Right.  And it's just simply a math exercise, isn't it?
20       If the total incurred values are correct, then you
21  would expect that anybody who is involved as a consultant
22  should be able to calculate premium?
23  A    As long as you are using the same information, yes.
24  Q    Right.  And, in fact, doesn't he indicate in his report
25  in all instances the Royal incurred claim values reduce the

1    workers' compensation values established from the February,

2    2002 adjustments for all periods, which is the adjustment

3    that had been made available by Royal?

4            Doesn't he say that?

5    A    I have to take a look.  Yes.  When he prepared his

6    calculations, he used the incurred values from the February,

7    2002 loss runs.

8    Q    That's what you did, right?

9    A    I used the loss runs, yes.

10           MR. GORDON:  No further questions.

11           MR. FOX:  No further questions.

12           THE COURT:  All right.  Thank you, Mr. Chimenti.

13   You may step down.

14   (The witness was excused.)

15           MR. GORDON:  Your Honor, we would rest.

16           THE COURT:  Okay.  Anything further, Mr. Fox?

17           MR. FOX:  Nothing further, Your Honor.

18           THE COURT:  Okay.  With respect to your 702 motion,

19   how long will it take you to prepare a brief?

20           MR. GORDON:  Your Honor, if we could have ten days

21   from the date that Mr. Powers gets the transcripts to us.

22           THE COURT:  That won't be for another two months.

23           MR. GORDON:  No.  He told us he could do this

24   imminently because he likes all of us here.

25           Your Honor, could we have, say, twenty-one days?

 1          THE COURT:  I am going to confer with my associate
 2     here.  How much time do you need?
 3          MR. GORDON:  I was thinking perhaps three weeks,
 4     assuming that I can get it in a week.
 5          MR. FOX:  Your Honor, we can certainly respond very
 6     expeditiously.  I would like a briefing schedule that's
 7     reasonable accelerated.
 8          If we could ask Mr. Gordon to do it in ten days, I
 9     would think that would be sufficient.  This hearing has not
10     been that long.
11          MR. GORDON:  It's hard for me to do it, Your Honor,
12     in light of the fact that I don't want to put a gun to the
13     Court Reporter's head.
14          THE COURT:  Well, he is going to -- Mr. Powers said
15     he will have it done within a week.
16          MR. GORDON:  How about ten days thereafter?
17          THE COURT:  All right.  Ten days after that then.
18     You have ten days to respond.
19          MR. FOX:  That is fine, Your Honor.
20          THE COURT:  Okay.  All right.  David asked whether
21     or not -- I think we've asked for this before, but do you
22     want to present proposed findings, either side?
23          MR. GORDON:  It would probably make sense in
24     keeping what we had done before.
25          THE COURT:  All right.

```
 1          MR. FOX:  We can do that, Your Honor.  Again, we
 2   would like to do it on an expedited basis, if we could.
 3          THE COURT:  All right.  We'll enter an order with
 4   respect to the proposed findings.  Okay.
 5          MR. GORDON:  Thank you, Your Honor.
 6          MR. FOX:  Thank you, Your Honor.
 7   (Court adjourned on Wednesday, May 3rd, 2006, at 10:45 a.m.)
 8
 9                        *  *  *  *  *
10          I certify that the forgoing is a correct transcript
11   from the record of proceedings in the above-entitled matter.
12
13                              S/Michael D. Powers
                                Michael D. Powers
14                              Official Reporter
15      *****NOT CERTIFIED WITHOUT ORIGINAL SIGNATURE*****
16
17
18
19
20
21
22
23
24
25
```