1   (Court reconvened at 1:30 p.m.)

2        THE COURT:  Okay, Mr. Gordon, you may continue you.

3            CROSS-EXAMINATION

4   BY MR. GORDON:

5   Q   Mr. Chimenti, did you review any of the actual claims in

6   the twenty one year program?

7   A   No.

8   Q   And I think in one of your reports, do I recall

9   correctly that you thought there were about eight hundred

10  claims?

11  A   I am not sure if that was in my report.  I don't believe

12  so.

13  Q   When Your Honor retained on behalf of Royal you assumed

14  that the only program here that was at issue based on the

15  complaint were the 1980, '95 program years?

16  A   That's correct.

17  Q   And Your Honor not asked to advise payment issues and

18  receipt issues prior to 1980?

19  A   No.

20        THE COURT:  Prior to what year, Mr. Gordon?

21      MR. GORDON:  Prior to 1980.

22      THE COURT:  Prior to '80?

23  Q   Was the information that you had received prior to July

24  10, 2003 such for you to render an opinion as to what

25  additional premiums were payable or returnable?

2

1  A   I reviewed probably a dozen boxes of documents, business

2  records from Royal Insurance and it probably took me a week

3  to go through.

4       Those included the underwriting records, loss

5  control reports, retrospective reading (adjustments) there

6  were claim files although I didn't reviewed claim files per

7  se but I did go through all those boxes to identify the

8  materials that were in those.  And the information that I

9  received was sufficient for me to calculate the retrospective

10  premiums.

11  Q   But, in your report you indicate that you, the amounts

12  indicated as premium owed are based on the assumption that

13  all prior retrospective premiums were paid in full.  Isn't

14  that true?

15  A    That's correct.

16  Q    And at the time you issued your report, I think in your

17  deposition you indicated that absent that information you

18  were not able to render an opinion as to what was owed and/or

19  what was returnable until you could determine what in prior

20  years was earned and paid, isn't that true?

21        MR. FOX:  I am going to object.  It's a

22  mischaracterization of the report.

23        THE COURT:  Overruled.

24        You can answer the question.

25  Q    Isn't that true?  What I are?

3

1   A    When I first wrote my record calculated the then current

2   retrospective premiums.

3   Q    And you indicated --

4         MR. FOX:  The witness, I believe, was continuing

5   his answer.

6         MR. GORDON:  Oh, I'm sorry.

7         THE WITNESS:  Yes.  Then I was advised that there

8   were prior years premiums that had not been paid.  That's

9   when I authored my supplemental report to bring it up to

10  date.

11  Q    Who told you that who told you that the premiums had not

12  been paid?

13  A    I don't know -- probably Mr. Fox.

14  Q    So Mr. Fox told you that prior premiums had not been

15  paid and that allowed you then to conclude how much premium

16  was owed?

17  A    What I did is I went back and calculated the premiums

18  for all of the years where the premiums had not been paid to

19  see whether there was money owed or whether there was return

20  premium to the policyholder.

21  Q    Right but you need some additional flower are

22  information you are needed to know what had previously be

23  paid and Mr. Fox was the source of that information that

24  allowed to you enter into the supplemental report?

25  A    What he gave me was the statement of account from Royal

4

1  Insurance.

2  Q    Well, the statement of account was attached to the

3  complaint.  You already had that?

4   A    Yeah but it wasn't explained to me from the statement of

5   account that was attached to the complaint that what I was

6   asked to do originally was to go back all wait to '94.  What

7   I was asked to do originally and it wasn't from Attorney Fox,

8   it was from another attorney in the firm, was similar simply

9   to calculate the current retrospective premiums, which for me

10  to do that, would simply be, which I did calculate the

11  retrospective premium as of that date and compare them to the

12  premiums from the prior retrospective adjustment.  Which

13  would then bring the premium current for that program.

14  A    Subsequent to that, I was asked to go back and calculate

15  and and verify all the amounts on the statement of account

16  which is what I did.

17  Q    And who asked you to do that?

18  A    That would have been Attorney Fox.

19  Q    And you said that someone had to explain to you what the

20  statement of account was.  Who did that, Mr. Fox?

21  A    No.  They didn't explain to me what what it was.  Just

22  that the retrospective premiums would have to be calculated

23  from a different start point than where I had started from.

24  Q    And who told you that?

25  A    Mr. Fox asked me to go through the statement of account

5

1    to verify all those amounts that were being claimed by Royal

2    insurance.

3    Q    But the statement of account doesn't reflect what's been

4    paid and when it's been paid, does it?

5    A    It reflects all of the charges and all of the credits on

6    Latrobe's account.

7    Q    It reflects what credit some -- by the way what is the

8    statement of account, do you know what that is?

9    A    That would be Royal's record of the premiums that were

10   charged and the credits for the various policies in that

11   program.  So, it's their record of the amounts that are due

12   under that program from 1980 to '95.

13   Q    Who told you that, who told you the statement of account

14   is roles eye records that reflect what has been paid and what

15   it paid who told you that?

16   A    Well, I had conversations with a few different people at

17   Royal?

18   Q    And who told you that?

19   A    Um, the lady's name was Dianne, who is not Dianne Leger.

20   It was another Diane, who I do not recall her last name, that

21   I spent a better part of the day going through all those

22   numbers, numbers where even I had questions about that we

23   needed to verify so that my calculations, if there is a

24   number on that statement of account that did not match any of

25   my calculations, then my point was, I would have to

6

1   disqualify that number if it was a charge to be fair to all

2   concerned.

3   Q    The statement of account that you reviewed was a summary

4   that was prepared on what date?

5   A    I don't have that statement of account with me.  So, I

6   can't tell you the date it was prepared.

7   Q    It's a summary of all the prior years, 1980 through 1995

8   as to what was charged and allegedly what was received, is

9   that what it is a summary?

10   A    I think it probably more than a summary.  It's their

11   record of the charges for the premiums for the various policy

12   periods and also the credits that would apply to throws

13   policy periods.

14   Q    But, you didn't review Diane ledgers testimony that

15  indicates that you can't determine what was paid or received

16  from the --

17       MR. FOX:  That's a complete misrepresentation of

18  her testimony, Your Honor.

19       MR. GORDON:  Well, she is here and she is going to

20  testify.

21  Q   So, you are assuming that the statement of account gives

22  gives you all the information that you would have record to

23  determine what was earned, what was paid and properly

24  credited from 1980 to 1995?  Is that your assumption today?

25  A   It's not my assumption.  My answer is, the statement of

7

1  account is all of the charges and credits as of the date of

2  the statement was prepared according to Royal's eye business

3  records.

4  Q   Well, how do you know it was according to roles business

5  record thes?

6  A   Because they prepared it they had to prepare it from

7  something.

8  Q   From what?

9   A   From their records.

10  Q   What is the records they prepared it from?

11  A   That you would have to ask Royal but it would be from

12  their accounting department, the billings that they would

13  bill and the payments that were received, whatever is

14  outstanding, would be outstanding would be on Latrobe's

15  account.

16  Q   So, somebody looked at Royal's business records and

17  prepared a summary which you call the account?

18  A   The statement of account.

19  Q   Right.  And you don't know who prepared that summary?

20  A   The individual, no.

21  Q   And you don't know what documents they looked at to

22  prepare that?

23       MR. FOX:  Objection asked and answered.  He

24  identified the documents.

25       THE COURT:  Overruled.


8


1   Q   You don't know who prepared it?

2   A   No.  The individual that I know that was, I don't want

3   to say.

4  Q    Do you know who prepared it, Jerry?

5  A    No, I don't know who prepared it.

6  Q    That's all.

7        MR. GORDON:  Judge, could you please ask him to

8  answer the questions?

9        THE COURT:  I think he is doing the best he can.

10  Q    You don't know who prepared it?

11  A    No.  But, I mean, the source of the record that we

12  received it from would have been Mr. Hooper.

13  Q    Did you complete where Mr. Hooper?

14  A    No.

15  Q    You tried to meet with Mr. Hooper?

16  A    I didn't try to meet with him.  We attempted to speak on

17  several occasions.

18  Q    You never could?

19  A    Then I spoke to someone else in his area.  (Yes is I

20  didn't?

21  Q    And in addition to not knowing who prepared the document

22  you don't know what actual business records were reviewed and

23  to calculate what was actually received?

24  A    I didn't prepare the account.  That was prepared by

25  Royal.

9

1  Q    Now, at no time in your report in either report, do you

2  address earned premium, payments and credits for 1974 to

3  1980, have you?

4  A    No.

5  Q    That's still part of the retro program that's at issue

6  in this case, is it not?

7  A    Not to my knowledge.  The only years at issue are 1980

8  through '95.

9  Q    So, your assumption as to what premium is due is

10  presented indicated on the assumptions that as of 1995 all

11  prepare that was earned was paid and that the program lasted

12  from 1980 to 1995?

13  Q    That is how you calculated premiums, correct?

14  A    I calculated the premiums based on the fact that

15  according to roles' records and admission that all of the

16  premiums were paid up through 1994.  So, it wasn't necessary

17  for me to go back prior to 1994 to calculate the

18  retrospective premium from 1995 to the current date.

19  Q    Okay.  That was the letter basically tells you that all

20  the premiums that were billed were paid, it doesn't indicate,

21  however, how much premium or credit over and above what was

22  billed was retained by Royal, does it?

23  A    That would have come {UTD} on the statement of account.

24  If there was a payment over and above what they would have

25  billed (all one stings.

10

1  A    And that just simply didn't exist.

2  Q    Well, when you say it didn't exist, you don't even know

3  the records that were reviewed to compile the statement of

4  account, do you.

5  A    What I am telling you is that there is no payment over

6  and above what was billed to Latrobe on Royal's statement of

7  account.

8         And that the statement of account would have

9  included all of the credits for payments made and all the

10  charges for the the premium so if there was something of and

11  above what was bill had paid by Latrobe, then it would appear

12  on that statement of account.

13  Q    Are you telling me that the statement of account is a

14  business record that's kept in the ordinary course of

15  business of Royal for its insureds?

16  Q   Are you telling me that's the case?

17  A   It's my understanding that that was prepared from their

18  business records that are kept for their policyholders.

19  Q   And who told you that, Mr. Fox?

20  A   No.  In my discussions with the Diane, not Dianne Leger,

21  at Royal.

22  Q   So, just so that I am clear on that there and we will

23  move on, you received a summary from swung named Diane whose

24  last name you do not know who basically purported to

25  represent to you that the statement of account is a summary

11

1  overall prior billingses between 1980 and 1995 and

2  establishing also a credit for what has been paid?

3  A   I didn't say that.

4  Q   Well, can you say that?

5  A   No, I wouldn't say that, no, because that is not way

6  I've testified.

7       THE COURT:  As I recall, what I said was the

8  statement of account shows what was earned, paid and credited

9   during that particular period, is that what you said?

10      THE WITNESS:  Your Honor.

11      THE COURT:  Is that how you have defined the

12   statement of account?

13      THE WITNESS:  No.  The statement of account is a

14   record overall of the credits and payments that are still

15   outstanding on the account.

16      THE COURT:  All right.

17   BY MR. GORDON:

18   Q   You leave no firsthand knowledge as to how accurate that

19   is, though?

20   A   I would say it's accurate if it was prepared from

21   Royal's business records.  I leave no information that would

22   lead me to believe that it not accurate.

23   Q   But you have no information that would establish that it

24   is accurate, you're not had custodian of that record are you?

25   A   I am not the crud I can't think of that record.


12


1   Q   And you know {SPWHRAEUD} {PHRA*EURD} no Royal in the

2   preparation of that document?

3   A   No, sir.

4   Q   Your opinions as to what premiums are owed as of today

5   are related in substance part to the 2002 loss run?

6   A   What I did to prepare per the.

7         MR. GORDON:  Judge, could I have an answer to that

8   question?

9         THE WITNESS:  I am answering your question.  And

10  the way you phrased your question I am going to reply.

11        THE COURT:  Time out.  This isn't the barroom.

12  This is a courtroom.  Ask your question again.

13        MR. GORDON:  Yes.

14  Q   The calculation of retrospective premiums are tied into

15  the 2002 -- owe {OEUFRPBLGTS}?

16  A   That's not even a fair question.  (Loss {HRUPB} {WAPSZ}

17  the last two word)?  Because they are sensitive as to time so

18  they are not tied into exclusively the 2002 loss run.

19  {STPHFRPBLT} {THAFPGS} the last two word in the question.

20  A   Loss run.

21        These programs as you had indicated before the

22  break are dynamic that they change from year to year.  So, in

23  order -- to answer your question and in order to prepare for

24  my testimony today, per the order issued by the Court asking

25  for expert testimony on the retrospective premiums due, what

13

1  I did is, I obtained the current loss runs valued in on six.

2  Q    But, you haven't testified to that?

3  A    Can I answer the question?  You asked me the question

4  and I am just us goods just going to give (blue) my answer.

5        What I did is, I calculated those premiums, (the

6  retrospective premiums) since they are dynamic in nature and

7  brought them to date and --

8        MR. GORDON:  Judge --

9        THE WITNESS:  And based on my --

10       THE COURT:  Just a second.  Please continue.

11       MR. GORDON:  He is trying to get in current loss

12  run data.  He has already given an opinion as to $851,000.

13  That's what I am asking him about.

14       THE COURT:  Well, let him finish.  Go ahead, you

15  can continue.

16       THE WITNESS:  Thank you, Your Honor.  Since these

17  programs shall dynamic and think change with time, based on

18  the current loss runs valued as of February, 2006, the

19  retrospective premium for the program would be $903,670.

20      MR. GORDON:  Your Honor, I would ask, for the same

21  reason as before, we have never been provided this

22  information we have never seen any of the claim

23  documentations we can't comment on whether or not that's

24  fair, reasonable, okay.

25      The question that I had is what he concluded how

14

1  much premium was due did he rely on the 2002 loss run.  His

2  response was not responsive at all.

3      THE COURT:  Answer that question.

4      THE WITNESS:  I understood your original question

5  to be for my preparation to testify today did I rely on the

6  2002 loss runs, which is not true.

7      When I authored my report back in 2000 three I

8  relied on the 2002 loss runs which would bring the

9  retrospective premium as current as possible.  To prepare for

10  today that would not be fair to Royal nor to Latrobe if

11  Latrobe was owed money.  (Period before to prepare for today.

12      THE COURT:  Don't forget to put the loss run at the

13  end of that question, the last two words.

14  BY MR. GORDON:

15  Q    As I understand it, your, the information that you had

16  requested that allowed to you calculate in 2003 what premiums

17  were payable was the, or owed or returnable was the statement

18  of the account and the 1999 letter that was issued by a

19  gentleman by the name of Hooper to attorney Gianotti?

20  A    Those weren't the only thing that I relied upon.  As I

21  stated, there were boxes stacked on end would be twenty feet

22  long, that I relied on, that I reviewed to come to my final

23  analysis of the premiums.

24  Q    But, you had had those boxes previously and that was not

25  sufficient for you to issue a decision on what was owed as of

15

1  July ten 2003, you said that you needed more information and

2  the information that you received that allowed to you reach

3  your opinion that $851,000 was owed was the statement of

4  account which had she previously proceeded to you but you

5  weren't sure that you could understand it and a letter in

6  1999?

7        MR. FOX:  Your Honor, I am going to object at this

8    attempt to summarize all this testimony.

9        MR. GORDON:  It is important, Your Honor.

10       THE COURT:  The objection is overruled.  Go ahead,

11   Mr. Gordon.

12   BY MR. GORDON:

13   Q    That's correct, that was, the new evidence that you got?

14   A    No.  It's just a matter of the difference between what I

15   was originally asked to do and what I was subsequently asked

16   to do.

17       MR. GORDON:  Do you have -- I would like to make a

18   copy of the 1999 letter that you have relied upon to

19   establish that they were, the parties were paid I guess up to

20   date through 1995 I would like to make that a exhibit in this

21   case.  Your Honor, I don't have that?

22       MR. FOX:  Your Honor, I am going to object to the

23   use of that letter since it does involve attorney-client

24   privilege and it's a letter between counsel and the client.

25       MR. GORDON:  Well, then I don't believe he can rely

16

1    on that communication, Your Honor and I would ask that the

2    testimony then be stricken.

file:///A|/ROYAL-2.TXT

3          THE COURT:  What does the -- thinks part of your

4   report?

5          MR. GORDON:  It's not, Your Honor.

6          THE WITNESS:  No, Your Honor, it is not part of my

7   report.  It was part of the premise of my report, though to

8   establish the baseline as to when the retrospective premiums

9   were paid in full with no premium due nor returned premium

10  owed to the policyholder.  So, to establish that baseline for

11  me then to do the subsequent retrospective adjustments for

12  '95, six, seven to current.

13         THE COURT:  All right.  How does the letter factor

14  into this opinion?

15         THE WITNESS:  All it does, Your Honor, it

16  establishes when Latrobe's account was at zero.  Then all --

17  it's.

18         THE COURT:  Can we read parts of that record, that

19  letter into the record if there was some communications

20  between counsel that you would consider to be confidential,

21  perhaps we can keep them out of the record.

22         MR. GORDON:  Well, Your Honor --

23         MR. FOX:  I would be happy to do that, Your Honor.

24          MR. GORDON:  Your Honor, in light of the fact that

25   he's relying on the letter that, that he has testified from

17

1   the letter, I hardly think that there is an

2   attorney-client, -- besides it's been disclosed to the

3   expert.

4          THE COURT:  I haven't read the letter.  I have no

5   idea what it says.

6          MR. FOX:  Your Honor, to cut through this, I am

7   happy to degree to the admission of the letter so long as

8   counsel will stipulate that we are not waiving

9   attorney-client privilege arrests to anything extending

10   beyond the letter.

11          THE COURT:  That solves our problem.

12          MR. GORDON:  I would like to offer it, Your Honor.

13          THE COURT:  We'll have it marked, please.

14          MR. GORDON:  In was the an as in {AL} better {S},

15   Your Honor (letters.  Letter.

16          MR. GORDON:  And I don't have a copy of it and I

17   would ask that David, later on perhaps we could --

18          MR. FOX:  We have a copy marked.  Give us a second.

19  (he said letter an and then letter {S}:  (as {STPH*FPLT}.

20      MR. GORDON:  Why don't I leave the witness with a

21  copy.

22  BY MR. GORDON:

23  Q   To the best of your knowledge, when this letter was

24  issued, the '74, '80 programs were not at issue,, is that

25  correct?

18

1  Q   There was a lawsuit involving '80 to 1995?

2  A   That would be correct.

3  Q   Mr. Chimenti, insureds move premiums through insurance

4  companies in a variety of ways, do they not?

5  A   Could you repeat the question?

6  Q   Sure.  Let me give you some examples.

7      An insured can make a direct payment to an insurer

8  correct?

9  A   That's correct.

10  Q   The broker can establish an account with a carrier and

11  make the payment on behalf of the client, correct?

12  A   That's true.

13  Q    Do you know what a factoring arrangement is?

14  A    It would be probably a financing arrangement.

15  Q    And you are familiar with those as will?

16  A    Somewhat.  I have not been directly involved in those,

17  though.

18  Q    That's a way that premiums are oftentimes moved to

19  insurers, correct?

20  A    Like I say, I don't have firsthand experience {STHO}

21  those thing.

22  Q    But, you understood what a (factoring) arrangement was?

23  A    Yes.  But, again, I am not here to testify regarding

24  that.

25  Q    Loss sensitive programs, {*FRPL} programs such as retro

19

1  programs, the insurance company in those types of programs is

2  effectively front go monies that ultimately the insured may

3  have to reimburse in while or in part, correct?

4  A    There are lot loss sensitive programs where, yeah, the

5  insurance carrier is going to charge a basic premium plus the

6  claim payments for the indemnity answer medical and a factor

7  for their expenses on the claims {STKPWHRO}.

file:///A|/ROYAL-2.TXT

Case 2:00-cv-02128-FXC    Document 177    Filed 06/14/2006    Page 24 of 82

8   Q    Well, but I think my question is, the insurance

9   companies is essentially going to start front go the loss

10   thanks ultimately are going to be reimburse I believe by the

11   insured in while or in part.

12   A    To a certain extent, that would be true.

13   Q    The insurance company can protect itself by securing

14   collateral?

15   A    With a retrospective program?

16   Q    Yeah.

17   A    I am not familiar with retrospective programs myself

18   where the, well I suppose I have had maybe one or two where

19   the carrier requested some collateral, but --

20   Q    As in the form of?

21   A    It could be a letter of credit.  Some type of

22   arrangement.

23   Q    {STPHRFPLTD} practice program?

24   Q    What are the documents, the business document thanks

25   Royal retains what are the names of those documents that

20

1   thanks address monies which are paid directly by the insured,

2  monies that come to an insured on behalf of the broker,

3  monies that are paid under a factoring arrangement or

4  collateral accounts, do you know?

5  A   I'm not sure I understand your question.

6  Q   Well, does Royal have a business record or business

7  records that establish had those types of payment

8  relationships?

9  A   I think I am probably the wrong person for you to ask

10  those questions.  I don't know what Royal has.

11  Q   And so the business records that confirm payments by or

12  on behalf of an insured or whether there is collateral or

13  draw down, you are not the proper person to address that

14  issue?

15  A   No.

16  Q   Do you know whether premium paid by Latrobe between

17  1974, 1995 and/or thereafter, was ever paid on Latrobe's

18  behalf by a broker?

19  A   That I don't know.

20  Q   Do you know if it was ever paid by a factor?

21  A   No.

22  Q   Do you know whether or not there was collateral that

23  would support the premiums in the (event) that the premiums

24  were not paid?

25  A    No.

21

1  Q    When we began this case in February of '05, we had a

2  seminar, if you will, from both you and Mr. Raabe on the

3  mechanics of the incurred loss retrospectively rated program,

4  and there was some discussion as to the importance of the

5  total incurred value in the formulation of the retrospective

6  premium.  Do you recall that?

7  A    I -- I don't recall the seminar, to tell you the truth,

8  no, so --

9  Q    You don't recall testifying in Court the importance of a

10  total incured value and plugging it into the --

11  A    I thought you meant a seminar --

12  Q    I meant a seminar for the benefit of the Court.

13  A    No.  No.  I thought you menat a seminar that me and

14  Mr. Raabe attended somewhere.

15  Q    Remember we had a lesson from you and Mr. Raabe talking

16  about the mechanics and the incurred loss retro program?

17  A    Yes.

18  Q    And I think you indicated that total incurred values are

19  the values that would have the greatest significant impact on

20  what premium is earned because that is the value that's going

21  to fluctuate.  (MAYBE THIS IS THE ANSWER)  It is going to be

22  the variable part of the equation.

23  A    It would be the variable part of the equation.

24  Q    Now, in light of the fact that you have not reviewed the

25  actual claims, would it be fair to state that you are relying

22

1  on the fact that the total incurred values contained in the

2  loss running accurately reflect that which has been paid,

3  medical, that which has been paid out in indemnity, and that

4  which has been paid out in litigation expenses?

5  A    Yes and I think that that was all resolved through phase

6  one of the trial.

7  Q    Well, no that's a damage issue.  That is not phase one

8  of the trial.

9  A    I guess to clarify mile answer, that Royal's records as

10  far as their total incurreds are accepted.

11  Q    No, they have not.  We haven't even talked about the

12  total incurred values.

13        All that we have talked about is whether the claim

14   was handled correctly.  We never talked about how much was

15   actually paid out and whether that is accurately reflected in

16   the loss run.  That's a damage issue here.

17        MR. FOX:  I am going to object.  Is that a question

18   or a statement?

19        MR. GORDON:  I was just identifying that for the

20   witness since he seemed to be confused on the issue.

21        THE WITNESS:  My function here today, in response

22   to the order from phase one, was to offer my calculations for

23   the retrospective premiums.

24   Q    Right.  The calculations though are now predicate at

25   this time on the loss run of 2002 because you did not go into


                                23


1    the file to determine what was paid with in the file, you

2    accept that the information contained in the loss run is

3    accurate?

4    A    Well, I think loss runs would be accurate.  What else

5    would we go by?  If there were issues regarding the total

6    incurreds and what was paid, it's my understanding that those

7  would have been claim handling issues if claims were overpaid

8  that they would not be part of today's proceedings.

9  Q    Mr. Chimenti, I am not contending on the claims that

10  we've already discussed that there has been any over or

11  underpayment, what I am asking you is whether or not you have

12  reconciled the information on the loss run, we haven't

13  discussed with the Court the loss run.

14        Does the loss run fairly reflect that which was

15  actually paid in the case?  Do you know?

16  A    I would have to say yes.

17  Q    How do you draw that conclusion?

18  A    Because the loss runs are produced from the payments

19  that were made on the claim files.

20  Q    Somebody then takes the claims information inputs that

21  into data that becomes the loss run?

22  A    It's all done through computerization.

23  Q    Right?

24  A    Yes.

25  Q    Was it all done by computerization in 1974 and 1990 and

24

1  1994?

2  A   I would have to say yes.  I'm just going back through my

3  own personal experience.

4  Q   With Royal?

5  A   Not with Royal.  My own personal experience that the

6  companies that I worked for had a computer sustem that

7  recorded claim payments that.  That information was then used

8  to produce loss runs.

9  Q   You don't know in the instant case whether Royal had

10  such a computer or who inputted the information to devise the

11  loss run, do you?  Do you know?

12  A   Mr. Gordon, if you are trying to say that Royal didn't

13  have a computer back in 1980 --

14  Q   No.  I am just asking you.

15  A   I think we are way past reality here.

16  Q   I am asking you, do you know whether or not there was a

17  computer system that transferred paid on a particular file

18  into the loss runs that were used for you?

19  A   That would be the whole design of the computer system

20  stood that.

21  Q   Do you know whether Royal had that in place?

22  A   I would have to say yes from the records that I

23  reviewed, I would have to conclude that yes that they did.

24  Q    And so your assumption is that the information in the

25  2002 loss runs accurately depict that which was actually

                                25

1  petition out in these claims?

2  A    Yes.

3  Q    And the assumption is made because you think they would

4  have a computer and that the computer would accurately take

5  on that task, that's your assumption?

6  A    That is the way that insurance systems operate.

7  Q    Yes.  Mr. Chimenti, as part of -- you are the principal

8  of American Adjustments Services or Management Services?

9  A    American Risk Management Services, Incorporated.

10  Q    And part of your role, is it not, is to make sure that

11  insureds who have statistical information filed with the

12  bureau have their statistical information filed accurately?

13  A    That's correct.

14  Q    And you make substantial dollars in fees by identifying

15  mistakes reporting mistakes where insurance companies have

16  proceeded data to the rating bureau and the rating bureau

17  miscalculateds or misinterprets or is misinformed about the

18  value the total incurred value on a claim?

19  A    I would say that what I find is either error is played

20  in the calculations of the experienced modification factors

21  by the Bureau or that there may be more than one way of

22  reporting data or that the data reported was not accurate.

23  Q    So, there is, in your world, unreliability of the data

24  at times as being reported to the Bureau you identify those

25  errors that compels the Bureau to recalculate experienced

26

1  modification factors and then when that is done, there is a

2  return of premium which you share with the client?

3  A    True.

4  Q    And the data that you review typically comes from the

5  loss runs that are being provided by the insurer to the

6  Bureau?

7  A    Don't really come from the loss runs.  Those are, it's

8  data that's proceeded on than unit statistical reports to the

9  go data Bureau.

10  Q    So, what does the insurer do?  The insurer doesn't go

11  through every single file and review all the data to file out

12  the statistical reports they go to the loss runs, don't they?

13  A    Well it's information that would be captured from their

14  computer system.  It may be slightly different from the same

15  system that would produce loss runs for an insured.

16  A    But there are other areas that I find in my practice

17  where although the data may have been reported correct him at

18  one level to the rating bureau, in prior levels it play not

19  have been reported and she rately, which would then pose a

20  situation where I would then go to the insurer and the rating

21  Bureau and ask that those values be revised.

22  Q    But, the total incurred values that have been reported

23  to you one way or another may not accurately reflect what the

24  losses were and we need to modify those correctly?

25  A    Well, let me just give you a example this way I think

27

1  everyone would understand.

2        For instance, let's say that there was a claim that

3  was reported to the insurer that was denied but they

4  establish a $50,000 reserve for their exposure on that claim.

5  That $50,000.00 would be used in the calculation of the

6  experienced modification factor.  If this claim claim is

7    litigate did I do for two or three years, that $50,000 value

8    would be report had to the Bureau and used in the calculation

9    of the policyholders' experience rating.  {SPEPB} {RAEULGT}.

10        If that claim -- I wasn't done.

11  Q   Sorry?

12  A   {TPREUFRPBLGTSD} that claim is then found to be

13   non-compensable, what the carrier is to do is to file a

14   correction report where the rating Bureau.

15        Now, the value when it was originally report

16   testimony at $50,000 was correct and accurate.  The value

17   subsequently the following year at level two when it was

18   reported to the Rating Bureau at $50,000 was correct and

19   accurate.

20        Then the claim is found to be non-compensable at

21   level three the carrier reports zero.  But, they are also

22   record to go back and correct level one and two.  Not because

23   of the information was incorrect when it was report had, it's

24   just in, after the fact a claim was declared non-compensable

25   which according to the rating Bureau rules they now need to

28

1   go and correct that value to zero?

2   Q    But that's only a limited, that is only a limited basis

3   for remember filing statistical cards that is not what,

4   that's not all you do at the rating Bureau there are traps

5   metal errors all the time that you are looking for are there

6   not?

7   A    Let put it this way:  There are claim values that are

8   report had to the rating Bureau.

9   Q    Right.

10  A    That simply can't be challenged.

11  Q    But, there are so that are reported that you will

12  challenge?

13  A    Very few.  There has to be a reason within the reading

14  Bureau rules to remember voice those values otherwise

15  although I may not agree with the values personally, it

16  really doesn't matter because there is no rating Bureau rule

17  that would allow the Bureau to revise those values.

18  Q    Oh, yeah.  Typographical errors are, in fact, a basis --

19  in other words, when the Bureau is confronted with a

20  statistical card where there has been a typhographical error

21  where the carrier has misreported the value of the client,

22  the rating Bureau has a --

23  A    That's one of the three reasons, yes.  What I am saying

24  is, if you simply don't agree with the value that the carrier

25  reports there is no {RAOULGT}.


29


1  Q    I am not talking about agreeing with the value I am

2  talking about the miss reporting of values.  In fact that

3  occurs with frequency where there is a specific regulation

4  that allows the Bureau to accept a refiling of the

5  information based on the real value of the claim that was

6  actually paid rather than what was report had, true?

7  A    If there was a clerical error made, yes.

8  Q    And that's one of the things that you would look for,

9  clerical errors?

10  A    It not a big area of errors {TPHAOEUPBDZ}.

11  Q    But, they do occur?  They created a regulation for it,

12  didn't they?

13  A    Well, I'll tell you what.  I am not going to say that

14  they don't occur because, I mean, something could latch where

15  a value is miss reported for whatever reason.

16  Q    Do you have the 2002 loss runs available?

17  A   I don't believe so.

18  Q    But, you would agree with me that if also, if the

19  information contained on the loss runs creates some

20  uncertainties as to whether errors were made, that it would

21  undermine your ability to render an opinion on premiums

22  within a reasonable degree of medical certainty that is to

23  say garbage in, garbage out?

24  A   If there was any evidence that it was a garbage in

25  garbage out system, then I would be concerned about that.

30

1        But, in my review of the records, I did not find

2  that {KHEFRPB}.

3  Q   But, you didn't look at the files or read carefully the

4  decision to say determine whether or not the values contained

5  in the loss runs could be justified you didn't do that yet

6  have you?

7  A   I didn't feel that was necessary, no.

8        MR. GORDON:  Your Honor, could I bring up the

9  easel?  ({R} he said medical opinion {STPHFRPLTD} put dashes

10  after one question.

11  Q   Mr. Chimenti, the reason I come up with this is that I

12  had reviewed your deposition testimony and it was among the

13  thing that you at least I thought you did, was you reviewed

14  statistical data with the Bureau to see whether those reports

15  were accurate.

16      Nad it kind of got me thinking and I would like to

17  talk to you about a couple of the claims that I just reviewed

18  last night?

19      MR. FOX:  Your Honor, I think we are going far

20  afailed if we are address go claims and claims handling

21  issues at this point.

22      MR. GORDON:  Your Honor, it's what we were

23  charged --

24      THE COURT:  I guess it it depends on what claims we

25  are talking about.  What claims are we talking about,

31

1  Mr. Gordon?

2      MR. GORDON:  Augustine one.

3      MR. GORDON:  What is at issue is whether or not

4  premiums -- this is an issues answer to whether or not, there

5  is testimony here that he used the 2002 loss run and assumed

6  they were accurate and they accurately reflect that which was

7  paid and what I would like to do is to go over your decision

8  in this case and figure out how he can regular conning so I

9  am the figures in the loss runs.

10        THE COURT:  Okay.  How many of these cases do you

11  intend to review?

12        MR. GORDON:  I only had time to look at three of

13  them Your Honor one as we were working today during

14  Mr. Weber's testimony.

15        So, I am going to get three for example they are

16  the first three that we came up.

17        THE COURT:  Well, go ahead, Mr. Gordon.

18  Q    There has been a judicial determination that August was

19  handled prudently Mr. Chimenti.  This is a case that was

20  close understand 1996 and it's a case where Mr. Augustine

21  received benefits from November 17, 1994 through September 9,

22  1996.  That's a period, I think you will agree, and if I put

23  it up on the board, let me see if I can get a felt tip --

24  (and you can is August sustain {STPHFRPLT} I think the word I

25  {HREUFTSD} out was and they created a rule for that or

32

1  something (I don't know.  If you can it.  {STPHFRPLTD} and

2  that's why they created the rule or something like that.  (?

3        It's a period of less than -- can the Court see

4  this?  It's a period of less than two years and actually last

5  night we contacted the Bureau ourselves that is ninety-four

6  and one-sevenths weeks.  Would that be about right?

7        Would you dispute that if I told you it was

8  ninety-four and one-seventh week?

9  A   I guess we will accept that for illustration purposes.

10  Q   And I am going to tell that you base base based on

11  documents that were submitted in this case by Royal, that

12  there is an average week live wage here that would derive a

13  benefit rate of 4 '87 point thirty-two?

14        MR. FOX:  Counsel is trying to testify now, Your

15  Honor.

16        MR. GORDON:  I will show him the document.  These

17  are --

18        MR. FOX:  Can I have a copy, please?

19        MR. GORDON:  Sure.

20        MR. GORDON:  And actually, Your Honor, your

21  decision indicated that the claimant was disabled on that day

22  and released to his regular employment and executed a

23  suspension in September of '96.  And I think, just so that I

24  can show the witness, can you determine the weekly comp rate

25  there, is that correct, at 487.32.

33

1  A    487.32.

2  Q    Okay.  And I tell you that I did the math and and if we

3  multiply that by 487.32, I think I did the math, but I don't

4  see it in front of me right now.  Oh, 45,000?

5       THE COURT:  So, you didn't do the math.  He did the

6  math.

7       MR. GORDON:  Actually, I did it, but then he took

8  my script and I did a typed copy for me.

9       THE COURT:  All right.

10  Q   You see that?

11  A   Yes, sir.

12  Q   And I realize that you don't have a calculator, I can

13  give it to you if you want to check on that, but I think

14  that --

15       THE COURT:  That's okay.

16       MR. GORDON:  Okay.

17  Q    The 2000 -- I am going to show you a copy of the 2002

18  loss run.

19        Based on your assumptions you would expect that the

20  indemnity would be 45,934.18, would you not?

21  A    I would have to have the claim file to be able to give

22  aanswer to that.

23  Q    Really?  The Judge's decision in this case, this Judge's

24  decision all indicated that this was what ultimately was paid

25  out in the case.  If, in fact, if, in fact, the retro, the

34

1  excuse me, the 2002 loss run is accurate reflect thanks which

2  should have been paid to the claimant this was not a

3  contested claim it was paid, you would expect to see a figure

4  of 45,934 in the loss run received, wouldn't you?

5        MR. FOX:  Your Honor, these questions are more

6  appropriate for Mr. Weber, not this witness.  He testified he

7  hasn't reviewed the claims files.

8        MR. GORDON:  Your Honor, he is calculating premium

9  he is using it on a document.  Okay?

10       THE COURT:  Go ahead.

11  Q   I'm going to show you Bates stamp are '00 '00 on seven

12  proceeded by Royal which is the 2002 loss run.  And I am

13  going to show you Augustine, and would you tell the Court

14  what the indemnity paid on that closed file was?

15      MR. FOX:  Company leave a copy, please?

16  Q   Do you see it?

17  A   Yes.

18  Q   It's a hundred and $67,934, is that right?

19  A   That's correct.

20  Q   Can you reconcile that with the Court's decision?

21  A   Not sitting here, no.  I mean, that would take some

22  analysis.

23  Q   Well, you would have to look at the claim file, wouldn't

24  you?

25  A   Well, let put it his way:


                                35


1       I'm also looking at there were expenses paid of {S}

2   8 thousand ones hundred {TPEUFRPTD} $4.00.  I don't know what

3   that was for.  There was a recovery of $3,659.  I don't know

4   what that was for.

5   Q   Right.  But, the indemnity certainly isn't had a

file:///A|/ROYAL-2.TXT

6  thousand 900 thirty-four dollars sit?

7  A   I am only going by what you are giving me.

8  Q   I am giving you what the Court basically what Webber

9  testified to that the Court indicated that the claim was paid

10  out until Mr. Augustine was able to return back to work.  It

11  was a closed file and paid ninety-four and seventh weeks of

12  benefits and 45 thousand '89 thirty-four eighteen.  I just

13  looked at it last night.

14  A   I guess for what you are putting there, and what is

15  here, there is a different for instance although I am not in

16  a position to explain why there number would be different

17  from whatever number you have.

18  Q   I understand that.  Okay.  There is some question I mean

19  you need to regular conning soil this don't you?

20  A   If you are going to ask me to regular conning soil it

21  thing I would have to reconcile it.

22  Q   I'm sorry.

23  A   If you are asking me to reconcile --

24  Q   You can't reconcile.  You haven't seen the claim file,

25  have you?

36

1   A    No.  What, I am saying is, I can't reconcile without

2   having information.

3   Q    Another case that we talked about was the Younker case.

4   And it was interesting in preparing for today, we had

5   commented and the Court the commented on the fact that there,

6   Younker was an issue with regard to how expenses were

7   allocated and my recollection is Mr. Chimenti, is that you

8   testified that, that to do your retro calculations, you

9   incorporated litigation expenses, is that true, as part of

10  your retro calculation?

11  A    No.

12  Q    The allocated loss expenses is not a part of your retro?

13  A    No.  Just the incurred loss.

14  Q    The medical and indemnity and not the expenses?

15  A    Not the expenses no.

16  Q    You didn't include any of the expenses?

17  A    No.

18  Q    One of the things that was confusing for us, I wonder if

19  you saw this because it was on the 2002 loss run.

20       MR. GORDON:  Can you see the claim for Younker?  I

21  think that is the second claim.

22        And can we give Mr. Fox a copy?

23  Q    In 2002, there was a reserve on the Charles Younker

24  case.  This was a silicate case, is that right, occupational

25  disease case?

                                37

1  A    Yes.  From the description, that's what it would sound

2  like to me.

3  Q    Remarkably, although we didn't ask for it, Mr. Fox,

4  among the Younker documents provided us are 01055, an exhibit

5  which I have marked for identification purposes as AU, a

6  decision on the Younker case that was issued October 15,

7  1997.  Could you review that, please?

8        Mr. Chimenti, I trust you're done?

9  A    I am completed.

10  Q    Now, would you agree that the loss run reflect as 1995

11  loss that shows that there are payments foreign denial in it

12  and I think some payments for medical I don't have the loss

13  run in front of me I think you have it, and outstanding

14  reserves?

15  A    There were no payments for indemnity.  $446.00 paid in

16   medical and a reserve of 48,905.

17   Q    And that's a 2002 loss run?

18   A    That's correct.

19   Q    And would you tell the Court what hand in 1997 to that

20   claim?

21   A    The --

22          MR. FOX:  I am going to object, just for the

23   record.  It's beyond the witness -- way beyond the scope of

24   his testimony in this case.

25          THE COURT:  All right.  Overruled, Mr. Fox.


                              38


1           THE WITNESS:  The claim was dismissed by the

2   worker's compensation judge.

3   Q    And if you were consulting the insured at that time,

4   would you have gone to the carrier to make sure that the

5   reserves goes were adjusted appropriately and that

6   statistical files, statistical card were filed with the

7   Bureau {TROE} reflect that the company had prevailed?

8   A    If it was warranted.  I mean, I am not sure if there was

9   any other claim associated with this or if this was his only

10   claim that he was presenting.

11  Q    That was in 1995.  Silicosis claim or silicate exposure

12  claim that resulted in sinus surgery, is that right?

13  A    That's what the --

14       MR. FOX:  Your Honor, I would just like to make a

15  further objection.  This isn't one of the files that was at

16  issue in the case, so we are not even dealing with the file

17  that was within the scope that we agreed to discuss.

18       THE COURT:  It could be a damage question.  That is

19  the issue here.

20  BY MR. GORDON:

21  Q    So, in any event, you can't reconcile this decision with

22  the loss run, can you?

23  A    Well, I don't have benefit of the file to be able to til

24  why they may have kept the reserve on this claim file.

25  A    I guess the answer to that is, I don't know why they

39

1  would have done that.

2  Q    Well, and just for your identification it does say that

3  the claimant conceded, the claimant's attorney that, they

4  couldn't make a causal connection and they withdraw the claim

5   didn't three they didn't withdraw it they took the Judge's

6   decision on it?

7        THE COURT:  Does a reserve, in any way, impact the

8   retrospective premium that's owed?

9        MR. GORDON:  Oh, yes.  And actually the point I am

10  trying to make here, Your Honor, is that if you are using

11  loss runs here,.

12       THE COURT:  I understand your point.

13       MR. GORDON:  If you are using loss runs, they

14  better be accurate.

15       THE COURT:  I understand.

16  Q    And what you really didn't need is you did need to

17  review that claim file is that right?

18  A    To answer your question or to do the retro calculation.

19  Q    Well, to do the retro, to reconcile this claim, you have

20  to review the claim file, the claim file {TKPWOEUGS} to have

21  more accurate information than is that loss run, is it not?

22  A    Well, let's put it this way:

23        If I was Latrobe Construction or their risk

24  manager --

25  Q    Well --

1           MR. GORDON:  Well, Your Honor, could I ask that

2    witness be allowed to finish his answer?

3           THE COURT:  Yes, you can finish.

4           THE WITNESS:  Excuse me.  Can I answer the

5    question?  If I had a question regarding a reserves on a

6    claim that there was no further suppose sure on?  Right.  And

7    I am the risk manage for Latrobe Construction, what I would

8    then do is call the carrier and discuss that with him and

9    find out why that reserve is still there.  If they have a sat

10   fact tore answer then the reserve would stand.

11          If they say it's an oversight on our part, we are

12   going to close it, then they would do that and then Latrobe

13   consistent would not get charged for that portion of the

14   incurred loss.  I will change it and maybe it will help the

15   Judge.

16   Q    That incurred loss is five years after the case was

17   dismissed because claimant's attorney conceded that he could

18   not, or she could not make out a prima facie case of

19   entitlement?

20   A    And that's why I would call the carrier and say can you

21  please explain to me why there is still a 4 $8,000.00 reserve

22  on this file.

23  Q    Okay.  In any event, your calculations took into

24  consideration the reserve on this case?

25  A    In 2002 it would have.  I would have to go look at the

41

1  current loss runs to see in that has since been removed

2  because fit has been removed, then they would have received

3  credit for that.

4  Q    But that is not part of your $851,000 assessment today?

5  A    If it was on the 2002 loss run, chances are it was.

6  Q    Included in your 850 --

7  A    Unless he was in a job classification that was not

8  subject to the (retrospective rating.)  Then none of that

9  would have been included in the retro calculation even when I

10  did them in 2003?

11  Q    In fact, some of the employees are not subject to the

12  retrospective calculation, is that right?

13  A    That's correct.

14  Q    And did you go through each one of the employees of the

15  800 claims to determine which ones were included that should

16  not have been included?

17  A   Yes.

18  Q   You did?

19  A   Yes.

20  Q   All eight hundred claims?

21  A   What I did is I went through every page of every loss

22  run from 1980 through 1995 and I identified those claims.

23  Some of them were already identified.  The ones that were not

24  if it appeared to be a claim that was in a classification

25  that should not be included, then I followed up on that.

42

1      MR. GORDON:  Let me have -- let me have the Freed

2  claim?

3  Q   The Freed claim is --

4      MR. GORDON:  Oh, and I would like to offer into

5  into the record.  (

6

7      (He) said let me answer because I think it will

8  help the judge if I do (I left that part out where the last

9  objection was or something about can I leave an answer.

10

11          MR. GORDON:  Your Honor, at this time, I would

12  offer into the record a the a you and a very.

13          MR. FOX:  No objection, Your Honor.

14          THE COURT:  The off first are admitted.

15          MR. GORDON:  And I think we did -- did we

16  previously move this.

17          Your Honor, I don't know if the Court has accepted

18  AS, which is the Royal and Sunalliance letter.

19          THE COURT:  Yes.  I think that Mr. Fox withdrew his

20  objection.

21          MR. GORDON:  Oh, okay.

22          {STPHFRPLTD} watch that one question way back there

23  {STPHFRPLTD} something about an statistical scared.

24  BY MR. GORDON:

25  Q   This morning we had some discussions on the Freed claim.


                              43


1  And I am going to show you what has been identified as {R}

2  '00 '03 five {STPHFRPBLGTS} {R} '00 '03 five, it looks like,

3  and this is the loss run, and let me identify this as an

4  Exhibit A.

5        THE COURT:  Dave, let me see that loss run, please?

6   (Off the record discussion.)

7   BY MR. GORDON:

8   Q    And Freed is the second from the bottom.  And I would

9   ask you if, in looking at that, you can determine for us what

10  the amount of the indemnity was paid on Freed?

11  A    The indemnity paid was $49,244.

12  Q    What was it?  49,000?

13  A    Two forty-four.

14  Q    Now, you've indicated that expense is not included in

15  the retro calculation, is that right?

16  A    That's correct.

17  Q    In the loss run, do they show the return from the

18  supersedeas fund going into the expense column?

19  A    There is a recoverly indicated of $28,873, if my eyes

20  are accurate.  These numbers are kind of small.

21  Q    Recovery in the expense?

22  A    Well, it is not an expense.  It's a recovery --

23  Q    Yeah.  But, it put under the expense column?

24  A    It's put under the recovery column.

25  Q    Doesn't say expense there?

1  A    No.  It says recovery on my page.  The expenses paid

2  would be the top number.  The recovered would be the second

3  number.

4  Q    Okay.  All right.

5  A    So, that's under the recovered, not the expense.

6  Q    Okay.  Now, we've already had testimony, so we have just

7  if we make another page here arrange this is an exhibit ear

8  size I tried this morning so let's see if I can get there

9  correct right now, 49 two forty-four was actually paid.

10  There was a recovery of $28,870, does it say three or five?

11  Q    Three.  And when we subtract the two, we have $20,371.

12  That is a net pay, is that right?

13  A    That would be correct.

14  Q    Now, we've already had a concession by by Mr. Weber that

15  that 3,855.24 should have been deducted from this amount

16  because of the delay in the supersedeas fund's application

17  and and the in some form of penalty.  And that figure he gave

18  us was 3,855.24.

19        And if I subtract that then what is alleged that

20  should have been peeled and which would have then fairly been

21   reflected on the loss run is $16,515.76.

22          Now, if you review the Freed decision the total of

23   67 and one-sevenths weeks was paid, and I can do the math for

24   you, but actually that comes to $15,946.43.

25          If this is, in fact, the net that's written on the

                                45

1   statistical information upon which you rely on the loss run

2   of 2002, and this is the deductions by virtue of the error,

3   then theoretically this figure here has to be 67 and

4   one-seventh's weeks of workers' compensation benefits, but it

5   is not.  And they paid out 67 and one-seventh's weeks of

6   benefits.

7          Without looking at the claim file, can you

8   reconcile that?

9   A    I can't reconcile that.  But, what I can tell you is

10   that the Freed claim along with the Younker's claim that we

11   just discussed (a minute ago) were all in the '89 2 to '94

12   retro period that was maxed out.

13   Q    But that is not the point.

14   A    My point being --

15          THE COURT:  Whoa.  Whoa.  Whoa.  Whoa.  Just a

16  second go ahead.  Continue.

17          THE WITNESS:  My point being is, you would have to

18  reduce the incurred losses by over $450,000 before the

19  retrospective premium.

20  Q   I agree.

21  A   Goes below the maximum.

22  Q   I agree.  But, the point here is that we have looked at

23  just three claims and the data upon which you are relying on

24  over eight hundred claims we just looked at the first three,

25  and you can't reconcile what was payable in those claims

46

1  versus what your loss run slows?

2          MR. FOX:  I am going to object.  Counsel is elected

3  three claims and the witness hasn't had the benefit to review

4  the files.

5          THE COURT:  It's a weight issue.

6  Q   So, you doln't know whether the data in your loss run is

7  accurate do you?

8  A   I guess I don't know if the figures that you are using

9  are inclusive of everything that should be included or not.

10   In other words, there might have been interest due on an

11   awards or something of that nature.

12   Q    You can't --

13   A    There might have been some other allowable expenses that

14   would make us that difference.

15        What I am saying is from what you are providing to

16   me I can't tell you what the answer is or whether their

17   number is correct okay your number is correct.  I can only go

18   by their {-P} number ever numbers when I calculate the

19   retrospective premium and I don't have any reason to believe

20   that their numbers are not accurate.

21   Q    Other than the fact that you slow a hundred and 677

22   thousand dollars were paid on a claim of disability for list

23   than two years?

24   A    Again, I don't have the benefit of going --

25   Q    I can only tell you, Mr. Chimenti, what was provided to

47

1   me.  I can't tell you, I mean, I can only rely on documents

2   that Royal provided me and which the experts addressed.  I

3   don't know that there are other documents out there.  They

4   have not been provided so I can't help you there either.

5   A   Right.  And this goes back to my point that I just made

6   a few minutes ago that if Latrobe had any questions

7   whatsoever about the values that were record order their loss

8   runs, there were plenty of people at Royal that were in

9   contact with the principals at Latrobe Construction where

10  they could have gone over these numbers am this was an annual

11  exercise that they did.  And if there were questions about

12  values on loss runs, they could have addressed those and got

13  even their answers which they may have done.  I don't know

14  that that wasn't done.

15       MR. GORDON:  Your Honor, I would offer a with which

16  is just the loss run data for the Freed claim.

17       MR. FOX:  No objection, Your Honor.

18       THE COURT:  All right.  The offer is admitted.

19

20       {STPHFRPLTD} way back in that question that I left

21  off the end or supervise an interruption they were talking

22  about a statistical card, try to fix it up.

23  Q   Do you know whether medical expenses in any of the

24  (actual) claims correlate with the medical expenses that are

25  shown on the 2002 summary or loss run that you ever?

Chimenti - Redirect              48

1  A    Could you repeat that question?

2  Q    Do you know whether or not are whether medical expenses

3  actually incurred on the twenty-one claims received correlate

4  to the medical expenses that were that revealing the 2002

5  loss run?

6  A    I did not go through the medical expense goes that were

7  paid but again going back to my privilege answer regarding

8  insurance company operations, I would have to say that they

9  would correlate.

10      MR. GORDON:  I don't have any other questions, Your

11  Honor.

12      THE COURT:  All right.  We'll take about a

13  ten-minimum recess.

14  (Court recessed at 2:25 p.m.):

15  (Court reconvened at 3:15 p.m.)

16      THE COURT:  Okay, Mr. Fox.

17          REDIRECT EXAMINATION

18  BY MR. FOX:

19  Q    Mr. Chimenti, you testified that you reviewed boxes and

20  boxes of documents in doing your analysis on the amount of

21  premium due.

22       Could you describe, just so the record is clear,

23  what documents you reviewed?

24  A   There were underwriting files, retrospective rating

25  adjustments, claim files.  The underwriting files contained

                    Chimenti - Redirect            49

1  some of the policy information, contained a correspondence

2  between the underwriter and the broker.  There was a wealth

3  this of information.  It was the --

4       MR. GORDON:  Your Honor, if I might, we have

5  requested the underwriting files in this case in discovery

6  and we were told that they did not exist.

7       THE COURT:  Okay.

8       MR. FOX:  Your Honor,.

9       THE COURT:  Is this an objection?

10       MR. GORDON:  It is an objection.

11       THE COURT:  Asking what?

12       MR. GORDON:  Well, any testimony that he is going

13  to offer right now based on an underwriting file that we

14  asked --

15      THE COURT:  We haven't gotten there yet.  He just

16   said he saw a couple.  So, if you want to raise an objection

17   with respect to a separate question in which he refers to a

18   claim file, I think that would be the appropriate to

19   interject the objection.

20      Continue, Mr. Fox.

21   Q   Yes.  Mr. Chimenti, you testified that you reviewed

22   retro adjustment documents?

23   A   Yes.

24   Q   Can you describe those and what they consistent consist

25   of?

Chimenti - Redirect            50

1   A   The retro documents that I reviewed were from 1980

2   through 1995 and they were the historical records from the

3   very inception of the retro.  In other words, take the 1980

4   retro, for instance, there was information there where I was

5   able to calculate the standard premium, then a record of the

6   first retro adjustment, a record of the second retro

7   adjustment, the third, fourth, fifth, all the way through the

8   twentieth adjustment, so to speak, to bring it up to current.

9  Q    Now, how were those documents general rate Ted those

10  retro just.  Documents?

11  A    Those were generated by Royal insurance, they are

12  records that would have been sent to the insured every year

13  when their retro adjustment was calculated.  They would

14  include the retro adjustment, worksheets that show exactly

15  how the premium was calculated, and also the supporting loss

16  runs that would be attached to the retrospective rating work

17  sheets.

18  Q    Were they business records of the company?

19        MR. GORDON:  Objection, Your Honor.  He is not

20  qualified to talk about what the business records of the

21  company are.

22        THE COURT:  Overruled.

23        THE WITNESS:  Yes.

24  Q    And what purpose did you review the retro just.  Sheets?

25  A    What I December I went back and calculated each of the

                    Chimenti - Redirect            51

1  retrospective rating periods star are starting from initial

2  adjustment to the current year for each of the retrospective

3  policy periods.

4    A    Just to make sure that the amounts that Royal had on

5    their documents were correct.

6    Q    What was the volume of the documents that you reviewed?

7        MR. GORDON:  Judge, I would object on relevancy and

8    also he says he reviewed many boxes.  So, what's the

9    relevance?

10       THE COURT:  All right.  Overruled.

11       THE WITNESS:  It was probably four boxes of

12    documents.  That would be just forth retrospective rating

13    information.

14    Q    Were there any documents that you wanted to review or

15    had asked to review that were not supplied to you?

16    A    No.

17    Q    Were the types of documents that you reviewed that you

18    describe documents that the types of documents that you would

19    routinely review as an expert in determining premium amounts

20    due?

21    A    Yes.

22    Q    You testified that you reviewed correspondence files.

23    A    Yes.

24    Q    Did that include correspondence from Mr. Gordon and his

25   law firm, that is correct, is that correct?

                    Chimenti - Redirect              52

1   A    There were some letters that were.

2        MR. GORDON:  Your Honor, this goes outside the

3   scope of both direct and cross.

4        THE COURT:  What about the letters, Mr. Fox?  What

5   are we getting into here?

6        MR. FOX:  Just the issue has been raised for the

7   first time today that there may have been some amount of

8   premium that had been of paid despite the fact that's never

9   be alleged before there is no documentation in the record.

10        THE COURT:  Well, we can go on and on about rooms

11   full of documents that he has reviewed.

12        I think perhaps you can restricted your questions

13   to things that he may have reviewed that relate to some of

14   the issues that were raised by Mr. Gordon during the course

15   of his cross-examination of Mr. Chimenti.

16        The letters might be one example of something that

17   have very little bearing whatsoever on his cross-examination.

18        MR. GORDON:  Your Honor if I might also, the

19   counterclaim there has been an alleged misrepresentation of

20   the premium.

21         THE COURT:  Certainly we covered that to some

22   extent in the liability phase of the case.

23         MR. GORDON:  But it has been raised.

24         THE COURT:  It's be raised there is no question

25   about it it's be raised, but I think that issue was covered

                    Chimenti - Redirect              53

1    what during the testimony of your expert, I forget her name

2    at this point.

3          MR. FOX:  LuAnn Haley.

4          THE COURT:  LuAnn Haley.

5          MR. GORDON:  In terms of how much premium was paid,

6    Your Honor?

7          THE COURT:  Well, there was some issue with respect

8    I think to, as I recall reading the transcript, and there was

9    some issue that was raised during the course of her testimony

10   and I don't recall with particularity about {*F} what that

11   was at this particular point.

12         But, I realize it was raised in the counterclaim

13   and it wasn't pursued too vigorously certainly during the

14  liability as specs of the case.

15      MR. GORDON:  Your Honor, how much money is due or

16  return --

17      THE COURT:  It is a liability issue I understand.

18  I understand why you are doing it at this point.  You are

19  raising these issues at this point because it relates to a

20  damage question.

21      MR. GORDON:  Right.

22      THE COURT:  I understand that.  What I am trying to

23  do is cut through this because we are going able are going to

24  be able, you can conduct your redirect examination of

25  Mr. Chimenti with respect to the documents so that he may


                  Chimenti - Redirect           54


1  have reviewed that reasonably raised by Mr. Gordon during

2  list cross-examination of Mr. Chimenti.

3      So, with that guideline in mind, please continue.

4  Kin (that were {ROEUPBLD} Ohio raise {STKPWHRADZ}.

5      MR. GORDON:  Sure.

6  BY MR. FOX:

7  Q   You are considering all the documents you reviewed

8  Mr. Chimenti including the reports of Mr. Gordon some expert,

9  Mr. Raabe, did any of those documents support in any claim

10  that Latrobe had overpaid on its premium?

11  A    I found no evidence whatsoever in any of the documents

12  that I reviewed that there was an overpayment of premium.

13  Q    Now, Mr. Raabe, in his report dated July 31st, 2003,

14  stated documents that were made available provided

15  (sufficient) information to calculate premiums I believe to

16  be reasonable and true.

17       Did you review that language from the report?

18       MR. GORDON:  Your Honor, that has been previously

19  asked and answered and it doesn't relate to any of the

20  cross-examination.

21       THE COURT:  All right.  Overruled.

22       THE WITNESS:  Yes, I reviewed that in his report.

23  Q    And did Mr. Raabe make any reference anywhere in his

24  report that suggest -- suggesting that premiums had been

25  overpaid by Latrobe?

                   Chimenti - Redirect          55


1  A    No, not at all.

2       {STPHRFPLTD} watch the the last ruling, (watch what

3   {TKPWORLDZ} open said, also, something about something being

4   {TOUFPLD} upon by.

5   Q    Now, you testified regarding your interest calculation

6   earlier and I believe that Mr. Gordon inferred that you

7   calculate interest in a way that I don't three is correct but

8   not to quibble with Mr. Gordon, can you just describe for me

9   specifically how you did the interest calculation?

10   A    What I did, Mr. Gordon had assumed what I did was to

11   take the $851,000 figure from my 2003 report and simply

12   calculate interest on that amount from 1996 coming forward.

13        What I actually did was, I summed up the criticisms

14   and premium charges for the retrospective adjustment in 1996,

15   and I came up with a retro premium due of $926,998.  And then

16   I caculated the six percent interest for one year on that

17   amount, which came out to $55,619.88.

18        Then I took the cumulative total of the retro

19   premiums for the '97 adjustment which was $785,415, again,

20   calculating the six percent on that amount.

21        I did that for the '98, '99, '00, '01, '02, '03,

22   '04 and '05 policy periods for six percent for one year.

23        And then I took the February, '06, retro adjustment

24   and calculated the interest at six percent for three months.

25   And the total of the interest at six percent simple interest

Chimenti - Redirect                56

1   from February 1st 1996 to May 1st, 2006, is $539,003.43.

2   Q    And what does that make the total claim?

3   A    The -- excuse me.  The retrospective premiums due would

4   be $943,670 to date.

5        The interest would be $530,003.  And the total

6   would be $1,473,673.

7   Q    Now, how -- when you calculated the interest, how did

8   you determine when the interest started to run again?

9   A    There was a deposit planned letter that was sent on

10   January 29th, 1996, and I used that date as the start date.

11   Actually I used February 1st just for simplicity sake rather

12   than January 29th.

13   Q    I would like to show you what's been marked as Exhibit

14   200-A.  It is actually a global exhibit?

15        MR. GORDON:  Do you have an extra one?

16   Q    I would ask you if you could identify the demand letter

17   that you referred to?

18   A    It would be about the sixth page through the sit of

19  documents.  It's a letter dated January 29th, 1996, from

20  Royal, Richard Fuller, the underwriting manager, in which he

21  asked for $546,709, which was owed on the adjustment, and the

22  $281,000 that was owed from the previous year.

23  Q    And you started the interest rate calculation from date

24  forward?

25  A    Within two days.  I used February 1st, 1996.


                Chimenti - Recross            57


1           MR. FOX:  I would move to introduce Exhibit 200-A

2  into evidence.

3           MR. GORDON:  Your Honor, I would object on hearsay

4  grounds.

5           THE COURT:  All right.  The offer is admitted.

6           MR. FOX:  I have no further questions of

7  Mr. Chimenti.

8           MR. GORDON:  Just two.

9                REDIRECT EXAMINATION

10  BY MR. GORDON:

11  Q    The amount in interest is predicated on 2006, is that

12  right?

13           In other words, you didn't, the interest

14  calculation that you provided to the Court along with the

15  amount of principal is predicated on 2006 loss runs and not

16  on 2002?

17  A    They were -- the interest from the 2006 loss runs would

18  only be interest for six months, from February 1st until to

19  date.

20  Q    But the principal you used in the calculation was what

21  you claimed to be due as of 2006 based on the 2006 loss runs?

22  Q    You used the $900,000, didn't you?

23  A    No.  What I used was --

24  Q    You didn't use the 851.

25  A    No, I did not use the 851.


                    Chimenti - Recross                58


1         What I did use was the retrospective premium that

2   was due on February 1st, 1996, based on the February 1st,

3   1996 loss runs.

4   Q    Right.  But, you valued the claims as of 2006?

5   A    No.  They were valued as of 1996.

6   Q    That is it?

7   A    That's it.

8   Q   So, your testimony is, it was $900,000 due based on what

9   the outstanding values were in 1996?

10  A   No.  The interest.

11  Q   I am not talking about the interest --

12  A   Well, we were just talking about the interest.

13  Q   But, the principal you used was more than 851,000, so

14  you were using the 2006 loss runs, weren't you?

15  A   No.

16  Q   No?

17  A   The principal amounts in the interest calculations is

18  based on the cumulative retrospective premiums for the years

19  1980 through 1995 valued as of February 1st, 1996 for one

20  year.  Then I used the loss runs valued as of February 1st,

21  1997.

22  Q   Let's cut to the chase?

23  A   I am getting to the chase.

24      MR. FOX:  I object, Judge.

25      MR. GORDON:  I know each year.


                    Chimenti - Recross            59


1   Q   The chase is did you use any loss runs beyond 2002.

2       THE COURT:  Just answer that question, please.  Can

3  you answer that question with a yes or no?

4         THE WITNESS:  You had to in order to calculate the

5  retrospective premiums that were due in 2003, four, five and

6  six.

7         MR. GORDON:  Your Honor, we have never gotten that

8  documentation, nor have we gotten claims information on that

9  despite the fact that it's also been an issue.  So, it's

10  objected to.

11        THE COURT:  Pardon me?

12        MR. GORDON:  It's objected to.

13        THE COURT:  Well, the objection is overruled.

14  Q   You assumed that Mr. Raabe when he was doing the

15  calculations assumed that which was, -- was taking

16  information that you yours had these are the adjustments with

17  the loss runs attached, is that right?

18  A   I didn't assume anything.  What Mr. Raabe did in his

19  report.  Mr. Raabe relied upon the records, what he states in

20  his report here, that the documents that remain available

21  provided sufficient information to calculate premiums I

22  believe to be reasonable and true.  That is what he relied

23  upon.  That's what he states in his report.

24  Q    Right.

25  A    I am not going to assume anything that he put in his

Chimenti - Recross                60

1  report I can only tell you what his report says.

2  Q    You don't know what he was relying?

3  A    He was relying on the information provided to him to

4  calculate the premiums which he believed to be reasonable and

5  true.

6  Q    And those are the loss runs?  Do you know?  Do you know

7  what he was relying on?

8  A    He relied upon whatever information he felt was

9  sufficient for him to calculate the retrospective premiums?

10  Q    And as did you and that was the loss runs?

11  A    I relied on the loss runs and write had questions about

12  the loss runs I asked questions.

13  Q    You didn't rely at all on Raabe's report, did you?

14  A    No.

15  Q    He didn't provide you with anything that you didn't

16  have?

17  A    I don't think -- know didn't provide me with anything.

18  Q    Do you know if he had any documentation that you yours

19  didn't have?

20  A    He may have had documentation from Latrobe Construction

21  that I didn't have.

22  Q    But, you don't know?

23  A    I would only assume that I probably did because his

24  report has premium amounts that Latrobe paid, so I would have

25  to say he probably had that available to him, which I did not

61

1  have available -- I didn't have Latrobe Construction's

2  records available to me.  I'm sure he, as their expert, had

3  their records available to him.

4  Q    Do you know that?  Do you know that, Mr. Chimenti?  Do

5  you know?  Did you talk to him?

6  A    I didn't talk to him.  What I am saying is, he has

7  information in his report that I don't have in my report

8  because it wasn't available to me, which would only leave it

9  that the only place where (I) would think to logically

10  conclude he had gotten it from.

11  Q    Doesn't he indicate in his report where he got his

12  information from?  Doesn't it indicate that this is all based

13  on information provided by Royal?

14  A    I am not sure that that's what that says.

15        MR. GORDON:  No further questions, Your Honor.

16        THE COURT:  All right.  Thank you.  Mr. Chimenti

17  you may step down.

18        THE WITNESS:  Thank you, Your Honor.

19        MR. FOX:  Your Honor, I believe we just have one

20  further witness Diane Leger.  And what I would like to do is

21  put her on first thing tomorrow morning and I intend to

22  complete her very quickly.

23        I think that if we do that we can address some of

24  the issues that were raised for the first time on cross today

25  with regard to some of these calculations that were done.  I

62

1  am hopeful at at at lesion that we can address that.

2        THE COURT:  Any problem with that, Mr. Gordon?

3  From that?  It's a quarter to four.  Would you like to end

4  today or continue?

5        MR. GORDON:  I would like to continue.

6        THE COURT:  How many witnesses do you have?

7        MR. GORDON:  I may have one.  I may have none.

8          THE COURT:  Okay.  How long will it take for the

9   next witness?

10          MR. FOX:  Dianne Leger is my only remaining

11   witness.

12          THE COURT:  How long will it take?

13          MR. FOX:  Probably fifteen minutes tomorrow

14   morning.

15          THE COURT:  Cross-examination, Mr. Gordon?

16          MR. GORDON:  Maybe -- I don't know what.  Maybe ten

17   minutes.

18          THE COURT:  It quarter after four.  Let's do it

19   now.

20          MR. FOX:  Your Honor, my point is, we need to do

21   some research on the issues that were raised for the first

22   time with regard to these loss runs and I --

23          THE COURT:  What type of research?

24          MR. FOX:  There may be explanations that there was

25   miscoding which we can easily determine.  We may be able to


63


1   easily determine by checking data at Royal as to whether

2  certain of the entries on the loss runs were miscoded and

3  that would show that there was no prejudice to Latrobe.

4  Those are really the only issues that.

5      THE COURT:  Question what, how many loss runs do we

6  have to get into here?

7      MR. FOX:  We would have to get into Augustine

8  that's the only issue we need to explore because that is the

9  leniency are only one of interest.  We may have a very well

10  do it in fifteen minutes.  We have been really blind-sided by

11  this.  It hasn't been raised in any of their interrogatories

12  or briefs or even by their experts until today and Mr. Gordon

13  was trying to testify as an expert witness on those issues.

14      MR. GORDON:  Your Honor, there was a -- the burden

15  here is to demonstrate what premiums are due.  We have had

16  testimony that there was reliance on the 2002 loss runs.  All

17  I did was demonstrate for him based on the Court's decision

18  what was paid out, what should have been paid out on

19  Augustine and how that can be reconciled.  That is not --

20  that doesn't raise rebuttal.  There was no, I just asked him

21  whether or not company reconcile that.  It not rebuttal.

22      THE COURT:  Well, he can't reconcile it.  There is

23  some question with respect to the loss runs and the accuracy

24    of those loss runs.  I think that is the issue here.

25          MR. GORDON:  But, wasn't that the --


                              64


1           THE COURT:  But, what you pointed out during the

2    course of your cross-examination was the loss runs basically

3    conflicted with the amount of money that was paid out on the

4    claim.  Those loss runs of course relate directly to the

5    amount of retrospective premiums that are due.

6           MR. GORDON:  I agree.

7           THE COURT:  So, you know, I guess I was taught a

8    long time ago and I am going to follow that lesson in this

9    case.  In any lawsuit there is always a search for the truth

10    and there can be some (reconciliation) in what appears in the

11    loss run and the amount of money paid out to Mr. Augustine.

12          The Court would be in error if it didn't hear that

13    testimony.  ({RERBG} is reconcile.

14          MR. GORDON:  I agree, Your Honor.  The issue is --

15          THE COURT:  The issue is whether or not we are

16    going hear her testimony today or tomorrow.

17          We will hear it tomorrow, nine-thirty tomorrow

18  morning.  Declare a recess, please.

19  (Court recessed on Tuesday, May 2, 2006, at 3:45 p.m.)

20              * * * * *

21          I certify that the forgoing is a correct transcript

22  from the record of proceedings in the above-entitled matter.

23

24              S/Michael D. Powers
                Michael D. Powers
25              Official Reporter


                      65


1    *****NOT CERTIFIED WITHOUT ORIGINAL SIGNATURE*****

2

3        {STPHFRPLTD} {STPHFRPLT} Court recessed (I (watch

4   the end end of one answer or one question there.  (Also, I

5   left out a question from Gordon, and I think the question

6   was:  You used the loss runs, didn't you?  {STPHFRPLTS} they

7   were all interrupting.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25